JUDGE TORRES

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

13 CIV 7884

UNITED STATES COMMODITY FUTURES TRADING COMMISSION,

Civil Action No. _____

Plaintiff,

COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT

v.

ECF CASE

DONALD R. WILSON AND DRW INVESTMENTS, LLC,

Defendants.

RECEIVED
NOV - 6 2013
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

### I.   SUMMARY

1.     Defendants Donald R. Wilson ("Wilson") and his company DRW Investments, LLC, acting through its agents and employees, including Wilson (collectively, "DRW" or "Defendants"), on numerous occasions from at least January 2011 through August 2011 (the "relevant period"), unlawfully placed orders for certain futures contracts with the intent to move the prices of the contracts in their favor, to increase the value of the futures contract positions they held in their portfolio.  As a result of DRW's manipulative scheme, Defendants profited by at least $20 million, while their trading counterparties suffered losses of an equal amount.

2.     As further alleged below, DRW's illegal scheme concerned a futures contract called the IDEX USD Three-Month Interest Rate Swap Futures Contract (the "Three-Month

Contract"), listed by the International Derivatives Clearinghouse ("IDCH"), and offered on the NASDAQ OMX Futures Exchange ("NFX"). The Three-Month Contract was marketed by IDCH as an instrument designed to hedge against or speculate on interest rate movements. The Three-Month Contract could be executed between two parties: a "long" that generally hoped interest rates would rise over the duration of the contract, and a "short" that hoped rates would drop. The "price" of the Three-Month Contract was expressed in terms of interest rates. The long could place a bid for a fixed rate of interest, and, if the bid were accepted, be obligated to pay that fixed rate throughout the life of the contract. The short would receive payments based on that obligation. Conversely, the short was obligated to pay a floating rate, and the long would receive payments based on that rate.

3.      In or about June and July 2010, DRW, having studied the Three-Month Contract and the pricing and valuation rules of the IDCH, concluded that it could exploit the Three-Month Contract pricing and valuation methodology in DRW's favor. Beginning in or about August 2010, at Wilson's direction, DRW acquired a large long (fixed-rate) position in the Three-Month Contract with a net notional value in excess of $350 million, which DRW hoped and expected would grow in value over time. The daily value of DRW's position was dependent upon the daily settlement rates of the Three-Month Contract for various maturities, collectively known as the "IDEX Curve", which IDCH determined each day according to a methodology designed and published by IDCH. The methodology was dependent upon various data including bids and offers for the Three-Month Contract that were electronically placed by market participants on the NFX, to the extent any were placed or pending during preset 15-minute, PM Settlement Period each day. The prices of bids and offers were expressed as the fixed rate side of the contract that a bidder would pay and an offeror would receive throughout the duration of the contract. If no

bids and offers were electronically placed or pending during the time period, then, for many of the contracts it listed, IDCH would generally default to setting its daily settlement rates, *i.e.* the IDEX Curve, to be the same as the prevailing interest rates in corresponding bilateral interest markets specified in IDCH's rules ("Corresponding Rate(s)").

4.      By in or about December 2010, the IDCH-determined daily settlement rates of the Three-Month Contract did not rise as high as defendants had hoped and expected because significant trading in the Three-Month Contract never materialized.  However, rather than accept the prices established by IDCH according to its methodology, Wilson and DRW took matters into their own hands.  DRW developed and executed a manipulative scheme designed to influence the daily settlement rates of the Three-Month Contract by injecting bids that DRW knew would never be accepted, and, in turn increase the value of DRW's positions in the Three-Month Contract.

5.      More specifically, Wilson and DRW manipulated and attempted to manipulate the daily settlement rates of the Three-Month Contract by strategically placing electronic bids at higher interest rates than the Corresponding Rates that otherwise would control the contract price under IDCH's rules, with the intent to affect or influence the daily settlement rates of the Three-Month Contract, and by subsequently withdrawing such bids shortly thereafter.  Just as in a "banging the close" scheme, where a trader uses bids or offers to influence a settlement price in his favor, Defendants' bidding focused on the 15-minute settlement period for the Three-Month Contract.

6.      By implementing this manipulative scheme, Wilson and DRW caused artificial prices on the Three-Month Contract over a period of at least 118 trading days.  Because Wilson

and DRW caused artificial prices in multiple maturities each day, the manipulative scheme affected more than 1,000 contracts.

