UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | |
| -against- | |
| DONALD R. WILSON and DRW INVESTMENTS, LLC, | |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __6/26/14___

13 Civ. 7884 (AT)

**MEMORANDUM
AND ORDER**

ANALISA TORRES, District Judge:

Plaintiff, the United States Commodity Futures Trading Commission (the "CFTC"), brings this action against Donald R. Wilson ("Wilson") and his company DRW Investments, LLC ("DRW" and collectively, "Defendants"), alleging violations of Sections 6(c) and 9(a)(2) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 9 and 13(a)(2). Defendants move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6) or, in the alternative, to transfer venue to the District Court for the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. § 1404(a). For the reasons stated below, Defendants' motion is DENIED.

## BACKGROUND

The following facts are taken from the complaint and accepted as true for the purposes of this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

### I. The Parties

The CFTC is a federal regulatory agency charged with responsibility for administering and enforcing the CEA, 7 U.S.C. §§ 1, *et seq.*, and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.*

DRW is an Illinois limited liability corporation with its principal place of business in

Chicago, Illinois.  DRW was registered with the National Futures Association as a Commodity Trading Advisor until January 23, 2013.  DRW is a wholly-owned subsidiary of DRW Holdings, LLC.  DRW Holdings, LLC, maintains an office for DRW Commodities, a business affiliated with DRW, in New York, New York.  Compl. ¶ 13.

Donald R. Wilson, a resident of Illinois, served at all times relevant to this action as CEO and Manager of DRW.  *Id.* ¶ 15.

## II.  The Three-Month Contract

### A.  Exchange-Traded Interest Rate Futures Contracts

As a general matter, an interest rate futures contract is an agreement executed between two parties, in which the parties agree to make cash payments based on an interest rate.  The party who is "long" the futures contract will pay a fixed rate for the duration of the contract, whereas the party who is "short" will pay a floating rate.  For this reason, the long party generally profits when interest rates rise, and the short party profits when rates decline.  The price of such an interest rate futures contract is typically expressed is terms of interest rates, and its value is based on the difference between the net present values of the fixed and estimated floating cash flows.  At the time the contract expires, the parties make cash payments to settle any difference between the fixed and floating rates.  *Id.* ¶¶ 2, 17, 26.

In the United States, futures contracts must be negotiated and cleared on a CFTC-registered futures exchange, sometimes referred to as a Designated Contact Market ("DCM"), which serves as an intermediary between contracting parties.[1]  As described in the complaint, one recognized method for parties to a futures contract to mitigate credit risk is to use a CFTC-registered intermediary known as a Derivatives Clearing Organization ("DCO").  A DCO is a clearinghouse that enables each party to a futures contract to substitute the credit of the DCO for

---

[1] As the CFTC notes, there are recognized exceptions to this requirement, which are not relevant to this case.

the parties' own, becoming, in effect, a "middle man" that guarantees that each party's financial obligations under the contract will be satisfied.  *Id.* ¶ 18.

Each exchange-traded futures contract has a daily official settlement price recorded every trading day at the close of trading on the exchange that lists the contract.  On a daily basis, each party's open futures contract positions are "marked to market," such that the daily settlement price is applied to determine the value of the party's position.  *Id.* ¶ 19.  After a party's position has been marked to market, the party with a position with a negative value makes a payment to the counterparty with a positive value.  These daily payments of profits and losses are referred to as "variation margin" or "maintenance margin."  These payments are made to and by the exchange rather than directly between the parties themselves.  *Id.* ¶ 20.  Variation margin payments are a transfer of ownership, and, accordingly, any such payments received may be reinvested by the recipient.  *Id.* ¶ 21.

In light of the manner in which the value of futures contracts is determined, the party that is long has a predictable advantage over the party that is short, and this advantage is referred to as "convexity bias."  As the CFTC explains, because the long party receives interest rate payments when interest rates increase and makes payments when interest rates decrease, the long party will, over time, benefit relative to the short party, who receives payments when interest rates decline.  *Id.*  Parties who are short a futures contract may seek to counteract this convexity bias by demanding a higher fixed rate in compensation at the time they negotiate the contract.  The resulting higher rate is referred to as the "convexity effect."  According to the complaint, a convexity effect will likely not appear in the price unless there is (a) market knowledge of the convexity bias, (b) collective action by shorts demanding higher rates, or (c) liquidity in the market.  *Id.* ¶ 22.  The convexity bias can also be counteracted by a rule or an adjustment known

as a "Price Alignment Interest" ("PAI") that can be applied by the exchange on which the futures contract is listed.  *Id.* ¶ 23.

B.  The IDEX USD Three-Month Interest Rate Swap Futures Contract

This case involves an exchange-traded interest rate futures contract called the IDEX USD Three-Month Interest Rate Swap Futures Contract (the "Three-Month Contract").  The Three-Month Contract, as described in the complaint, was marketed as "an instrument designed to hedge against or speculate on interest rate movements."  *Id.* ¶ 2.

The Three-Month Contract was listed by the International Derivatives Clearinghouse ("IDCH"), which was registered with the CFTC as a DCO in 2008.  *Id.* ¶¶ 2, 18.  IDCH is a wholly-owned subsidiary of the International Derivatives Clearing Group ("IDCG"), which is itself a subsidiary of the NASDAQ OMX Group, Inc. ("NASDAQ").  *Id.* ¶ 24.  The Three-Month Contract was offered on the NASDAQ OMX Futures Exchange ("NFX"), a recognized DCM under the CEA.  *Id.* ¶¶ 2, 24.  IDCH, IDCG, NASDAQ, and NFX were at all times relevant to this action headquartered in New York, New York.  *Id.* ¶ 24.

Market participants could obtain the Three-Month Contract by either (1) executing a bilateral agreement and clearing the contract through IDCH or (2) placing a bid (if the party desires to place a long position) or an offer (if the party decides to place a short position) through IDCH and having that position accepted by a counterparty.  *Id.* ¶¶ 25, 26.  The Three-Month Contracts were listed each trading day in fourteen different maturities ranging from two to thirty years.  The NFX trading hours for the Three-Month Contract were from 7:00 a.m. and 5:00 p.m. Eastern Time (ET).  *Id.* ¶ 27.

C.  IDCH Rules Governing the Three-Month Contract's Settlement Price

In the complaint, the CFTC refers to the September 1, 2010 version of an IDCH rulebook

4

(the "Rulebook"), which describes, among other things, how ICDH calculates settlement prices and values any party's open position in listed IDCH contracts, including the Three-Month Contract. *Id*. ¶ 27.

