**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES COMMODITY FUTURES TRADING COMMISSION,** | **13-7884 (AT/KNF)** |
| **Plaintiff,** | |
| **v.** | |
| **DONALD R. WILSON AND DRW INVESTMENTS, LLC,** | |
| **Defendants.** | |

**U.S. COMMODITY FUTURES TRADING COMISSION'S MEMORANDUM IN**
**SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY AND**
**EXPERT REPORTS OF MATTHEW A. EVANS AND JEFFREY HARRIS**

A. Daniel Ullman II (*pro hac vice*)
Paul G. Hayeck (*pro hac vice*)
Jason Mahoney (*pro hac vice*)
Sophia Siddiqui (*pro hac vice*)
Jonah McCarthy
David Kent (*pro hac vice*)

U.S. Commodity Futures Trading Commission
Division of Enforcement
1155 21st St., N.W.
Washington, DC 20581
(202) 418-5400 (telephone)
(202) 418-5523 (facsimile)
dullman@cftc.gov
phayeck@cftc.gov
jmahoney@cftc.gov
ssiddiqui@cftc.gov

Michael R. Berlowitz
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9759 (telephone)
(646) 746-9940 (facsimile)
mberlowitz@cftc.gov

**ATTORNEYS FOR PLAINTIFF**
**COMMODITY FUTURES TRADING COMMISSION**

## TABLE OF CONTENTS

BACKGROUND ..................................................................................................... 1

ARGUMENT .......................................................................................................... 2

    I.     LEGAL STANDARD ............................................................................... 2

          A.    Summary Judgment ................................................................... 2

          B.    Federal Rule of Evidence 702 .................................................. 3

                (1)    Qualifications ................................................................. 4

                (2)    Reliability ...................................................................... 4

                (3)    Relevance ....................................................................... 5

                (4)    Rule 403 Exclusion ....................................................... 6

    II.    THE PROFFERED TESTIMONY OF MATTHEW EVANS IS
          INADMISSIBLE. ...................................................................................... 6

          A.    Evans's Report ......................................................................... 6

          B.    Evans is not qualified to give opinion testimony. ................... 8

          C.    Evans's methodology is flawed and should be excluded. ........... 9

                (1)    Evans has no basis for the methodology underlying his
                        opinion regarding legitimacy and is therefore unreliable
                        and excludable. .............................................................. 9

                      (a)    Evans's "Empirical Hypothesis Test" is made
                              from whole cloth. ............................................. 10

                      (b)    Evans's price discovery methodology is flawed. .............. 10

                      (c)    Evans's "Bargain Hunting Strategy" is unreliable ........... 11

                (2)    Evans offers inadmissible legal conclusions. ............... 12

                  (3)    Evans's suppositions and conclusions concerning intent are
                          inadmissible. ................................................................. 13

           D.    Evans's testimony is irrelevant. ............................................... 15

    III.    THE PROFFERED TESTIMONY OF JEFFREY HARRIS IS ALSO
          INADMISSIBLE. ...................................................................................... 17

          A.    Harris's Report ......................................................................... 17

          B.    Harris's conclusions about defendants' bidding behavior, artificial price,
               and "price discovery," are flawed and inadmissible. ................. 18

i

(1)    Harris's artificiality model is purely theoretical and ignores DRW's actual model ................................................................. 18

(2)    Harris's layperson "thought experiment" should be excluded. .... 21

C.    Harris offers inadmissible legal conclusions. ........................................... 22

D.    Harris's Suppositions and Conclusions Concerning Intent Are Not Admissible. ................................................................................................ 22

E.    Harris's testimony is prejudicial and cumulative ..................................... 23

CONCLUSION ....................................................................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Arista Records LLC v. Lime Grp. LLC,*
   784 F. Supp. 2d 398  (S.D.N.Y. May 2, 2011)..................................................................4

*Bah v. Nordson Corp.,*
   2005 WL 1813023 (S.D.N.Y. Aug. 1, 2005) ...................................................................5

*Bd. of Trustees of AFTRA Ret. Fund,*
   2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011).........................................................13, 23

*BP America Inc.,*
   152 FERC ¶ 63016 (Aug. 13, 2015)..........................................................9, 10, 11, 12

*CFTC v. Amaranth Advisors, LLC,*
   554 F. Supp. 2d 523 (S.D.N.Y. 2008) ...........................................................................13

*CFTC v. Wilson,*
   27 F. Supp. 3d 517 (S.D.N.Y. 2014)..................................................................2, 13, 16

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,*
   650 F. Supp. 2d 314 (S.D.N.Y., 2009) .........................................................................12

*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579 (1993) ..............................................................................................3, 6, 15

*Forte v. Liquidnet Holdings, Inc.,*
   2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015) ...............................................................2

*Gen. Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) ..............................................................................................3, 5, 18

*Hygh v. Jacobs,*
   961 F.2d 359 (2d Cir.1992) ...........................................................................................12

*In re Initial Pub. Offering Secs. Litig.,*
   174 F. Supp. 2d 61 (S.D.N.Y. 2001) .......................................................................12, 22

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,*
   2008 WL 1971538 (S.D.N.Y. May 7, 2008)...........................................................6, 8, 15

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999) ............................................................................................5, 10, 18

*Nimely v. City of New York,*
   414 F.3d 381 (2d Cir. 2005) ...................................................................................4, 6, 20

*S.E.C. v. Tourre,*
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) .................................................................. 3, 8

Emig v. Electrolux Home Products Inc., No. 06-CV-4791,
  2008 WL 4200988 (S.D.N.Y. Sept. 11, 2008) .......................................................... 5

*United States v. Amuso,*
  21 F.3d 1251 (2d Cir. 1994) .................................................................................. 21

*Veleron Holding, B.V. v. Morgan Stanley,*
  2015 WL 4503580 (S.D.N.Y. July 23, 2015) ........................................................ 3, 5

*Zaremba v. Gen. Motors Corp.,*
  360 F.3d 355 (2d Cir. 2004) ..................................................................................... 9