7.     By virtue of this conduct, Wilson violated, or aided and abetted in the violation of Sections 6(c)and 9(a)(2) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV).  Because Wilson, and other agents of DRW acting at Wilson's direction, violated the Act by engaging in conduct that was within the scope of their agency or employment, DRW is vicariously liable for their violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006 & Supp. IV).

8.     Wilson controlled DRW directly or indirectly, and did not act in good faith, or knowingly induced, directly or indirectly, DRW's acts constituting the violations alleged in this Complaint.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006 & Supp. IV), Wilson is liable as a controlling person for DRW's violations of Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV).  Alternatively, Wilson aided and abetted the violations of Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV), by knowingly assisting in the conduct that led to the violations of those provisions, in violation of Section 13(a) of the Act, 7 U.S.C. §13c(a) (2006 & Supp. IV).

9.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006 & Supp. IV), the Commission brings this action to enjoin such acts and practices, and compel compliance with the Act.  In addition, the Commission seeks civil penalties and such other ancillary relief, as the Court deems necessary or appropriate under the circumstances, including, but not limited to, disgorgement of unlawful profits, restitution and damages.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006 & Supp. IV), which authorizes the Commission to seek injunctive relief against any person, or, to enforce compliance with the Act, whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

11.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006 & Supp. IV), in that Defendants transact business in this District and/or the acts and practices in violation of the Act have occurred or are occurring within this District.

## III.     THE PARTIES

12.     **Plaintiff U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 (2006 & Supp. IV) et seq., and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 et seq.  One of its core responsibilities is to protect the public interest by deterring and preventing price manipulations on the commodity markets and futures markets, and other disruptions to market integrity.

13.     **Defendant DRW Investments, LLC** is an Illinois limited liability corporation. Its principal place of business is Chicago, Illinois.  DRW is a wholly-owned subsidiary of DRW Holdings, LLC.  Until January 23, 2013, DRW was registered with the National Futures Association as a Commodity Trading Advisor.  DRW Holdings, LLC maintains an office for DRW Commodities, a business affiliated with DRW, in New York, New York.

14.     According to DRW's parent company's website, the DRW Trading Group "is a principal trading organization", or, in other words, all of its trading is for its "own account and risk", and all of its "methods, systems and applications" are solely for its own use. "Unlike hedge funds, brokerage firms and banks, DRW has no customers, clients, investors or third party funds . . . [its] trading spans a wide range of asset classes, instruments, geographies and trading venues, with a focus on trading listed, centrally-cleared instruments".

15.     **Defendant Donald R. Wilson** was at all relevant times the Chief Executive Officer ("CEO") and Manager of DRW, and a resident of Illinois. As CEO and Manager, Wilson acted on behalf of, as agent for, and was authorized to direct the trading of, the Three-Month Contract on behalf of DRW.

## IV.     BACKGROUND FACTS

### A.     Exchange-Traded Interest Rate Futures Contracts

16.     A futures contract is a standardized agreement to buy or sell a commodity for future delivery at a price determined at the initiation of the contract. Futures contracts are often used to assume or shift price risk.

17.     An interest rate futures contract is "cash settled". In these, instead of purchasing or selling a physical commodity for delivery, a party buys or sells an obligation to make a cash payment based on an interest rate. The party who is long the future pays a fixed rate, and the party who is short the future pays a floating rate. When such a futures contract expires, any differences in value are settled with a final cash payment. Consequently, the value of an interest rate futures contract includes the net difference between the net present values of the fixed and estimated floating cash flows.

6

18.     In the United States, except in certain legally authorized circumstances, futures contracts must be negotiated and cleared on a CFTC-registered futures exchange, which is sometimes referred to as a Designated Contract Market ("DCM").  DCMs act as intermediaries between the two parties.  A recognized method to mitigate credit risk associated with a party to a futures contract is to utilize a CFTC-registered Derivatives Clearing Organization ("DCO"), which can "clear" a futures contract.  A DCO is a clearinghouse that in this context enables each party to substitute, through novation or otherwise, the credit of the DCO for the credit of the parties.  In essence, the DCO becomes a "middle man" by standing between the parties and guaranteeing that each party's financial obligations under the contract will be satisfied.  On December 22, 2008, IDCG registered IDCH as a DCO.