The Rulebook set forth the method used by the IDCH to calculate, on a daily basis, the net present value of a party's open positions in the Three-Month Contract, which determines the variation margin that each party was obligated to pay or entitled to receive. The value of a party's position depended on what was known as an "IDEX Curve," a line graph plotting interest rates versus maturities for fourteen maturities of the Three-Month Contract ranging from two years to thirty years. The Rulebook stated that the net present value of each open position was calculated based on "'valuing each leg of the cash flows of the contract (fixed and floating) according to the discount factors generated by the IDEX Curve'." IDCH populated the relevant IDEX Curve with interest rates twice per day: once, between 10:45 a.m. and 11:00 a.m. ET (the "Morning Settlement Period"), and once between 2:45 p.m. and 3:00 p.m. ET (the "Afternoon Settlement Period"). *Id*. ¶ 28. The Afternoon Settlement Period was then used to determine the daily settlement rates of the fourteen maturities. *Id*. ¶ 29. More specifically, if any bids were placed during the Afternoon Settlement Period, IDCH would set as the settlement rate for each of the fourteen maturities either (a) the exact rate that was bid or (b) a similar rate generated using a curve-smoothing calculation. *Id*. ¶ 30. Importantly, bids placed during the Afternoon Settlement Period did not have to be executed in order to factor into the settlement rate. *Id*. ¶ 57. If no bids were placed during the Afternoon Settlement Period, IDCH would use widely available public information about substantially similar bilateral interest rate markets ("Corresponding Rates") to set the daily settlement rates for the Three-Month Contract. *Id*. ¶¶ 3, 29.

The CFTC provides the following example to illustrate how one such settlement rate

would be determined under the IDCH rules:

> [I]f a 5% bid for the Three-Month Contract with a 30-year maturity was electronically placed during the PM Settlement period, and no other bids were placed, the IDEX Curve would generally reflect a settlement rate of 5% for the 30-year contract, even if the prevailing Corresponding Rate was only 4.75%. In this example, as a result of the electronic bid, the contract for the 30-year maturity would close with a higher daily settlement rate than in the absence of the electronic bid, i.e., the IDEX curve would be higher for the 30-year maturity than it otherwise would have been by 0.25%, which is 25 basis points.

*Id.* ¶ 31. Higher numbers on the corresponding IDEX Curve benefit long positions relative to short positions, thus increasing the variation margin payments flowing from the short party to the long party. *Id.* ¶ 32. The Rulebook did not provide for any rules or PAI adjustment that would counteract the Three-Month Contract's convexity bias. *Id.* ¶ 33.

### III. DRW's Alleged Price Manipulations

#### A. DRW's Open Long Position in the Three-Month Contract

On August 13, 2010, IDCH authorized DRW to trade the Three-Month Contract. *Id.* ¶ 39. DRW subsequently accumulated a substantial long position in the Three-Month Contract, and by September 20, 2010, DRW had acquired a "net long position of approximately 3,500 contracts with a total net notional value of $350 million." *Id.* ¶¶ 39, 40. Between August and October 2010, DRW acquired its long position through a voice broker, Newedge USA, LLC ("Newedge"). Newedge would locate parties interested in taking a short position, and these bilateral agreements would be cleared through IDCH. *Id.* ¶¶ 25, 41.

The CFTC alleges that DRW acquired its long position in order to take advantage of the convexity bias in the Three-Month Contract and the fact that IDCH did not apply a PAI adjustment that would counteract that bias. *Id.* ¶¶ 35, 37. In the months preceding its investment, DRW conducted research into the methodology used by IDCH in generating the

6

IDEX Curve and setting the net present value of party's open positions.  In a July 23, 2010 email Wilson instructed several of his subordinates to "'[c]onfirm the contract has full convexity bias (despite the fact they will force it to settle at non-convexity based prices)'." *Id*. ¶ 35.  On August 30, 2010, after DRW had begun to acquire its open position, a DRW trader stated that the Three-Month Contract is "'flawed and we are working on taking advantage of the PAI/Convexity flaw'."  According to the complaint, the same trader stated during the CFTC's investigation that, consistent with DRW's goals, his role was to "'buy as much of this stuff as I could at prices that I thought were cheap because, yes, where I thought they were valued [] much higher'." *Id*. ¶ 37.

According to the CFTC, however, the anticipated convexity effect in the price of the Three-Month Contract failed to appear "at least until the end of 2010." *Id*. ¶ 43.  The CFTC has alleged statements by Wilson and DRW employees during November and December of 2010 that the Three-Month Contract was not performing as expected and should have been settling above Corresponding Rates because a convexity effect should have driven prices higher. *Id*. ¶¶ 38, 42-44.  The CFTC points to November 2010 statements by Wilson and DRW employees, for example, concluding that the Three-Month Contract should have been trading 240 basis points (2.4%) higher than the Corresponding Rate. *Id*. ¶ 42.

B.  DRW's Electronic Bids

On January 21, 2011, DRW, which lacked the ability to place bids directly on NFX, hired Sky Road, LLC ("Sky Road"), a third-party firm with direct electronic access to NFX, allegedly for the "sole purpose of placing electronic bids to affect or influence the daily settlement rates of the Three-Month Contract." *Id*. ¶ 47.  The CFTC claims that from January 24, 2011 to August 31, 2011, DRW placed through Sky Road numerous electronic bids on the Three-Month Contract at above-market prices and "quickly withdrew them." *Id*. ¶¶ 48, 54, 55.  Specifically,

the CFTC alleges that DRW placed more than 2,400 long bids for Three-Month Contracts during that period, and, based on data analyzed by the CFTC, nearly 60% of these bids were concentrated during the Afternoon Settlement Period. *Id*. ¶ 48. The CFTC further alleges that the majority of DRW's bids (99.96%) were focused on Three-Month Contracts of maturities from seven to thirty years. *Id*. ¶ 49. During the CFTC's investigation of DRW, Wilson allegedly made statements acknowledging that DRW's bids on the Three-Month Contract were "three, four, five basis points over [the Corresponding Rates] because we thought that we had positive expected value in doing so." *Id*. ¶ 54. According to the CFTC, electronic bids placed by DRW were as high as 101.04 basis points higher than the Corresponding Rates. *Id*. ¶ 55. DRW withdrew these bids after the Afternoon Settlement Period allegedly to ensure that none of the contracts were executed at those prices. On at least 118 trading days, none of DRW's electronic bids resulted in the consummation of an actual transaction on the NFX exchange. *Id*. ¶¶ 57, 58.

These bids were allegedly made at the direction of Wilson "with the intent to affect or influence the Three-Month Contract's daily settlement rates." *Id*. ¶ 51. DRW's bids were allegedly concentrated during the Afternoon Settlement Period and in contracts of longer maturities because those bids most directly affected the IDEX curve and therefore the price of the Three-Month Contract. *Id*. ¶¶ 49-51. The CFTC cites alleged statements made by Wilson directing DRW traders to place bids that would increase the IDEX Curve and ensure it "'didn't have a bunch of weird kinks in it'." *Id*. ¶ 56. According to the complaint, Wilson also stated, "'I was aware of all that and certainly involved in discussing with the traders how we were putting those prices in and moving them around'." *Id*. The CFTC claims that these bids were "artificial" and "manipulative" because they were not placed with the intent to consummate an exchange but rather to affect the IDEX curve and drive up the daily settlement rates of the Three-

Month Contract.  *Id.* ¶¶ 50, 51.  Elsewhere in the complaint, the CFTC described this conduct as resembling a "banging the close" scheme, in which a trader "uses bids or offers to influence a settlement price in his favor."  *Id.* ¶ 5.