**Statutes**

7 U.S.C. §§ 9 and 13(a)(2) (2006 & Supp. IV) ............................................................ 1

**Rules**

Fed. R. Civ. P. 7 ............................................................................................................ 1

Fed. R. Evid. 26(a)(2)(A) at ¶ 1, (a), (c), (d); ¶ 2(e), (f), (g) ........................................ 1

Fed. R. Evid. 401, 402, 403, 701, and 702 .................................................................... 1

Federal Rule of Evidence 402 ............................................................................. 5, 6, 15

Federal Rule of Evidence 403 ............................................................................... 6, 24

Federal Rule of Evidence 702 .................................................................................... 3

Pursuant to Fed. R. Civ. P. 7, Rule III.J and IV.A of the Court's Individual Practices in Civil Cases, the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), the Court's October 23, 2015 Order (ECF No. 91), and Fed. R. Evid. 401, 402, 403, 701, and 702, Plaintiff U.S. Commodity Futures Trading Commission ("plaintiff" or "Commission), respectfully submits the following Memorandum of Law in Support of its Motion to Exclude the Testimony and Expert Reports of Matthew A. Evans ("Evans") and Jeffrey Harris ("Harris").

Defendants propose two testifying "experts" to opine that defendants' bids on the Three-Month Contract "were indicative of intent to transact" and further price discovery: (i) Matthew Evans, an economic consultant for National Economic Research Associates, Inc. ("NERA"), and (ii) Jeffrey Harris, a freelance finance professor. *See* Defs.' Expert Disclosure of Witnesses Pursuant to Fed. R. Evid. 26(a)(2)(A) at ¶ 1, (a), (c), (d); ¶ 2(e), (f), (g), Exhibit A.  As delineated *infra*, under the Federal Rules of Evidence and relevant case law, Evans's proposed opinion testimony and report should be excluded because he is not qualified "by knowledge, skill, experience, training or education" under Fed. R. Evid. 702, his methodology is flawed, and his testimony is irrelevant.  Similarly, Harris's proposed opinion testimony and report should be excluded because his methodology is flawed—or non-existent—and his testimony is prejudicial and cumulative.

## BACKGROUND

On November 6, 2013, the Commission filed a Complaint against defendants in the United States District Court for the Southern District of New York for attempted and perfected manipulation between January 24, 2011 and August 12, 2011 (the "Relevant Period") under Sections 6(c) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9 and 13(a)(2) (2006 &

1

Supp. IV) (the "Act").  Complaint, E.C.F. No. 1; *CFTC v. Wilson*, 27 F. Supp. 3d 517, 522

(S.D.N.Y. 2014).  The parties completed fact discovery on June 4, 2015.  *See* Court's Second

Amended Civil Case Management Plan and Case Scheduling Order.  (E.C.F. No. 61).  Expert

discovery closed on September 2, 2015.  *Id.*  On October 7, 2015, the Commission submitted

pre-motion letters to the Court seeking to exclude the testimony of defendants' two testifying

"experts," Harris and Evans ("pre-motion letters to exclude").[1]

On October 7, 2015, the Commission sent a letter to the Court requesting leave to file

partial summary judgment on plaintiff's attempted manipulation claim.  On October 16, 2015,

the Court granted the parties' respective requests to file motions for summary judgment, partial

summary judgment, and to exclude, and established a briefing schedule.  (E.C.F. 88; 90; 91).

Thereafter, the Court granted defendants' request to extend the briefing schedule.  (E.C.F. 90;

91).

## ARGUMENT

### I.  Legal Standard

#### A.  Summary Judgment

"On a motion for summary judgment, the Court may consider only admissible evidence."

*Forte v. Liquidnet Holdings, Inc.,* No. 14 Civ. 2185, 2015 WL 5820976, at *4 (S.D.N.Y. Sept.

30, 2015) (Torres, J.) (citation omitted).  Accordingly, when (1) a party offers expert testimony

in support or opposition to summary judgment and (2) a separate motion has been made to

preclude such testimony, a court must decide the motion to preclude first, in order to determine

whether such testimony may be considered in connection with the summary judgment motion.

*Id.*  "This is true even if the exclusion of expert testimony would be outcome-determinative."

---

[1] Pursuant to the Court's Order dated October 16, 2015, the parties previously filed the pre-motion letters to exclude in unredacted form.  (E.C.F. No. 93; 94; 95).

2

*Id.*; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-143 (1997) (rejecting argument "that because the granting of summary judgment in this case was 'outcome determinative,' it should have been subjected to a more searching standard of review") (citations omitted).

### B. Federal Rule of Evidence 702

"Federal Rule of Evidence 702 encourages a liberal approach to expert witness qualifications." *See Veleron Holding, B.V. v. Morgan Stanley*, No. 12 Civ. 5966, 2015 WL 4503580, at *31 (S.D.N.Y. July 23, 2015) (internal quotations and citation omitted); *see also S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (holding that "[c]ourts have construed the inquiry into an expert's qualifications with an eye towards the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." (internal quotations and citation omitted)).  "[A] trial court is obligated to act as a gatekeeper with respect to expert testimony." *Tourre*, 950 F. Supp. 2d at 673; *accord Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993).

Under this gatekeeping function, and to determine whether a proposed expert's testimony is admissible under Rule 702 of the Federal Rules of Evidence, courts "must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." *Tourre*, 950 F. Supp. 2d at 674.  Rule 702 ascribes to courts "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met.  *Id.* at 593 n.10.

### (1)  Qualifications

Whether a purported expert witness is qualified as such by his or her "knowledge, skill, experience, training or education[,]" Fed. R. Evid. 702, is a "threshold question" to be resolved prior to the other inquiries.  *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005).

In order to determine whether a witness is qualified to render an expert opinion, a court "must first ascertain whether the proffered expert has the educational background or training in a relevant field," by looking at the "totality of [the] witness's background."  *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV5936KMW, 2011 WL 1674796, at *5 (S.D.N.Y. May 2, 2011) (internal citations omitted).  The court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *Id.* at *2 (internal citations omitted).  The court must ensure that the expert will actually be testifying "on issues or subject matter[s] within his or her area of expertise."  *Id.* (internal quotations omitted).  "[A]n expert who is qualified in one field cannot offer an opinion about aspects of the case in another field for which she is not qualified."  *Id.* (quoting *In Re Methyl Tertiary Butyl Ether Products Liab. Litig.*, No. 1:00-1898, 2008 WL 1971538, at *6 n.48 (S.D.N.Y. May 7, 2008).