19.     An exchange-traded futures contract has a daily official "settlement price" or "closing price" recorded every trading day at the close of trading on the exchange that lists the contract.  A party's open futures contract positions are "marked-to-market" on a daily basis, meaning that the current day's daily settlement price is applied to the party's open position in the contract, resulting in a value for the position.

20.     "Variation margin" (sometimes referred to as "maintenance margin") is a daily payment of profits and losses after a party's positions are marked-to-market.  A party that has position with negative value must pay margin.  A party that has a position with a positive value receives margin.  These margin payments are made to and by the exchange, and not directly between parties.

21.     A variation margin payment transfers ownership of the property transferred, and the recipient of variation margin payments enjoys the benefits of such ownership – for example, he can invest those funds for gain.  Thus, the fixed payer (long) of an interest rate futures

7

contract receives variation margin when interest rates increase and pays variation margin when interest rates decrease. Over time, this gives the longs an advantage over the shorts because they are paying and receiving variation margin at interest rates that benefits them at the expense of the shorts. This advantage is known as "convexity bias."

22.     The shorts may elect to counteract this bias for any contracts not yet executed if, collectively, they demand that the longs pay higher fixed interest rates in compensation at the time the terms of the agreement are set.[1] These higher fixed rates resulting from the shorts' collective action is known as the "convexity effect." The convexity effect requires at least two preconditions: (a) market knowledge of the benefit accruing to those paying fixed rates in an interest rate contract; and (b) collective action by the shorts demanding higher rates in compensation. Market liquidity may also impact whether a convexity effect arises. Accordingly, an interest rate futures contract may not include a convexity effect either by lack of market knowledge, collective action by the shorts, or market liquidity.

23.     Convexity bias can also be counteracted by rule. For example, during the relevant period, some exchanges that listed interest rate futures contracts applied a pricing adjustment known as a "Price Alignment Interest" or "PAI" to eliminate this financial advantage to the long position. IDCH did not apply a PAI, or any other rule to counteract convexity bias, as Wilson and DRW well knew.

**B.     IDCH's Exchange-Traded Interest Rate Futures Contracts**

24.     At all times relevant to this Complaint, IDCH was headquartered in New York, New York. During all times relevant to this Complaint, IDCH was a wholly-owned subsidiary

---

[1] The demand for higher compensation in the form of higher fixed rates at the outset of an agreement will not benefit existing, short open positions because the terms of those agreements have already been set. In fact, as explained below in paragraph 32, higher rates demanded by shorts to induce them to enter into a contract with convexity bias will actually negatively impact any existing, short open position.

of International Derivatives Clearing Group, LLC ("IDCG"), also with headquarters in New York, New York. IDCG was a subsidiary of NASDAQ OMX Group, Inc. also headquartered in New York, New York. NASDAQ operated the NFX exchange, a DCM under the Act. IDCH listed contracts it called "IDEX" interest rate futures contracts on NFX.

25.     Market participants were able to obtain IDCH cleared interest rate futures, such as the Three Month Contract, in two ways. First, counterparties could execute an interest rate agreement bilaterally and then clear that agreement through IDCH. Using this process, the parties' bilateral contract was novated and a corresponding interest rate futures position was created.

26.     Another method of establishing a position in an "IDEX" interest rate futures contract was for a party to place a bid at a certain interest rate, if it desired to be the long (paying the fixed rate cash flow and receive the floating rate cash flow), or an offer, if it desired to be the short (paying the floating rate cash flow and receiving the fixed rate). If such a contract was executed, the long was obligated to pay the fixed rate at which he placed his bid throughout the life of the contract, and the short was obligated to pay the floating rate. Regardless of which method was employed, the "price" of the IDCH IDEX interest rate futures contracts was expressed in terms of interest rates.

**C.    IDCH Rules Governing The Three-Month Contract and Net Present Value**

27.     On August 10, 2010, IDCH publicly issued its Rulebook, informing the market, among other things, how it would calculate settlement prices and value a party's position in listed contracts including Three-Month Contract.[2] In accordance with the IDCH

---

[2]     The Rulebook was renumbered, but not substantively changed, on September 1, 2010. The Complaint cites to the Rulebook numbers established by the September 1, 2010 IDCH Rulebook, that were in place for the remainder of the period relevant to this Complaint.

Rulebook, new Three-Month Contracts were listed each trading day in 14 different maturities that ran from two to 30 years. The NFX trading hours for the Three-Month Contract were from 7 a.m. to 5 p.m. Eastern Time ("ET"), Monday through Friday.