C.  Settlement Prices of the Three-Month Contract

The CFTC claims that Defendants' alleged conduct in fact increased the settlement prices of the Three-Month Contract and created "artificial prices expressed in rates."  *Id.* ¶ 59.  The CFTC explains that Defendants were able to affect the settlement rate in part because of the illiquidity of the Three-Month Contract, noting that there were at least 118 days in which DTW placed 100% of the long bids and that none of those bids were accepted.  *Id.* ¶ 58.  The CFTC provides detailed allegations regarding electronic bids that were placed by Defendants during the Afternoon Settlement Period on February 25, 2011, which were subsequently cancelled, and the resulting settlement prices.  Defendants' bids became the settlement prices of the Three-Month Contracts in nine different maturities at prices ranging from 17.9 to 30.8 basis points above the Corresponding Rates.  *Id.* ¶ 59.  The CFTC alleges that Defendants engaged in similar manipulative conduct from January 24, 2011 to August 13, 2011, thereby causing "artificial prices on at least 118 trading days, involving at least 1,032 Three-Month Contracts, reaping unlawful profits of at least $20 million."  *Id.* ¶ 60.  The CFTC alleges that on February 3, 2011, the head of quantitative research at DRW wrote to Wilson stating that, as a result of Defendants' "'new regime,'" the "'IDCG settle curve is DRW defined'."  *Id.* ¶ 53.

IV.  Defendants' Prior Action

On April 23, 2013, the CFTC issued a Wells Notice and notified DRW that it intended, based on its investigation, to recommend filing this action.  Pl. Letter 2, ECF No. 11.  On August 2, 2013, the CFTC informed DRW that it intended to file this action in the District Court for the

Southern District of New York. *Id*. On September 17, 2013, DRW filed an anticipatory action in the District Court for the Northern District of Illinois. *DRW Inves., LLC, v. CFTC*, No. 13 C 6630, 2013 WL 6153157, at *1 (N.D. Ill. Nov. 22, 2013). In that action, DRW sought a declaratory judgment that the CFTC's imminent enforcement action violated DRW's due process rights and sought both preliminary and permanent injunctions preventing the CFTC from filing the contemplated enforcement action. *Id*.

On November 22, 2013, the Honorable Sara L. Ellis held that DRW's motion for a preliminary injunction and its request for a permanent injunction were moot in light of the CFTC's November 6, 2013 filing of this enforcement action against DRW and declined to exercise its discretionary jurisdiction under the Declaratory Judgment Act. *Id*. In declining to exercise jurisdiction, Judge Ellis also noted that DRW's action in the Northern District of Illinois "seems likely to have been brought for forum shopping reasons." *Id*. at *2.

## DISCUSSION

I. Defendants' 12(b)(2) Motion to Dismiss for Personal Jurisdiction

A. Applicable Standard

At the motion to dismiss stage, the plaintiff bears the burden of demonstrating that its factual allegations constitute a prima facie showing of personal jurisdiction over each defendant. *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). "Where, as in this case, plaintiffs have had minimal opportunity for discovery, the plaintiff need make only a prima facie showing of jurisdiction by pleading in good faith legally sufficient allegations of jurisdiction." *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013) (citations and internal quotation marks omitted). When inquiring into personal jurisdiction at the motion to dismiss stage, a court must

construe the pleadings and affidavits "in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Banker v. Esperanza Health Sys., Ltd.*, 201 F. App'x 13, 15 (2d Cir. 2006) (quoting *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 80 (2d Cir. 1993)).

As the Second Circuit has recognized, "[i]n a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules 'if the federal statute does not specifically provide for national service of process.'" *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (citing *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir. 1990)).  The parties agree that New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), governs.  Def. Mem. 20, ECF No. 33; Pl. Opp. 21, ECF No. 35.

As the CFTC points out, however, there is at least one case within the Southern District, involving a different section of the CEA, in which the court did not apply New York's long-arm analysis and instead analyzed personal jurisdiction under the requirements of the Due Process Clause.  *See In re Amaranth*, 587 F. Supp. 2d at 526.  The private right of action provision under the CEA allows for an action to be brought "in any judicial district wherein the defendant is found, resides, or transacts business, or in the judicial district wherein any act or transaction constituting the violation occurs" and provides for service of process "in any judicial district of which the defendant is an inhabitant or wherever the defendant may be found."  7 U.S.C. § 25(c). The Honorable Shira A. Scheindlin, in a decision that was subsequently affirmed by the Second Circuit, concluded that this language indicates a congressional intention to extend personal jurisdiction to the limit permitted by the Due Process Clause of the Fifth Amendment.  *In re Amaranth*, 587 F. Supp. 2d at 526 (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir. 1972)).  Judge Scheindlin, accordingly, declined to analyze jurisdiction under New York State's personal jurisdiction rules and instead addressed whether the proposed

exercise of jurisdiction comported with the requirements of Due Process.  *See id*. at 526-27.

Because the nationwide service of process provision applies specifically to private rights of

action brought under 7 U.S.C. § 25(c) and because the provisions at issue here, 7 U.S.C. §§ 9 and

13(a)(2), do not contain similar language providing for nationwide service of process, the Court

agrees with the parties that personal jurisdiction here is appropriately assessed under the New

York long-arm statute.  *See also CFTC v. Amaranth Advisors, LLC*, 554 F. Supp. 2d 523, 529

(S.D.N.Y. 2008) (applying New York's long-arm statute in analyzing personal jurisdiction in

CFTC action brought under sections 6(c), 6(d), 9(a)(2), and 9(a)(4) of the CEA; *Michelson v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F. Supp. 1279, 1284 (S.D.N.Y. 1989).

    B.  Long-Arm Jurisdiction Under Section 302(a)(1)

New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), "permits a court to exercise

personal jurisdiction over an out-of-state party if he 'transacts any business within the state' and

if the 'cause of action aris[es] from' the business contacts."  *CFTC v. Amaranth*, 554 F. Supp. 2d

at 529.

    1.  Transaction of Business Requirement

The transaction of business requirement of New York's long-arm statute "extends the

jurisdiction of New York state courts to any nonresident who has purposely availed [himself] of

the privilege of conducting activities within New York and thereby invoked the benefits and

protections of its laws."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779,

787 (2d Cir. 1999) (citations and internal quotation marks omitted).  Under this prong, "courts

must look at the totality of circumstances concerning the party's interactions with, and activities

within, the state."  *Id*.  "A defendant need not physically enter New York to transact business, 'so

long as the defendant's activities here were purposeful.'"  *Licci ex rel. Licci v. Lebanese*

*Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012) (quoting *Deutsche Bank Sec., Inc. v. Montana Bd. of Investments*, 7 N.Y.3d 65, 71 (2006)).  The New York Court of Appeals has, for example, recognized long-arm jurisdiction over "commercial actors and investors using electronic and telephonic means to project themselves into New York to conduct business transactions." *Deutsche Bank*, 7 N.Y.3d at 71 (citations omitted).