### (2)  Reliability

"The test of reliability applies equally when an expert's testimony is not scientific in nature."  *In Re Methyl,* 2008 WL 1971538, at *3.  However, in such cases, "expert testimony will not rely on anything like a scientific method."  *Id.* (internal quotations omitted).  "The four factors set out in *Daubert* as a means of determining reliability may therefore not be applicable when assessing the testimony of non-scientific experts."  *Id.* (explaining that *Daubert* factors including whether the theory has been tested; published in a peer-reviewed journal; known or

potential rate of error; and general acceptance, may not be applicable in non-scientific matters).

Thus, the reliability determination in such non-scientific cases should "make certain that an

expert, whether basing testimony upon professional studies or personal experience, employs in

the courtroom the same level of intellectual rigor that characterizes the practice of an expert in

the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  A district court

has "broad latitude when it decides how to determine reliability[.]"  *Id.* at 142.

      "Of course, courts do not simply take the word of people with experience; the court's

gatekeeping function applies even to experts whose opinion testimony derives from their

experience."  *Veleron Holding*, 2015 WL 4503580, at *31.  "There is no clear application of the

*Daubert* factors . . . where [the] expert[] relied primarily, if not solely, on [his] experience in

forming [his] . . . opinions."  *Emig v. Electrolux Home Products Inc.*, No. 06-CV-4791, 2008

WL 4200988, at *7 (S.D.N.Y. Sept. 11, 2008).  "[A] proffered expert who relied solely on his or

her experience in arriving at his or her expert opinion must have based that opinion on sufficient

facts or data," *id.* at *8, and "must explain how that experience leads to the conclusion reached,

why that experience is a sufficient basis for the opinion, and how that experience is reliably

applied to the facts," *Bah v. Nordson Corp.*, No. 00 Civ. 9060, 2005 WL 1813023, at *9

(S.D.N.Y. Aug. 1, 2005) (quoting Fed. R. Evid. 702 advisory committee note).  "[N]othing in

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may

conclude that there is simply too great an analytical gap between the data and the opinion

proffered."  *Gen. Elec.*, 522 U.S. at 146.

### (3)  Relevance

Under Federal Rule of Evidence 402, expert testimony must be relevant, *i.e.* whether it "has[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," and under Rule 702, opinion testimony will only be admitted if it will assist the trier of fact.  Fed. R. Evid. 402; *accord In re Methyl*, 2008 WL 1971538, at *3.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (internal quotations and citation omitted).

### (4)  Rule 403 Exclusion

Last, even if the three foregoing criteria are met, admissible and relevant evidence may be excluded if the prejudicial nature of that testimony justifies its exclusion pursuant to Federal Rule of Evidence 403.  Fed. R. Evid. 403 (codifying the exclusion of "relevant evidence if its probative value is substantially outweighed by . . . unfair prejudice, confusing the issues, misleading the jury").  The Rule 403 inquiry is particularly important in the context of expert testimony, "given the unique weight such evidence may have in a jury's deliberations."  *Nimely*, 414 F.3d at 397.

Both the testimony of defendants' proposed experts, Matthew Evans and Jeffrey Harris, should be excluded under Fed. R. Evid. 702 and 403.

## II.  THE PROFFERED TESTIMONY OF MATTHEW EVANS IS INADMISSIBLE.

### A.  Evans's Report

Evans concludes that DRW's bids were legitimate based on his personal, made-from-whole-cloth, "empirical hypothesis test" and his interpretation of third-party conversations. Evans Report ¶¶ 32-44, 53-61.  Evans also reaches the legal conclusion that this matter is not a

"Bang[ing] the Close" case.  *Id.* ¶¶ 75-86.  Evans's opinions, along with defendants' reliance

upon those opinions in their motion for summary judgment, are summarized as follows:

| Opinion | Corresponding Paragraph Number in Expert Report | Corresponding Reference in the Parties' Combined 56.1 Statement ("56.1") | Summary of Infirmities under Fed. R. Evid. (as discussed *infra*) |
|---|---|---|---|
| DRW's bids were a legitimate part of the price discovery process.  Evans Report at ¶ 10(a). | ¶¶ 14-23 | 56.1 ¶ D51 | Unreliability under Fed. R. Evid. 702: general statements about price discovery wholly unconnected to DRW's behavior. |
| DRW's bids were legitimate, and were executable orders.  *Id.* at ¶ 10(b). | ¶¶ 24-31; 31-44 | 56.1 ¶¶ D48, D95 | Unreliability under Fed. R. Evid. 702; impermissible intent testimony. |
| "DRW was willing to, and desired to, execute trades at its bid levels."  *Id.* at p. 17. | ¶¶ 45-47; 50, 51; 53-61 | | Impermissible intent testimony. |
| DRW's bids were consistent and conservatively placed with respect to DRW's trading strategy and were lower than DRW's estimates of fair value.  *Id.* at ¶ 10(c), (d). | ¶¶ 52; 65-68 | 56.1 ¶¶ D29, D39; DC ¶ 1 | Unreliability under Fed. R. Evid. 702. |
| DRW's bids moved in ways that are inconsistent with how a manipulator would act in seeking the maximum settlement price increases.  *Id.* at ¶ 10(e). | ¶¶ 69;70-74 | | Impermissible legal conclusion |

| Opinion | Corresponding Paragraph Number in Expert Report | Corresponding Reference in the Parties' Combined 56.1 Statement ("56.1") | Summary of Infirmities under Fed. R. Evid. (as discussed *infra*) |
|---|---|---|---|
| DRW's bids are inconsistent with typical "Bang the Close" allegations. *Id.* at ¶ 10(f). | ¶¶ 75-86 | | Impermissible legal conclusion. |

As analyzed below, Evans's opinions should be excluded because (i) Evans is not qualified as an expert based on his training or experience; (ii) his proposed opinions are not based upon reliable data and methodology; and (iii) his testimony will not be helpful to the trier of fact. *Tourre*, 950 F. Supp. 2d at 674.