28.     The Rulebook set forth the precise method IDCH employed to establish the daily net present value of a party's open position in the Three-Month Contract and all other IDEX contracts. The net present value was the basis for determining a party's daily profits and losses, and, as a result, the variation margin that a party paid or received on a daily basis. IDCH Rules provided that the net present value of an open position in a contract was based on "valuing each leg of the cash flows of the contract (fixed and floating) according to the discount factors generated by the IDEX Curve." The IDEX Curve employed to determine the daily net present value was the one "that corresponds to the fixed rate" portion of the contract and was composed of the daily settlement rates of fourteen different maturities of the Three-Month Contract. The IDCH rules did not provide for any adjustment to the daily settlement price to counteract any convexity bias that might arise. In other words, the value of a party's position, and the daily variation margin it would pay or receive, depended on the IDEX Curve, which was a line graph plotting interest rates versus maturities ranging from two years to 30 years. For margining purposes, IDCH populated the IDEX Curve with interest rates twice a day: (a) between 10:45 and 11:00 a.m. ET (9:45 and 10:00 a.m. Central Time ("CT")) (the "AM Settlement Period") and (b) between 2:45 and 3:00 p.m. ET (1:45 and 2:00 p.m. CT) (the "PM Settlement Period"). (The AM Settlement Period and PM Settlement Period are together referred to as the "Daily Settlement Periods"). The following graph is an example of the IDEX Curve for the Three-Month Contract, on December 23, 2010, for the End-of-Day ("EOD") PM Settlement Period:



29.     IDCH used the PM Settlement Period to determine the daily settlement rates of all fourteen maturities of the Three-Month Contract.  In the absence of electronic bids and offers made during the PM Settlement Period, IDCH used widely available information concerning the Corresponding Rates in related markets to establish the IDEX Curve.

30.     In this regard, if at least one bid was electronically placed or pending during the fifteen-minute PM Settlement Period, IDCH would either (a) incorporate the exact rate that was bid or (b) a substantially similar rate through a curve smoothing calculation, into the IDEX Curve instead of the default Corresponding Rates.

31.     For example, if a 5% bid for the Three-Month Contract with a 30-year maturity was electronically placed during the PM Settlement period, and no other bids were placed, the IDEX Curve would generally reflect a settlement rate of 5% for the 30-year contract, even if the prevailing Corresponding Rate was only 4.75%.  In this example, as a result of the electronic bid, the contract for the 30-year maturity would close with a higher daily settlement rate than in the

absence of the electronic bid, i.e., the IDEX curve would be higher for the 30-year maturity than it otherwise would have been by 0.25%, which is 25 basis points.

32.     Relatively higher IDEX Curves – higher floating rates – positively impacted the net present value of an open long position (which receives the floating rate) and negatively impacted the net present value of an open short position (which pays the floating rate).  As a result, relatively higher IDEX Curves tilted the variation margin cash flows in favor of an open long position – increasing the amount of variation margin that an open short position would pay and that an open long position would receive.

33.     IDCH rules did not provide for any mechanism to counteract the Three-Month Contract's convexity bias.  Accordingly, the Three-Month Contract's convexity bias could only be counteracted legitimately by shorts demanding higher fixed rates at the time of execution of the contract.  This, of course, would negatively impact any existing, short open position and benefit any existing, long open position.

### V.     THE DEFENDANTS' CONDUCT

34.     Wilson and DRW developed and implemented a manipulative strategy designed to affect or influence the daily settlement rates of the Three-Month Contract after Wilson and DRW had established a significant long open futures position in the Three Month Contract through the bilateral process described above.  On a majority of trading days during the relevant period, Wilson and DRW intended to affect or influence, and did affect or influence, the prices of Three-Month Contracts by, during the PM Settlement Period, repeatedly placing electronic bids significantly above the Corresponding Rates that they knew, under the published IDCH rules and procedures, would otherwise determine the IDEX Curve.  By doing so, Defendants intended to and did affect or influence the daily settlement rate of the Three-Month Contracts

and, in turn, the IDEX Curve, all for the ultimate purpose of driving-up the value of DRW's positions.