Defendants argue that the sole theory of personal jurisdiction asserted in the complaint is that the exchange (NFX) and clearinghouse (IDCH) that were used by DRW to trade in the Three-Month Contract maintain office headquarters in New York.  Def. Mem. 21.  Defendants maintain that because all of the bids at issue were placed electronically, and not on "physical trading floors or pits," the CFTC has not alleged sufficient basis for the exercise of personal jurisdiction.  *Id.*; Def. Reply 12, ECF No. 37.  Defendants also note that the CFTC has not alleged that the NFX and IDCH technological hardware through which orders were placed were actually located in New York.  Def. Mem. 21, 22.  Defendants contend that trading in New York-listed financial instruments is not a sufficient basis for personal jurisdiction and that unless Defendants employed brokers in New York or traveled to the state, their conduct does not fall within the purview of New York's long-arm statute.  *Id.* at 22.  Defendants' emphasis on physicality, however, is misplaced.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (In light of the "inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines," jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State.") (emphasis in original); *Deutsche Bank*, 7 N.Y.3d at 72 ("[A] sophisticated institutional trader knowingly entering our state—whether electronically or otherwise—to negotiate and conclude a substantial transaction is within the embrace of the New York long-arm statute.").  What matters

13

is whether under the totality of the circumstances Defendants availed themselves of the privileges of transacting business in the state and the benefits and protections of New York's laws. *See Bank Brussels*, 171 F.3d at 787.

In a similar CFTC manipulation action, the district court concluded that a defendant who placed trades over the phone from Canada availed himself of the privilege of doing business in New York for purposes of the long-arm statute. *CFTC v. Amaranth*, 554 F. Supp. 2d at 530. In another case involving alleged manipulations of futures contract prices by an out-of-state defendant, also decided in this district, the court concluded that the alleged conduct had "the purpose of manipulating the market for natural gas futures on the *New York* Mercantile Exchange" and concluded that the alleged price manipulations prohibited under the CEA "occurred in New York, not Louisiana or Texas or Iowa." *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 517 (S.D.N.Y. 2004) (emphasis in original). Similarly here, the CFTC has alleged not only that Defendants' bids were placed on a New York-based exchange and cleared through a New York-based clearinghouse, but also, as in *Natural Gas*, that the alleged price manipulations occurred in New York. *Id.*; Compl. ¶¶ 11, 24, 53. Defendants' contacts also include the fact that they were registered with IDCH and maintained contractual relationships with IDCG and other New York-based entities. *See Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 22-23 (2d Cir. 2004). Contrary to Defendants' assertions, the question of whether Defendants transacted business in New York does not turn on the fact that CFTC was not a party to those contracts.

Defendants characterize the fact that DRW entered into contractual relationships with New York entities and registered with the IDCH as "incidental" and cite two cases in which courts declined to exercise personal jurisdiction where non-essential meetings took place in New

York.  Def. Mem. 22; *see Barrett v. Tema Dev. (1988), Inc.*, 463 F. Supp. 2d 423, 432-33

(S.D.N.Y. 2006); *ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.P.A.*,

775 F. Supp. 650, 655 (S.D.N.Y. 1991).  Unlike the present case, which involves recurrent and

purposeful bids on a contract traded on a New York exchange and cleared by a New York

clearinghouse, *Barret* involved a mere possibility that certain real estate transactions might

include investments in New York.  463 F. Supp. 2d at 433.  Likewise, in *ICC Primex*, the only

alleged connection to New York was a meeting regarding a potential joint venture that was still

in its exploratory phase, which the district court found "did not substantially advance the

proposed joint venture."  775 F. Supp. at 655.  The connection here involved purposeful bids

placed at Defendants' direction and is far less nascent and attenuated.

 Nor can Defendants defeat personal jurisdiction on the grounds that they merely placed

bids and did not consummate trades on the Three-Month Contract or because Newedge, not

DRW, was the entity responsible for identifying DRW's counterparties.  Def. Mem. 23.  The

CFTC has alleged that Defendants' bids were made at the direction of Wilson and DRW and that

this practice succeeded in creating artificial prices for the Three-Month Contract in New York.

*See* Compl. ¶¶ 47-61.  Accordingly, the CFTC has adequately alleged that Defendants transacted

business under the New York long-arm statute.

  2. Nexus Between the CFTC's Claims and Defendants' Transactions in New York

 The "arising out of" element of the New York long-arm statute requires "a substantial

nexus" between the business transaction and the claim.  *Agency Rent A Car Sys., Inc. v. Grand

Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996).  This prong requires "a relatedness between the

transaction and the legal claim such that the latter is not completely unmoored from the former,

regardless of the ultimate merits of the claim."  *Licci ex rel. Licci v. Lebanese Canadian Bank,*

*SAL*, 732 F.3d 161, 168-69 (2d Cir. 2013).  In other words, "the 'arise-from' prong limits the broader 'transaction-of-business' prong to confer jurisdiction only over those claims in some way arguably connected to the transaction." *Symmetra Pty Ltd. v. Human Facets, LLC*, 12 Civ. 8857, 2013 WL 2896876, at *4 (S.D.N.Y. June 13, 2013) (quoting *Licci v. Lebanese Canadian Bank*, 960 N.Y.S.2d 695, 703 (2012) (answering certified question from Second Circuit)).

The CFTC's allegations easily satisfy this requirement.  As noted above, the bids placed by DRW on the New York-based NFX and cleared through the New York-based IDCH were central to Defendants' allegedly manipulative scheme and succeeded in creating artificial prices for the Three-Month Contract.  The complaint explains, in detail, how DRW's New York-targeted offers impacted IDCH settlement prices.  *See* Compl. ¶¶ 11, 24, 47-61.  Regardless of the ultimate merits of the CFTC's allegations, the alleged wrongdoing stems directly from the business contacts with New York.  Moreover, Defendants do not specifically address this prong in their moving papers.  Def. Mem. 21-23; Def. Reply 11-13.  For purposes of the "arising out of" prong of the New York long-arm statute, the alleged connection between Defendants' transactions in New York and the CFTC's claims is sufficient.

3.  Requirements of Due Process

The exercise of personal jurisdiction must also satisfy the requirements of the Due Process Clause of the U.S. Constitution.  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).  As the Second Circuit has held, the "application of N.Y. C.P.L.R. § 302(a) meets due process requirements." *Id.* at 105; *see also United States v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir. 1966) (exercise of personal jurisdiction under New York's long-arm statute does not present constitutional issues because the jurisdictional reach of N.Y. C.P.L.R. § 302(a) over non-domiciliaries is narrower than what is permitted under the Due Process Clause).  Accordingly, as

16

the CFTC has satisfied the requirements of New York's long-arm statute, the requirements of the

Due Process Clause have been met here.  *See also CFTC v. Amaranth*, 554 F. Supp. 2d at 529.

The CFTC has made the prima facie showing necessary for the exercise of personal jurisdiction.

   II.  Defendants' 12(b)(6) Motion to Dismiss for Failure to State a Claim

    A.  Legal Standard

    To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient

factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of

facts which would entitle him or her to relief."  *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir.

2000).  A court must construe the complaint liberally, accept all factual allegations in the

complaint as true, and draw all reasonable inferences in the nonmovant's favor.  *Chambers v.

Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citing *Gregory v. Daly*, 243 F.3d 687, 691

(2d Cir. 2001)).  On a 12(b)(6) motion, a district court may consider only the complaint,

documents attached to the complaint, matters of which a court can take judicial notice, or

documents that plaintiff knew about and relied upon.  *Chambers*, 282 F.3d at 153.