### B.   Evans is not qualified to give opinion testimony.

To qualify as an expert under Rule 702, a witness must be qualified "by knowledge, skill, experience, training, or education." *In re Methyl*, 2008 WL 1971538, at *3.

Evans has an undergraduate degree in international business, took six economic courses in college, has no relevant certifications or licenses, and has no post-graduate schooling. *See* Evans Dep. 9:10-10:12.[2]  Evans has never traded interest rate products and, during his time in the financial industry, only served as a broker. *Id.* at 10:14-11:8; 12:16-13:22 (describing experience as a broker, not a trader, on a desk that hedged with interest rate products, and admitting he's "never run his own book of business.").  Evans has never been qualified as an expert in a case involving interest rate products or market manipulation. *Id.* at 14:1-3; 30:17-31:3.  *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 359 (2d Cir. 2004) (finding that a witness did not qualify as an expert in automobile design where the expert "had only a bachelor's

---

[2] Plaintiff is providing a copy of the deposition transcript of Matthew A. Evans dated August 28, 2015 and Expert Report of Matthew A. Evans dated July 27, 2015 ("Evans Report"), to the Court, as Exhibits "B" and "C" respectively.

degree in engineering and his only practical experience was in designing parts for automobile air bags").

Recently, in a market manipulation case, Evans's opinions were afforded "no weight" by a judge because of significant failures in his methodology. *See BP America Inc.*, 152 FERC ¶ 63016, ¶ 62, 68 n.52 (Aug. 13, 2015) (highlighting flaws in Evans's background, qualifications, and analysis and concluding that Evans "only offered possible alternative explanations for the behavior of the Texas traders . . . but had not read the traders['] depositions and did not test any of his alleged explanations against the data in this case") (excerpted in relevant part as Exhibit C); Evans Dep. 16:12-18 (testifying that "I had a judge, basically, afford no weight to some of my opinions").[3]  Like this matter, *BP America* involved trading behavior during the settlement window that affected the settlement price of various derivatives contract. *Id.* at 19:3-17.

### C. <u>Evans's methodology is flawed and should be excluded.</u>

#### (1) Evans has no basis for the methodology underlying his opinion regarding legitimacy and is therefore unreliable and excludable.

Under Fed. R. Evid. 702, and *Daubert* and its progeny, an expert's methodology and opinions must be reliable. *Arista Records*, 2011 WL 1674796, at *4 (holding that the reliability determination in such non-scientific cases should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Kumho Tire Co.*, 526 U.S. at 152.

---

[3] Notably, the flaws and failures in Evans's methodology and analysis in *BP America* mirror many of Evans's infirmities in this matter.  *See* 152 FERC ¶ 63016, at 62, 68 n.52.

**(a)  Evans's "Empirical Hypothesis Test" is made from whole cloth.**

In concluding that "DRW's participation in the settlement price process for IDCH swaps was legitimate," Evans's methodology is simply to compare defendants' bids to three criteria, hand-selected by him, after-the-fact.  These criteria are whether the bids were: (1) "placed in good time, vis-a-vis the settlement period"; (2) "open for a period of time making them executable"; and (3) "of enough volume to transfer risk[.]"  Evans Report p. 12; ¶ 33-44.  Yet, Evans does not know whether defendants were aware of these criteria during the Relevant Period and, if they were, whether defendants ever followed his after-the-fact test.  Evans Dep. 63:12-64:2 (Evans testified that "I don't have any specific evidence that they have a good grasp of the above concepts").

Additionally, the meaninglessness of Evans's after-the-fact test is illustrated by the following: (1) on one hand, these criteria are undiscerning and capture virtually every bid on every exchange.  *Id.* 101:7-19 (testifying that "[w]ell, every bid or offer that's placed into the order book is executable.") and (2) on the other, these criteria would have excluded virtually all of defendants' bids.  *Id.* 112:13-18 (admitting that none of defendants' bids actually transferred risk).

**(b)  Evans's price discovery methodology is flawed.**

In the context of determining whether DRW's bids were based on legitimate price discovery, Evans testified that his methodology was simply to base his opinion on an internal letter drafted by DRW's counsel, Patricia Levy, and "there were certain bids that came in which look like they're specifically to provide price information into the settlement price process."  *Id.* 65:14-66:3.  Similar to the *BP matter*, 152 FERC ¶ 63016, ¶ 62 (Aug. 13, 2015), Evans makes general statements about price discovery and settlement procedures that are disconnected to DRW's *actual* daily bidding behavior during the Relevant Period and the relevant testimony in

this matter. *Compare* Evans Report ¶¶ 14-23, 24-31 (generally summarizing price discovery

process, and concluding that "[i]t is expected  and rational behavior when . . . DRW traders in

this matter, place qualifying orders into the settlement procedure in an effort to make settlement

prices more demonstrable, and thus reliable") *with BP America*, 152 FERC ¶ 63,016, at 62

(plaintiff's expert "is further correct that Evans uses generalized defenses to explain the Texas

team's behavior without supporting data or analysis and by distorting [plaintiff's expert's]

analyses"). Significantly, Evans is not even clear whether he has reviewed the actual trading

data at the center of this matter or if he only looked at DRW's bids. *Id.* 56:12-57:2 ("I think [the

trading data is] comprehensive for DRW's own bids, but I can't say whether or not it's

comprehensive for everyone else's bid logs.").

      **(c)  <u>Evans's "Bargain Hunting Strategy" is unreliable.</u>**

Without citation or support, Evans also concludes that DRW employed a "'bargain

hunting' strategy, in which DRW would slowly try to find additional buyers at relatively lower

prices, so that it could add to its position at lower entry points." Evans's Report ¶ 66. Evans

testified that he "introduced that phrase" and that he cannot "point to any documents where

DRW discusses a trading strategy of conservatism." Evans Dep. 125:7-18. Moreover, Evans's

analysis is unreliable and incomplete where he cherry-picks a few dates in March and April 2011

and concludes that "the level of the DRW bid spread for the 10-year contract . . . eventually

reached levels consistent with the fair model outputs," and therefore "DRW's bidding structure

implies specific market logic, conservatism, and reticence . . ." *See* Evans Report ¶ 68-69.