**A.    DRW, through its Agents, including Wilson, Planned to Exploit a Perceived Flaw in the Three-Month Contract**

35.     In or about June and July 2010, Defendants researched the Three-Month Contact, including how IDCH generated the IDEX Curve and how IDCH determined the net present value of a party's open positions.  As an employee of IDCH observed on June 18, 2010, "[i]t seems that DRW is trying to understand ou[r] [IDEX] curve construction methodology with a degree of precision that we have not seen from other clients".  On July 23, 2010, Wilson drafted an email to several of his subordinates including DRW's head of Quantitative Analysis noting that among his priorities were "to really understand IDCG".  He directed them to "[c]onfirm the contract has full convexity bias (despite the fact they will force it to settle at non-convexity biased prices)".

36.     As a result of this research, Defendants understood that the IDCH contract possessed convexity bias (meaning that the longs would receive and pay variation margin at beneficial rates) and expected that that the shorts would respond collectively, causing a convexity effect, which would raise the prices of newly formed IDCH contracts and positively impact the value of existing long open positions.  Defendants also understood that IDCH did not apply a PAI to adjust the daily settlement rate and lower the IDEX Curve.  As a result of the absence of a PAI adjustment, Defendants came to believe that the Three-Month Contract would carry a convexity effect which would, in their opinion, cause the daily settlement rates on the IDEX Curve to move higher, inuring to the benefit of parties that held existing open long positions in the Three-Month Contract.

37.     Defendants believed that by acquiring substantial Three-Month Contract long positions they could exploit the fact that IDCH did not apply a PAI adjustment.  On August 30,

2010, one of the DRW Traders noted that the Three-Month Contract is "flawed and we are working on taking advantage of the PAI/Convexity flaw".  As this trader acknowledged during the course of the CFTC's investigation of this matter, DRW's goal was to "buy as much of this stuff as I could at prices that I thought were cheap because, yes, where I thought they were valued [] much higher".  Put another way, Defendants believed that in the absence of the PAI adjustment, they could acquire Three-Month Contracts at prices that were relatively low, and that the value of their positions would increase over time by a greater amount than they would increase if IDCH did apply a PAI.

38.     As further alleged below, however, prices did not rise to meet the expectations of Defendants, at least prior to the time they took matters into their own hands and began to place manipulative bids.

**B.     DRW Established Open Positions in the Three-Month Contract**

39.     On August 13, 2010, IDCH authorized DRW to trade the Three-Month Contact. From that day through at least October 2010, DRW accumulated a long position in the Three-Month Contract based on Wilson's belief that the contracts were undervalued due to the absence of a PAI adjustment.

40.     By September 30, 2010, DRW had acquired a substantial net long position of approximately 3,500 contracts with a total net notional value of $350 million.  For most of the period relevant to this Complaint, DRW held nearly 90% of all of the long positions held by all parties in the Three-Month Contract.

41.     From August through October 2010, DRW bid for and acquired long positions in the Three-Month Contract through a voice broker, Newedge USA, LLC ("Newedge"), a firm that would find parties interested in taking the short position.  The deals were consummated through the bilateral process described above.

14

**C.      Wilson's and DRW's Profit Expectations Were Initially Frustrated When Prices
Did Not Rise as High as They Expected**

42.      At least by October 2010, Wilson and DRW believed that the Three-Month

Contract should have been settling at considerably higher rates than the Corresponding Rates

because they had presumed that a convexity effect would have driven the daily settlement rates

higher.  For example, analysts employed by DRW believed at the time that the 10-year Three-

Month Contract should have been trading 140 basis points (1.4%) higher than the Corresponding

Rate for that Three-Month Contract.  In November 2010, Wilson and DRW staff concluded that

the Three-Month Contract should have been trading 240 basis points (2.4%) higher than the

Corresponding Rate.

43.      However, at least until the end of 2010, the convexity effect in the pricing of the

Three-Month Contract that Wilson and DRW anticipated did not materialize—the daily

settlement rates did not rise to the point that Wilson and DRW had predicted perhaps because

there was very little, if any, trading of the contract.  That is, based on legitimate market forces,

and upon application of IDCH's published methodology, IDCH determined that the daily

settlement rates of the Three-Month Contract should be the same as the Corresponding Rates,

and not the higher rates predicted by DRW management and staff when they established DRW's

positions.

44.      In November and December 2010, Wilson and other DRW senior management

communicated with IDCH senior management concerning the settlement rates.  Wilson

expressed his frustration to IDCH that the Three-Month Contracts' daily settlement rates were

not higher than the Corresponding Rates.  Wilson and DRW were displeased with the lower rates

because they translated into lower profits for DRW.