    B.  Manipulation and Attempted Manipulation Claims

    The CFTC alleges market manipulation and attempted market manipulation in violation

of Sections 6(c) and 9(a)(2) of the CEA.  Section 6(c) provides that,

> It shall be unlawful for any person, directly or indirectly, to use or employ,
> or attempt to use or employ, in connection with any swap, or a contract of
> sale of any commodity in interstate commerce, or for future delivery on or
> subject to the rules of any registered entity, any manipulative or deceptive
> device or contrivance . . . .

7 U.S.C. § 9.  Section 9(a)(2) prohibits "[a]ny person [from] manipulat[ing] or attempt[ing] to

manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 13(a)(2).  Given the absence of a statutory definition of "manipulation" in the CEA, the CFTC has established a four-prong test. *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013); *see also DiPlacido v. CFTC*, 364 F. App'x 657, 661 (2d Cir. 2009) (summary order).

Pursuant to this test, to state a claim for market manipulation the CFTC must allege "(1) that the accused had the ability to influence market prices; (2) that [he] specifically intended to do so; (3) that artificial prices existed; and (4) that the accused caused the artificial prices."  *Id.* (citing *In re Cox*, CFTC No. 75-16, 1987 WL 106879, at *4 (July 15, 1987)).  To state a claim for attempted manipulation, the CFTC must allege (1) an intent to affect market prices and (2) an overt act in furtherance thereof.  *CFTC v. McGraw–Hill Cos.*, 507 F. Supp. 2d 45, 51 (D.D.C. 2007) (internal citations omitted).

Although manipulation and attempted manipulation claims that "sound in fraud" are evaluated under the heightened pleading requirements of Rule 9(b), *see, e.g.*, *Natural Gas*, 358 F. Supp. 2d at 342-44, fraud is not a necessary element of a market manipulation claim.  *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012) ("[T]he weight of authority rejects this bright line rule in favor of a case-by-case examination into whether the allegations do, in fact, 'sound in fraud.'"); *see also DiPlacido*, 364 F. App'x at 661.  Adopting the case-by-case approach described in *Parnon*, this Court lacks any basis to conclude that the claims asserted here "sound in fraud."  *See Parnon*, 875 F. Supp. 2d at 244-45.  As in *CFTC v. Amaranth*, "the CFTC's theory of attempted manipulation is not based on misleading statements or omissions, but rather on a particular trading strategy," one that involved "the timing of trades intended to change the closing price."  554 F. Supp. 2d at 531.  Moreover, as both parties have

18

acknowledged, the complaint contains no allegation that the Defendants engaged in fraud.  Def.

Mem. 17; Pl. Opp. 48.  Accordingly, the Court will apply the flexible pleading standards of Rule

8(a) and 12(b)(6) summarized above.

     1.  Ability to Influence Market Prices

Under the first element of a market manipulation claim, the plaintiff must allege that the

accused had the ability to influence market prices.  The complaint includes detailed allegations

explaining how Defendants' practice of placing bids above the Corresponding Rates during the

Afternoon Settlement Period influenced the settlement price on the Three-Month Contract.

Compl. ¶¶ 47-61.  As described in the complaint, given the lack of liquidity in the market and the

absence of any PAI adjustment by IDCH, Defendants' above-market bids were able to influence

the IDEX Curve which in turn influenced the price at which the Three-Month Contract settled.

*Id*.  Indeed, the CFTC has alleged that the head of quantitative research at DRW acknowledged

that DRW could influence prices, stating that as a result of Defendants' practices, the "'IDCG

settle curve is DRW defined'."  *Id*. ¶ 53.  The CFTC has pleaded facts which may establish that

Defendants had the ability to influence the market price of the Three-Month Contract.

     2.  Specific Intent to Influence Market Prices

The second element of a market manipulation claim requires that the defendant had the

specific intent to influence market prices.  The intent requirement applies to both attempted and

completed acts of manipulation.  *See In re Hohenberg Bros. Co.*, CFTC No. 75-4, 1977 WL

13562, at *7 (Feb. 18, 1977).  "To meet the specific intent element of a claim for manipulation or

attempted manipulation of a futures contract, the Commission must plead that Defendants 'acted

(or failed to act) with the purpose or conscious object of causing or effecting a price or price

trend in the market that did not reflect the legitimate forces of supply and demand.'"  *Parnon*,

875 F. Supp. 2d at 249 (S.D.N.Y. 2012) (quoting *In re Energy Transfer Partners Natural Gas Litig.*, 07 Civ. 3349, 2009 WL 2633781, at *5 (S.D. Tex. Aug. 26, 2009)).  A generalized intent to obtain trading profits "which could be imputed to any corporation with a large market presence in any commodity market, is insufficient to show intent."  *In re Crude Oil Commodity Litig.*, 06 Civ. 6677, 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007).

The CFTC has alleged that Defendants "intended to affect or influence the daily settlement rates of the Three-Month Contracts during the relevant period" and "had the intent and ability to influence prices."  Compl. ¶¶ 60, 64, 71.  In support of these allegations, the CFTC points to a number of statements by Wilson and other DRW employees indicating that they intentionally injected bids during the critical Afternoon Settlement Period at rates above the prevailing Corresponding Rates with the purpose of influencing the IDEX Curve and the settlement rates of the Three-Month Contract.  *See* Compl. ¶¶ 50-57.  Moreover, as noted above, the CFTC has alleged that DRW was aware of its impact on prices and nonetheless persisted in this practice.  The CFTC alleges that DRW's head of quantitative research stated to Wilson that as a result of DRW's "'new regime,'" the "'IDCG settle curve is DRW defined'."  *Id*. ¶ 53.  The CFTC has also alleged that another market participant complained to DRW in February 2011 that DRW "'get[s] to set the mark,'" and that DRW continued its allegedly manipulative bidding activity through August 2011.  *Id*. ¶ 61.

Defendants argue that the CFTC has alleged only that Defendants had the intent to influence the settlement rates of the Three-Month Contract and, therefore, failed to allege that Defendants had a specific intent to create an artificial price in violation of the CEA.  *See* Def. Reply 9.  The complaint, however, is not drafted as narrowly as Defendants contend.  *See, e.g.*, Compl. ¶¶ 1, 60.  The CFTC has provided detailed allegations explaining precisely how

Defendants' intentional efforts to increase daily settlement rates and move the IDEX Curve in order to affect market prices and produce profits for Defendants.  *See id*. ¶¶ 1, 4, 5, 41-60; *see also Banker*, 201 F. App'x at 15 ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor.").  Defendants also maintain that their bids were "based on their own calculations and beliefs about value" and, therefore, that the requisite intent was lacking.  Def. Mem. 15-16.  Although Defendants may attempt to prove at a later stage of the litigation that their bids reflected a "legitimate source of demand," *see id.*, this issue is not appropriate for resolution at the motion to dismiss stage.  With respect to both the manipulation and attempted manipulation claims, the CFTC has alleged facts capable of showing that Defendants specifically intended to influence the market price of the Three-Month Contract.