Thus, based on the infirmities with his "methodology" and its unreliability, Evans's

above-referenced opinions and proposed testimony should be excluded as "speculative or

conjectural" under Fed. R. Evid. 702. *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi

Cola Co.*, 650 F. Supp. 2d 314, 318-19 (S.D.N.Y. 2009) (granting motion to exclude where

expert based damage calculations on unreliable and inaccurate data, together with a series of assumptions that have no basis in fact or reality).

**(2)** **Evans offers inadmissible legal conclusions.**

In this jurisdiction, it is a well-established, axiomatic principle, and a basic premise of evidence law, that experts are precluded from providing legal opinions or conclusions. *See In re Initial Pub. Offering Secs. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir.1992) (holding that in "[t]his circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion").

Evans's legal conclusions, in addition to being inaccurate and unreliable, are inadmissible. In this regard Evans, himself, acknowledges that he is neither qualified, nor someone who holds himself out as qualified, to provide legal opinions. Evans Dep. 40:10-13. Despite these admissions, Evans dispenses a panoply of legal opinions. For example, he compares defendants' bidding activity to plaintiff's "manipulation theory" and opines as to how the bidding activity of other "would-be manipulators" might achieve market manipulation. *See* Evans Report ¶¶ 69-70. Evans also forwards legal "opinions" of other "Bang the Close" market manipulation cases and concludes that "DRW's Actions in this matter have no economic analogs to Bang the Close Cases." *Id.* ¶¶ 75-86. Evans bases these "conclusions" on a few of the "Bang the Close" cases that "initially came to mind." Evans Dep. 133:10-133:15. However, *Evans did not perform any economic analyses, whatsoever, on any of these cases*. *Id.* 134:10-135:1 (testifying that he simply reviewed the allegations in the complaints in these matters). Moreover, Evans is not an attorney. *Id.* 40:8-40:13 ("**Q.** And you're not an attorney, I take it? **A.** Not an attorney. **Q.** Okay. Are you qualified, do you ever hold yourself out as being qualified to give legal opinions? **A.** No."). Additionally, Evans inexplicably omits *CFTC v. Amaranth Advisors,*

12

*L.L.C.*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008), the most relevant and factually-similar

manipulation case to the immediate case in the Southern District:

> Q.   Did you ever hear of a case called CFTC v.
> Amaranth?
> A.   Yes.
> Q.   And Brian Hunter?
> A.   Both.
> Q.   What do you know about those cases, that
> case?
> A.   What's in public domain.
> Q.   Okay.
> A.   That there's allegations that Hunter and
> Amaranth, by the company he was working for, had
> manipulated natural gas futures prices.
> Q.   Do you know if it had anything to do with
> a closing period?
> A.   Yes.
> Q.   Did it?
> A.   I believe it did, yes.
> Q.   How come -- did you include it in your
> "Bang The Close" section here?
> A.   No.
> Q.   Why didn't you include it?
> A.   I don't know.

*Id.* 137:1-22.  *See also Wilson*, 27 F. Supp. 3d at 532, 536 (noting similarities between this case

and *Amaranth Advisors,* 554 F. Supp. 2d at 534).

Accordingly, under the law of this jurisdiction, Evans's legal conclusions should be

excluded.

**(3)  <u>Evans's suppositions and conclusions concerning intent are inadmissible.</u>**

Likewise, it is well-established that expert opinions concerning intent are inadmissible

and should be stricken.  *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No.

09-CIV 3020, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011) (concluding that "[t]here is no

dispute that opinions concerning state of mind are an inappropriate topic for expert opinion").

Defendants, too, concede this point of law and agree that expert testimony regarding intent is inadmissible.  *See* Defs. Ltr. to Hon. Analisa Torres dated Oct. 7, 2015 at 4 n.3 (ECF No. 93).

Under this jurisdiction's prohibition on expert opinions on intent, Evans's repeated attempts to "peer into another's mind" are inadmissible and should be excluded.  *See, e.g.,* Evans Report ¶ 45 ("In addition to the above data analysis . . . there is nothing in the non-data evidence that I have reviewed which would even remotely suggest ***DRW did not intend to, or want to***, execute on those orders") (emphasis supplied); *id.* at ¶ 53 ("I have analyzed a series of communications from early February 2011, which demonstrate that when MF Global thought to transact with DRW at its posted bid level in early February 2011, ***DRW was eager to execute***") (emphasis supplied).

In this regard, Evans, himself, repeatedly acknowledges that he could not determine a party's "true subjective intent" or determine whether a party was manipulating the market.  Evans Dep. 21:25-22:14 ("**Q:**  Does this comport with your understanding about what an economist can do relative to intent?  **A:**  True subjective intent, I don't think an economist can get back in the head of the traders that, you know, and can make a determination of true subjective intent.").  Additionally, Evans concludes that "DRW was willing to, and desired to, executed trades at its bid levels," based only on the testimony of defendant Donald R. Wilson, himself, and DRW's traders.  Evans Report at p. 17 ("Evidence reviewed indicates that ***DRW was willing to, and desired to,*** execute trades at its bid levels"); *id.* at ¶¶ 45-47 (emphasis supplied).  Evans also interprets a series of communications between DRW's traders and Newedge USA LLC, its broker, regarding the "broken trade" between DRW and MFGlobal, and concludes that the "actions and real time statements of DRW confirm the data analysis and collectively show that DRW's bids represented true buying interest."  *See* Evans's Report ¶¶ 61,

53-61 ("The chats confirm that there was a readiness to deal . . . [also] . . . traders discussed a hedging strategy, which would be a typical discussion if there were a genuine interest and intention to trade.").