45.     By in or about November 2010, Wilson and DRW understood that bids placed electronically during the PM Settlement Period could affect the daily settlement rates of the Three-Month Contracts.  Wilson and DRW decided to take advantage of that process by electronically placing bids at rates that were higher than Corresponding Rates during the PM Settlement Period, to unlawfully push the settlement rates higher.

46.     On November 3, 2010, the unlawful plan was explained by one DRW trader to a colleague: "I think what we will have to do is at 10:00am send our offers to IDCG directly to move the 10am settles and then do the same at the close".  Although that trader apparently mistakenly believed that electronic bids in both Daily Settlement Periods (a.m. and p.m.) affected the daily settlement rates, the plan was clear – place electronic bids to push the daily settlement rates.  By the time they actually began to place their electronic bids in early 2011, Wilson and DRW knew that activity in the PM Settlement Period alone drove the relevant Three-Month Contract daily settlement rates.

**D.     DRW's Manipulative Electronic Bids in the PM Settlement Period**

47.     DRW did not have the capacity to place electronic bids on NFX directly.  Rather, on January 21, 2011, it retained the services of a third-party firm, Sky Road LLC ("Sky Road"), which had direct electronic access to NFX, for the sole purpose of placing electronic bids to affect or influence the daily settlement rates of the Three-Month Contract.  DRW had no business purpose for retaining Sky Road other than to carry out the manipulative scheme.

48.     On January 24, 2011, DRW began placing electronic bids through Sky Road for Three-Month Contracts.  To ensure they affected the daily settlement rates of the Three-Month Contracts, DRW concentrated its bids during the PM Settlement Period, between 1:45 p.m. and 2:00 p.m. CT, and then quickly withdrew them.  From January 24, 2011 to August 31, 2011,

DRW placed more than 2,400 bids for the long side of Three-Month Contracts. Based on the trading data analyzed by the CFTC, nearly 60% of DRW's bids were placed or remained open during the fifteen-minute PM Settlement Period. On at least 13 days, all of DRW's bids occurred during the narrow PM Settlement Period.

49.     The maturities that most directly affected DRW's profits, via the IDEX Curve, were the 7, 8, 9, 10, 12, 15, 20, 25, and 30-year maturities of the Three-Month Contract. It was therefore no coincidence that virtually all (99.96 %) of DRW's electronic bids were placed for contracts of maturities from 7 to 30-years, and that almost none (0.04%) were placed for contracts of shorter maturities. In other words, DRW, through its agents, including Wilson, focused its bids, and subsequently manipulated, only the futures contracts that most directly affected its profits.

50.     On February 18, 2011, DRW's General Counsel wrote to IDCH and admitted in words and substance that DRW intended to and did enter bids during the PM Settlement Period for the purpose of affecting the IDEX Curve.

51.     DRW staff injected bids higher than the prevailing Corresponding Rates during the PM Settlement Period with the intent to affect or influence the Three-Month Contracts' daily settlement rates. This was done at the direction of Wilson. From January 24, 2011, through August 2011, the difference between the rates bid by DRW electronically and the Corresponding Rates grew, as DRW placed increasingly higher bids relative to those rates. The Three-Month Contracts' daily settlement rates affected by DRW's injected bids were artificial for a number of reasons, including that they did not result from legitimate bids. DRW's bids were not legitimate because DRW's intent in making the bids through its manipulative scheme was to influence the

Three-Month Contracts' daily settlement rates, and primarily not to consummate trades on an exchange where nobody traded.

52.     The higher DRW's bids as compared to the Corresponding Rates, the greater the financial reward to DRW.  The following chart reflects the increase in DRW's bids in the 30-year maturity of the Three-Month Contract, during the PM Settlement Period, over time, as compared to Corresponding Rates, based on the trading data analyzed by the CFTC:



53.     On February 3, 2011, DRW's head of quantitative research wrote to Wilson and confirmed that DRW's plan was working.  As she remarked to Wilson, as a result of the "new regime", the "IDCG settle curve is [now] DRW defined".

54.     Wilson acknowledged during the course of the CFTC's investigation of this matter that DRW intentionally injected increasingly higher bids than prevailing Corresponding Rates:

> Well, initially when we put the trades on we started off paying, you
> know, maybe a basis point higher rate than the [Corresponding

> Rates] at the time. And eventually we, you know, tried to pay two
> basis points over and then we bid three basis points over . . .
>
> And so, you know, eventually we were bidding three, four, five
> basis points over because we thought that we had positive expected
> value in doing so.