### 3.   Existence of Artificial Prices

Under the third element, the plaintiff must allege the existence of artificial prices.  An artificial price is a price that "does not reflect basic forces of supply and demand."  *Parnon*, 875 F. Supp. 2d at 246 (citations and internal quotation marks omitted).  "[M]arket manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone."  *Id*. (quoting *In re Kosuga*, 19 Agric. Dec. 603, 618 n.4 (U.S.D.A. 1960) (internal quotation marks omitted)); *see also U.S. v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

The CFTC has presented sufficient allegations to satisfy this prong.  As an initial matter, the CFTC has alleged that Defendants' bids were artificial—and produced artificial prices—because the bids (1) were placed and quickly withdrawn, primarily during the Afternoon Settlement Period, (2) were not intended to consummate actual trades, (3) were as high as 101.04

basis points above the Corresponding Rates that would have otherwise determined the daily

settlement rates, and (4) did not result in the consummation of actual trades on at least 118 days.

Compl. ¶¶ 1, 51-60.  Moreover, the CFTC has alleged that Defendants were aware prices were

not being determined through standard market forces but were, according to one DRW

employee, "'DRW defined'."  *Id.* ¶ 53.  The CFTC has also alleged that at least one other market

participant believed that DRW "'get[s] to set the mark'."  *Id.* ¶ 61.

Defendants argue that the complaint, rather than alleging that the prices of the Three-

Month Contract during the relevant period were artificial, alleges only that Defendants sought to

move the prices "into line with what Defendants believed was their true economic value."  Def.

Mem. 11.  Stated differently, Defendants contend that they engaged in lawful arbitrage and not

market manipulation.  Defendants maintain that because they moved the price of the Three-

Month Contract *toward* a price that better reflects the forces of supply and demand, that the

resulting price could not, as a matter of law, have been artificial.  *Id.* at 11-13.  In support of this

argument, Defendants point out that the complaint recognizes that there was a convexity bias in

the Three-Month Contract but, given the lack of liquidity in the market and the absence of any

PAI adjustment by IDCH, that the resulting price did not take that convexity bias into account.

Def. Mem. 12-15.  Defendants maintain that their bids, which did take the convexity bias into

account, better reflected the "intrinsic value" of the Three-Month Contract.  Defendants go so far

as to argue that it was the prevailing market prices that were "artificial" before they began

placing bids at levels above the Corresponding Rates.  *See id.*[2]

---

[2] In support of this position, Defendants have identified two cases in which courts rejected federal securities laws market manipulation challenges to the short selling of stocks and recognized that the short sales at issue brought stock prices back into alignment with their underlying value.  *See Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 421 (S.D.N.Y. 2010).  As an initial matter, neither of these cases involves manipulation under the CEA.  *See CFTC v. Amaranth*, 554 F. Supp. 2d at 537-38 (declining to apply federal securities laws cases to CEA manipulation claim in holding that it is not necessary to plead fraudulent intent under the CEA as it is under the 1934 Act).  Moreover, the short selling described in those

Defendants' arguments are unpersuasive.  At this stage of the litigation, this Court cannot conclude as a matter of law that bids placed and withdrawn at above-market rates reflect the legitimate forces of supply and demand, particularly where it is alleged that few if any of these bids resulted in the consummation of an actual transaction.  Although the CFTC has alleged that the Three-Month Contract has a convexity bias and that the IDCH rules did not provide for an adjustment that would counteract that bias, it does not necessarily follow that the prevailing market price before Defendants' intervention was "artificial" or that Defendants helped to uncover the "intrinsic value" of the Three-Month Contract.  Def. Mem. 13.  This Court also declines to hold that a party's subjective belief that a financial instrument is mispriced is sufficient at the motion to dismiss stage to defeat well-pleaded allegations of artificial prices.  Indeed, it is not appropriate for the Court to make such determinations as to the "intrinsic value" of the Three-Month Contract or Defendants' actual motives at this time.  *See Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996) ("In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.").  In sum, the CFTC's allegations are capable of supporting a conclusion that artificial prices existed during the relevant period.

   4.   Causation of Artificial Prices

   The fourth element of a CEA market manipulation claim requires a plaintiff to allege that the defendant caused the artificial conduct.  Other courts have recognized that there is some

---

cases, which involved actual transactions with bona fide counterparties, is easily distinguishable from the specific "banging the close" type of scheme alleged here, which involves carefully timed bids which were never intended to be and for the most part were not consummated.  *Cf. Sullivan*, 47 F.3d at 861-62 (Posner, J.) (concluding that defendant's "unprecedented massive short selling" did not create "a false impression of supply and demand" because on the other side of defendant's transactions were "real buyers, betting against [defendant], however foolishly, that the price of [the] stock would rise"); *Cohen*, 722 F. Supp. 2d at 424 (dismissing securities law market manipulation claim because, among other deficiencies, complaint "does not assert that the parties to the alleged short sales were anything other than bona fide buyers and sellers trading at the reported price of the transaction.").

overlap between this element, the artificial price element, and the element addressing defendants' ability to influence prices.  *See Parnon*, 875 F. Supp. 2d at 248;  *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995) (noting that the four elements in a CEA manipulation case are "occasionally modified to fit the specific facts of a particular case, and there is some question to what extent these elements should be treated as separate and independent or whether they are factually and legally interdependent.").

As discussed above, the CFTC has provided detailed allegations explaining how DRW's bids, placed primarily during the Afternoon Settlement Period at rates exceeding the Corresponding Rates, influenced the IDEX Curve and in turn created artificial prices for the Three-Month Contract.  *See* Compl. ¶¶ 1, 4, 5, 41-60.  Moreover, the CFTC has also claimed that employees of DRW perceived the IDEX Curve, according to which prices were set, as "'DRW defined'."  *Id*. ¶ 53.  Defendants argue that the CFTC has failed to allege causation because the IDCH exercises discretion and could have ignored Defendants' bids in determining the settlement prices of the Three-Month Contract.  Def. Mem. 17-18.  In other words, Defendants argue that unless their orders "automatically moved the settlement prices," they cannot be said to have caused artificial prices.  *See id*.  This is not what is required.  As recognized in *Parnon*, "it is enough, for purposes of a finding of manipulation in violation of sections 6[c] and 9(a)(2) of the CEA that respondents' action contributed to the price movement."  875 F. Supp. 2d at 248 (quoting *In re Kosuga*, 19 Agric. Dec. at 618 n.4) (alterations and internal quotation marks omitted); *see also In re Cox*, 1987 WL 106879, at *12 (holding that a charge of manipulation can be sustained where respondents' acts are "one of the proximate causes" of the artificial price).

The CFTC has pleaded non-conclusory allegations sufficient to establish that Plaintiffs' conduct caused or contributed to artificial prices in the Three-Month Contract.  In addition, the

CFTC's allegations that Defendants placed bids during the Afternoon Settlement Period at above-market rates are sufficient to meet the overt action requirement of an attempted manipulation claim.