These "peering into another's mind" intent opinions are inadmissible.  Therefore, Evans's conclusions regarding defendants' intent should be excluded.

**D.  Evans's testimony is irrelevant.**

Under Federal Rule of Evidence 402, expert testimony must be relevant, *i.e.* whether it "has[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," and under Rule 702, opinion testimony will only be admitted if it will assist the trier of fact.  Fed. R. Evid. 402; *In re Methyl*, 2008 WL 1971538, at *3.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (internal quotations and citation omitted).

Evans is not offering any opinions about the manipulative conduct at the center of this action, and his opinions are therefore irrelevant.  In this regard, Evans admitted that he was not offering any opinions underlying the elements of a market manipulation claim:

> Q:  Am I right that your expert report
> contains no opinions regarding the defendant's intent
> in this matter?
>     MR. COGAN:  Object to the form.
> A.   I don't think I can provide a conclusion
> or determination of the true intent of any of the
> fact witnesses or participants in this -- in this
> matter…
> Q.   Okay.  In your report, do you have any
> opinions about DRW's ability to influence market
> prices?

> A.   No.
> Q.   In your report, do you offer any opinions
> about whether artificial prices existed on the Three
> Month Contract during the relevant period?
> A.   I -- no.
> Q.   Okay, last question.
> In your report, do you provide any
> opinions about causation of artificial prices?
> A.   No.

Evans Dep. 40:22 - 41:21.[4]  *See Wilson*, 27 F. Supp. 3d at 531 (holding that the elements of a

market manipulation claim are: "(1) that the accused had the ability to influence market prices;

(2) that [he] specifically intended to do so; (3) that artificial prices existed; and (4) that the

accused caused the artificial prices").

For the foregoing reasons, the Commission respectfully requests that the following

opinions be excluded in connection with summary judgment and at trial, as set forth in

paragraphs 24-31, 31-44, 45-47, 50, 51, 52, 53-61, 65-68, 69, 70-74, and 75-86 of Evans's

Report, that:

- DRW's bids were legitimate, and were executable orders.  Evans Report at ¶ 10(b).

- "DRW was willing to, and desired to, execute trades at its bid levels."  *Id.* at p. 17.

- DRW's bids were consistent and conservatively placed with respect to DRW's trading strategy and were lower than DRW's estimates of fair value.  *Id.* at ¶ 10(c), (d).

- DRW's bids moved in ways that are inconsistent with how a manipulator would act in seeking the maximum settlement price increases.  *Id.* at ¶ 10(e).

- DRW's bids are inconsistent with typical "Bang the Close" allegations.  *Id.* at ¶ 10(f).

The Commission also respectfully requests that paragraphs D29, D39, D48, D51, D95

and DC1 of the Parties' Combined 56.1 Statement be stricken to the extent they rely on Evans's

---

[4] Despite his testimony, as discussed *supra*, Evans attempts to dispense intent opinions. *See*, *e.g.,* Evans Report at ¶¶ 45, 53.

inadmissible opinions.

### III.   THE PROFFERED TESTIMONY OF JEFFREY HARRIS IS ALSO INADMISSIBLE.

#### A.  Harris's Report[5]

Harris's opinions, along with defendants' reliance upon those opinions in their motion for

summary judgment, are as follows:

| Opinion | Corresponding Paragraph Number in Expert Report | Corresponding Reference in the Parties' Combined 56.1 Statement ("56.1") | Summary of Infirmities under Fed. R. Evid. (as discussed *infra*) |
|---|---|---|---|
| "The rates that represent fair value on the cleared Three-Month Contract are higher than rates on the non-cleared OTC interest rate swaps with similar terms due to cash flows from daily variation margins   . . ." Harris Report ¶ 4(a). | ¶¶ 41; 43-45; 66; 70 | 56.1 ¶¶ D34, D81, D82, D89, D90; DC ¶ 3 | Impermissible intent testimony. |
| DRW's bids on the Three Month Contract are consistent with my calculations of the NPV and convexity effect using the Hull-White model.  DRW bid at reasonable prices that represented legitimate forces of supply or demand and not artificial prices.  Harris Report at ¶ § 4(c). | ¶¶ 56-65 | 56.1 ¶ D32; DC ¶ 1 | Unreliability under Fed. Evid. 702. |
| DRW's bids represented legitimate price discovery. *Id.* at § 4(d). | ¶ 73-75; 79; 85; 93-95; 106-110 | 56.1 ¶¶ D38, D48, D51 | Impermissible intent testimony. |
| DRW's bids offered premium rates relative to the non-cleared | 46; 47 | 56.1 ¶ D35 | Unreliability under Fed. Evid. |

[5] Plaintiff is providing a copy of the deposition transcript of Jeffrey Harris dated September 2, 2015 and Expert Report of Jeffrey Harris dated July 27, 2015 ("Harris Report"), to the Court, as Exhibits "D" and "E" respectively.

| Opinion | Corresponding Paragraph Number in Expert Report | Corresponding Reference in the Parties' Combined 56.1 Statement ("56.1") | Summary of Infirmities under Fed. R. Evid. (as discussed *infra*) |
|---|---|---|---|
| OTC interest rate swap with similar terms and therefore were more representative of true supply or demand. *Id.* at § 4(e). | | | 702 |
| DRW's bids represented true interest to buy because they exposed DRW to the risk of being hit. *Id.* at § 4(f). | ¶ 66-70; 96-102; 103 | 56.1 ¶¶ 32, 39, 90, 94; DC ¶ 1 | Unreliability under Fed. Evid. 702; impermissible legal conclusion. |
| DRW's trading interests were broadly exposed to the market. *Id.* at § 4(g). | ¶¶ 104-107 | | Impermissible intent testimony. |
| DRW's profit did not depend on DRW's bids in the electronic market. *Id.* at § 4(h). | ¶¶ 111-115 | 56.1 ¶ 75 | Unreliability under Fed. Evid. 702. |

**B.** **Harris's conclusions about defendants' bidding behavior, artificial price, and "price discovery," are flawed and inadmissible.**

**(1)** **Harris's Artificiality Model is Purely Theoretical and Ignores DRW's Actual Model**

To determine reliability, the Court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.,* 522 U.S. at 146.