55.     While Wilson admitted to bidding "five basis points over" prevailing

Corresponding Rates, in fact DRW bid as many as 101.04 basis points higher than those rates.

56.     DRW increased the number of Three-Month Contract maturities the firm bid on

during the PM Settlement Period, to push-up a greater swath of the IDEX Curve. As Wilson

stated during the course of the CFTC's investigation of this matter, he directed DRW Traders to

bid for more maturities to influence more points on the IDEX Curve:

> And then during certain points of the day we would actually input
> more points on the curve so that IDCG's . . . settlement curve didn't
> have a bunch of weird kinks in it. So I was aware of all that and
> certainly involved in discussing with the traders how we were
> putting those prices in and moving them around.

57.     After the PM Settlement Period each day, DRW would regularly cancel its bids,

which avoided the possibility that DRW would actually have to enter into a futures contract and

pay the higher rates that it bid. In fact, none of DRW's electronic bids were accepted or "hit" to

consummate an actual transaction. Yet, all of its bids during the PM Settlement Period pushed

the Three-Month Contract settlement prices higher than they would have been in the absence of

DRW's bids.

**E.     DRW, through its Agents, Including Wilson, had the Ability to and did Affect the Settlement Prices**

58.     Wilson and DRW had the ability to affect the Three Month Contract due the fact

that very few of these contracts were executed on the NFX. On at least 118 trading days that

DRW manipulated the daily settlement rates, there was not a single consummated on-exchange

trade of the Three-Month Contract, and DRW alone, placed 100% of the electronic bids for long positions during this period; there were no offers for short positions placed at all. Wilson and DRW were well aware of these facts as they inserted bids to affect the settlement rate. As in the words of one DRW trader, the Three-Month Contract was the "ultimate of illiquid products."

59.      DRW's manipulative scheme was successful in creating artificial prices, expressed in rates. For example, on February 25, 2011, for the twenty-fourth trading day in a row, DRW was the only market participant placing orders on the Three-Month Contract during the entire day. No exchange trading activity took place until the PM Settlement Period, between 2:45 and 3:00 p.m. ET. Then, between 2:51 p.m. and 2:53 p.m. ET, DRW placed bids electronically for 250 contracts in each of nine different maturities of the Three-Month Contract (2,250 contracts in all), from the 7-year to the 30-year. DRW cancelled these bids between 3:05 and 3:06 p.m. ET. As detailed in the chart below, each of DRW's bids, which became the February 25th daily settlement rate for the corresponding Three-Month Contract, was well in excess of the Corresponding Rate, which would have been the settlement rate in the absence of DRW's manipulative bid:

### Manipulative Bids on February 25, 2011

| Maturity | DRW Bid Rate (%) | Corresponding Rate (%) | Artificial Rate Increase Amount (basis points) |
|----------|------------------|------------------------|------------------------------------------------|
| 7-year   | 3.174            | 2.995                  | 17.9                                           |
| 8-year   | 3.403            | 3.211                  | 19.2                                           |
| 9-year   | 3.600            | 3.393                  | 20.7                                           |
| 10-year  | 3.747            | 3.539                  | 20.8                                           |
| 12-year  | 3.976            | 3.769                  | 20.7                                           |
| 15-year  | 4.201            | 3.993                  | 20.8                                           |

| 20-year | 4.473 | 4.165 | 30.8 |
|---------|-------|-------|------|
| 25-year | 4.554 | 4.248 | 30.6 |
| 30-year | 4.597 | 4.290 | 30.7 |

60.     Just as they did on February 25 in the above example, from January 24, 2011 to August 13, 2011, Wilson and DRW, executed a manipulative scheme with the intent and ability to influence prices, and caused artificial prices on at least 118 trading days, involving at least 1,032 Three-Month Contracts, reaping unlawful profits of at least $20 million.

61.     In February, 2011, Wilson had a teleconference with an official of another market participant, in part, about DRW's trading conduct.  In the call, the official notes to Wilson and DRW's conduct is indicative of manipulation, stating in relevant part that the DRW bids "go up at 2:45 every day so they make sure the marks screw other people . . . You get to set the mark". Despite the fact that another market participant viewed their conduct as unfair and manipulative, Wilson and DRW continued manipulating the market through August 2011.