C.   Due Process and Adequacy of Notice

Defendants argue that granting the CFTC the relief it requests would violate Defendants' due process rights because the agency did not provide adequate notice that Defendants' alleged conduct was unlawful.  Def. Mem. 18-19.  "Due process requires that 'laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'"  *Upton v. S.E.C.*, 75 F.3d 92, 98 (2d Cir. 1996) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

Defendants' argument that they lacked adequate notice regarding the illegality of the alleged conduct is unpersuasive.  The claims alleged here are not based on a novel interpretation of manipulation and are consistent with other manipulation claims that have been recognized under the CEA.  *See DiPlacido*, 364 F. App'x at 660 (holding that CFTC interpretation of manipulation under the CEA was not a change of position that banned a "commonplace" practice) (citing *In re Indiana Farm Bureau Coop. Ass'n. Inc.*, CFTC No. 75-14, 1982 WL 30249, *3 (Dec. 17, 1982)); *CFTC v. Enron Corp., & Hunter Shively*, H-03-909, 2004 WL 594752, at *5 (S.D. Tex. Mar. 10, 2004) ("Buying or selling in a manner calculated to produce the maximum effect upon prices, frequently in a concentrated fashion and in relatively large lots is one form of manipulation, among others.") (citation and internal quotation marks omitted). Indeed, the CFTC has previously brought enforcement actions involving "banging the close" schemes and other conduct similar to the practices alleged here.  *See, e.g.*, *CFTC v. Amaranth*, 554 F. Supp. 2d at 534 ("[T]here is no doubt that marking the close or any other trading practices, without an allegation of fraudulent conduct, can also constitute manipulation in

contravention of the CEA, so long as they are pursued with a manipulative intent."). Accordingly, Defendants' adequacy of notice argument is unavailing. Dismissal for failure to state a claim is unwarranted.

III. Defendants' 12(b)(3) Motion to Dismiss for Lack of Venue

Upon a motion to dismiss under Rule 12(b)(3), the plaintiff has the burden of pleading venue. *See Pers. v. Google Inc.*, 456 F. Supp. 2d 488, 493 (S.D.N.Y. 2006). "[T]he Court accepts facts alleged in the complaint as true and draws all reasonable inferences in [the plaintiffs'] favor." *Caremark Therapeutic Servs. v. Leavitt*, 405 F. Supp. 2d 454, 457 (S.D.N.Y. 2005). At this stage, the plaintiff is only required to make a prima facie showing of venue. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (applying the same standard of review in Rule 12(b)(3) dismissals for improper venue as in Rule 12(b)(2) dismissals for lack of personal jurisdiction).

The CFTC alleges venue in this Court pursuant to Section 6c(3) of the CEA, 7 U.S.C. § 13a-1(e), on the grounds that Defendants' transactions and alleged violations of the CEA occurred within the Southern District of New York. Compl. ¶ 11. Defendants argue that the CFTC has failed to make a prima facie showing that any of the alleged acts or transactions occurred in New York. Def. Mem. 23-24. For the reasons provided above and reading the complaint in the light most favorable to Plaintiff, venue is appropriate in the Southern District.

IV. Defendants' Motion to Transfer Venue Pursuant to Section 1404(a)

A. Legal Standard

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "District

courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair*, 462 F.3d at 106.  On a motion to transfer venue under Section 1404(a), "the burden is on the movant to show that the transfer is justified." *Xiu Feng Li v. Hock*, 371 F. App'x 171, 175 (2d Cir. 2010) (citation omitted).  "Absent a clear and convincing showing that the balance of convenience strongly favors the alternate forum . . . discretionary transfers are not favored." *Id.* (citing *Ayers v. Arabian American Oil Co.*, 571 F. Supp. 707, 709 (S.D.N.Y. 1983)).

In order to overcome the plaintiff's choice of forum, the movant must make "a strong showing that the balance of convenience and the interest of justice weigh heavily in favor of a transfer." *Schechter v. Tauck Tours, Inc.*, 17 F. Supp. 2d 255, 260 (S.D.N.Y. 1998) (citation and internal quotation marks omitted).  An agency's choice of forum is "entitled to that level of deference to which a plaintiff's choice of forum is ordinarily entitled." *S.E.C. v. KPMG, LLP*, 03 Civ. 671, 2003 WL 1842871, at *3 (S.D.N.Y. Apr. 9, 2003).  However, a plaintiff's choice of forum is accorded substantially less deference when the forum is "neither the plaintiff's home nor the place where the operative facts of the action occurred." *Hall v. S. Orange*, 89 F. Supp. 2d 488, 494 (S.D.N.Y. 2000).  Some of the factors a district court is to consider are, among other things:  "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties." *Id.* at 106-07.

B.  Application

1.  Degree of Deference and Locus of Operative Facts

Defendants are based in Chicago and argue that the locus of operative facts is in Chicago

as well.  Specifically, Defendants argue that nearly all of the relevant activity described in the complaint occurred in Chicago.  Def. Mem. 24-25.  Defendants maintain that the Three-Month Contract was "entirely an electronic market without any physical trading floors or pits" and that "the computers and other technological hardware used by IDCH to receive electronic orders from market participants such as DRW Investments, on information and belief, were actually located outside of New York."  *Id*.; Silberberg Decl. ¶¶ 24-28, ECF No. 34-2.  Defendants also contend that DRW's trading decisions and the analysis relied on by DRW, as well as DRW's interactions with brokers (including Newedge), vendors (including Sky Road), and counterparties, all took place in or arose from DRW's Chicago headquarters.  Def. Mem. 25; Silberberg Decl. ¶¶ 21-25.

The CFTC disputes that the location of operative events was in Chicago and states that IDCH and IDCG, both of which are located in the Southern District, "were involved in all aspects of the Three-Month Contract, including its creation, the rules governing its trading, and its pricing."  Pl. Opp. 30-31.  The CFTC points to a litany of actions taken by IDCH and IDCG, which are described in the complaint and without which, the CFTC argues, "the Three-Month Contract would not exist and DRW and Wilson's manipulative scheme could not have been executed."  *Id*. at 31.  The CFTC also names several counterparties to DRW's long position in the Three-Month Contract which are headquartered in the Southern District and which, the CFTC argues, were necessary to the alleged scheme.  *Id*. at 31-32; Malas Decl. ¶¶ 5, 6, 8-10, ECF No. 36.  The CFTC further asserts that other entities located in the Southern District were either "involved in financial transactions relating to the Three-Month Contract" or "important in setting the daily settlement rates on the contracts at issue."  *Id*.; Malas Decl. ¶¶ 6, 11, 12.  In response, Defendants note that IDCH is not a party and reiterate that Defendants' conduct took

28

place in Chicago.  Def. Reply 15.

Although some of the incidents relevant to the parties' dispute took place in Chicago, the CFTC has alleged substantial contact with a number of New York-based entities and that the price manipulations in question occurred in this district.  Defendants have failed to meet their burden of showing by clear and convincing evidence that the locus of operative facts was not in New York.  *See Xiu Feng Li*, 371 F. App'x at 175.  Accordingly, the CFTC's decision to bring this action in the Southern District of New York is entitled to deference and is presumed to be convenient.  *KPMG*, 2003 WL 1842871, at *3.