First and foremost, Harris admits that his artificiality model is theoretical and his "valuation analyses are not identical to those of [DRW's White Paper] . . .")." Harris Report

¶ 65; *see also id.* (conceding that "[i]nterest rate modeling involves the choice of modeling assumptions and data inputs. *Differing specific assumptions and inputs naturally translate into differing valuations, as confirmed by the various analyses that I performed*.") (emphasis supplied). In other words, not even Harris can duplicate DRW's estimates of the "fair value" of the Three-Month Contract. In this regard, Harris ignored DRW's actual Three-Month Contract model—supposedly used by the defendants during the Relevant Period—and even Harris, himself, "can't vouch for whether that's exactly the right price." *See* Harris Dep. 134:22-136:7; 139:10-141:2.[6] That is, Harris intends to testify that DRW's prices were non-artificial when he, himself, cannot determine what the "non-artificial" prices actually are.

Likewise, Harris's conclusions about price discovery are bereft of any identifiable or acceptable methodology. Harris concludes that DRW was engaged in legitimate price discovery, but fails to investigate the basic market structure of the exchange NFX, the clearinghouse IDCH, and the Three-Month Contract itself, including its lack of liquidity. *See* Harris Dep. 158:7-19 (acknowledging, with respect to claim of price discovery, lack of information and certainty: "Well, the entire market, whoever had a data feed. I don't have a specific example of who subscribed to the data from IDCH or . . . IDCG. We do -- I guess, with one example, we do have it. Apparently, from the MF Global example, they did see the bid, at least we know one participant saw it on the screen"). Likewise, Harris's conclusion that (1) defendants' bids were exposed to the market for an "extremely long period of time," (2) defendants' bids helped defendants and others engage in price discovery, and (3) defendants engaged in price discovery,

---

[6] *See* Harris Dep. 123:6-124:7 (testifying that he does not know whether DRW employed a model in February 2011); *id.* at 151:15-152:1 (acknowledging that his "model *really has nothing to do with any type of transaction that occurred during the relevant period or before the relevant period on—regarding the Three Month Contract*") (emphasis supplied).

are bare and are not underpinned by a satisfactory methodology.  *Id.* 152:8-155:5 158:7-19.  For

example, Harris testified that a party that bids the price of a futures contract up in order to make

a profit was a "problem," but that DRW was engaging in price discovery in this case:

> Q:  Okay.  What about if it's manipulative
> activity that is also promoting price discovery?
> Should a regulator -- what does a regulator do then?
> A.  I'm not sure that manipulative behavior
> would promote price discovery.
> Q.  But I thought you said that every bid
> contributes to -- to price discovery.
> A.  Yeah, it does.  But I guess -- so what
> results from that bid, I think, would be what the
> regulator would have to look at, right?  So
> typically, in a [manipulation] case, you find
> out, you know, did you change the price for something and if
> you're bidding and bidding and bidding up just for
> the sake of making some money at something, and it's
> not in your economic interest to do that bidding,
> that's -- that's a problem.

Harris Dep. 170:15-171:8.  Harris also reaches certain conclusions about defendants' profits (*see,*

*e.g.*, Harris Report ¶¶ 111-115), but later acknowledges he never looked at any actual profit and

loss data (*see* Harris Dep. 185:17-21; 186:10-16).  Again, Harris's profit and loss opinions are

not underpinned by an acceptable methodology.

Therefore, Harris's opinions on bidding behavior, artificial price, "price discovery,"

and profit and loss are devoid of any actual methodology, unverifiable, and unconnected to the

actual, real world trading of the Three-Month Contract.  *See Nimely*, 414 F.3d at 399 (concluding

that expert's analytical leap "driven by the need to find a way of explaining the admitted facts"

was "essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between

methodology and conclusion that the district court has the duty to exclude").  Harris's opinions

on these points are not reliable or admissible, and therefore they should be excluded.

**(2)   Harris's Layperson "Thought Experiment" should be excluded.**

Courts exclude expert evidence that a layperson can provide.  *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) (holding that "[a] district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror").

A centerpiece of Harris's Report is an artificiality "thought experiment," that Harris, himself, describes as follows:

> Q.  Well, I guess in general, what's a -- is
> this your thought experiment?
> A.  It's an experiment that's -- it's an
> observation of -- that anybody could do.
> Q.  Okay.
> A.  But it's my logic behind what I document
> in the next two paragraphs.
> Q.  Okay.  When you said -- when you
> testified that anyone could do it, what did you mean
> by that?
> A.  Well, it's a series of logical
> connections.

*See* Harris Dep. 191:10-21; Harris Report ¶ 121.  In his "thought experiment," Harris compares his after-the-fact model of the Three-Month Contract—not DRW's actual model that Harris neglects to consider—to DRW's bids and concludes that "valuation of the Three Month Contract and daily estimates of the NPV and convexity effects are consistently in the range of DRW's bids during the Relevant Period across multiple maturities."  Harris Report ¶ 58.

Simply put: Harris's admission that "anyone could do" his artificiality "thought experiment" renders his proffered testimony inadmissible.  *See* Harris Dep. 191:10-13; Harris Report ¶ 121.

### C.  Harris offers inadmissible legal conclusions.

Legal conclusions, in addition to being inaccurate and unreliable, are inadmissible. *Initial Pub. Offering Secs. Litig.*, 174 F. Supp. 2d at 64 (citing the well-established, basic premise of evidence and axiomatic principle prohibiting experts from providing legal opinions or conclusions).

Harris inappropriately reaches the ultimate legal conclusion that "DRW did not manipulate market prices or create artificial prices[.]"  Harris Report ¶ 103.  Likewise, Harris opines as to how CFTC, the SEC, and other regulators promote price discovery through rulemakings, regulations, and policies, how other markets promote price discovery through their contractual rules, and how plaintiff's allegations in this case will dissuade price discovery.  *See* ¶¶ 78-85, 92, 93-95, 101.