## VI. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

### MANIPULATION OF THE PRICE OF THE IDEX USD THREE-MONTH FUTURES CONTRACTS

62.     Paragraphs 1 through 61 are realleged and incorporated herein by reference.

63.     Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV), make it unlawful for any person to manipulate or attempt to manipulate the market price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market.

64.     Wilson and DRW, acting through its agents and employees, intended to affect or influence and did affect or influence the daily settlement rates of the Three-Month Contracts

during the relevant period.  Accordingly, Wilson and DRW violated Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV).

65.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006 & Supp. IV), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation.  Because Wilson, and other DRW agents and employees, were agents or employees of DRW and their actions that violated Sections 6(c) and 9(a)(2) of the Act were within the scope of their agency or employment, DRW is liable for those violations pursuant to Section 2(a)(1)(B) of the Act.

66.     Wilson controlled DRW directly or indirectly, and did not act in good faith, or knowingly induced, directly or indirectly, DRW's acts constituting the violations alleged in this Count.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006 & Supp. IV) , Wilson is liable as a controlling person for DRW's violations of Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV).

67.     Each and every day the daily settlement rates of the Three-Month Contracts described above were artificial as a result or partial result of Wilson's and DRW's conduct is alleged herein as a separate and distinct violation of Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV).

68.     Alternatively, Wilson aided and abetted the violations of Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV), by knowingly assisting in the conduct that led to the violations of these provisions, in violation of Section 13(a) of the Act, 7 U.S.C. §13c(a) (2006 & Supp. IV).

## COUNT II

### ATTEMPTED MANIPULATION OF THE PRICE OF THE IDEX USD THREE-MONTH FUTURES CONTRACTS

69.     Paragraphs 1 through 61 are realleged and incorporated herein by reference.

70.     Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV), make it unlawful for any person to attempt to manipulate the market price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market.

71.     Wilson and DRW, acting through its agents and employees, intended to affect or influence the daily settlement rates of the Three-Month Contracts during the relevant period. Wilson and DRW engaged in repeated overt acts in furtherance of that intent.  Accordingly, Wilson and DRW violated Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV).

72.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006 & Supp. IV), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation. Because Wilson, and other DRW agents and employees, were agents or employees of DRW and their actions that violated Sections 6(c) and 9(a)(2) of the Act were within the scope of their agency or employment, DRW is liable for those violations pursuant to Section 2(a)(1)(B) of the Act.

73.     Wilson controlled DRW directly or indirectly, and did not act in good faith, or knowingly induced, directly or indirectly, DRW's acts constituting the violations alleged in this Count.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006 & Supp. IV), Wilson is liable as a controlling person for DRW's violations of Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV).

74.   · Each and every day the daily settlement rates of the Three-Month Contracts described above were artificial, as a result or partial result of Wilson's and DRW's conduct, is alleged herein as a separate and distinct violation of Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV).

75.   Alternatively, Wilson aided and abetted the violations of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006 & Supp. IV) by knowingly assisting in the conduct that led to the violations of these provisions, in violation of Section 13(a) of the Act, 7 U.S.C. §13c(a) (2006 & Supp. IV).

## VII. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1(2006 & Supp. IV), and pursuant to its own equitable powers:

A.      Find Defendants liable for violating Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV);

B.      Enter an order of permanent injunction restraining and enjoining Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert with them who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Sections 6(c) and 9(a)(2) of the Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV);

C.      Enter an order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not to exceed $1,000,000 or triple the monetary gain to them for each violation of the Act, as described herein;

D.      Enter an order providing for such other and further remedial and ancillary relief, including, but not limited to, restitution, disgorgement, damages to all persons affected by Defendants' actions, trading suspensions, and trading bans, as this Court may deem necessary and appropriate; and

E.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006 & Supp. IV).

Dated: _11_ , _6_ , 2013

Respectfully Submitted,

Michael R. Berlowitz
ATTORNEY FOR PLAINTIFF
U.S. COMMODITY FUTURES TRADING COMMISSION
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9759 (telephone)
(646) 746-9940 (facsimile)
MBerlowitz@cftc.gov

Joan M. Manley
Paul G. Hayeck
A. Daniel Ullman II (*pro hac vice* admission pending)
Jason Mahoney (*pro hac vice* admission pending)
Sophia Siddiqui (*pro hac vice* admission pending)
Division of Enforcement

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5334 (telephone)
(202) 418-5523 (facsimile)