2.   Convenience of Parties and Witnesses and Availability of Process

Defendants also argue that the convenience of the parties and witnesses favors a transfer to the Northern District of Illinois.  With respect to the witnesses, Defendants have identified eleven DRW employees, including Wilson, who reside in the Northern District of Illinois and who have knowledge of "Defendants' specific participation in the Three-Month Contract market or Defendants' relevant business practices."  Def. Reply 16; Def. Mem. 25, 29; Silberberg Decl. ¶¶ 8-20.  In addition, Defendants identify three likely non-party witnesses, including contacts from Newedge and Sky Road, who reside in the Northern District of Illinois.  Def. Mem. 26, 29-30.  The CFTC, on the other hand, has named twenty-one likely non-party witnesses who include the current and former employees of several relevant entities including:  IDCG and IDCH; DRW counterparties, including MF Global, Jeffries, and Virtu; organizations involved in other relevant transactions with DRW, including Newedge and Bank of New York Mellon; and organizations that provided the Corresponding Rates, including the International Swaps and Derivatives Association, Inc., Thompson Reuters, and Bloomberg LP.  Pl. Opp. 33-35.  The CFTC states that these individuals all work or reside in the Southern District of New York.  *Id*. at 35.

29

In addition to their list of witnesses, Defendants have submitted declarations attesting to the burden that litigating this case in the Southern District will place on Wilson and DRW. Wilson asserts that facing trial in New York would be a particular hardship to him in light of the recent dissolution of his marriage and his duties with respect to his children's supervised visitations with their mother, their schooling, and their medical appointments.  Def. Mem. 26; Wilson Decl. ¶¶ 2-3, 7-10.  Wilson further states that his divorce proceedings, which could "continue for years," require "weekly, and oftentimes daily" participation, occasionally "on a day's notice."  Def. Mem. 27; Wilson Decl. ¶¶ 11-12; Kim Decl. Ex. A, ECF No. 38-1. Defendants argue that it would be a burden on the other DRW employees, as well as a burden on DRW's business and financial interests, if any DRW employee witnesses, Wilson in particular, are required to be absent for an extended period.  Def. Mem. 27-28; Silberberg Decl. ¶¶ 7-17, 29-34.

Although the convenience of the parties is a factor in determining whether transfer should be granted, the convenience of non-party witnesses is accorded more weight than that of party witnesses.  *See ESPN, Inc. v. Quiksilver, Inc.*, 581 F. Supp. 2d 542, 548 (S.D.N.Y. 2008). "When weighing the convenience of the witnesses, courts must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district."  *Millennium, L.P. v. Hyland Software, Inc.*, 03 Civ. 3900, 2003 WL 22928644, at *3 (S.D.N.Y. Dec. 10, 2003).  Defendants contend that their witnesses have direct knowledge of DRW's relevant business practices whereas certain witnesses identified by the CFTC and who are employed by Bank of New York Mellon and the entities that provided the Corresponding Rates are unlikely to be important witnesses in light of the CFTC's allegations.  *See* Def. Mem. 16.  At this stage in the litigation, however, the Court is not prepared to conclude that these witnesses will be

unimportant or to disregard the substantial number of non-party witnesses named by the CFTC who are located in this district.  The Court is likewise not persuaded by clear and convincing evidence that the convenience of Defendants necessitates a change of forum.  Many of the hardships Defendants have identified, including the disruption of DRW employees' workday and ability to monitor the market during trial, would not be resolved by transferring this action to Chicago.  *See* Silberberg Decl. ¶¶ 29-35.  Moreover, "a forum is not necessarily inconvenient because of its distance from pertinent parties or places if it is readily accessible in a few hours of air travel."  *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 10 (2d Cir. 1995) (citations omitted).  With respect to Wilson's alleged hardships relating to his divorce and his childcare responsibilities, the Court does not find these circumstances sufficiently exceptional to tilt considerations of convenience in Defendants' favor.

The availability of process factor also favors the Southern District.  Both parties have informed the Court that whether this case proceeds in the Northern District of Illinois or the Southern District of New York one side or the other will face prejudice because certain witnesses will be beyond the subpoena power of the respective district court.  Defendants claim that they will suffer prejudice if the case is not transferred because they will be unable to serve subpoenas on witnesses who reside in the Northern District of Illinois.  Def. Mem. 30.  Defendants fail to note, however, that the Rule 45 limitation on the courts' subpoena power applies to non-party witnesses and have provided the Court with no basis for concluding that the eleven DRW employees could not, by virtue of their employment relationship, be made available to testify. *See Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000) ("The availability of compulsory process . . . is generally relevant only with respect to third-party witnesses, since employees of the parties will as a practical matter be available in any venue by

virtue of the employment relationship.") (citations omitted).  Defendants have identified three

non-party witnesses who cannot be subjected to subpoenas by this Court.  Plaintiffs, on the other

hand, claim that if the case is transferred to Chicago that they will be unable to compel as many

as twenty-one non-party witnesses who reside in the Southern District.  Pl. Opp. 41-42.  This

factor is, at best, neutral as between the parties.  *See Citigroup*, 97 F. Supp. 2d at 561.

Defendants have failed to demonstrate by clear and convincing evidence that the convenience

and service of process factors favor transfer.

     3.  Remaining Transfer Factors

     Nor does the location of documents factor weigh in favor of transfer.  Courts in this

district recognize that "[t]he location of documents, is neutral in today's era of photocopying, fax

machines and Federal Express."  *Walker v. Jon Renau Collection, Inc.*, 423 F. Supp. 2d 115, 118

n.3 (S.D.N.Y. 2005) (alterations, citations, and internal quotation marks omitted).  In addition,

many of the relevant documents are likely to stem from New York as well as from Illinois.  This

factor is neutral and does not serve to overcome the deference owed to the CFTC's choice of

forum.

     Defendants argue that it is in the interest of justice to transfer this action because doing so

will serve judicial economy and help the Court avoid complex questions of personal jurisdiction.

Def. Mem. 19-20.  However, as this Court is satisfied that the exercise of personal jurisdiction in

New York is appropriate, this argument is unpersuasive.  Defendant further argues that judicial

economy would be better served by transfer because the Southern District of New York has a

more crowded docket than the Northern District of Illinois.  Def. Reply 36.  However, "[w]hile

differences in docket crowding are entitled to some weight, this factor is . . . accorded little

weight in this district."  *Toy Biz, Inc. v. Centuri Corp.*, 990 F. Supp. 328, 331 (S.D.N.Y. 1998).

Defendants have failed to persuade the Court that judicial economy or the interest of justice more broadly favor transfer.  Moreover, the District Court for the Northern District of Illinois previously dismissed a related anticipatory action filed by Defendants seeking a declaratory ruling and an injunction against the CFTC barring the present enforcement action, noting in dicta that the action seemed "likely to have been brought for forum shopping reasons." *DRW Inves. v. CFTC*, 2013 WL 6153157, at \*2.  This further weighs against finding it in the interest of justice to transfer this case to the Northern District of Illinois.

Finally, Defendants have not briefed the relative means factor, and the Court declines to hold that this factor weighs in favor of transfer at this time.  Giving appropriate deference to the CFTC's choice of forum, the Court concludes in its discretion that Defendants have failed to meet their burden under Section 1404(a).

## CONCLUSION

Defendants' motion to dismiss, or in the alternative, to transfer venue is DENIED.

The Clerk of Court is directed to terminate the motion at ECF No. 32.

SO ORDERED.

Dated: June 26, 2014
New York, New York

_____
ANALISA TORRES
United States District Judge