Harris acknowledges that he is neither an attorney nor someone who holds himself out provide legal opinions.  Harris Dep. 173:15-174:1.  Therefore, these opinions are excludable as legal conclusions.  *See In re Initial Pub. Offering Secs. Litig.*, 174 F. Supp. 2d at 64 (citing the well-established, basic premise of evidence law, and axiomatic principle prohibiting experts from providing legal opinions or conclusions).

### D.  Harris's Suppositions and Conclusions Concerning Intent Are Not Admissible.

Experts cannot testify on the issue of intent.  *See Bd. of Trustees of AFTRA Ret. Fund*, 2011 WL 6288415, at *8 (noting that "[t]here is no dispute that opinions concerning state of mind are an inappropriate topic for expert opinion").  Defendants, too, concede this point of law and agree that expert testimony regarding intent is inadmissible.  *See* Defs. Ltr. to Hon. Analisa Torres dated Oct. 7, 2015 at 4 n.3 (ECF No. 93).

Despite that fact that Harris, during his deposition, acknowledged that he was not offering any opinions about defendants' intent, he does, in fact, attempt to offer "backdoor" intent opinions.  Harris Dep. 37:18-21.  For example, Harris opines that DRW employees bid at higher yields based on their understanding of the NPV and convexity effect and that DRW "was ready to, and indeed would likely want to, consummate any potential transaction on these bids[.]"  Harris Report ¶¶ 43, 44, 66, and 70.  These opinions should be stricken as impermissibly offering an opinion about intent.

Likewise, Harris also offers opinions on the intentions and motivations of third parties.  *See* Harris Dep. 109:21-113:7; 174:11-176:12; Harris Report ¶¶ 44-45, 93-95, 106-07, 112-113 (opining that IDCH encouraged DRW to contribute electronic quotes through its actions and opining about MF Global's and Jefferies' motivations).  These peering-into-another's-mind opinions are similarly inadmissible.  *See AFTRA Ret. Fund*, 2011 WL 6288415, at *8 (concluding that "[t]here is no dispute that opinions concerning state of mind are an inappropriate topic for expert opinion").  Therefore, Harris's intent opinions are not a proper subject of expert testimony.

### E.  Harris's testimony is prejudicial and cumulative.

For the reasons listed above, even if Harris's testimony were admissible, the prejudicial nature of that testimony (which also overlaps, significantly, with the testimony of defendants' other "expert" Evans) justifies its exclusion pursuant to Federal Rule of Evidence 403.  *See* Fed. R. Evid. 403 (codifying the exclusion of "relevant evidence if its probative value is substantially outweighed by . . . unfair prejudice, confusing the issues, misleading the jury").  Likewise, Harris's testimony should be excluded to the extent it is duplicative of Evans's, assuming Evans

is allowed to testify on these points.  *Id.* (precluding evidence that is "needlessly presenting cumulative evidence").

For the foregoing reasons, the Commission respectfully requests that the following opinions be excluded in connection with summary judgment and at trial, as set forth in paragraphs 41, 43-45, 46, 47, 56-65, 66-70, 73-75, 79, 85, 93-95, 96-102, 103, 104-110, and 111-115 of Harris's Report:

- "The rates that represent fair value on the cleared Three-Month Contract are higher than rates on the non-cleared OTC interest rate swaps with similar terms due to cash flows from daily variation margins . . ."  Harris Report ¶ 4(a).

- DRW's bids on the Three Month Contract are consistent with my calculations of the NPV and convexity effect using the Hull-White model.  DRW bid at reasonable prices that represented legitimate forces of supply or demand and not artificial prices.  Harris Report at ¶ 4(c).

- DRW's bids represented legitimate price discovery.  *Id.* at ¶ 4(d).

- DRW's bids offered premium rates relative to the non-cleared OTC interest rate swap with similar terms and therefore were more representative of true supply or demand.  *Id.* at ¶ 4(e).

- DRW's bids represented true interest to buy because they exposed DRW to the risk of being hit.  *Id.* at ¶ 4(f).

- DRW's trading interests were broadly exposed to the market.  *Id.* at ¶ 4(g).

- DRW's profit did not depend on DRW's bids in the electronic market.  *Id.* at ¶ 4(h).

The Commission also respectfully requests that paragraphs D32, D34; D35, D38, D39, D48, D51, D75, D81; D82; D89; D90, and D94,  DC1, and DC3 of the Parties' Combined 56.1 Statement be stricken to the extent they rely on Harris's inadmissible opinions.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that both the testimony and expert reports of defendants' proposed experts, Matthew A. Evans and Jeffrey Harris, as delineated above, be excluded.

Respectfully Submitted,

/s/ Sophia Siddiqui
A. Daniel Ullman II (*pro hac vice*)
Paul G. Hayeck (*pro hac vice*)
Jason Mahoney (*pro hac vice*)
Sophia Siddiqui (*pro hac vice*)
Jonah McCarthy
David Kent (*pro hac vice*)
U.S. Commodity Futures Trading Commission
Division of Enforcement
1155 21st St., N.W.
Washington, DC 20581
(202) 418-5400 (telephone)
 (202) 418-5523 (facsimile)
dullman@cftc.gov
phayeck@cftc.gov
jmahoney@cftc.gov
ssiddiqui@cftc.gov
jmcarthy@cftc.gov
dkent@cftc.gov

Michael R. Berlowitz
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9759 (telephone)
(646) 746-9940 (facsimile)
MBerlowitz@cftc.gov

**ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION**

25

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 23, 2015, service of the foregoing document was made on the following parties via UPS Overnight Mail, and a courtesy copy sent by e-mail:

Michael S. Kim, Esq.
Jonathan Cogan, Esq.
Jason Manning, Esq.
Kelly Karneeb, Esq.
Melanie L. Oxhorn, Esq.
Kobre & Kim LLP
800 Third Avenue
New York, New York 10022

Andrew C. Lourie, Esq.
Kobre & Kim LLP
1919 M Street, N.W.
Washington, DC 20036

Attorneys for Defendants

<u>/s/ Sophia Siddiqui</u>
Sophia Siddiqui