# Exhibit D

# DRW Trading GroupDRW Investments

## *Harris, Jeffrey 2015/09/02*

### *9/2/2015 10:00 AM*

**Full-size Transcript**

1

1       IN THE UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - -

5    UNITED STATES COMMODITY            )

6    FUTURES TRADING COMMISSION,     )

7             Plaintiff,          )  Case No.

8        vs.                    ) 13-7884 (AT/KF)

9    DONALD R. WILSON and DRW,      )

10   INVESTMENTS, LLC,                )

11            Defendants.         )

12   - - - - - - - - - - - - - - - -

13

14      VIDEOTAPED DEPOSITION OF JEFFREY H. HARRIS

15

16                 Washington, D.C.

17             Wednesday, September 2, 2015

18                  10:00 a.m.

19

20

21   Job No:  60934

22   Reported by:  Karen Brynteson, RPR, RMR, CRR, FAPR

2

1        The deposition of JEFFREY H. HARRIS held at the

2    offices of:

3

4

5            COMMODITY FUTURES TRADING COMMISSION

6            1155 21st Street, N.W.

7            Washington, D.C. 20581

8

9

10

11

12

13

14        Pursuant to Subpoena, before Karen Brynteson,

15    Registered Professional Reporter, Registered Merit

16    Reporter, Certified Realtime Reporter, Fellow of the

17    Academy of Professional Reporters.

18

19

20

21

22

3

1                  A P P E A R A N C E S

2


3    ON BEHALF OF THE PLAINTIFF:

4         A. DANIEL ULLMAN II, ESQ.

5         SOPHIA SIDDIQUI, ESQ.

6         JASON A. MAHONEY, ESQ.

7         Commodity Futures Trading Commission

8         1155 21st Street, N.W.

9         Washington, D.C. 20581

10        202-418-5420

11        dullman@cftc.gov

12


13


14   ON BEHALF OF THE DEFENDANTS:

15        JASON SHARMA MANNING, ESQ.

16        Kobre & Kim LLP

17        800 Third Avenue

18        New York, New York 10022

19        212-488-1277

20        jason.manning@kobrekim.com

21


22

4

1

2    APPEARANCES (Continued):

3

4    ON BEHALF OF THE DEFENDANTS:

5         ANDREW C. LOURIE, ESQ.

6         Kobre & Kim LLP

7         2 South Biscayne Boulevard

8         35th Floor

9         Miami, Florida 33131

10        305-967-6107

11        andrew.lourie@kobrekim.com

12

13

14        PATRICIA L. LEVY, ESQ.

15        DRW Trading Group

16        540 West Madison Street

17        Chicago, Illinois 60661-2555

18        312-542-1145

19        plevy@drwholdings.com

20

21

22

5

```
1                    C O N T E N T S

2   WITNESS: JEFFREY H. HARRIS                   PAGE

3     By Mr. Ullman                               7

4           AFTERNOON SESSION:  130

5

6

7                    E X H I B I T S

8   DEPOSITION EXHIBIT NO:                        PAGE

9   Exhibit 1  Subpoena to testify                9

10  Exhibit 2  Acknowledgement and Declaration

11             of Compliance                      10

12  Exhibit 3  Expert Report of Jeffrey H. Harris   11

13  Exhibit 4  Rule 1002. IDEX                     59

14  Exhibit 5  Excerpt of deposition of

15             Garry O'Connor                     109

16  Exhibit 6  July 23, 2010 e-mail from Vander

17             Luitgaren to Stephenson            118

18  Exhibit 7  February 2, 2011 e-mail chain

19             from Ferber to Shay, et al         164

20  Exhibit 8  Wilson/Ferber Telephone

21             Conversation, February 4, 2011    166

22  Exhibit 9  Chart                              189
```

6

1                    P R O C E E D I N G S

2                       (10:03 a.m.)

3           THE VIDEO OPERATOR:  Here begins Disk 1

4    in the videotaped deposition of Jeffrey Harris taken

5    in the matter of the United States Commodity Futures

6    and Trading Commission v. Donald R. Wilson and DRW

7    Investments LLC, in the United States District

8    Court, Southern District of New York, Case Number

9    13-7884 (ST/KF).

10          Today's date is September 2nd, 2015.  The

11   time is 10:03.  This deposition is being held at

12   1155 21st Street, Northwest, Washington, D.C.,

13   20581.

14          The court reporter is Karen Brynteson.

15   The videographer is Patrick Graham.  Both are

16   presenting on behalf of Alderson Court Reporting.

17          Will counsel and others please introduce

18   themselves and state whom they represent, beginning

19   with the party noticing the deposition.

20          MR. ULLMAN:  Good morning, Dan Ullman for

21   Plaintiff, Commodity Futures Trading Commission.

22          MS. SIDDIQUI:  Sophia Siddiqui on behalf

7

1   of the, plaintiff, Commodity Futures Trading

2   Commission.

3            MR. MAHONEY:  Jason Mahoney on behalf of

4   the Plaintiff,  Commodity Futures Trading

5   Commission.

6            MR. MANNING:  Jason Manning of Kobre &

7   Kim LLP on behalf of Defendants Donald R.  Wilson,

8   Jr., and DRW Investments LLC.

9            MR. LOURIE:  Andrew Lourie of Kobre & Kim

10  on behalf of the Defendants.  And also with us today

11  is Pat Levy, general counsel of DRW.

12            THE VIDEO OPERATOR:  Would the court

13  reporter please administer the oath.

14  Whereupon--

15                JEFFREY H. HARRIS,

16  having been first duly sworn, was examined and

17  testified as follows:

18          EXAMINATION BY COUNSEL FOR PLAINTIFFS

19  BY MR. ULLMAN:

20      Q.   Good morning, Mr. Harris.  We met

21  earlier.  Can you state your full name for the

22  record, please?

8

1          A.    Yeah, my name is Jeffrey H. Harris.

2          Q.    Your address?

3          A.    3941 Livingston Street, Northwest,

4    Washington, D.C.

5          Q.    Have you had your deposition taken

6    before?

7          A.    I have.

8          Q.    Okay.  On how many occasions?

9          A.    Only one formal deposition.

10         Q.    Okay.  Was that as an expert witness?

11         A.    Yes.

12         Q.    Okay.  And in what matter?

13         A.    It was on a matter on the CFTC side.  I

14   don't recall the case.  It was a year and a half

15   ago.

16         Q.    Okay.  It happens.  I am going to go over

17   a few rules about depositions for you, that

18   hopefully will expedite your day.

19              The first thing and most important thing

20   is to realize that this is being transcribed by a

21   court reporter, so we can't talk over each other.

22   Do you understand that instruction?

9

1        A.    Yes.

2        Q.    Okay.  And the second instruction is that

3    you have to answer verbally because the court

4    reporter can't take down oohs, and ahhs and head

5    shrugs.  Do you understand that instruction?

6        A.    Yes.

7        Q.    You can take a break at any time you

8    would like, but I just request that you don't take a

9    break while a question is pending.  Do you

10   understand that instruction?

11       A.    Yes.

12       Q.    Okay.  It is my job to give you a

13   question that you can understand.  If you don't

14   understand it, please let me know, and I will

15   rephrase.

16            Do you understand that instruction?

17       A.    Yes.

18       Q.    Okay.  I would like you to look at what

19   has been marked as Exhibit 1, please.  Please give

20   it a look and look up when you have had a chance to

21   look at it.

22            (Deposition Exhibit Number 1 was marked for

10

1    identification.)

2                 THE WITNESS:   Okay.

3    BY MR. ULLMAN:

4         Q.   Do you recognize what is marked as

5    Exhibit 1?

6         A.   Yes.

7         Q.   Okay.  Can you just describe it for what

8    it is on the record, please?

9         A.    It is the subpoena to testify in this

10   deposition today.

11        Q.   Okay.  And you understand you are under

12   subpoena today for your testimony?

13        A.   Yes.

14        Q.   Okay.  Please look at what has been

15   marked as Exhibit 2.

16        (Deposition Exhibit Number 2 was marked for

17   identification.)

18   BY MR. ULLMAN:

19        Q.   I take it you have seen Exhibit 2 before?

20        A.   Yes.

21        Q.   Okay.  Can you describe what it is for

22   the record, please?

1          A.   It is the admonishment for compliance for

2    me to keep everything that I have done in this case

3    confidential.  I'm not sure of the formal word for

4    it.

5          Q.   Okay.  On page 2 there is a signature.

6    Can you just confirm that that's your signature?

7          A.   Yes, it is.

8          Q.   Okay.  And thank you.  If you could

9    please look at Exhibit 3.

10         (Deposition Exhibit Number 3 was marked for

11   identification.)

12   BY MR. ULLMAN:

13         Q.   When you have had a second to look at it,

14   please describe that for the record.

15         A.   So this appears to be my expert report

16   dated July 27th of this year.

17         Q.   Okay.  And is it a true and correct copy?

18         A.   Yes, it appears to be.

19         Q.   In total how many cases have you appeared

20   as an expert witness?

21         A.   Appeared in what sense?

22         Q.   Well, let's start with how many times

12

1    have you been retained as an expert witness?

2         A.   So I have written, I believe,

3    approximately eight different expert reports.  Some

4    of those are Court cases.  Some have been -- well,

5    one was an arbitration case in front of FINRA.  And

6    then one was just a dispute.  It wasn't actually in

7    a court of law.

8         Q.   Okay.  Have you ever testified at trial

9    as an expert witness?

10        A.   No.

11        Q.   Okay.  Have you otherwise been qualified

12   as an expert witness?

13        A.   The only qualification I believe I have

14   was in the arbitration case in front of FINRA, where

15   there was a procedure where the panel had to, I

16   think, accept me as an expert in that case.

17        Q.   Okay.  And what was the subject of the

18   FINRA matter?

19        A.   It was a derivatives case dispute about

20   residential mortgage-backed securities, credit

21   default swaps and credit default obligations.

22        Q.   Did that case have anything to do with

1    futures contracts?

2         A.   Only in the sense that they dealt with

3    derivatives, not futures contracts specifically.

4         Q.   Mortgage-backed securities was the

5    derivative at play?

6         A.   Yes.

7         Q.   In terms of the eight reports you have

8    written as an expert, have any of those cases had to

9    deal with interest rate products?

10        A.   No, none directly with interest rates.

11        Q.   Okay.  Have you ever been disqualified as

12   an expert witness?

13        A.   No, not to my knowledge.

14        Q.   Okay.  Have your opinions ever been

15   criticized by a judge as an expert witness?

16        A.   No.

17        Q.   Has a motion to exclude ever been filed

18   against you in any matter that you appeared as an

19   expert witness?

20        A.   Is that a Daubert exclusion or something,

21   is that what it is called?

22        Q.   It can be.

14

```
 1          A.    Because there was one actually in the

 2    case that I gave the deposition on at the CFTC.

 3          Q.    Okay.  Do you recollect what the name of

 4    that case is?

 5          A.    It is in my vitae, I believe.

 6          Q.    Okay.

 7          A.    Could we look it up?

 8          Q.    Sure.  Please.

 9          A.    So, yeah, it is the U.S. Commodity

10    Futures Trade Commission versus Donald A. Newell and

11    Quiddity.

12          Q.    Do you remember what the subject matter

13    of that matter was?

14          A.    Yes.  It was about trade allocations

15    where the parties were -- transaction for their own

16    account and for customers.  And so there is a

17    dispute about which, which trades got allocated to

18    different accounts.

19          Q.    Do you know what the result was of the

20    Daubert motion?

21          A.    I don't, no.

22          Q.    Do you know who Matt Evans is?
```

15

```
 1          A.   Yes.
 2          Q.   Okay.  Who is he?
 3          A.   He is the other expert on, I believe, on
 4     the defense side.
 5          Q.   Okay.  And throughout the deposition I
 6     don't want you to reveal or disclose any
 7     conversations that happened with counsel.  Do you
 8     understand that?
 9          A.   Yes.
10          Q.   Okay.  So it is not my intent to ask
11     anything that you have discussed with -- with the
12     Defendants' lawyers.  So just keep that in mind when
13     I am asking questions.  Do you understand that?
14          A.   Yes.
15          Q.   Okay.  Outside -- have you had any
16     conversations with Matt Evans about this case,
17     outside of counsel?
18          A.   No.
19          Q.   Okay.  Did you review his report?
20          A.   Yes.
21          Q.   Okay.  Did you agree with his report?
22          A.   Yes.
```

16

1          Q.   Did you disagree with anything in his

2    report?

3          A.   I don't think I disagreed.  I think I

4    would have phrased things differently.

5          Q.   What things?

6          A.   He made some statements about liquidity

7    and what adds liquidity, so I would have just

8    phrased some things differently, I guess.

9          Q.   Well, how would you have phrased the

10   liquidity portions of Mr. Evans' report differently?

11         A.   Well, my view of liquidity is much more

12   on information-based, so I have, I think, probably

13   from our backgrounds, I have more of an academic

14   background, so I look at liquidity and price

15   discovery as being sort of information-based driven.

16   And so he -- he came up with things from a different

17   angle.

18         Q.   Okay.  Do you have any certifications?

19         A.   Professional certifications?

20         Q.   Yes.

21         A.   No.

22         Q.   Okay.  Any licensures?

17

1          A.    No.

2          Q.    Have you ever traded any financial

3     products?

4          A.    No, other than buying securities.

5          Q.    Okay.  That would be for yourself, I take

6     it?

7          A.    Yes.

8          Q.    Okay.  But in your professional capacity,

9     any trading of any futures products?

10         A.    No.

11         Q.    Okay.  Any other derivatives?

12         A.    No.

13         Q.    Okay.  If you could, flip to Exhibit 3,

14    please.  And I would like you to look on, way back

15    in your report on page A-10.  This is Exhibit A,

16    page 10.

17         A.    Okay.

18         Q.    I want to draw your attention to the last

19    quarter of the page where it talks about director.

20    Do you see that?

21         A.    Yes.

22         Q.    Okay.  What is the Eris Exchange?

18

1          A.    Eris Exchange is an Exchange in Chicago

2    that has products that trade interest rate

3    securities and, and markets.  It is basically a

4    business startup that markets do derivatives on

5    interest rates and clears futures and swaps

6    basically through the CME Group.

7          Q.    Is it a designated contract market?

8          A.    I believe so, yes.

9          Q.    Okay.  And it says here that you are a

10   director.  Is that correct?

11         A.    Yes, I am on the Board of Directors.

12         Q.    Okay.  And that was starting in 2011; is

13   that right?

14         A.    Yes.

15         Q.    And as you sit here today, are you a

16   member of the Board of Directors of Eris?

17         A.    Yes.

18         Q.    Okay.  Do you remember what month you

19   started as a director at Eris?

20         A.    I don't know.

21         Q.    Okay.  Do you believe -- do you remember

22   it being in the first half of 2011 or the second

19

1    half?

2           A.    No, I don't remember.  No, I don't.

3           Q.    Okay.  What are your -- do you have

4    duties as a director of the Eris Exchange?

5           A.    Yeah, I am on four different committees.

6    And then we have quarterly meetings, of course, to

7    review the operations of the -- of the Exchange.

8           Q.    Okay.  What committees are you on?

9           A.    I am on the Nominations Committee, the

10   Exchange Practices Committee, the Exchange

11   Participants Committee, and the Regulatory Oversight

12   Committee.

13          Q.    Have you been on all four committees

14   since 2011?

15          A.    Yes.

16          Q.    Okay.  Are you compensated as a director

17   of the Eris Exchange?

18          A.    Yes.

19          Q.    What is your yearly compensation from the

20   Eris Exchange?

21          A.    $12,500.

22          Q.    Okay.  And has that been since 2011,

20

1   every year since 2011?

2          A.   No.  I think they started paying me

3   $25,000.

4          Q.   In 2011?

5          A.   In 2011.

6          Q.   Okay.

7          A.   And I believe the first two years that

8   was the case.

9          Q.   Okay.

10         A.   But somewhere in between there is a

11  business startup, so the cash flows necessitated a

12  trimming, I guess, of the directors' fees.

13         Q.   Okay.

14         A.   Compensation.

15         Q.   Okay.  So just -- I want to understand

16  the sum total.  The first two years you think it was

17  about $25,000 a year?

18         A.   Yes.

19         Q.   And then would it be safe to, based on

20  your testimony, 2013, 2014, 2015, about $12,500 a

21  year?

22         A.   Right.

1    Q.   Okay.  How many hours a year do you work

2   as a director for the Eris Exchange?

3    A.   Well, it has varied over the years.  I

4   mean, for each quarterly meeting, I prepare probably

5   10, 12 hours.

6    Q.   Okay.

7    A.   We have had a disciplinary case, so we

8   had some other work to do on the side.  So I would

9   guess recently about 60 to 70 hours a year.

10    Q.   Okay.  Has that always been the case, 60

11   to 70 hours a year?

12    A.   The first year was probably more than

13   that.  Being a director, I wanted to make sure that

14   I understood the products and understood sort of the

15   structure of the organization, so I probably spent

16   double that in 2011.

17    Q.   Okay.  And how did you become a director

18   of Eris?

19    A.   So while I was chief economist here, I

20   actually met Steve Humenik, who became the chief

21   counsel, I believe, of Eris.  Steve and I knew each

22   other because he worked in the -- in one of the

22

1    Commissioners' offices here.  And we had talked

2    about, actually about some of the issues that Eris

3    is facing and some of the issues that are actually

4    in this particular case.

5           And those issues related to the prospect

6    that swaps would trade on an exchange.  Since I

7    teach derivatives, I shared some experiences with my

8    teaching on how I characterized the difference

9    between a forward contract and a futures contract.

10          I think when Steve went to Eris, he

11   immediately sort of made the connection that I had

12   similar understanding or my understanding of the

13   differences between those two markets may be

14   relevant for their market.  So that's how I got

15   onboard.

16      Q.   Okay.  I have read your report, and

17   obviously I understand you have familiarity with

18   this case.  I am going to try to expedite your

19   deposition by not defining -- I will be using

20   acronyms, but to the extent you don't understand an

21   acronym, will you tell me?

22      A.   Yes.

23

1        Q.    Okay.  Do you know what IDCH is?

2        A.    Yes.

3        Q.    Okay.  Can you explain for the record

4    what IDCH is?

5        A.    Well, it is an international derivative

6    clearinghouse.  So it is a clearinghouse basically

7    that stands in between two futures traders, and

8    basically takes the counterparty risk from both

9    traders to trade in the marketplace and manages the

10   risk to make sure that if someone defaults, that

11   there is money enough to be paid to the

12   counterparty.  And so that's basically the function

13   of a clearinghouse.

14       Q.    Okay.  Was IDCH -- and does IDCH

15   currently exist?

16       A.    I am not sure, actually.

17       Q.    Okay.  Was IDCH a competitor of Eris?

18       A.    Well, they are a competitor of the CME

19   Group.  So Eris actually clears through the CME

20   Group process, so it is a synergistic relation,

21   where Eris runs the Exchange separately and clears

22   their product through a contractual agreement with

24

```
 1    the CME Group.
 2         Q.   Okay.
 3         A.   So as a clearinghouse, I would say IDCH
 4    was probably a competitor to the CME Group.
 5         Q.   Okay.  Is the Eris Exchange a stand-alone
 6    corporation?
 7         A.   Yeah, there is, there is Eris the
 8    Exchange, and then there is an umbrella organization
 9    on top of that.
10         Q.   Okay.  And so you are just a Board of
11    Director of the Exchange component of Eris?
12         A.   Yes.
13         Q.   Okay.  And is that owned completely by
14    the umbrella company?  Sorry, I will rephrase.
15              Is the Eris Exchange a subsidiary of this
16    Eris umbrella group?
17         A.   As far as I understand, yes.
18         Q.   Okay.  Does Eris, the umbrella company,
19    have owners?
20         A.   Other than the umbrella firm?
21         Q.   I am talking about the umbrella firm.
22    Does the umbrella firm have owners?
```

25

```
 1              MR. MANNING:  Objection to form.

 2              THE WITNESS:  Yes.

 3    BY MR. ULLMAN:

 4         Q.   Okay.  Who are the owners of the Eris

 5    umbrella company?

 6         A.   Well, I believe Don Wilson is the primary

 7    owner.

 8         Q.   Okay.

 9         A.   I am not sure of all the other owners at

10    this stage.

11         Q.   Okay.

12         A.   There has been --

13         Q.   Sorry, go ahead.

14         A.   So there has been equity stakes made that

15    I'm not privy to or at least I haven't kept up with.

16         Q.   Okay.  Do you know if Mr. Wilson has been

17    an owner -- what is the name of the Eris umbrella

18    company?

19         A.   I am not sure of the exact name,

20    actually.  It is something like Eris.  It is sort of

21    like IDCG and IDCH.  It is a related name.

22         Q.   For clarity's sake, I will call the
```

1    umbrella company -- I will refer to the umbrella

2    company as Eris and where you are a director as the

3    Eris Exchange.  Does that make sense?

4         A.    Sure.

5         Q.    Okay.  And do you know if DRW or any of

6    the DRW -- go back.

7              Do you know what DRW is?

8         A.    Yes, it is a trading firm, a proprietary

9    trading firm, I believe.

10        Q.    Okay.  And do you know if DRW is an owner

11   of Eris?

12        A.    No, I don't.

13        Q.    Okay.  Do you have any evidence that DRW

14   is not an owner of Eris?

15        A.    I don't know how I would know that I

16   don't know something, but no.

17        Q.    Okay.  In other words, you just, you just

18   don't know?

19        A.    Right.

20        Q.    Okay.  Do you know Don Wilson?

21        A.    I don't know him personally.  I have met

22   him once.

27

1          Q.   Is Mr. Wilson a director of the Eris

2     Exchange?

3          A.   He is.

4          Q.   Okay.

5          A.   I think.  He is on our -- he is on our

6     Board call, so we hold our Board meetings via

7     conference call.  And normally he is not on the

8     call.

9          Q.   Okay.

10         A.   So I guess the question is, in my mind, I

11    am not sure whether he is there as an official

12    capacity as a manager informing us or whether he

13    actually holds a directorship.

14         Q.   In your capacity as a director of the

15    Eris Exchange, did you ever discuss IDCH?

16         A.   No.

17         Q.   Same question but in your capacity as a

18    director of the Eris Exchange, did you ever discuss

19    DRW?

20         A.   I don't believe so, no.

21         Q.   Do you know if there are any DRW

22    employees or officers that are on the Board of

28

1   Directors of the Eris Exchange?

2        A.   I don't recall, actually.

3        Q.   Okay.

4        A.   Sorry.

5        Q.   What about same question but for Eris

6   itself?

7        A.   Well, so there are Eris Exchange

8   representatives that do relate during our Board

9   meeting discussions that occur for Eris, the broader

10  entity.  Whether they are conveying that from the

11  Board of Directors' side or just from the

12  management, I am not particularly sure.

13       Q.   Okay.  Are any of those people employees

14  or officers of DRW?

15       A.   Not that I know of.

16       Q.   Okay.  Underneath there it talks about

17  the Southern Finance Association.  Do you see that?

18       A.   Yes.

19       Q.   What is the Southern Finance Association?

20       A.   Primary an academic and practitioner

21  organization that sponsors conferences, publishes

22  journals, solicits membership, and shares research

1    information among academics and interested parties

2    in the field of finance.

3         Q.   Okay.  Is it safe to say it is primarily

4    an academic association?

5         A.   Yeah, probably.

6         Q.   Okay.

7         A.   They try to broaden the umbrella, but --

8         Q.   Yeah.

9         A.   -- the interest in research isn't always

10   that attractive to practitioners.

11        Q.   When did you leave the CFTC?

12        A.   Early February of 2010.

13        Q.   And why did you leave?

14        A.   Well, I was on academic leave from the

15   University of Delaware, so I had applied for leave,

16   extended my leave, and my leave was up, so I had to

17   go back to teach spring of 2010.

18        Q.   Okay.  What is a RIX TREMA?

19        A.   What was that?  I didn't get that.

20        Q.   R-I-X T-R-E-M-A, do you know what that

21   is?

22        A.   I don't.

30

1          Q.   Okay.  Outside of -- outside of your

2     engagement in this case, have you had any business

3     dealings with, with DRW?

4          A.   No.

5          Q.   Okay.  If you look at Exhibit 3 for a

6     minute, please.  Do you recognize -- you said you

7     recognize Exhibit 3, I'm sorry, not the Exhibit 3 of

8     the report, but Exhibit 3, which is marked your

9     report.

10         A.   Oh, sorry.

11         Q.   Exhibit 3, do you see it?

12         A.   Yes.

13         Q.   Okay.  And you testified earlier that

14    that's your expert report; is that right?

15         A.   Yes.

16         Q.   Okay.  And who drafted your expert

17    report?

18         A.   I did.

19         Q.   Did anyone else help you?

20         A.   I had assistance behind the scenes, but I

21    drafted the report.

22         Q.   Okay.  How were you assisted behind the

1    scenes?

2         A.   I had a group of people at the Analysis

3    Group help me with formulation of the model and

4    running the optimization of the model and providing

5    data and formatting tables, putting data into charts

6    and that sort of thing.

7         Q.   What is the Analysis Group?

8         A.   It is a consulting firm.

9         Q.   Okay.  Is that where you are currently

10   employed?

11        A.   No, no.  So they were correlating or, you

12   know, corresponding with me to assist in my work.

13        Q.   Okay.  Is the Analysis Group a

14   stand-alone concern?

15        A.   I believe so, yes.

16        Q.   Okay.  And where are they?

17        A.   They have offices all over the world.

18        Q.   Okay.

19        A.   There is, there was one down here on like

20   Pennsylvania and 18th.  I think they moved now.

21        Q.   Okay.

22        A.   Some of the --

32

1       Q.    Sorry.  Go ahead.

2       A.    I think they are all over the world.

3       Q.    Okay.  And is that, the group on

4  Pennsylvania Avenue, the office on Pennsylvania

5  Avenue, is that who you interfaced with for your

6  report?

7       A.    No.  Actually, I guess some of the people

8  were in Montreal, if not all.

9       Q.    Okay.

10      A.    All of our interaction was via phone.

11      Q.    Okay.  And if you could, I apologize if

12  you already testified to this, what specifically did

13  they -- did they help you with on the report?

14      A.    Well, specifically I directed them to do

15  the optimization, so there is a number of technical

16  operations that had to be done to try to estimate

17  prices in this case.  So they coded up the actual

18  optimization program.

19           From that then they provided output and

20  then they, at my direction, put in the output into

21  the formats that we have in the -- in the tables and

22  charts and graphs that we have in the report.

33

1        Q.    Okay.   Anything else?

2        A.    Well, I sent some of them on --

3    searching, sort of like an RA, a research assistant,

4    to dig up some articles for me.  And then I guess

5    did get some editing feedback, say like this is a

6    typo in the report and so they helped read for, you

7    know, cosmetic and where I used the wrong verb or

8    put an "S" in for an "A" or something like that.

9        Q.    What are the names of the people that

10   helped you with your report from the Analysis Group?

11       A.    Eric Dufresne, Samir Warty, Michael

12   Quinn, and Anne Catherine Faye, F-a-y-e.

13       Q.    And, I'm sorry, the first name, what is

14   Eric's last name?

15       A.    Dufresne.  It is D-u-f-r-e-s-n-e, I

16   believe.

17       Q.    Again, I want to ask you a very specific

18   question about your interactions with counsel.

19   Okay?  I want you to listen very specifically what I

20   am asking you for, okay?  I don't want anything

21   outside of the literal meaning of the question.  Do

22   you understand that?

34

```
 1          A.   Yes.
 2          Q.   Okay.  Did you receive any factual
 3     assumptions from the Defendants' counsel in this
 4     case that made it into your report?
 5          A.   Factual assumptions?  I don't believe so,
 6     no.
 7          Q.   Okay.  In your report you list the
 8     material that you reviewed and composed in your
 9     report; is that right?
10          A.   Yes.
11          Q.   Okay.  Outside -- again, this is a
12     specific question about counsel, so please answer
13     specifically.
14               Outside of the documents or the facts and
15     data listed in your report, did you receive any
16     other facts and data from counsel that are not
17     listed in your report?
18          A.   No, I believe we made sure that we had
19     everything that we referred to, that I referred to
20     in the report included in the list.
21          Q.   Okay.  Do you have an understanding of
22     the lawsuit that you are appearing today to testify
```

35

1    in?

2         A.   Yes.

3         Q.   Okay.  And what is your understanding of

4    what the nature of the lawsuit is?

5         A.   Well, the allegations are that DRW and

6    representatives, the firm, put in bids in the

7    settlement period to manipulate the futures price of

8    the Three Month Contract that we have referred to in

9    the report to benefit their -- you know, to make, to

10   make money on our -- creating artificial prices.

11        Q.   Okay.  Do you understand who the

12   Defendants are in this case?

13        A.   Yes.

14        Q.   And what is your understanding?

15        A.   It is Don Wilson and DRW.

16        Q.   Okay.  I am going to refer to something

17   called the relevant period throughout the

18   deposition, and I am going to define that as January

19   2011 to August 2011.

20             Will you understand that as the relevant

21   period when I use it in your deposition?

22        A.   Yes.

1      Q.   Okay.  Did you attend the deposition of

2  Bob MacLaverty last week?

3      A.   I did.

4      Q.   And why did you do so?

5           MR. MANNING:  Objection, to the extent it

6  calls for any privileged information.

7           MR. ULLMAN:  Of course, as standing, I

8  don't want you to, if you -- maybe you can't answer

9  the question.  But to the extent -- do not testify

10  about anything you have talked to with counsel.

11  BY MR. ULLMAN:

12      Q.   But with that, can you -- for the record,

13  can you tell us why you attended Mr. MacLaverty's

14  deposition?

15      A.   Well, I thought it would be informative

16  having the economist listening to an economist, you

17  know, the expert on the other side of what he had to

18  say.

19      Q.   Informative for whom?

20      A.   For me.

21      Q.   Okay.  Did you think it was going to help

22  you with your testimony?

37

1          A.   I don't think it -- I think it would help

2     for me to understand what he was saying and where he

3     was coming from on some of his statements.

4          Q.   Okay.

5          A.   To the, to the extent that helps me be

6     better informed about the case, I guess it helps me

7     with my testimony.

8          Q.   Okay.  We're going to go through your

9     report, but I want to ask you a few questions on the

10    top to make sure I understand the scope, to make

11    sure.  Are you working any more on this case,

12    outside of the -- do you have any new opinions that

13    aren't contained in the report?

14         A.   No.

15         Q.   Okay.  Are you currently working on any

16    other opinions relative to this case?

17         A.   No.

18         Q.   And am I right that you are not offering

19    any opinions about the Defendants' intent in this

20    case?

21         A.   Yeah, that would be accurate, I think.

22         Q.   Okay.  And are you offering any opinions

38

1    about DRW's ability to influence market prices in

2    this matter?

3         A.   Well, I believe my report looks at

4    whether there was artificial prices or not and their

5    behavior during the relevant period.  I don't know

6    if I have any facts to preclude looking at their

7    ability, but I also don't think I have any facts to

8    actually confirm that they had an ability to

9    manipulate the market or to create artificial

10   prices.

11        Q.   Okay.  Well, we know for sure your report

12   discusses artificial price, right?

13        A.   Yes.

14             MR. MANNING:  Objection.  I just want to

15   state, obviously the witness can answer the

16   question, but to the extent you are asking what the

17   report says, the report speaks for itself, right?

18             So you can ask him what his opinions are

19   here, but whatever answers he gives to what the

20   report says, don't control what the report actually

21   says.

22             MR. ULLMAN:  Yeah, but he can summarize

39

1      the report, right?

2              MR. MANNING:  Sure.

3      BY MR. ULLMAN:

4          Q.   Okay.  I am asking for a summary of your

5      report.  Does your -- does your report discuss

6      artificial prices?

7          A.   Yeah, it discusses DRW's bidding behavior

8      in the context of whether they created artificial

9      prices or not, yes.

10         Q.   Okay.  Do you have an opinion, either

11     contained in your report or not, whether DRW had the

12     ability to influence market prices of the Three

13     Month Contract?

14         A.   It is an interesting question because it

15     wasn't something directly related to the ability.

16     If you ask my impression in a market where there is

17     no trading and obviously anybody with capital has

18     the ability to create artificial prices, so I would

19     agree that DRW would have the capacity to create

20     artificial prices.

21             MR. ULLMAN:  Okay.  Why don't we take a

22     five-minute break.

40

1          THE VIDEO OPERATOR:  Going off the

2   record.  The time is now 10:40.

3          (A recess was taken at 10:40 a.m., after which

4   the deposition resumed at 10:48 a.m.)

5          THE VIDEO OPERATOR:  We are back on the

6   record.  The time is now 10:48.

7   BY MR. ULLMAN:

8          Q.   Mr. Harris, I want to go back and talk

9   briefly about the Analysis Group, that certain

10  members helped you with your report.  Is that right?

11         A.   Yes.

12         Q.   Okay.  Did you oversee the Analysis

13  Group's work that went into your report?

14         A.   Oversee?  Well, I directed it and, yeah,

15  talked to them about issues in the, in the analysis

16  that we were doing.

17         Q.   Okay.

18         A.   I talked to them about the data we wanted

19  to collect to do the analysis that we -- that I had

20  planned.  And then, yes, so I directed them to

21  producing charts and graphs that I thought

22  illustrated what I was finding in the case.

41

1      Q.    Okay.   Did -- do you know if the Analysis

2   Group used any methodologies that you did not

3   approve of?

4      A.    I believe they did what I instructed, as

5   far as the Hull-White Model and the optimization

6   technique that we programmed to actually do the

7   estimation of the prices in this case.

8      Q.    Okay.

9      A.    So I am confident that what I directed

10   them to do, they did.

11      Q.    Okay.   Do you know about -- well, you

12   referenced four people.   Did you investigate their

13   qualifications before they performed these analyses?

14      A.    I didn't.   I had conversations with them

15   about the issues in stochastic interest rate

16   modeling.

17      Q.    Okay.

18      A.    And they appeared to know what they were

19   talking about.

20      Q.    Okay.

21      A.    I didn't get their resumes.

22      Q.    Okay.   And as you sit here today, you

1    don't know anything about the four people that you

2    listed before, about their qualifications?

3         A.   I can't say for certain, but I believe

4    Eric has a Ph.D. and I believe Michael Quinn, he is

5    one of their senior guys, so he has got a lot of

6    experience, if not an academic degree.

7         Q.   Okay.  Any other qualifications that you

8    know about, as you sit here today?

9              MR. MANNING:  Objection, form.

10             THE WITNESS:  Are you asking me about

11   other qualifications of the individuals at the

12   Analysis Group?

13   BY MR. ULLMAN:

14        Q.   Um-hum.

15        A.   Other than they are employees of the

16   Analysis Group, it is a professional organization

17   that does this professionally, no.

18        Q.   Okay.  Why don't you turn to page 14 of

19   your report.  The next series of questions are going

20   to be on paragraphs 25 through 31, so you may want

21   to give them a quick read.  I have general questions

22   to begin with.

43

```
 1              But why don't you look at pages 14, 15,
 2    and 16 and look up when you have had a chance to
 3    review them.
 4         A.   Okay.
 5         Q.   I think it would be helpful if you could
 6    describe -- let's start out with, you testified
 7    earlier that you are providing opinions on
 8    artificial price.  Can you describe for the record
 9    what you understand artificial price to be?
10         A.   Sure.  I believe an artificial price is a
11    price that doesn't reflect supply or demand in the
12    marketplace.
13         Q.   Okay.  And you are using supply or demand
14    in the disjunctive; is that correct?
15         A.   I am not sure what you mean there.
16         Q.   Okay.  So your understanding is that, am
17    I correct, that an artificial price is something
18    that doesn't reflect -- well, I don't want to put
19    words in your mouth, but -- well, correct me if I am
20    misstating your testimony.
21              But it seems like you are saying that
22    your understanding of artificial price is a price
```

1    that doesn't reflect legitimate sources of supply or

2    demand; is that correct?

3         A.   Right.  So I would say supply or demand

4    that leads to a price that is sort of not economic

5    or somehow artificial in the sense that it doesn't

6    represent value.

7         Q.   Okay.  Is it your understanding that a

8    legitimate price can be reached just with supply?

9         A.   Yes.

10        Q.   Okay.  And so that's the same as your

11   understanding for just demand?

12        A.   Yes.

13        Q.   Okay.  Does an artificial price -- can an

14   artificial price be created if -- rephrase.

15             How can a price be non-artificial if it

16   is just based on supply?

17        A.   Well, any market participant that has

18   supply and wants to sell something can come up with

19   what they believe to be the appropriate price to

20   sell that.  And if they are willing to put that

21   price into the marketplace being exposed to

22   executions or, you know, present that as a valid

45

```
 1    price, as long as it is, you know, rationally

 2    economic for them, that supply, I think, represents

 3    a true price.

 4         Q.   And that's your -- that's your

 5    understanding of what a non-artificial price is; is

 6    that correct?

 7         A.   Yes.

 8         Q.   Okay.  And your understanding of what

 9    artificiality means permutes the report; is that

10    correct?

11              MR. MANNING:  Objection, form.

12              THE WITNESS:  I would say, right, the

13    underlying assumption that a bid or an offer is just

14    a quote.  I mean, they could be two different prices

15    for a commodity or for any other asset.

16              Even though they are different, I don't

17    think either one could be -- is by definition,

18    artificial, but by definition one was -- represents

19    supply and the other one represents demand.

20    BY MR. ULLMAN:

21         Q.   So I am asking sort of a more general

22    question.  Your definition of artificiality that you
```

46

1    have -- that you have previously provided, that

2    exists and informs your entire report, to the extent

3    that you are discussing artificiality; is that

4    correct?

5              MR. MANNING:  Objection, form.

6              THE WITNESS:  Yeah.  I think any price

7    that is produced with economic rationality behind

8    it, I think by definition is not artificial.

9    BY MR. ULLMAN:

10       Q.   Okay.  I want you to flip back a few

11   pages to page 9, please.  Starting in Roman numeral

12   VI.  Before we get to that other section, if you

13   could just look at paragraph -- paragraphs 17, 18,

14   and 19.

15       A.   Okay.

16       Q.   Can you just look at that?  As you sit

17   here today, you still agree with that definition,

18   the definitions contained in, in paragraph 17; is

19   that correct?

20       A.   Yes.

21       Q.   Can you explain for the record what

22   variation margin is?

 1          A.    Variation margin is the cash flows

 2   exchanged at the end of a day, facilitated by the

 3   clearinghouse to make sure that the clearinghouse

 4   minimizes the risk and accurately prices the

 5   contract that changes in value in that day.

 6          Q.    Okay.  And is variation margin important?

 7          A.    Yes.

 8          Q.    Okay.  These are basic questions, but we

 9   need it for the record.  Why is it important?

10          A.    Well, variation margin and any margin is

11   a performance bond.  So the clearinghouse wants to

12   make sure there is no default on either side of the

13   transaction, since the -- technically the

14   counterparty to all transactions, and so the

15   clearinghouse faces some risk if, if the margin is

16   depleted or if the margin somehow -- the entity on

17   one side of the trade goes bankrupt, presents some

18   risk for the clearinghouse.

19          Q.    Okay.  And do you know what the phrase

20   marked-to-market means?

21          A.    Yes.

22          Q.    Okay.  And just for the record, can you

1    explain what that means?

2         A.   So typically an exchange traded product,

3    those products are marked-to-market each day in the

4    sense that there is a settlement price or some price

5    determined at the end of the trading day, in which

6    the clearinghouse marks that particular contract or

7    security to the market price for that day.

8              And so that dictates, again, the cash

9    flows that are made for that day.  It is a formal

10   procedure that the clearinghouse goes through to

11   actually determine and to balance out the risk of

12   their -- what they are counterparty to, you know.

13        Q.   Okay.  You obviously spent some time with

14   the Three Month Contract and you have described the

15   Three Month Contract in your report.  Is that right?

16        A.   Yes.

17        Q.   And is it your understanding that at the

18   end of each day various tenors of the Three Month

19   Contract were marked-to-market?

20        A.   Yes.

21        Q.   Okay.  And is it your understanding that

22   based on that marking, that variation margin was

49

1    paid to IDCH or received from IDCH every day?

2         A.   Yes.

3         Q.   Okay.  Have you looked at the rule --

4    well, let's back up for a second.

5              Do you have an understanding of how the

6    Three Month Contract was listed?

7         A.   Listed as far as what, Exchange listed?

8         Q.   Yeah.  To start with, do you know what

9    Exchange listed the product?

10        A.   Yeah, it was the Philadelphia Board of

11   Trade, NDX, I guess.

12        Q.   Yeah.

13        A.   What it is called now.

14        Q.   NFX?

15        A.   NFX, there we go, National Futures.

16        Q.   And do you have an understanding about on

17   an average trading day, how many Three Month

18   Contracts were listed by IDCH on NFX?

19        A.   How many were listed on a day?  Well,

20   there is tenors that are main, sort of like one

21   year, three year, five, seven, 10, 20, 25, 30.  So

22   there was along the curve at different tenors, ten

50

1    or so.

2         Q.   Okay.  Do you understand -- sorry, I

3    interrupted you.  Keep going.

4         A.   I think that suffices.

5         Q.   And you understand those individual

6    tenors as being futures contracts, right?

7         A.   Right.

8         Q.   Okay.  Have you looked at IDCH's rules

9    about valuing open positions in the Three Month

10   Contract?

11        A.   Well, the Exchange doesn't necessarily

12   value open positions.

13        Q.   Okay.

14        A.   When they set settlement prices, is that

15   what you mean?

16        Q.   Well, I guess I mean actually valuation

17   of open positions.  And maybe I should limit it

18   to -- to NFX.

19             Have you looked at IDCH's rules about

20   valuing open positions in the Three Month Contract?

21        A.   Well, I believe the only time they would

22   be concerned about valuation is at settlement at the

1    end of the day.

2         Q.   Okay.  Have you looked at those rules?

3         A.   Yes.

4         Q.   Okay, okay.  And what is your

5    understanding of how a party's open position was

6    valued by IDCH?

7         A.   Well, you would take the notional value

8    and you would have some settlement price, so the

9    settlement price would, you know, depending on the

10   size of your position, in the settlement price that

11   was established, that would establish the value of

12   your open position.

13        Q.   Okay.  And do you know whether IDCH used

14   any type of curve methodology to figure out the

15   value of the open position?

16        A.   Well, what they -- from what I

17   understand, they valued each one of the individual

18   tenors, and that would create a curve.  So if you

19   would connect the dots along the spectrum of term

20   structure, then you would get a curve or a line or

21   whatever it amounted to.

22              But that would, that would be the result

1    of valuating each individual day's tenor.

2         Q.   Of that day's tenor?

3         A.   Of that day's, right.

4         Q.   So maybe you can walk me through this.

5    Your report indicates that DRW had, during the

6    relevant period, open positions in the Three Month

7    Contract?

8         A.   Yes.

9         Q.   Okay.  And I take it from your testimony

10   in your report that you understand that those were

11   valued on every trading day, marked-to-market at the

12   end of the trading day; is that correct?

13        A.   Yes.

14        Q.   Okay.  And so because this is an interest

15   rate product, right, and some of their positions

16   were open during the relevant period for five or six

17   months; does that sound right?

18        A.   Yeah.  I mean, I think they had positions

19   open for longer than that.

20        Q.   Okay.  Do you know when they established

21   their long positions in the Three Month Contract?

22        A.   Sometime in late 2010.

53

1        Q.    Okay.

2        A.    They at least had one trade in the Three

3    Month Contract.

4        Q.    Okay.  Do you know how DRW obtained its

5    open positions in the Three Month Contract?

6        A.    I think through the voice broker.  They

7    had -- they had a trade with Jeffries, I believe,

8    that opened up a long position in the Three Month

9    Contract.

10       Q.    Okay.  Do you know how many open

11   positions they had, let's say starting January 24th,

12   2011?

13       A.    No, I don't.

14       Q.    Okay.  Did you investigate that at all in

15   drafting your report?

16       A.    I didn't look into the details of what

17   their open positions were, other than knowing that

18   they were long in the contract.

19       Q.    Okay.  So I am not trying to quiz you on

20   your knowledge.  I just want to make sure we -- that

21   we're on the same page on this.

22              What is your understanding how DRW's open

 1    long positions, say in February, were -- the value

 2    of those positions were determined on an average --

 3    on any trading day?

 4          A.   Well, the value would just be the open

 5    interest that they had multiplied by whatever --

 6    well, it is -- if you look at the -- are you marking

 7    this to their book or are they looking at the value

 8    to them as far as getting in and out or --

 9          Q.   Well, I guess I am asking you.  So I

10    think you've -- you have testified about what

11    variation margin is.  Your report discusses

12    variation margin.

13               And I think you aptly described that

14    variation margin is important or is an important

15    concept in terms of the financial integrity of a

16    clearinghouse.

17               Is that a fair summary of your testimony?

18          A.   Yes.

19          Q.   And so you also testified that a

20    clearinghouse sits in between these positions, both

21    sides, right?  So it is the long to the open short

22    position; and the short to the open long position;

1    is that a fair way to describe it?

2        A.   Yes.

3        Q.   Okay.  So you also testified that your

4    understanding is that DRW had open positions during

5    the relevant period?

6        A.   Yes.

7        Q.   And that they were long, right?  And I am

8    asking you what is your understanding of how IDCH

9    was valuing your position on a daily basis to

10   determine the amount of variation margin either

11   received or provided to the clearinghouse?

12       A.   Well, that's -- I think that's a little

13   different than I understood.

14       Q.   Okay.  Good.

15       A.   I mean, I don't think they value it.

16   What they look at is the change in price for that

17   day.  And they want to have -- make sure that if the

18   price has moved against any individual entity, that

19   they collect the margins appropriate in the

20   variation margin.

21       Q.   Okay.

22       A.   So -- but the variation margin doesn't

1    represent necessarily the value of the position.  It

2    is just -- it is a risk management technique for the

3    clearinghouse, again.

4         Q.   Okay.  So I don't want to put words in

5    your mouth, but do you believe that the value of

6    DRW's open positions were evaluated every trading

7    day by IDCH?

8              MR. MANNING:  Objection, form.

9              THE WITNESS:  Well, I guess to the extent

10   that the size of their position mattered for the

11   margin that they had up and down, I don't think that

12   would be -- the valuation of those positions, I

13   don't think, would be central focus, again, of the

14   clearinghouse; the clearinghouse being more

15   concerned with what the change in value was that

16   day.

17   BY MR. ULLMAN:

18        Q.   Okay.

19        A.   So I guess behind the scenes they have to

20   have some notion of the value, right, because you

21   have to have margin posted.  And if you have a

22   bigger position, you have to post bigger margins.

57

1           So in that regard it is true, but I don't

2  -- I am not aware of a clearinghouse actually

3  calculating the value of open positions for the

4  participants of the market.

5       Q.   Okay.  All right.

6           So I guess the answer is you don't know?

7       A.   I don't know what?

8       Q.   Well, I am asking you whether you, you

9  believe or do you have any knowledge about whether

10  IDCH was evaluating the value of DRW's open

11  positions at the end of every trading day?

12       A.   Well, I am not aware of the technique

13  they would go through to actually value that.  I

14  mean, I am not quite sure what the question is, I

15  guess.

16       Q.   Okay.

17       A.   Again, I think the focus of a

18  clearinghouse is again to -- on a variation margin

19  basis, is to make sure that the price movements of

20  that day were reflected in the variation margin

21  panes.

22           And behind the scenes, again, there is

1    some value or some valuation of original -- what

2    size of the positions matter, but I am not aware of,

3    you know, someone at the clearinghouse itself

4    sitting down and calculating out the total value

5    every day.

6          Q.   Okay.  In paragraph 17 you talk about

7    cash flows.  Do you see that?

8          A.   Yes.

9          Q.   Even though this section deals with

10   interest rate swaps, is that your understanding of,

11   of how the flows associated with open positions in

12   the Three Month Contract?

13         A.   Yeah, the Three Month Contract, the

14   futures contract is meant to mirror the cash flows

15   that would be exchanged in a swap contract.

16         Q.   Okay.

17         A.   Although is not cleared.

18         Q.   Okay.  And if you look at paragraph 20,

19   you delineate that.  And do you understand what it

20   means to be long in the Three Month Contract in

21   terms of cash flows?

22         A.   Yes.

59

1          Q.    And what does that mean?

2          A.    So if you are long with the Three Month

3     Contract, that means you are the fixed rate payer.

4          Q.    Okay.  And what happens -- how do you

5     benefit in that position?

6          A.    So since you are the fixed rate payer,

7     interest rates go up, you received higher variable

8     rates, so that is a benefit for you.  So long

9     benefits when rates go up; and short benefits when

10    rates go down.

11         Q.    Okay.  And by definition, for the short,

12    the opposite is true; is that correct?

13         A.    Right.

14         Q.    Okay.  I am marking this as Number 4,

15    please.

16         (Deposition Exhibit Number 4 was marked for

17    identification.)

18    BY MR. ULLMAN:

19         Q.    Just to direct your attention, for the

20    record, this is an excerpt from the -- from the

21    Three Month Contract Rule Book.  I am mostly

22    interested in what is on page 100 of Exhibit 4,

60

```
1    which is the daily settlement price paragraph.

2            Please take a second to look at it, and

3    then I have a few questions about that for you.

4        A.   Okay.

5        Q.   Do you see in your report page 14, if you

6    keep both documents open please, and on page 14 it

7    looks like you cite the specific rule.  Is that a

8    correct understanding?

9        A.   Yes.

10       Q.   Okay.  In footnotes 29 and 30.  Okay.

11            In paragraph (i) on page 100 of

12   Exhibit 4, is that your understanding of how IDCH

13   calculated the value of open positions in the Three

14   Month Contract?

15       A.   Yes, it is right from their rule book.

16       Q.   Okay.  Now, in paragraph (i), am I right

17   that there is no reference to variation margin

18   proceeds as being one of the price flows that was

19   used to determine the open position valuation on the

20   Three Month Contract?

21       A.   Repeat the question again?  I'm sorry.

22            MR. ULLMAN:  Could you read it back,
```

1    please?

2            THE REPORTER:  "Question:  Now, in

3    paragraph (i), am I right that there is no reference

4    to variation margin proceeds as being one of the

5    price flows that was used to determine the open

6    position valuation on the Three Month Contract?"

7            THE WITNESS:  Yes.

8    BY MR. ULLMAN:

9        Q.   Going to page 14 of your report, let's

10   first discuss the relationship between a

11   clearinghouse and an Exchange as you understand it.

12   Can you describe that for the record, please?

13       A.   Yes.  So typically the Exchange is

14   interested in the rules that govern trading and

15   dissemination of information on the Exchange.  And

16   typically -- well, in a large number of cases, the

17   Exchanges run their own clearinghouse, because they

18   are uniquely positioned to know who is trading and

19   have some estimate of who is a good credit risk and

20   who is not.

21           So the clearinghouse sometimes is

22   interchangeable with the Exchange, but in

62

1    technicality, they are a little bit different

2    because the clearinghouse, you know, is meant to

3    manage the risk of the positions and the Exchange

4    maybe has a dichotomous role of trying to get more

5    trading done.

6            So it is perhaps a little tension there

7    between the Exchange, who wants a lot of the

8    trading, and the clearinghouse that wants to make

9    sure that the participants are fully vetted and

10   properly, you know, good risk, actually, for

11   counterparties.

12   Q.   Um-hum.  And in the example when

13   clearinghouses and exchanges are operated by the

14   same entity -- well, let's back up for a second.

15           Clearinghouses are referred to as

16   designated -- hold on a second.

17           Do you know what the efficiency of CFTC

18   registrant classification is for clearinghouses?

19   A.   I am not sure of the acronym at this

20   stage, no.  We had a whole division, the DCIO, when

21   I was here, was for the Division of Clearing and

22   Intermediate Oversight.  So that entity was

63

 1    regulated separately in the market.

 2         Q.   Okay.  And Exchanges design contracts,

 3    correct?

 4         A.   Right.

 5         Q.   Okay.  And, you know, let's take CME as

 6    an example.  CME designs new contracts all the time,

 7    right?

 8         A.   Yeah, but there is a huge failure rate in

 9    trying to launch new contracts that have buyers and

10    sellers that want to trade.

11         Q.   It is -- yeah.  And the Exchange and the

12    clearinghouse design contracts with various

13    characteristics; is that fair?

14         A.   Yes.

15         Q.   And that, that a specific type of

16    contract designed by an Exchange and a clearinghouse

17    could be vastly different from -- from Exchange and

18    clearinghouse A and Exchange and clearinghouse B's

19    contract, even if it is the same underlying, we will

20    say, commodity, right?

21         A.   Right.  I think this is a good example of

22    that.  There is a number of interest rate contracts

1    that are sensitive to interest rates with different

2    contract features, yes.

3        Q.   Yeah.  And they have different, different

4    characteristics from each other, we will say, in the

5    interest rates or futures contract realm, right?

6        A.   Yes.

7        Q.   Okay.  And, and that can lead to the

8    success or failure of a futures contract?

9        A.   Yes.

10       Q.   Okay.  And that can lead to pricing

11   differentials in futures contracts?

12       A.   Yes.

13       Q.   Okay.  And that stems from -- let me

14   rephrase.

15            The pricing of a contract stems from the

16   actual creation of the characteristics of the

17   futures contract, at least in part.  Do you agree

18   with that statement?

19            MR. MANNING:  Objection, form.

20            THE WITNESS:  Yeah, certainly.  I mean,

21   there is never a futures contracts, for instance,

22   with different delivery points.  You are going to

65

1    get different prices for those, depending on where

2    the futures or commodity or underlying might be

3    delivered, right.

4    BY MR. ULLMAN:

5        Q.   And there are different futures contracts

6    with -- the most obvious reason would be the

7    quantity of delivery, right, like one futures

8    contract would have, you know, a million barrels and

9    one has 100,000 barrels, that would result in

10   pricing distinctions?

11       A.   Yeah.  I mean, there is e-mini futures

12   and all sorts of different variations of sizes,

13   right.

14       Q.   Okay.

15       A.   We did a paper on that looking at the

16   wheat market, and the fact that you didn't

17   necessarily get wheat, you got a certificate in

18   delivery.

19       Q.   In Roman numeral VII on page 14, as the

20   header you write, "the value of the Three Month

21   Contract differs from an OTC interest rate swap due

22   to the exchange of variation margins but IDC chose

66

1   not to account for this when it designed the Three

2   Month Contract."

3            Do you see that?

4        A.   Yes.

5        Q.   And do you agree with that statement as

6   you sit here today?

7        A.   Yes.

8        Q.   First of all, what do you mean by the

9   word "value," the value of the Three Month Contract?

10       A.   Well, in this context I would say what I

11  had in mind was the value of the Three Month

12  Contract was whatever the price would be if someone

13  wanted to enter into that contract at any point in

14  time, looking at the remaining life of a contract.

15       Q.   Okay.

16       A.   So what, you know, contract

17  specifications, time horizon and all the other

18  specifications.

19       Q.   Okay.  So, say a party puts a bid in on

20  the Three Month Contract.  Is that -- would that fit

21  into your definition of what the value of the Three

22  Month Contract is in this header?

67

1      A.   Well, if a party is putting in a bid,

2   presumably they have had -- they've come up with

3   some valuation.  And so that would, that would

4   qualify as value, yes.

5      Q.   Okay.  But I guess what I am trying to

6   figure out is what you mean by the value of the

7   Three Month Contract in this header, differs from

8   the OTC rate, okay.

9           So are you talking generally the value or

10  what -- what do you mean by that?

11     A.   Yeah, I think generally the value of a

12  Three Month Contract, the one we have here that has

13  the variation margin exchange at the end of the day,

14  generally differs from an OTC interest rate swap,

15  yes.

16     Q.   Okay.  And, and what is your measurement

17  of, of value?

18     A.   Well, I tried to get at that in my

19  report.  There is, I think, two components of what

20  the value -- the difference in the value anyway

21  between these two contracts.  One is the NPV effect,

22  and the other one is convexity effect.

1      Q.    And did you do an analysis of the closing

2    prices of the Three Month Contract when you were

3    drafting your report?

4      A.    No, I did an analysis of what I believed

5    the Three Month Contract would be worth and then

6    made some comparisons to what the closing prices

7    were.

8      Q.    Okay.  So you did look at closing, the

9    actual closing prices of the --

10     A.    Yes.

11     Q.    -- of the --

12     A.    Yes.

13     Q.    And you said that there are, there are

14   two dynamics that you believe create this difference

15   in price between the Three Month Contract and the

16   over-the-counter swap.  Is that right?

17     A.    Yes.

18     Q.    Okay.  And are you aware that there is a

19   period of time before the relevant period, January

20   2011, where DRW was placing voice bids?

21     A.    Yes, I understand that they produced

22   voice bids through the relevant period as well.

1          Q.    Okay.  But let's just talk about the

2     period.  Let's talk about September, October,

3     November, and December of 2010.  Okay?

4          A.    Okay.

5          Q.    During that period are you aware that DRW

6     was placing voice bids on the Three Month Contract?

7          A.    I presume they were because they actually

8     consummated a trade during that period, yes.

9          Q.    Okay.  And I believe the report says

10    this, but correct me if I am wrong, it is your

11    understanding that during that period in late 2010,

12    that the Three Month Contract settlement price was

13    the OTC price.  Is that your understanding?

14         A.    Yeah, my understanding is there was no

15    activity on the Exchange, so they defaulted to the

16    OTC price.

17         Q.    Okay.  And so am I right that a party's

18    open position, this is in October -- let's say

19    September through December 2010, a party's -- DRW's

20    open long position was affected by interest rate

21    changes; is that correct?

22         A.    Yes.

70

1        Q.    Okay.  And because it is a futures

2    contract, variation margin was exchanged to the

3    clearinghouse during this period; is that right?

4        A.    Yes.

5        Q.    Okay.  And so this valuation difference,

6    when did you first observe that in terms of closing

7    prices relative to the Three Month Contract?

8              MR. MANNING:  Objection, form.

9              THE WITNESS:  So I didn't go back into

10   2010 and estimate closing prices, but if I would

11   have, it would have been observed in 2010.  The

12   closing prices I have seen appear to have not have

13   reflected those two components, given that the logic

14   that if they defaulted to OT swap rates, then the

15   OTC swap rate didn't include those two components.

16   BY MR. ULLMAN:

17       Q.    Okay.  So when you talk about these two

18   factors that you considered to be difference in

19   valuation, you are not necessarily talking about

20   pricing valuation; am I correct?

21       A.    I don't know how to interpret that

22   question.

71

1        Q.   Okay.  Your report talks about the NPV

2   effect and the convexity effect, correct?

3        A.   Yes.

4        Q.   And you, tell me if I am misstating, but

5   my read of your report is that you are saying that

6   these are inherent characteristics to all interest

7   rate contracts that affect their valuation vis-a-vis

8   OTC contracts.  Is that fair?

9        A.   That's right.

10            MR. MANNING:  Objection.  You can answer.

11            THE WITNESS:  Yeah, I think given the

12   interest rate environment we have.

13   BY MR. ULLMAN:

14        Q.   Okay.

15        A.   So the NPV effect depends on an upward

16   sloping yield curve, and the convexity effect

17   depends on volatility of interest rates.

18        Q.   But both the NPV effect and the convexity

19   effect as explained in your reports relate to

20   variation margin, right?

21        A.   Well, the NPV effect, yeah, yeah,

22   basically.

72

1          Q.    Okay.  And you testified earlier that

2     there is a period of time when DRW was placing voice

3     bids in 2010 where variation margin was being

4     exchanged between the open positions and the

5     clearinghouse?

6          A.    Yes.

7          Q.    Okay.  But there wasn't any pricing

8     difference that was being priced to the OTC contract

9     during that period; is that -- is that your

10    understanding?

11         A.    Yeah.

12         Q.    Okay.  So there wasn't any resulting

13    valuation difference based on variation margin

14    between September and December of 2010?

15         A.    No, I think there was, actually.  Because

16    as long as you have prices going up, the long party

17    benefits; and prices going down, the short party

18    benefits.  And the convexity effect only depends

19    upon that.

20              So even the variation margin that would

21    be exchanged in 2010 would, would create value for

22    the long side that exceeded the value for the short

1    side.

2         Q.   Can you point to a single price between

3    September and December 2010 that reflected

4    differences in pricing based on the convexity

5    effect?

6         A.   Well, I am not sure what you mean by

7    price.  If the, if the value of the contract -- if

8    the interest rates went up, the long party got cash

9    flow in.  So that long party got some value because

10   when -- if interest rates go back down, they had to

11   put variation margin back in.

12             But if you look at it in terms of say

13   just a simple example, so if interest rates go up,

14   that gave a cash flow into the long party.  That

15   long party could make an investment, even if it is

16   an overnight investment.  If interest rates went

17   down the next day, they could sell that investment

18   and reap the benefit.

19             So that generates value to the long party

20   in the cleared swap or -- yeah, in the cleared

21   account that has these variation margins.

22        Q.   Yeah, but I guess I am reading -- I read

74

1    your report a little bit differently than that.  And

2    maybe that is my mistake.  But what you are

3    describing is, is discussing how the winning party

4    gets to use funds on -- based on variation margin

5    overnight, right?

6              And what I think you have testified to in

7    your report says that this dynamic creates valuation

8    differences for the contract itself, not, not a

9    benefit to the winning party or the long position

10   that would potentially be able to invest it at a

11   higher rate overnight vis-a-vis the short, right,

12   but what you seem to -- what I understand your

13   report is saying is that both the NPV effect and the

14   convexity effect create inherent pricing

15   differences.

16             Am I misunderstanding your report?

17             MR. MANNING:  Objection.

18             THE WITNESS:  To the extent that price

19   reflects value, yes, it would have pricing

20   differences.

21   BY MR. ULLMAN:

22        Q.   Okay.  But -- but variation margin,

1   again, was transferred between October and December

2   of, of 2011?

3        A.   Right.

4        Q.   Okay.  But there wasn't any price

5   difference in the contract in the Three Month

6   Contract?

7             MR. MANNING:  Objection.  Just to be

8   clear, you said October, December, 2011.

9   BY MR. ULLMAN:

10       Q.   Sorry.  I will call it the fall period,

11  which I will define the fall period as September to

12  December 2010.  Okay.

13            During the fall period, were there -- did

14  you see any price changes that were based on --

15       A.   Well, what I witness is, right, the

16  default was -- back to the over-the-counter swap

17  prices.  So, right, those swap prices wouldn't have

18  reflected the value of the NPV in the, in the

19  convexity effects.

20       Q.   Okay.

21       A.   And it is probably why nobody traded the

22  contract.

76

1          Q.   But, but didn't -- weren't there open

2     positions?

3          A.   There was no market activity after -- as

4     far as I know after that --

5          Q.   Okay.

6          A.   -- after that one trade with Jeffries.

7          Q.   Okay.  You think it was one trade?

8          A.   I know of the one trade.

9          Q.   Okay.  Looking back at paragraph 26,

10    where you cite to rule 1002, and we looked at

11    paragraph (i) before, daily settlement price.

12              You write here in paragraph 26,

13    "importantly, IDCH expressly reserved for itself the

14    sole discretion in establishing a daily settlement

15    price that is deemed fair -- that it has deemed a

16    'fair and appropriate reflection' of the market."

17              Do you see that?

18         A.   Yes.

19         Q.   Is it your -- and you cite to this rule

20    in (i) on Exhibit 4, on page 100, right?

21         A.   Yes.

22         Q.   Okay.  And do you understand this

77

1    discretion is applying to valuation of a party's

2    open position or to the contracts themselves that

3    may have been bid or offered up?

4           A.   Can you repeat that?

5                MR. ULLMAN:   Can you read back that

6    question?

7                THE REPORTER:   "Question:   And do you

8    understand this discretion is applying to valuation

9    of a party's open position or to the contracts

10   themselves that may have been bid or offered up?"

11               THE WITNESS:   I'm not sure of the

12   distinction there.   The rule says that they have

13   discretion about the settlement price, so the

14   settlement price is -- could be considered the

15   contract that has either been bid or offered.   But

16   that also translates into the value of the

17   positions.

18   BY MR. ULLMAN:

19          Q.   Okay.   So which one is it?   Do you think

20   it applies to both or the open position?

21          A.   I would read it as applying to both.

22          Q.   Okay.

78

1        A.    To the extent that settlement prices

2    affect both.

3        Q.    Can you -- at the time that DRW entered

4    into its open position in the Three Month Contract,

5    have you reviewed any, any e-mails, internal DRW

6    e-mails about DRW's understanding of the Three Month

7    Contract?

8        A.    I have seen the e-mails internally from

9    DRW.  Whether they speak directly to their

10   understanding at the time they entered into the

11   contract, I don't recall.

12       Q.    Okay.  Do you know whether DRW understood

13   the pricing of the Three Month Contract at the time

14   it entered into its open positions?

15       A.    I don't have any specific knowledge of

16   the time.  They did produce or one of the DRW

17   employees produced this white paper early 2011 that

18   seemed to enunciate a fairly sophisticated valuation

19   of these contracts.

20       Q.    Okay.  What about in --I don't want to

21   belabor this, but just so the record is clear, what

22   about in -- I will represent to you that DRW created

79

1    its open position in August and September of 2010.

2    Okay?

3             At that point do you know whether DRW

4    understood the pricing of the Three Month Contract?

5        A.   I presume they had some valuation why

6    they entered into the contract, but that's all I

7    know.

8        Q.   Okay.  The internal DRW report that you

9    are referring to, is that what you reference or

10   partially what you reference in paragraph 29 on page

11   16?

12            MR. MANNING:  Objection, form.

13            THE WITNESS:  The Cont, et al. paper?

14   BY MR. ULLMAN:

15       Q.   Yeah.

16       A.   Is on of the enunciation of estimation of

17   convexity effects.

18       Q.   Do you know if that paper was peer

19   reviewed?

20       A.   I don't believe so.  It is just posted on

21   the Social Sciences Research Network.

22       Q.   What is the Social Sciences Research

1    Network?

2         A.   It is a venue, a forum for disseminating

3    research, putting out ideas; sometimes used by

4    people to sort of put a marker in the sand to say

5    I'm working on this project, so I have a date and

6    timestamp to say this is a working paper that I

7    thought of before you did or something.  But it is a

8    venue for sharing research information.

9              MR. ULLMAN:  Let's take a ten-minute

10   break.

11             THE VIDEO OPERATOR:  Going off the

12   record.  The time is now 11:40.

13        (A recess was taken at 11:40 a.m., after which

14   the deposition resumed at 11:53 a.m.)

15             THE VIDEO OPERATOR:  We are back on the

16   record.  The time is now 11:53.

17   BY MR. ULLMAN:

18        Q.   Back on the record.  Let's flip to,

19   through your report to page 17, please.  The next

20   series of questions I have are going to be through

21   paragraph 32 through 34, so if you give it a look

22   and look at me when you have a second to -- when you

1    have had a second to review it.

2         A.   Okay.

3         Q.   For the record, can you explain what the

4    net present value effect is?

5         A.   Sure.  So in interest rate swap that is

6    cleared, so in interest rate swap, fixed versus

7    available rate, there is an imbalance, first of all,

8    in any swap between who makes the payments upfront

9    and who makes the payments later in the life of the

10   contract.

11        And so in a cleared contract, the NPV

12   effect comes from, in this case the fixed rate payer

13   receives more payments earlier in the contract.  And

14   so they can take those cash flows and invest them

15   over the life of the contract until approximately

16   halfway through the contract, where then they start

17   paying more, and the cash flows are negative on

18   average, and so the NPV effect represents the value

19   of being able to get those early cash flows and

20   investing them.

21        And then, of course, ends up being zero,

22   because over the life of the contract, the present

1    value of all the later payments offset the value of

2    the earlier payments.

3            So in the life, during the life of the

4    contract, though, the NPV effect is the net present

5    value of the differences remaining in the, in the

6    cash flows on the contract.

7        Q.   And is that -- is the NPV effect

8    observable in any futures contracts?

9        A.   Well, it would be in the interest rate

10   futures, any future that has convexity or any

11   imbalance -- I guess, not convexity in this case --

12   but any imbalance between early and late payments

13   that are marked-to-market on a daily basis would

14   have an NPV effect.

15       Q.   But can you give me an example of a

16   futures contract that has observable price

17   differences based on NPV effect?

18       A.   Well, Eurodollar futures have been shown

19   to have an NPV effect.  The characteristics that I

20   have here have been shown, in this interest rate

21   contract, I believe, have an NPV effect.  So

22   anything that is cleared or the differential there.

83

1              Literature, I guess, generally -- and I

2    try to refer to that in my report -- refers to

3    convexity bias or convexity effects.  And I think in

4    general some of those, you know, there is a number

5    of people that talk about convexity effects.  And I

6    think that they impound sometimes the NPV effect

7    along with that.

8         Q.   Okay.  But Eurodollar futures, do you

9    believe there is a convexity effect in Eurodollar

10   futures?

11        A.   Well, I think other people have shown

12   that there is one, yes.

13        Q.   Okay.  And do you or do other people that

14   you have read believe that there are pricing

15   distinctions based on the convexity effect on

16   Eurodollar futures?

17        A.   Yeah, I believe the Gupta and

18   Subrahmanyam paper actually looks at the development

19   of that, of that market and shows that there is an

20   evolution of understanding of the convexity effect.

21   And that there was a time where valuations shifted

22   from either pricing or settling it at prices that

84

1    didn't reflect the convexity effect to, to a later

2    regime that did understand that.

3              So I think that that particular paper

4    was, I think, fairly compelling that they

5    demonstrate that there is one in that marketplace.

6        Q.    And I read that Gupta, he concludes that

7    the, that the pricing differentials based on the

8    convexity effect were not immediately apparent to

9    the market.

10       A.    I would say he showed that there is an

11   evolution of, of understanding of how big that

12   convexity effect would be.  I'm not sure he opines

13   on whether the original prices had any convexity

14   effect in them or not.

15       Q.    Okay.  What was the evolution that

16   occurred on Eurodollar futures?

17       A.    Well, I believe that he, in their, in

18   their research, empirical, I think it is called an

19   empirical investigation or something like that, they

20   documented that this appears to have grown over time

21   to what they deem in their paper something more like

22   full value.

85

1          So it was only partially, perhaps,

2    adopted in the marketplace.  And as market

3    participants understood the product better, it

4    became more fully represented in the prices.

5          Q.   Is, is Eurodollar futures a liquid

6    contract?

7          A.   Well, it depends on which ones you look

8    at.

9          Q.   Well, not the gold sheets.  Let's talk

10   about the ten year Eurodollars future, a liquid

11   contract?

12         A.   I think for purposes of my report, I

13   could find, I think, fairly good seven- and ten-year

14   liquidity.  So, you know, active marketplace for

15   those two particular contracts in Eurodollars, yes.

16         Q.   What about any other Eurodollar, how

17   about the 30-year?

18         A.   Well, I don't have specific knowledge of

19   that market, but when I tried to put my empirical

20   work together, it was, it was difficult to find a

21   good time series of data for all the particular

22   tenors in the Eurodollar market.

86

1      Q.   Do you have an opinion about whether the

2   NPV effect ever affected the closing prices of the

3   Three Month Contract?

4      A.   Talking about settlement prices?

5      Q.   Um-hum.

6      A.   Well, I guess to the extent that if DRW

7   was including the NPV effect in their bids, then it

8   would have been reflected in their bids, that then

9   got translated into the settlement price, yes.

10     Q.   Okay.  Is that, is that the first time --

11  well, did you, did you ever observe any pricing

12  differences on the Three Month Contract before DRW

13  -- let me rephrase.

14          Did you observe any pricing differences

15  on the Three Month Contract based on the NPV effect

16  before DRW started streaming bids electronically?

17     A.   I would say almost by definition, if we

18  were defaulting to the over-the-counter prices, then

19  the over-the-counter prices wouldn't include that

20  component, no.

21     Q.   Okay.  And same question but for the

22  convexity effect.  Is -- when did you first observe

87

1    pricing differentials based on the convexity effect

2    in the Three Month Contract?

3        A.   So one of the things, again, I didn't do,

4    I didn't go back into 2010 and reconstruct what an

5    appropriate price would be to look at a

6    differential, but it appears maybe by logic, if we

7    were defaulting before DRW's bids were put in,

8    defaulting back to the -- to the over-the-counter

9    swap prices, then almost by definition those swap

10   prices are not going to have the convexity effect in

11   them.

12       Q.   Okay.  Is it a fair summary of your

13   testimony that but for DRW's bids, the NPV effect

14   would not have shown up in the Three Month

15   Contract's pricing?

16           MR. MANNING:  Objection.

17           THE WITNESS:  No, I don't think you can

18   say this.  I mean, I think this other market in

19   Eurodollars show markets learn.  And I think part of

20   my report was getting at that, that this is the

21   beginning of this market.  And I think participants

22   were learning.

1        And as people learn how to trade or how

2    the valuation of these contracts in the

3    specifications affect that valuation, I don't

4    think -- I don't think you would say that it never

5    would have shown up.

6    BY MR. ULLMAN:

7        Q.   Okay.  What people were learning about

8    the valuation of the Three Month Contract in terms

9    of an NPV effect during the relevant period?

10        A.   Well, certainly anybody who read the

11    Cont, et al. paper that I cited would have some

12    notion that that was a paper about this particular

13    market that mattered.  Anybody, I think, who then

14    saw DRW's bids would have some estimation that, you

15    know, if I see a bid that someone is higher than any

16    other, any other pricing, you have to wonder or at

17    least perhaps investigate what the source of their

18    bidding would be, what valuation would be, but I

19    don't know who those people might be other than, you

20    know, MF Global, obviously, I think was attracted to

21    seeing bids on the screen.

22        Jeffries obviously was aware of this.

89

1    Those are the only other two counterparties in the

2    market that I know of because there wasn't -- there

3    just wasn't any trading.

4         Q.   And I take it that would be the same

5    answer for the convexity effect, that you don't have

6    any parties learning -- well, I will rephrase.

7              Do you have any knowledge about any

8    parties learning about price differentials and the

9    convexity effect based on DRW's bids during the

10   relevant period?

11        A.   Not direct knowledge, no.

12        Q.   Okay.  And by just looking at the amount

13   of bid, say you are looking at a screen and a bid

14   comes up, you wouldn't be able to understand why the

15   bid would be higher than the OTC corresponding

16   rates, would you?

17        A.   Well, you might be.  If you are familiar

18   with the market, if there was no trading beforehand

19   and that's what -- and people recognized that they

20   should be in there, that might be a reason there was

21   no trading beforehand, right?

22              So I don't know that people didn't know

1    about this, and that that's why there was no trading

2    because they didn't think that the prices at the

3    over-the-counter swap were accurate.  And that could

4    be an explanation for why there was no liquidity in

5    this.

6         Q.   Was there, was there any liquidity based

7    on DRW's electronic bids created?

8         A.   Yeah, yeah, I think that's what a bid is,

9    it provides liquidity in my world and the academic

10   world.  And I think in the market in general,

11   posting a bid is providing liquidity.

12        Q.   What about in terms of consummated trade

13   liquidity?

14        A.   I don't know what that means.  I mean --

15        Q.   Okay.  Did DRW's electronic -- sorry I

16   interrupted you, go ahead.

17        A.   I mean, consummated trade is a

18   consummated trade.  It is not liquidity.  I mean, it

19   is, it is a trade.

20        Q.   Yeah.

21        A.   Liquidity is something that you provide

22   for somebody.

1          Q.    Right.  Are you aware that --

2          A.    In a trade.

3          Q.    Right.  But sometimes markets are -- a

4     metric of trading volume is used to describe

5     liquidity, right, in futures contracts?

6          A.    Yeah, I mean, there is, there is

7     liquidity metrics that use the combination of

8     trading volume and price changes, but it is not the

9     trade itself that is the liquidity.  It is how far

10    do you move price perhaps with, with the trade.  But

11    it is not the trade itself.

12         Q.    Okay.  But do DRW's electronic bids ever

13    end into a consummated trade?

14         A.    Well, the only consummated trade that I'm

15    aware of is the MF Global trade.  And I understand

16    that they did see a posted bid and then negotiated

17    the trade over the counter in the voice broker.

18         Q.    Right.  But that trade was DK'd, right?

19         A.    As far as I know, yes.

20         Q.    And the specifics of that trade were

21    negotiated through a broker; am I right on that?

22         A.    Yeah, I understand there was some

1    negotiation that went on behind the scenes about how

2    much to do and what the size would be and at what

3    price, yes.

4         Q.   Right.  And that was different than

5    whatever bid was being shown on the screen on that

6    day?

7              MR. MANNING:  Objection.

8    BY MR. ULLMAN:

9         Q.   Is that right?

10        A.   Well, I think they price they settled

11   upon or the price that ended up being DK'd differed

12   than the price they were quoting.  But I -- in my

13   understanding it is the posting of the bid that led

14   to the interchange.

15        Q.   Outside the DK'd MF Global trade, did any

16   of DRW's electronic bids end up into a consummated

17   trade?

18        A.   No, not as far as I am aware.

19        Q.   When you talked about -- is it Gupta or

20   Goopta?

21        A.   Gupta.

22        Q.   When you talked about Gupta's papers that

1    you cite in here and it talks about the evolution of

2    Eurodollar futures to understand its effects and the

3    resulting pricing differences, was that -- do you

4    have an understanding of whether the evolution had

5    to do with consummated trades or just orders?

6         A.   Well I think that speaks to the price

7    discovery process that I tried to discuss in my

8    report.  And I think both trades and quotes and all

9    market activity, I think, contributes to some price

10   discovery.

11        Q.   Okay.  But in terms of the differences

12   and -- or the evolution of pricing differentials on

13   Eurodollar futures, that occurred based on actual

14   trades; am I right about that?

15        A.   Well, like I said, I think most likely it

16   had something to do with consummated trades, but I

17   don't think you can rule out the fact that quoting

18   behavior or -- also evolved.  And so that

19   contributed to the price discovery as well.

20             It is almost by definition, right?

21        Q.   Yeah.

22        A.   You can't typically trade outside of the

1    quotes, so by consummating a trade, you must have

2    had a quote at that same price.

3        Q.   Yeah.  And, and --

4        A.   That preceded it, actually.

5        Q.   So I guess what I am asking is the

6    Eurodollar futures contract, at least the seven- and

7    ten-years that you look at, you agree is a heavily

8    traded instrument?  Do you agree with that?

9        A.   Yeah, it is fairly liquid, yes.

10       Q.   And this price evolution that occurs in

11   Eurodollar futures, was that -- were those prices a

12   result of bids hitting offers?

13       A.   I presume so.  I wasn't familiar with the

14   exact information in the paper, but most of the time

15   you have quotes and trades.  The way markets

16   operate, you have people buying and selling and it

17   is usually somebody posts a bid or an offer that

18   gets hit by somebody else.

19       Q.   Right.  And that is part of the evolution

20   that you are describing in terms of how Eurodollar

21   futures, the market realized this effect and its

22   resulting pricing differentials?

95

1        A.    Right.

2        Q.    Okay.  Why don't you look at, if you

3    would, the paragraphs 35 through, let's go 35

4    through 39.  But if you would like, I am going to

5    ask you questions based on paragraphs 35 to 43.  So

6    we can break it up any way you would like.

7            If you look at paragraph 39,

8    specifically, near the middle of the paragraph your

9    report indicates, "although quantifying the NPV and

10   convexity effects requires some modeling, both

11   benefit the fixed rate payer in an interest rate

12   swap futures contract."

13           Do you see that?

14       A.    Yes.

15       Q.    Okay.  And why does quantifying the NPV

16   and convexity effects require modeling?

17       A.    Well, if you want to get -- well, if you

18   want to quantify it, so we know they exist.  As long

19   as there is upward sloping yield curve, you get NPV

20   effect.  In the downward sloping yield curve, you

21   would actually have the opposite.

22           And if there is a flat yield curve, there

1    wouldn't be one.  But to try to quantify what it is

2    worth, right, you have to know the slope.  So that

3    is why.

4           And then the modeling comes in with the

5    convexity effect.  And the convexity effect of risk

6    is related to the interest rate volatility.  And so

7    you have to have some estimate over the life of the

8    contract.  If you are buying something today, you

9    want to make some estimate about what the value of

10   these cash flows are going to be looking forward, so

11   you have to have some model that predicts what the

12   volatility in the interest rate path is going to be

13   to try to quantify what you think the value to those

14   extra cash flows will be.  So that's, that's where

15   the modeling comes in.

16         Q.   Okay.  Would you have to model in a

17   heavily-traded market?

18         A.   Yeah.

19         Q.   Why?

20         A.   Well, because you would want to know, if

21   you are heavily traded, even there, like there are

22   slight differentials, right?  So somebody might have

1    a demand to buy or something like that and you want

2    to stand ready to purchase or sell, excuse me, but

3    you want to do it at a price, right?

4           So if you are making a market or

5    providing any liquidity in a market, I think the

6    prudent thing is to try to value what you are going

7    to actually model.  A model to get a value before

8    you actually enter the market.

9        Q.   Okay.  And at the end of the sentence you

10   state -- well, I will read it again.  "Although

11   quantifying the NPV and convexity effects requires

12   some modeling, both benefit the fixed rate payer in

13   an interest rate swap futures contract."

14          I think you testified earlier that DRW

15   held a long position in the Three Month Contract?

16       A.   Right.

17       Q.   And that's the fixed payer in the Three

18   Month Contract?

19       A.   Right.

20       Q.   Okay.  Did DRW benefit from the NPV and

21   convexity effect?

22       A.   Did they benefit?  Well, they benefitted

98

1    only to the extent that they entered in at a

2    favorable rate in my estimation at the initiation of

3    the trade.  But then, yeah, they benefitted, like I

4    said, even through 2010 and beyond that from the

5    convexity effect and the NPV effect.

6              I think, again, the NPV effect would be a

7    zero over the life of the contract but they got out

8    early.  I don't know if they -- I don't know what

9    the negotiated exit from the strategy was.

10        Q.   I read your word "benefit" to mean

11   financially benefit.  Am I reading that incorrectly?

12        A.   Yeah.  I mean, if -- I mean, like I said,

13   the NPV effect is zero over the life of the

14   contract, so if you don't ever exit, you don't get

15   any benefit.  But the value is inherent in the

16   contract if you go out and market it again, and you

17   wanted to sell it, you should be able to reap the

18   benefit, if there was some liquidity at that price

19   because it is a real benefit for owning the

20   contract.

21        Q.   Okay.  Did, did DRW financially benefit

22   from the NPV effect in its long position in the

1    Three Month Contract?

2         A.   Like I said, I don't know -- I didn't

3    break out like what the negotiated price was or how

4    much would be attributable to convexity or NPV.  But

5    presumably you could map out where we were in the

6    life of the contract with some estimation of what

7    that value was.

8         Q.   Okay.  So you don't know about financial

9    benefits based on the NPV and convexity effect for

10   DRW?

11        A.   No, that was -- I mean, that was just a

12   statement about NPV effect.  And so part of the

13   benefit could be from the convexity effect too.

14        Q.   Okay.  Did DRW financially benefit from

15   the convexity effect in holding its long position in

16   the Three Month Contract?

17        A.   I believe so.

18        Q.   Okay.  When, when did it first benefit?

19        A.   Well, it would have benefitted I think

20   right away if they entered in at an advantageous

21   price, but I think the convexity value accrues as

22   long as, like I said, as long as there is volatility

1    in the interest rate market.

2            I don't know, like I said, I didn't

3    quantify how much of that was at the beginning of

4    the contract or the first part of the life of their

5    open position.

6        Q.   Okay.

7        A.   So during 2010, but I think probably

8    started benefitting right away.

9        Q.   Okay.  But, but you don't know because

10   you didn't look at the value of their open position

11   in September to December 20 --

12       A.   No, I mean, by extrapolation --

13            MR. MANNING:  Objection.

14            THE WITNESS:  -- since this exists and we

15   know positive interest rate changes give them the

16   cash flow, then they did benefit.

17   BY MR. ULLMAN:

18       Q.   Even, even if they were using OTC rates

19   during that period?

20       A.   Yeah, because even if you benchmarked to

21   OTC rates, as long as there is volatility, right, so

22   as long as interest rates -- as long as whatever

1   interest rate you are abusing goes up and down, and

2   there is variation margin exchanged, that accrues a

3   benefit to the long side.

4        Q.   Did DRW -- do you have any idea about

5   what DRW did with variation margin when, when it won

6   its trades -- I will, I will rephrase.

7             Do you know what DRW did on a day that it

8   had positive variation margin?

9        A.   No.  I mean, most firms have some sort of

10  short-term investment strategy.  They want to keep

11  some margins liquid.  And, of course, they are

12  running a big firm, they have multiple positions,

13  but I don't know how they managed their cash from

14  day to day, no.

15       Q.   Let's go to paragraph 41.  Please review

16  that and look up when you have had a chance to look

17  at it.

18       A.   Okay.

19       Q.   The second sentence says, "Given that the

20  Three Month Contract lacked a PAI adjustment, the

21  difference in value between the Three Month Contract

22  and its non-cleared counterpart would be accounted

102

1    for in another way, such as higher fixed rates that

2    incorporate the value of NPV and convexity effects."

3            Do you see that --

4        A.   Yes.

5        Q.   -- sentence?  And you agree with that

6    sentence as you sit here today?

7        A.   Well, it is in the context of the

8    LCH.Clearnet, right?

9        Q.   It refers to the sentence above it?

10       A.   Right.

11       Q.   Okay.  How would -- how -- you are saying

12   here that it would be accounted for, such as higher

13   fixed rates that incorporate the value of the NPV

14   and convexity effects.  Is that how it would be

15   accounted for, the distinction that you are talking

16   about?

17           MR. MANNING:  Objection.

18           THE WITNESS:  I would say that is one way

19   it could be.

20   BY MR. ULLMAN:

21       Q.   Okay.  What are the other ways?

22       A.   Well, the Eris Exchange, for instance,

103

1    incorporates those effects at settlement.  So PAI is

2    something we do along the life of the contract to

3    compensate the short party for the lost value.

4            Eris has come up with a technique to look

5    at that cash flow at the end of the life of the

6    contract, but they -- both those mechanisms in my

7    impression help to offset this convexity and NPV

8    effect, right.

9        Q.   Okay.  And who does that accounting as

10   described in your second sentence in paragraph 41?

11       A.   I am not talking about accounting as a

12   field.  I am talking about accounting in terms of

13   with a value of the contract.

14       Q.   Right.  So you just described a way an

15   Exchange can counteract this.  Right?

16       A.   Right.

17       Q.   Are there any other ways that the lack of

18   a PAI adjustment can be accounted for?

19       A.   I, I can't think of any.  I'm sure

20   innovation -- I mean, that's one of the innovations

21   of the Eris Exchange, is to pile it into the final

22   cash flows.

104

1          Q.    And that's -- that's a specific

2    characteristic of the Eris product, right?

3          A.    Right.

4          Q.    And that's different than the specific

5    characteristics of the Three Month Contract in terms

6    of PAI; is that right?

7          A.    Right.

8          Q.    Okay.  Next sentence.  "Indeed, only with

9    the NPV and convexity effects reflected in daily

10   settlement prices would IDCH contract prices reflect

11   the Three Month Contract's true economic value."  Do

12   you see that?

13         A.    Yes.

14         Q.    Okay.  Who determines true economic

15   value?

16         A.    Typically that's what markets are for.

17   So markets are established to provide a venue for

18   price discovery.

19         Q.    In fact, DRW's bids on the next sentence

20   says, "In fact, DRW's bids on the Three Month

21   Contract rationally did this exact thing."  By

22   "exact thing," do you mean reflect what a market

105

1    would typically do to reflect true economic value?

2          A.   Yes.

3          Q.   And DRW bid higher yields for the Three

4    Month Contract reflecting its willingness to pay a

5    premium relative to the close buying rates to the

6    short future side.  Do you see that?

7          A.   Yes.

8          Q.   Okay.  Do you believe that there are any

9    other rational reasons for DRW to bid higher yields

10   for the Three Month Contract than the corresponding

11   rates?

12         A.   Other rational reasons?

13         Q.   Um-hum.

14         A.   I guess your allegations go to that, if

15   you think somebody nationally wants to manipulate, I

16   don't know if that is rational or not.

17         Q.   What, what was the effect of -- do you

18   know what the effect would have been to put -- place

19   a bid on a trading day on a tenor of the Three Month

20   Contract that was higher than the corresponding

21   rates?

22         A.   Yeah, I think it is, it is in your

106

1   allegations.  And I think set forth that higher

2   prices lead to cash flows in on the variation margin

3   for the long party.

4        Q.   Okay.  And DRW is the -- had a long

5   position in the Three Month Contract?

6        A.   Yes.

7        Q.   If you move to paragraph 42, if you can

8   read paragraphs 42 and 43, please give them a look

9   or please review and then give me a look and we can

10  talk about them.

11       A.   Okay.

12       Q.   In the last sentence of paragraph 42 you

13  write, "Without adjustment to counteract the NPV and

14  convexity effects like, for example, PAI, the NPV

15  and convexity effects benefit the party with the

16  long position at the expense of the party with the

17  short position."

18            Do you see that?

19       A.   Yes.

20       Q.   Was there ever an adjustment to

21  counteract the convexity effects of the Three Month

22  Contract?

1        A.    Not that I'm aware of.  I think there was

2    some negotiation from Jeffries to try to convince

3    the Exchange to incorporate something to counteract,

4    but that was -- the contract terms weren't altered.

5        Q.    Okay.  How about the orders placed on the

6    Three Month Contract?

7        A.    I was talking here about adjustment to

8    the contract itself.

9        Q.    Okay.  Through the Exchange or

10   clearinghouse?

11       A.    Right.

12       Q.    Okay.  Look on paragraph 43.  If you

13   could, give it a read.

14       A.    Okay.

15       Q.    In the last sentence you write "According

16   to their testimony, all of DRW's bids both during

17   and outside the settlement period reflected DRW's

18   calculations of the NPV and convexity effects they

19   bid at higher yields, reflecting the fact that the

20   short party could be expected to demand a higher

21   yield to offset the NPV and convexity effects."

22             Do you see that?

1        A.    Yes.

2        Q.    And what is your understanding of how

3   long DRW is placing bids electronically in the Three

4   Month Contract?

5        A.    Electronically?  I think it was mostly

6   the relevant period from January through August,

7   mid-August 2000.

8        Q.    So eight months, give or take, seven

9   months?

10       A.    Yeah, seven months.

11       Q.    So seven months.  And during the seven

12  months, did a short ever demand a higher yield to

13  offset the NPV and convexity effects?

14       A.    Yeah.  In fact, I don't know how many

15  shorts were out there, but nobody chose to hit their

16  bids, which meant they might have demanded something

17  higher.

18       Q.    But you don't know for sure?

19       A.    No, right.

20       Q.    Okay.  Let's look at paragraph 44.  Why

21  don't you read it to yourself and look up.

22       A.    Okay.

1        Q.    In paragraph 44 you write, "Garry

2   O'Connor, former CEO of IDCG, has stated that he was

3   aware of the fact that the lack of a PAI adjustment

4   (or any other feature to compensate for the cash

5   flows that would benefit the long party) led to a

6   valuation difference between the Three Month

7   Contract and the corresponding OTC interest rate

8   swap."

9            Do you see that?

10       A.    Yes.

11       Q.    As you sit here today, do you believe

12   that to be true, that's what Mr. O'Connor testified

13   to?

14       A.    Yes.

15       Q.    Okay.

16            MR. ULLMAN:  What are we up to, 5?

17            THE REPORTER:  Correct.

18       (Deposition Exhibit Number 5 was marked for

19   identification.)

20   BY MR. ULLMAN:

21       Q.    Can you mark this as 5, please.

22            I am handing you what has been marked as

110

1    -- an excerpt that has been marked as Exhibit 5.  On

2    your footnote 45, you cite the deposition of Garry

3    O'Connor, February 29th, 2012, pages 21 and 22.  Do

4    you see that?

5         A.   Yes.

6         Q.   Okay.  And am I right that what I have

7    handed you as Exhibit 5 is what appears to be a

8    February 29th, 2012 transcript.  Do you see that?

9         A.   Yes.

10        Q.   Is this the transcript that you were

11   citing in footnote 45?

12        A.   It appears to be, yes.

13        Q.   Okay.  Can you -- and you cited pages 21

14   through 22, right?

15        A.   Yes.

16        Q.   Okay.  Why don't you give those a read,

17   pages 21 and 22.

18        A.   Okay.

19        Q.   Can you point out in the transcript where

20   Mr. O'Connor testifies that the lack of PAI led to a

21   valuation difference between the Three Month

22   Contract and the corresponding OTC interest rate

1    swap?

2         A.   Well, he explains that he is not -- that

3    they chose not to have PAI in the contract.  He ends

4    on line 20 of page 21 -- well, I guess line 15 of

5    page 20, he says, "price alignment interest is an

6    adjustment to variation market to reflect the cost

7    of funding cumulative collateral."

8         Q.   Right.  But it doesn't talk anything

9    about leading to the valuation difference; am I

10   correct?

11        A.   No, but the cost of funding cumulative

12   collateral is a difference in valuation.  That's why

13   PAI is made.  It is a compensation for that

14   differential in value.

15        Q.   Yeah, and I don't want to belabor it, but

16   I am reading it, and I don't see anything that talks

17   about valuation differences between the Three Month

18   Contract and the corresponding OTC interest rate

19   swaps.

20             Do you see that in this testimony that

21   you have cited?

22        A.   No, these are my words.  I didn't quote

112

1    him.

2        Q.   Oh.

3        A.   I am citing what he is saying.

4        Q.   Well, but you say here he stated that he

5    was aware of the fact that the lack of a PAI

6    adjustment led to a valuation difference between the

7    Three Month Contract and the corresponding rates --

8    I'm sorry, and the corresponding OTC interest rate

9    swaps.  And I am just asking you where in this cite

10   it says that?

11       A.   That's what I just pointed you to.  He is

12   aware they don't have PAI.  And he precedes that by

13   saying PAI is an adjustment to variation market,

14   reflecting the cost of funding cumulative

15   collateral.  That's, that's the difference.

16       Q.   Do you have any other cites that support

17   what you are writing in paragraph 44?

18       A.   No.  It is pretty much just about what he

19   said.

20       Q.   Okay.

21       A.   He does, though -- he has a letter that

22   would explain some of the same things.

113

1      Q.    What is the letter?

2      A.    I believe he sends a letter to the CFTC.

3   And, if I recall, it said similar things that, you

4   know, we have contract specifications, so we

5   actually didn't include PAI in that contract.

6   Generally I guess to differentiate the product for

7   different market participants.

8      Q.    Paragraph 46, you write, "When the

9   corresponding rates are used as a default price for

10  the Three Month Contract, as IDCH did prior to the

11  bids at issue in this matter, the settlement price

12  will not reflect true supply or demand or fair value

13  for the Three Month Contract."

14          Do you see that sentence?

15     A.    Yes.

16     Q.    Okay.  And to the bids, are you referring

17  to DRW's bids?

18     A.    Yeah, the bids at issue, right.

19     Q.    Okay.  And you say the settlement price

20  will not reflect true supply or demand.  Can you

21  elaborate on that, please?

22     A.    Well, if we default to the

114

```
1    over-the-counter swap price, it is different than

2    the exchange traded futures contract.  So if we

3    default to those prices, as whatever prices

4    establish those over-the-counter swaps aren't

5    necessarily the supply or demand for the actual

6    futures product itself that is cleared.

7         Q.    Do clearinghouses get to determine how

8    settlement prices are arrived at?

9         A.    Yeah.

10        Q.    Okay.  The next thing you say is, true

11   supply or demand or fair value for the Three Month

12   Contract.  What do you mean by "or fair value"?

13        A.    Some estimation of the value of the

14   contract that is traded.

15        Q.    Okay.  And who does that estimation?

16        A.    Well, generally speaking, traders do.  I

17   guess the clearinghouse could do it too if they

18   wanted to.

19        Q.    Go to paragraph 47, please.  The first

20   sentence, "The fact that OTC rates, (i.e., the

21   corresponding rates) can be and were used by IDCH as

22   reference rates for the Three Month Contract, given
```

115

1    the lack of actual electronic bids, does not mean

2    that the corresponding rates were the most

3    appropriate rates to apply."

4         Do you see that sentence?

5    A.   Yes.

6    Q.   Again, clearinghouses are able to

7    determine how they calculate settlement rates.  Am I

8    right?

9    A.   Yes.

10   Q.   Okay.  And I think you testified before

11   that you looked at some e-mails, internal DRW

12   e-mails about its valuation or its understanding of

13   the Three Month Contract before it entered into its

14   long positions.  Is that a fair summary of your --

15   A.   Yes.

16   Q.   Okay.

17   A.   Well, before they entered in?

18   Q.   Yeah.  I want to know --

19   A.   No.  I didn't, I didn't -- I didn't do

20   any valuation necessarily of 2010 conditions or --

21   Q.   Okay.  Do you know whether anyone at DRW

22   understood that in the absence of market activity,

116

1    that the Three Month Contract would settle to the

2    corresponding OTC rates before DRW entered into its

3    long positions?

4        A.   Well, I presume they could see that they

5    were settling to the OTC rates, yeah, so that seems

6    like a tautology.  Anybody who is watching the

7    market would know where they were settling.

8        Q.   Okay.  If you are a market participant

9    and you disagree with the way a clearinghouse is

10   settling a contract in which you have a position,

11   are there any options to remedy that, if you are a

12   market participant?

13           MR. MANNING:  Objection.

14           THE WITNESS:  Well, I think this case is

15   an example of that.  Jeffries tried to get the

16   clearinghouse to alter their clearing and settlement

17   procedures very specifically, right?  They lobbied

18   to ask for a change in the contract terms.

19   BY MR. ULLMAN:

20       Q.   Well, how about in terms of -- and I

21   guess you could exit the position.  Is that another

22   option?

117

1      A.   Option to -- it wouldn't necessarily

2   affect the settlement procedures.  Is that what you

3   are asking?

4      Q.   Well, I am not saying -- I am not talking

5   about -- I am talking about you are a market

6   participant.  You enter into a contract and you

7   understand how it is going to be settled.  And

8   throughout the life of the contract, you become

9   displeased with how it is being settled.

10          And your experience at the CFTC as an

11   economist, are there -- what options would that

12   market participant have?

13      A.   Well, other than, I think, lobbying the

14   exchange and lobbying the CFTC, I mean, to see if

15   something somehow was inherently unfair, but I think

16   in this case, again, I think a non-accretion on the

17   road back, something like everyone agreed on the

18   settlement terms, the contract was established.

19          And so I don't know, I don't know how

20   fruitful that would be in this particular case.  I

21   don't know of any case where the CFTC or a contract

22   has been altered after or retroactively to people

118

1    entering into that contract.

2        Q.   Mark this as 6.  Is the microphone

3    better?

4        (Deposition Exhibit Number 6 was marked for

5    identification.)

6    BY MR. ULLMAN:

7        Q.   I am handing you what has been marked as

8    Exhibit 6.  Will you give it a read.  And when you

9    have had a chance to look at it, I have a few

10   questions for you.

11       A.   Okay.

12       Q.   Did you see this document before?

13       A.   I am not sure actually.  I don't think

14   so.

15       Q.   Okay.  If you look down to the first

16   e-mail in the chain, which is from Don Wilson on

17   July 23rd, 2010 at 1:54 p.m. central time, central

18   daylight savings time?

19       A.   Right.

20       Q.   Do you see that?

21       A.   Yes.

22       Q.   Down here in DRW only number 4, Mr.

119

1    Wilson writes, "priority is to really understand

2    IDCG.  Confirm the contract has full convexity bias

3    (despite the fact that they will force it to settle

4    at non-convexity biased prices."

5              And then that's what I am interested in.

6    Have you -- so does this refresh your recollection

7    about how this thing --

8         A.   It suggests at least they know about the

9    convexity bias before they put on that trade.

10        Q.   Okay.  And they understand that before

11   they put on the trade, that it is settling to

12   non-convexity biased prices, right?

13        A.   Yeah, that's their impression anyway,

14   right?

15        Q.   Okay.  And then you write here, on

16   paragraph 47, "As noted before, the Three Month

17   Contract and its non-cleared OTC interest rate swap

18   counterpart have different economic values.  Just as

19   the process for valuing a home in Boston might be

20   similar to valuing a home in Detroit, it would not

21   be appropriate to value Boston's real estate based

22   on Detroit's prices."

120

1          Do you see that?

2      A.   Yes.

3      Q.   Okay.   But if you bought a house in

4  Boston and you understood that Detroit was being

5  used to value that real estate, would that be

6  acceptable?

7      A.   That would be a bargain, right, because

8  nobody wants to live at Detroit prices.

9      Q.   Right?

10     A.   Yeah.

11     Q.   Okay.   Then further on you say,

12  "Likewise, given the economic differences between

13  the Three Month Contract and OTC interest rate swap,

14  the supply or demand in the two markets would also

15  be expected to differ."

16          What did you mean by that sentence?

17     A.   Just what it says, two different

18  contracts, so people would be willing, different

19  people would be willing to trade, buy or sell in

20  each contract.

21     Q.   Okay.   Did the -- do you believe that the

22  economic differences between the Three Month

1    Contract and the OTC interest rate swap resulted in

2    pricing differences?

3         A.   Results in valuation.  I am not sure what

4    you mean by pricing.  There was no trading, really,

5    in the -- in the Three Month Contract, so I don't

6    know how it could get a difference in prices.

7              There is no quoting in Three Month

8    Contract at this time, so, again, difference in

9    prices is kind of moot.

10        Q.   Did the supply or demand in the two

11   markets ever differ?

12        A.   Well, almost certainly.  There was no

13   supply or demand in the Three Month Contract for the

14   most part of 2010, right.  And there was

15   over-the-counter swap contracts being traded but

16   that they were benchmarked to, at least, in the fall

17   of 2010.

18        Q.   Okay.  Let's look at page 25.  Well,

19   let's start talking generally about this.

20             Starting on page 25 we talk about

21   modeling; is that right?

22        A.   Yes.

122

1        Q.    And here the modeling was, am I right,

2    that the modeling in this case was largely

3    accomplished by employees of the Analysis Group?

4        A.    Yeah.  I mean, I settled on -- I directed

5    them to estimate Hull-White One-Factor Model based

6    on the two markets' empirical data that I thought

7    were relevant.

8        Q.    Did you ever look -- do you know if DRW

9    employed a model when placed -- before placing its

10   bids?

11       A.    I don't know, like, again, at the time in

12   August or when that e-mail was sent, but they are

13   talking about convexity effects, they came out six,

14   eight months later with a paper on this.

15            I mean, I presume someone behind the

16   scenes was doing this work.  And the woman they

17   refer to in that e-mail that we just discussed was

18   an author on that paper.

19       Q.    And so in February of 2011, you are aware

20   DRW was placing electronic bids?

21       A.    Yes.

22       Q.    On the contract?

123

1          A.    Yes.

2          Q.    And your report says and I think you

3     testified to that those rates were above the

4     corresponding rates.  Is that fair?

5          A.    Right.

6          Q.    So that specific bid level that DRW was

7     putting in, do you know if that was a result of a

8     model?

9          A.    Again, I mean, I presume it was being --

10    the result of a model because that's what traders do

11    in these marketplaces.  And they -- they produced a

12    model in a publicly-released paper on March 11th.

13               So you can't write a paper and do it all

14    in one day, so I presume there was some lead-up time

15    that they were doing the modeling internally.

16               Again, I didn't verify could you tell me

17    when you came up with a model or anything.  I don't

18    have any timing issue or any knowledge of the timing

19    of when they came up with that.

20         Q.    Okay.  But outside of your presumption,

21    you don't have any facts or evidence that shows that

22    you believe DRW was using a model to figure out the

124

1    bid rates that it was putting in, electronic bid

2    rates it was putting in in February of 2011?

3         A.   I don't know how the statements that

4    could be made in the e-mail and otherwise to get a

5    convexity effect, if you are not modeling it.  But,

6    yeah, I don't have a specific knowledge of what they

7    were doing at that point in time.

8         Q.   Okay.  And that's throughout the bidding

9    in the relevant -- that goes for the bidding in the

10   relevant period, right?

11        A.   Well, the paper was released on March

12   11th.  At least there is some public dissemination

13   that there is a model that one of their employees

14   was using to value the convexity effect through that

15   model.

16        Q.   But in terms of -- your report says this,

17   and you understand that the pricing on the Three

18   Month Contract was expressed in terms of rates.  Do

19   you understand that?

20        A.   Yes.

21        Q.   Okay.  And you understand that DRW was

22   putting in rates or prices above the corresponding

125

1    rates electronically during the relevant period.  We

2    agree on that point?

3         A.   Yes.

4         Q.   But in terms of the specifics, the

5    specific rates that DRW was putting in as bids, you

6    don't know whether they are using a model or not to

7    come up with those rates, do you?

8         A.   In the statements that these employees

9    made themselves and the facts that we see coming

10   out, I don't know if I know.  I could say I am

11   95 percent confident.

12        I would say I am 99 percent confident,

13   yeah, that they -- that they were using a model.  I

14   mean, prudent traders who were in the marketplace

15   and trying to talk about a convexity effect will

16   have to monitor it because there is literature out

17   there that shows some markets don't have a convexity

18   effect.  So it is not something you are just going

19   to guess at and say that it is there.

20        Q.   Did you ever look at DRW's model?

21        A.   No.

22        Q.   Okay.  So you don't know?

1          A.    I don't know what?

2          Q.    Well, I mean, if you never looked at

3     DRW's model, then how would you ever know whether

4     the bids they put in that were over the

5     corresponding rates corresponded to that model?  Is

6     that a fair statement?

7          A.    I think my report was getting at do their

8     bids -- could I, if I were trying to model it, are

9     there bids similar?  So that was the spirit in which

10    I approached my report, not to justify what they

11    were doing, necessarily, because I didn't know.

12             For all I knew, they couldn't be telling

13    the truth and they were just putting in bids and

14    trying to reap some benefit from settlement prices.

15             So my whole exercise in my report was to

16    try to put some science to the issue, look at

17    concurrently traded products that have the same

18    features that depend on interest rate changes and

19    get an estimation, you know, I wouldn't probably

20    have written the same report if I came up with a

21    convexity bias of two basis points and I saw that

22    they were quoting 40 ahead.  To me that would have

127

1    been a little bit more problematic from the

2    Defendants' side.

3              So, all right, so my estimation was to do

4    my own independent work to see if it comported with

5    their behavior.

6         Q.   Did your independent work in the report

7    take into account anything that was delineated in

8    DRW's white paper?

9              MR. MANNING:  Object to the form.

10             THE WITNESS:  Well, the techniques were

11   dissimilar in the sense that Hull-White One-Factor

12   Model, so Hull-White do this model.  And there is

13   Cox-Inger-Soll-Ross and Vasicek interest rate

14   variability models that you can use.

15             Hull-White actually, the benefit of their

16   paper is that they show that the results from their

17   exercise that Hull-White did back in 1990, came to

18   similar valuation as a number of other models.

19             So being familiar with that model, that

20   was the choice that I made.  But that -- so it

21   happens to be the same thing they did.  The Cont,

22   et al. paper, which is the DRW White Paper, I

128

```
1    believe they used simulated interest rate curve.
2            And so, again, I wouldn't have been
3    comfortable with using simulations.  I wanted to use
4    actual market data, which is typically how it is
5    done.
6            And I presume they probably did use
7    actual market data too.  And then in their publicly
8    displayed model, put something more generic in.
9    BY MR. ULLMAN:
10       Q.   Why do you presume they would use however
11   they have market information?
12       A.   Well, market information, so, for
13   instance, I went to the swaptions market and got
14   prices from actively-traded contracts on the day
15   that I was valuing the contract in this convexity
16   bias.
17       Q.   So let me make sure I understand.  In
18   your report you independently constructed a model to
19   see whether DRW's bids reflected the convexity
20   effect and the NPV effect.  Is that a fair
21   statement?
22       A.   Yes.
```

1          Q.    But by doing that, you didn't take into

2    -- you were not trying to emulate DRW's model when

3    it placed the bids, if it indeed used the model that

4    did so?

5          A.    Right.

6          Q.    Okay.  So this is just -- so this is sort

7    of an after the fact, I am making a model to see if

8    DRW's bids fit into my -- your model's description

9    of where fair value was?

10               MR. MANNING:  Objection, form.

11               THE WITNESS:  Yeah.  I mean, yeah, it is

12   my -- it is my, my application of the Hull-White

13   Model, so it is not really my model, but --

14   BY MR. ULLMAN:

15         Q.    Okay, okay.  It is about 1:00.  Take an

16   hour for lunch?  Thanks.

17               THE VIDEO OPERATOR:  Going off the

18   record.  The time is now 12:56.

19               (Whereupon, at 12:56 p.m., a lunch recess

20   was taken.)

21

22

130

```
 1                     AFTERNOON SESSION

 2                       (2:04 p.m.)

 3              THE VIDEO OPERATOR:  We are back on the

 4       record.  The time is now 14:04.

 5       BY MR. ULLMAN:

 6          Q.   Back on the record after lunch.

 7              Mr. Harris, could you look at Exhibit 3,

 8       please, your report.  And if you could, I'm

 9       interested in asking a few questions about paragraph

10       57 under pricing and calibration.

11          A.   Okay.

12          Q.   Here you talk about the calibration of --

13       of the model you use in your report.  Is that

14       correct?

15          A.   Yes.

16          Q.   Okay.  And did you use any data points

17       that related to actual trades in the Three Month

18       Contract in your model?

19          A.   No, the calibration calibrates to the

20       actual trades in these other markets.

21          Q.   Okay.

22          A.   That are sensitive to interest rates but
```

1    not to the three month.

2        Q.   Okay.  So it ignores consummated trades

3    on the Three Month Contract?

4        A.   Well, yeah, there were no trades in the

5    Three Month Contract, so --

6        Q.   What about the -- the OTC positions that

7    were -- that were negotiated off Exchange and then

8    converted to futures contracts?

9        A.   Well, there were none of those in the

10   relevant period either.

11       Q.   Okay.  What about before the relevant

12   period with those trades?  Did you -- you didn't

13   look at those either?

14       A.   Not for calibration, no.  The way the

15   calibration works is looking at concurrent market

16   conditions, so that would necessitate having a trade

17   like on the particular day.

18       Q.   Okay.

19       A.   And then estimating the model for that

20   day and then extrapolating from those parameters

21   what the value of the Three Month Contract would be.

22       Q.   Okay.

132

1        A.    On that day.

2        Q.    I'm not sure you can make -- you can make

3    this -- if you can make this conclusion, but I'm

4    going to ask you anyway.

5              Is -- is the best metric of pricing

6    information on a contract previous consummated

7    trades of the same contract?

8        A.    Well, I think it depends on the

9    conditions.  In this contract, I would say no.

10       Q.    Okay.  Why not?

11       A.    Well, substantial amount of time had

12   passed since the previous trade was made, so like

13   any financial market, you know, things change day to

14   day, week to week.  And the only time you -- you

15   could go back, you would have to look back months to

16   try to figure out, and so in this case, I would say

17   no.

18       Q.    Okay.  In your model, you are analyzing

19   the differences between where you deemed fair value

20   and over-the-counter swap contracts.  Am I right

21   about that?

22       A.    Yeah, that's one component, right.

133

1     Q.   Okay.  And that component measures, what

2   you call it, in economics, the delta or the

3   difference between -- the spread between these two

4   rates, right?

5     A.   Right.  So the difference would be an

6   estimate of this NPV and convexity effects.

7     Q.   And you could -- understanding that the

8   markets go back and forth when DRW opened its -- or

9   back up.

10         I think you testified earlier, we talked

11  about earlier, I represented to you that DRW opened

12  its positions off exchange in August and September

13  of 2010.  Do you remember that?

14    A.   Yes.

15    Q.   Okay.  And understood that, between the

16  relevant period and when these positions were opened

17  in August and September 2010, the markets have

18  shifted.  Is that fair to say?

19    A.   Yeah.  Interest rate sensitive security

20  markets, yes.

21    Q.   And I think that's what you were

22  testifying about, about the components of your

1    model.  But you could -- you could measure -- you

2    could isolate those variables by measuring the

3    spread between the OTC rate and what those contracts

4    were executed on, and then using that in your model

5    going forward; is that -- can you do that or is that

6    -- would that bother your --

7                MR. MANNING:  Object to form.

8                You can answer.

9                THE WITNESS:  If we had prices from this

10   market, the Three Month Contract market, yeah, that

11   would be another valuation point.  Again, there was

12   no trades in the Three Month Contract, so --

13   BY MR. ULLMAN:

14        Q.   Okay.

15        A.   -- it was hard to do that on -- during

16   the relevant period.

17        Q.   Okay.  Please turn to paragraph 58.  If

18   you could, please read paragraph 58 and 59 to

19   yourself and look up when you've had a second to

20   review it.

21        A.   Okay.

22        Q.   That sentence says, "I find my valuation

1    of the Three Month Contract and daily estimates of

2    the NPV and convexity effects are consistently in

3    the range of DRW's bids during the relevant period

4    across multiple maturities."

5            Do you see that sentence?  It's the last

6    sentence on 58.

7        A.    Yes.

8        Q.    Okay.  What does -- what did you mean by

9    "consistently in the range of DRW's bids"?

10       A.    Well, the exhibit kind of shows that.  I

11   don't know if you want to turn to that.

12       Q.    Sure.

13       A.    So to get these specifics -- I mean, so

14   if you just want to look at Exhibit 3-A, I get

15   estimates from my model in the, say, 17 to 23 basis

16   points range, which would be the value of the

17   convexity and NPV effects in this contract, that

18   particular one.

19       Q.    Um-hum.

20       A.    And DRW's bids are in that range.

21       Q.    Okay.  Does your model allow you to

22   specifically determine what the proper price is on a

1    certain tenor on a certain day?

2         A.   No, the model yields an estimate of what

3    the price would be.

4         Q.   Okay.  So -- so it can't?

5         A.   Well, I mean, the estimate is specific.

6    I can't vouch for whether that's exactly the right

7    price or not.

8         Q.   Okay.  And -- and the futures contracts,

9    are there multiple prices for -- correct prices for

10   futures contracts on any given day?

11        A.   Well, in most markets, there's at least a

12   bid and an offer and sometimes transaction prices

13   that are all different.  So in that regard, yeah,

14   usually there is a rage of prices that are -- seem

15   deemed acceptable or that are executable within the

16   market.

17        Q.   But for mark to market purposes and for

18   purposes of -- of determining variation margin,

19   there's one price?

20             MR. MANNING:  Are we talking about the

21   free-market contract or we talking about markets

22   generally?

1    BY MR. ULLMAN:

2         Q.   We're talking futures generally --

3    futures market generally.  Right.

4         A.   Yeah, yeah, generally, I mean, you have

5    to have something to settle to, and so that's why I

6    think there's a lot of -- most Exchanges put a lot

7    of mechanisms around determining what that price is

8    so that it reflects fair value.

9         Q.   Okay.  And, again, not to put words in

10   your mouth, but I'm right that, as a general

11   concept, for futures contract, there's one closing

12   price?

13        A.   One settlement price, yeah.

14        Q.   Okay.  And -- but your model doesn't

15   delineate one closing price?

16        A.   No, it does provide one estimate, so the

17   -- the connecting the dots there, the line is drawn

18   between the point estimate on every day.

19        Q.   Okay.  But that's -- that's a range,

20   right?

21        A.   Well, each one of the lines represents a

22   different model, so you can see where two models

138

```
1    give two different prices, right, on the same day.
2         Q.   Okay.  Because different models can yield
3    different prices, right?
4         A.   Right.
5         Q.   Okay.  And so, for example, if I were to
6    ask you, look at 3-A, what was the supply and demand
7    price for the Three Month Contract according to your
8    model on June 11th, could you give me the price?
9              MR. MANNING:  Objection, form.
10             THE WITNESS:  No, because there was no
11   visible supply or demand.  There wasn't -- at least,
12   there wasn't a supply and demand in the marketplace
13   and there was no price discovery in the marketplace.
14   So --
15   BY MR. ULLMAN:
16        Q.   Okay.
17        A.   -- or at least the only thing we have for
18   price discovery is one bid.
19        Q.   Okay.
20        A.   And, again, the model uses supply and
21   demand from other markets, so in that sense it -- it
22   represents supply and demand of interest rate
```

1    sensitive instruments, but, again, they're not

2    exactly the same, which is why you can't simply do a

3    -- in my estimation, you can't just simply do a

4    spread between one market and the other blindly.

5             The modeling, I think, exercise gets at

6    that a little more specifically.

7        Q.    Let's go to paragraph 65.  It's under

8    header D on page 30.

9        A.    Okay.

10       Q.    The second sentence here says, you write,

11   "However, the precise results of my valuation

12   analyses are not identical to those of Cont et al.

13   (2011).  This is not at all surprising or

14   concerning.  Interest rate modeling involves the

15   choice of modeling assumptions and data inputs."

16            Do you see that?

17       A.    Yes.

18       Q.    Okay.  That's -- the read is true and

19   correct to you?

20       A.    Yes.

21       Q.    Okay.  And can you explain a little bit

22   further how the choice of modeling assumptions and

140

1    data inputs can create different results in a model?

2        A.   Sure.  Well, first of all, the Cont

3    et al. paper doesn't actually use any data.  They

4    use simulated data.  So they're not using like live

5    market data.  So in that regard, you can make up

6    data and then estimate the model.

7            So it's not surprising that my results

8    are different from theirs because what I did in my

9    estimation was to go out and get market prices from

10   the Eurodollar swaption market -- from the

11   Eurodollar market and then from the swaption market,

12   two different ways of getting real prices from the

13   data.

14           And so, I mean, the differences that I

15   find between my model and theirs almost certainly

16   stem from the fact that I am using live market data.

17   And I think the price changes you see that I trace

18   out in my figures reflect the fact that those prices

19   in the swaption market and the Eurodollar market

20   change from day to day, and then I have reestimated

21   the model on a daily basis.

22           And so even yesterday's price is not

1     exactly -- typically not exactly the same as today's

2     price.

3          Q.   I see.  Do you have an understanding --

4     and we -- we touched on this before, but I'm not

5     sure I either recall or I got the full answer.

6               Do you have an understanding of -- first

7     of all, do you know, as you sit here today, the

8     names of any DRW traders who placed bids on offer or

9     placed bids on a Three Month Contract?

10         A.   Well, I understand there was two traders.

11    Brian --

12         Q.   Vander Luitgaren and --

13         A.   Yeah, Vander Luitgaren, right.  And then

14    I thought the other guy was Brian.

15         Q.   Well, it's not a test.  I just --

16         A.   No.

17         Q.   I just wanted to have an example for the

18    record.

19         A.   There were two of them that I knew.

20         Q.   Okay.  Let's talk about -- let's talk

21    about Mr. Vander Luitgaren.  Do you have an

22    understanding of how -- what his process was for --

142

1    for placing bids?

2         A.    Process as physically putting the bid up

3    on the exchange?

4         Q.    Well, maybe I would say, you know, let's

5    -- start to finish, but let's first of all talk

6    about -- yeah, let's start with give me your sum

7    understanding of mechanically how you would do it

8    and what the bid level was based on.

9         A.    Well, I think based on the testimony and

10   the information I have read, they -- to get

11   electronic bids is what we're talking about?  To get

12   electronic bids, you need to first have an

13   electronic front entry, order entry system into the

14   exchange so you need to contract with some vendor to

15   actually link into the exchange to post the bids.

16              And any trader, whether they have a model

17   in their mind or a model on their screen, usually

18   generates some sort of valuation of the contract and

19   then takes that valuation, and their job is to trade

20   on that.  So they either put in a bid or an offer or

21   sometimes both.

22              If it's more actively traded, they might

143

1    actually hit somebody else's bid or offer.  But

2    that's the mechanics of it or the general -- the

3    general notion of how bids are entered.

4         Q.   Okay.  But I'm not -- I appreciate that,

5    the general response, the response to the general

6    question, but in terms of Mr. Vander Luitgaren, do

7    you have any idea about the specifics of his process

8    in terms of determining what level of bid to put in?

9         A.   No, other than presuming, like I said, he

10   either has a model in his mind or some model on his

11   screen that he translates on to the public exchange

12   where it's visible to other people.

13        Q.   Okay.  But no hard facts?

14        A.   Have I watched him enter orders and

15   stuff?  No.

16        Q.   Okay.  On page 31 under topic 9, this

17   would be under paragraph 66-A, can you look at 68-A

18   and B -- sorry, 66-A and B, please, and look up when

19   you've had a chance to review.

20        A.   Okay.

21        Q.   First sentence:  "DRW bids were placed

22   throughout the trading day and remained posted long

1    enough to potentially attract a counterparty to

2    trade during the settlement period."

3            Do you see that?

4        A.   Yes.

5        Q.   Is it your understanding that DRW always

6    placed bids throughout the day on the Three Month

7    Contract?

8        A.   No.  In fact, there were days they didn't

9    bid.

10       Q.   Were there days that DRW, for certain

11   maturities, just put in bids during the closing

12   period?

13       A.   I can't recall exactly, but I -- it's not

14   -- I presume that could be possible, yes.

15       Q.   Okay.  Then you write "remained posted

16   long enough to potentially attract a counterparty."

17           Do you see that?

18       A.   Yes.

19       Q.   What -- what is that opinion based on,

20   that the bids remained posted long enough to

21   potentially attract a counterparty?

22       A.   Well, it was based on my analysis of how

145

```
 1    long the bids were in place and when they were

 2    placing them.  So the average bid placed during the

 3    settlement period was somewhere north of 17 minutes.

 4    The settlement period is only 15 minutes long.

 5               So, basically, almost the entire

 6    settlement period, they were exposed -- they exposed

 7    their bids to counterparties.

 8         Q.   Okay.  Are there examples of bids that

 9    are placed on a DCM that potentially can't get hit

10    by a counterparty?

11               MR. MANNING:  Objection, form.

12               THE WITNESS:  There are ways to try to

13    game the system to sort of submit a canceled order

14    microseconds after submitting your bid.  You know,

15    high-frequency traders have been accused of that.

16    And so I would say some of that might be suspect,

17    that you put it in for two microseconds and cancel

18    it.  That would be a concern.  What I've have -- my

19    statements are all about these minutes of exposure.

20    BY MR. ULLMAN:

21         Q.   Okay.  Okay.  Is there -- well, let's

22    take high-frequency trading out of it, but -- and we
```

1    don't necessarily have -- in terms of bids placed in

2    good faith, in other words, non-spoofing, bids

3    placed in good faith, are those by definition bids

4    that can be hit by another party on a DCM?

5         A.   Yeah, by -- I mean, I guess you could get

6    your trade busted, there could be some lobbying

7    after the fact.  Yeah, they're executable.

8         Q.   Okay.

9         A.   You wrote a paper about that back in the

10   mid-'90s about NASDAQ and implementing systems that

11   have executable orders.  If you put a bid up or an

12   offer up, then once you get hit, that trade is

13   consummated.

14        Q.   Okay, okay.  And did DRW's bids ever

15   attract a counterparty?

16             MR. MANNING:  Just to be clear, you said

17   that these are the electronic bids during the

18   relevant period?

19             MR. ULLMAN:  Um-hum.

20             MR. MANNING:  Thank you.

21             THE WITNESS:  No, right, so on that

22   basis, their electronic bids --

147

1    BY MR. ULLMAN:

2         Q.   Right.

3         A.   -- never got hit on the electronic

4    platform.

5         Q.   Okay.   What -- in your experience at the

6    CFTC and as an economist, what are the reasons that

7    bids don't get hit?

8         A.   Well, I tried to get to some of that in

9    my report, actually.   One of the major reasons a bit

10   might not get hit is that it's not high enough.

11        Q.   Okay.

12        A.   Because -- I mean, you're bidding up and

13   I can come and offer you, you know, 5 dollars for

14   your car but if it's worth 50,000, you're not going

15   to hit my bid, right?   So if you're -- you're far

16   enough below the market, you won't get hit.

17             And, of course, if there's no liquidity

18   and if it's -- you know, I guess in these markets,

19   they seem to be fairly broad, the interest rate

20   market and derivative market in particular.   There's

21   a large number of traders, but, I mean, I guess if

22   you're bidding somewhere in Tahiti and not linking

148

1   your computer to anybody except for the island of

2   Tahiti --

3          Q.    Yeah.

4          A.    -- you might not get hit, right?   So

5   there's some notion of dissemination of that bid

6   that matters.

7          Q.    Okay.   In paragraph B, you write, "DRW

8   bids carried higher rates than those on a

9   non-cleared OTC rate swap, thereby accounting for

10  the presence of the NPV and convexity effects to

11  reflect a value closer to fair market value which

12  would be more likely to attract a counterparty."

13         What's the basis of your conclusion that

14  accounting for the presence of NPV and convexity

15  effects to reflect a value closer to fair market

16  value would be more likely to attract a

17  counterparty?

18         A.    Well, any bid above the non-cleared OTC

19  interest rate is a better price for the market.   So

20  in that regard, it's more likely to attract a

21  counterparty because you're offering a better price

22  or you're bidding up, willing to pay more in this

1    case, than somebody in the OTC market.  So in that

2    regard, it seemed to be an attractive thing to do if

3    you're benchmarking to the OTC price.

4        Q.   Any other reason?

5        A.   I mean, what I'm coming up with the

6    statement, part of NPV and convexity effect, is

7    based on the fact that I've modeled and estimated

8    what I would consider one estimate of the fair value

9    for that contract.  And so that's where that phrase

10   comes in, is that the prices that they're bidding

11   seem to be in the range, again, of what I'm getting

12   for what the convexity and NPV effect would give for

13   the value of that contract.

14       Q.   So going back to your testimony about

15   subparagraph B, your testimony is that because the

16   bids were over OTC rates, they were more likely to

17   attract a counterparty.  Is that correct?

18       A.   Yes.

19       Q.   Okay.  And you've also testified that

20   none of the electronic bids were hit during the

21   relevant period by a counterparty.  Is that correct?

22       A.   Yes.

150

1          Q.    And your -- I think, your testimony is

2     that the reason why they weren't hit is because they

3     weren't high enough.  Is that right?

4          A.    Well, that could be one reason, right.

5          Q.    Okay.  Do you have any other potential

6     reasons why they weren't hit?

7          A.    Well, there could be people that -- on

8     the short side that just didn't like the contract.

9          Q.    Um-hum.

10         A.    So if something in the contract terms was

11    somehow poisonous or perceived as infeasible.

12         Q.    In terms of the prices not being high

13    enough, does that conclusion -- is that conclusion

14    predicated on potential shorts using the same

15    valuation model?

16         A.    No, not at all.  I mean, you can -- you

17    could come up with any valuation, and as long as you

18    had a valuation that deemed that bid a good value,

19    you would hit the bid.

20         Q.    What if -- what if you had a model that

21    disagreed with the central premise of your model,

22    that these effects would result in higher prices?

151

1          A.    Again, I would seem -- then it would seem

2     logical, for me, in profit maximizing mode, if I

3     want to go short, that I would hit the bid and --

4     and be happy about having gotten into that trade at

5     the expense of some ill-informed or wrongly headed

6     counterparty.

7          Q.    If you were -- if you spent -- did your

8     -- let's back up for a second.

9              Did your model take into account at all

10    the fact that the bids entered by DRW were never

11    hit?  Was that ever a component of your model?

12         A.    No.  It was -- the model is based on,

13    like I said, the transactions that occur in these

14    other interest rate sensitive securities.

15         Q.    Okay.  So just to be clear, and I'm

16    sorry, I'm no modeling expert, but your model really

17    has nothing to do with any type of transaction that

18    occurred during the relevant period or before the

19    relevant period on -- regarding the Three Month

20    Contract?

21              MR. MANNING:  Objection.

22              THE WITNESS:  Right, because there was

1    only one.

2    BY MR. ULLMAN:

3         Q.   Right.

4         A.   I think we covered that before.

5         Q.   Okay.  Going down to paragraph 68, please

6    give that a read and look up.

7         A.   Okay.

8         Q.   Okay.  Halfway down the paragraph, you

9    say, "This time period is sufficiently long for

10   potential investors to accept DRW's bids.  In fact,

11   the average 17 minutes between bid placement and

12   deletion is an extremely long window of time,

13   reiterating the fact that DRW was ready to trade at

14   posted prices and provided ample opportunity for

15   other investors to trade at these prices as well."

16           Do you have any -- what underpinned your

17   conclusion that this was an extremely long window of

18   time?

19        A.   Well, I guess my knowledge of electronic

20   trading and electronic markets.

21        Q.   Okay.

22        A.   Knowing that if you see a bid and you put

1    in an order, like if within, again, fractions of

2    seconds, that you can hit that bid, and so even if

3    you allow for, you know, a few seconds to assess

4    whether you want to hit the bid or a few minutes to

5    assess the bid, 17 minutes seems like an inordinate

6    amount of time or ample time for someone to view the

7    bid and then to make a decision whether they want to

8    hit it or not.

9        Q.   Is that conclusion based on a comparison

10   of other futures markets?

11       A.   Well, it's based on my experience with

12   all markets, but, you know, we've analyzed futures

13   markets for high-frequency trading, other features,

14   trading -- electronic trading in both futures and

15   equity markets and markets worldwide.

16       Q.   Have you spent time working on illiquid

17   markets or thinly traded markets?

18       A.   Well, it's hard to do empirical work on

19   thinly traded because, again, there's not much data

20   there.  I have done some work and, in fact, the Eris

21   Exchange probably is the most relevant because it

22   was an exchange that started the contract that was

154

1    suffering from liquidity at the beginning of the

2    contract.  So, I mean, we haven't -- I mean, other

3    than being aware of this and looking at the

4    incentives that markets put forth to try to attract

5    liquidity to the market, it's -- again, it's hard to

6    do an empirical analysis where there's no data.

7         Q.   In other words, if -- if you don't have

8    any data that culls the amount of time an average

9    bid is open until it's hit, it's hard to estimate

10   what a either long or short period of the bid to be

11   open to be hit is?

12        A.   No, I mean, I have plenty of data.  In

13   fact, we know how systems operate, and it's not like

14   I'm sending a horse across the country to send my

15   bid to somebody.  The bid is electronically

16   displayed, almost instantaneously, and if you want

17   to hit that bid, it's almost instantaneous to hit

18   it.

19             So, I mean, I guess the time for

20   execution or the exposure that you have is related

21   to the systems that you use and the length of time.

22   Again, if I go back, you know, if -- if there was

155

1    somebody putting up a bid and canceling it

2    microseconds later, then you might want to question

3    that, but in this case, I don't think it's even

4    debatable that 17 seconds -- 17 minutes is a long

5    time.

6         Q.    Um-hum.  Okay.  Let's go to page 32.  And

7    your header, "whether or not a counterparty hit

8    them, DRW's bids were invaluable for, and a

9    legitimate source of price discovery."

10             Do you see that header?

11        A.    Yes.

12        Q.    Okay.  To whom were DRW's bids invaluable

13   for price discovery?

14        A.    I think they're valuable to any other

15   trader who's either observing the market or

16   potential trader who wants to trade this contract.

17   I think it was valuable for the clearinghouse that's

18   interested in making sure they have the price right

19   at the end of the day.

20        Q.    Was it invaluable to DRW?

21        A.    I don't think you could say "invaluable."

22   Clearly, I mean, you know, if the cash flows at the

156

1      end of the day go in their favor, they get some

2      benefit from that, but that's not -- I mean, you can

3      kind of quantify that.

4          Q.   Going to paragraph 72, where it talks

5      about price discovery.  You write, "In simple terms

6      price discovery, one of the central tenets of

7      financial markets, is the process of determining the

8      price of an asset, a good or a service."

9              Do you see that?

10         A.   Yes.

11         Q.   Okay.  Can price discovery -- can you

12     accomplish price discovery through the unilateral

13     acts of one market participant in a thinly traded

14     market?

15         A.   Yes.

16         Q.   How so?

17         A.   Well, we just use the facts of this case.

18     There is no bids or offers, so the fact that a

19     participant was willing to put up a bid tells the

20     entire market much more than we knew before the bid

21     went up.  If there's no information in the bid or

22     offer and no transactions, then the market is sort

1   of left with total uncertainty about what that

2   contract might be worth.

3            Now, if someone steps up to the plate and

4   puts a bid in, now at least we know on one side of

5   the market what people are willing to buy or sell

6   for, and so that gives a lot of information, I

7   think.  You're going from zero to one, you know?

8   Basically, it's 100 percent of the information.

9       Q.   Well --

10      A.   Impounded in that bid.

11      Q.   But in this case, market participants

12  understood that -- well, am I right that market

13  participants understood that with the absence of

14  market activity, the market would settle to

15  over-the-counter comparable rates?

16           MR. MANNING:  Objection.

17           THE WITNESS:  I mean, if the market

18  assumed that, that doesn't really speak to price

19  discovery, though.

20  BY MR. ULLMAN:

21      Q.   Okay.  So --

22      A.   Because if we believe that, then you

158

1   would never change any markets.  You would never

2   worry about price discovery because it's just going

3   to go back to the over-the-counter market, then it

4   doesn't make any sense to participate in a market

5   that's simply benchmarked to one that's over the

6   counter.

7        Q.   Okay.  Do you have any specific examples

8   of who discovered DRW's prices?

9        A.   Well, the entire market, whoever had a

10  data feed.  I don't have a specific example of who

11  subscribed to the data from IDCH or --

12       Q.   Okay?

13       A.   -- IDCG.  We do -- I guess, with one

14  example, we do have it.  Apparently, from the MF

15  Global example, they did see the bid, at least we

16  know one participant saw it on the screen.  I

17  believe, you know, Jeffries was probably monitoring

18  this market, to the extent that they got out of

19  their contract at some point in time.

20       Q.   Can you generalize that do all bids

21  contribute to the price discovery process?

22       A.   Yeah, I would say.

1      Q.    Okay.  And the same -- the same for

2   offers?

3      A.    Yeah.

4      Q.    Okay.  Next sentence where you say,

5   "Finding the proper price involves analysis of

6   supply and demand factors, as well as other factors

7   related to the transaction, the market, and

8   available information."

9           Do you see that?

10     A.    Which one was this?

11     Q.    I'm sorry, this is in paragraph 72, the

12  second sentence.

13     A.    Okay, yes.

14     Q.    Okay.  Do you see that?  And you cite

15  Lehman on that.

16     A.    Right.

17     Q.    Okay.  Are you saying this is a general

18  statement or are you referring to the Three Month

19  Contract in the second sentence of paragraph 72?

20     A.    I would say it applies to both.

21     Q.    Okay.  So -- so what -- what transactions

22  do you believe help find a proper price on the Three

160

1   Month Contract?

2       A.   Well, there were no transactions.

3       Q.   Okay.

4       A.   So just affording it the opportunity

5   might contribute to price discovery doesn't mean it

6   always does.

7       Q.   Okay.  And were there factors relating to

8   the market that helped find the proper price of the

9   Three Month Contract?

10      A.   Yeah, based on my analysis, the bids were

11  about where I estimate the price to be, so my

12  estimates were coming out of the market for other

13  contracts, interest rate sensitive securities.  The

14  market for interest rates generally, I think, were

15  translated into those bids, you know, at least into

16  the prices or near those bids.

17      Q.   When did you -- when did you complete

18  your model that's referenced in the report?

19          MR. MANNING:  Objection to form.

20  BY MR. ULLMAN:

21      Q.   Did you complete your -- did you complete

22  the model before you issued your report on July

161

1    27th, 2015?

2         A.   Yeah, I'm trying to remember the exact

3    first output came out --

4         Q.   Okay.

5         A.   -- because we did it in two stages.

6    First the model with the swaptions and then we did

7    the model with Eurodollars because we were trying to

8    figure out whether we had enough Eurodollar data.

9         Q.   Is it fair to say your model was

10   completed in 2015?

11        A.   Oh, yeah, yeah.  Sorry.

12        Q.   Okay.

13        A.   I was trying to be more specific.

14        Q.   So in -- what I'm trying to figure out is

15   what did the -- what did the NFX market where the

16   Three -- Three Month Contract was traded, what

17   factors related to the NFX market helped find the

18   proper price?

19        A.   Well, like I said, what -- what the

20   models do is take interest rate sensitive

21   securities, the actual transactions for those, and

22   extract out model parameters that basically are

162

1    forward-looking estimates on a particular day of

2    what other expectations of interest rate dynamics

3    might be.

4         We take those parameters then and put

5    them back into the Three Month Contract and then

6    estimate the point estimate for what the price would

7    be for the Three Month Contract.

8         So the general statement, I guess, would

9    be that the model incorporates forward-looking

10   interest rate expectations into the Three Month

11   Contract.

12   Q.   Okay.  Let's look at paragraph 75, page

13   34.  Please give that a look.

14   A.   Okay.

15   Q.   In paragraph 75, toward the middle, you

16   write, "Given the fact that no transactions for the

17   Three Month Contract were consummated during the

18   relevant period, DRW's bids were the primary source

19   of price discovery in the Three Month Contract

20   market.

21        "Second, the dissemination of information

22   collected through price discovery also contributes

163

```
 1    to building investor confidence and maintaining

 2    stable financial systems."

 3              Do you see that?

 4        A.   Yes.

 5        Q.   Okay.  Do you believe that DRW's bids

 6    placed on the Three Month Contract contributed to

 7    building investor confidence?

 8        A.   Yes.

 9        Q.   Okay.  What facts support that opinion?

10        A.   Well, a publicly displayed bid can be

11    hit, so investors who are interested in this

12    particular contract are more confident in the price

13    that they can get for that contract now.  Before the

14    bids were out there, they didn't know what price

15    they could get.  It was a blank slate.

16        Q.   When you -- we discussed earlier the DK'd

17    MF Global trade.  Have you looked at any documents,

18    MF Global documents or internal DRW documents, about

19    that transaction?

20        A.   I don't recall any internal MF Global

21    documents.  What I do recall is there was some

22    controversy about what they were going to settle at
```

164

1    and what sizes they were going to execute in the

2    over-the-counter market.

3         Q.   Okay.

4         (Deposition Exhibit Number 7 was

5    marked for identification.)

6              MR. ULLMAN:  Are we up to 6?

7              THE REPORTER:  7.

8              MR. ULLMAN:  7.

9    BY MR. ULLMAN:

10        Q.   Take a minute and look at what has been

11   handed to you as Exhibit 7.

12        A.   Okay.

13        Q.   Have you seen this document before?

14        A.   I don't think so.

15        Q.   Okay.  Do you know who Laurie Ferber is?

16        A.   She worked for MF Global, but I don't

17   know what her capacity was.

18        Q.   Okay.  If you could, look at the top

19   e-mail on -- what's this?  I'm sorry, Exhibit 7?  On

20   Exhibit 7.

21             Have you had a chance to look at the top

22   e-mail on Exhibit 7?

165

1          A.    Yes.

2          Q.    Okay.  If you had seen this

3    exhibit before you finalized your report, would you

4    still conclude that DRW's bids helped build investor

5    confidence?

6          A.    Yes.

7          Q.    Do you see Ms. Ferber here talking about

8    the serious issue with prices being shown,

9    potentially market manipulation?  Do you see that?

10         A.    Yeah.  I don't know what that refers to,

11    exactly.

12         Q.    Okay.  Do you know around the time where

13    the -- the DK'd trade occurred between DRW and MF

14    Global?

15         A.    February 2nd or so.

16         Q.    Okay.  Do you see the date of this

17    e-mail?

18         A.    Yes.

19         Q.    Okay.  Do you see when she says at the

20    end, which needs to be addressed for your own best

21    interests and certainly before we do anything with

22    IDCG?

1        A.   Yeah, I don't know what she's referring

2   to there, though.

3        Q.   Okay.  All right.  We'll mark this as 8,

4   please.

5        (Deposition Exhibit Number 8 was marked for

6   identification.)

7   BY MR. ULLMAN:

8        Q.   Have you seen what has been marked as

9   Exhibit 8 before?

10       A.   I don't believe so.

11       Q.   Okay.  Have you heard any recordings of a

12  conversation between Mr. Wilson and Ms. Ferber?

13       A.   No.

14       Q.   Okay.  I think you testified earlier that

15  maybe you had only met Don Wilson one time.  But

16  have you had any communications with Mr. Wilson

17  about this matter?

18       A.   No.

19       Q.   Okay.  Do you see the date on Exhibit 8?

20       A.   Yes.

21       Q.   And can you read what that is for the

22  record, please?

167

1           A.   It's Friday, February 4th, 2011.

2           Q.   Okay.  And you understand that to be in

3       proximity to when the broken trade occurred between

4       MF Global and DRW?

5           A.   Yeah, two days later, I believe.

6           Q.   Okay.  Can you look on the bottom of page

7       7.  And I would just start at page -- on line 13.

8       And then if you could, just read over to page 8,

9       line 7.

10          A.   Okay.

11          Q.   Do you recognize what's being referred to

12      in these pages as the Three Month Contract?

13          A.   Yes.

14          Q.   Okay.  And if you had looked at Exhibit 8

15      before you wrote your report, would you still

16      conclude that DRW's bids built investor confidence?

17               MR. MANNING:  Objection to form.

18               You can answer.

19               THE WITNESS:  Well, I think they -- yeah,

20      they build investor confidence.  I'm not -- she

21      obviously wasn't happy with something here.

22      BY MR. ULLMAN:

168

1        Q.    Do you have any -- can you refer to us

2    any scholarly sources for your opinion that -- that

3    unilateral -- the unilateral placement of bids in a

4    thinly traded market can continue to price

5    discovery?

6        A.    Well, the -- the cites that I have in the

7    paper, Hasbrouck talks about it, the O'Hara paper

8    talks about it.  Price discovery is any piece of

9    information that comes into the market.  I think

10   Maureen O'Hara maybe puts it best when she talks

11   about any piece of information might come in new and

12   then makes old information obsolete.

13          So anybody who is -- you know, anybody

14   who is posting a one-sided bid or two-sided bid, for

15   that matter, I mean, they're providing some

16   information to the market that the market otherwise

17   didn't have.  And so those papers discuss that.

18       Q.    Okay.  And those papers correspond to,

19   what I think is your testimony, that all bids

20   contribute to price discovery?

21       A.    Right.

22       Q.    Okay.  On page 35, where you talk about

169

1    regulators, of your report, I have some general

2    questions on this section.

3            And this is not -- this is since you're

4    talking broadly about policy, my questions on policy

5    reason.

6            What's the basis of -- of your conclusion

7    that regulators should and do promote price

8    discovery?

9        A.   Well, drawing from the statement I made

10   from price discovery creating investor confidence,

11   we want to have fair and accurate pricing within

12   markets.  I mentioned earlier that the division of

13   clearing and intermediary oversight is an entire

14   division of the regulation here at the CFTC that was

15   interested in making sure the risk to the

16   clearinghouse was appropriate, so they passed the

17   rules, we set up all these mechanisms around the

18   clearinghouse, in particular, to protect the

19   clearinghouse.

20           I think we also -- I mean, the CFTC's

21   words, I guess, here in paragraph 78 were -- I mean,

22   the Commission has put front and center, at least

1    the CFTC, the idea that bids and offers and price

2    discovery are some of the important parts of -- of

3    financial markets, lending credence to capital flows

4    in the economy, and we talk about the broader

5    economy, but that's -- that's the idea.  We want to

6    -- futures markets generally are there to transfer

7    risk and to provide hedging opportunities for

8    different market participants.  And so the policy

9    implication, I guess, from the entire agency that

10   we're in here is that, is trying to foster fair and

11   effective markets.

12        Q.    And in that regard, is it a -- should

13   regulators try to dissuade manipulative activity?

14        A.    Oh, definitely.

15        Q.    Okay.  What about if it's manipulative

16   activity that is also promoting price discovery?

17   Should a regulator -- what does a regulator do then?

18        A.    I'm not sure that manipulative behavior

19   would promote price discovery.

20        Q.    But I thought you said that every bid

21   contributes to -- to price discovery.

22        A.    Yeah, it does.  But I guess -- so what

1    results from that bid, I think, would be what the

2    regulator would have to look at, right?  So

3    typically, in a minification case, you find out, you

4    know, did you change the price for something and if

5    you're bidding and bidding and bidding up just for

6    the sake of making some money at something, and it's

7    not in your economic interest to do that bidding,

8    that's -- that's a problem.

9         Q.   At your time at the CFTC and as an

10   economist, do you know whether market manipulation

11   can be accomplished through consummated trades?

12        A.   Oh, yeah.

13        Q.   Isn't that most of the time?

14        A.   I mean, banging the close and most of

15   these manipulations are you want to push the price

16   somewhere, and to get the price somewhere, you have

17   to somehow do a transaction.

18        Q.   In a market manipulation case that

19   involves actual consummated transactions on an

20   Exchange, that involves the actual conference of

21   risk to a party.  Is that correct?

22        A.   Well, maybe not.  I mean, most

1    manipulation cases we have in derivative markets is

2    somebody pushing one market so they have a gain in

3    some other market.  And so that's where the

4    economics of the trading in one market don't comport

5    with the overall position.  So it might actually be

6    the opposite.  So they're not actually taking risk;

7    they are actually moving one market so they benefit,

8    and so the risk is not really conveyed.

9            It might be conveyed in one market, but

10   from the portfolio of the trading strategy, it

11   actually is -- the manipulative part of that

12   actually minimizes risk.

13       Q.   Right.  So you're referencing what they

14   would call like a cross-exchange manipulation,

15   right?

16       A.   Right.

17       Q.   Where you lose on A to make on B?

18       A.   Which in the derivative markets, I guess,

19   in my experience here and in most places, that's --

20   that's the most common.

21       Q.   Yeah.  And -- and going back to what you

22   were talking about, cross-exchange manipulation

173

1    where you lose money on you're a trade but make

2    money on the B trade, on the A trade, since -- since

3    it's an actual consummated transaction and you have

4    an open position, you, at least in theory, have

5    actual risk to the value of that specific position

6    on exchange A?

7              MR. MANNING:  Objection to form.

8              THE WITNESS:  I think you have -- you

9    could incur losses, right?  So if you're

10   artificially pushing prices up, you know, supply and

11   demand dictate that it should have been lower,

12   you're going to lose money on those trades.  So in

13   that regard, there's risk, yes.

14   BY MR. ULLMAN:

15        Q.   Okay.  Going back -- I'm not trying to be

16   sarcastic, but I just want to make sure the record

17   is straight.  You're not an attorney; is that

18   correct?

19        A.   No.

20        Q.   Okay.  You never -- you don't hold

21   yourself out as someone who can provide a legal

22   opinion?

174

```
 1            A.   No, not as an attorney, no.

 2            Q.   Okay.  We've been going for about an

 3     hour.  Why don't we just go off the record a minute.

 4                 THE VIDEO OPERATOR:  Going on the record.

 5     The time is now 14:54.

 6            (A recess was taken at 2:55 p.m., after which

 7            the deposition resumed at 3:02 p.m.)

 8                 THE VIDEO OPERATOR:  We are back on the

 9     record.  The time is now 15:02.

10     BY MR. ULLMAN:

11            Q.   If you could, please turn to page 43 of

12     your report.  And if you could, please review

13     paragraph 93 and then look up when you've had a

14     chance to review this.

15            A.   Okay.

16            Q.   Okay.  Two-thirds of the way down the

17     paragraph, you write, "IDCH subsequently provided a

18     list of third-party vendors that can facilitate

19     DRW's transmission of bids directly into an

20     electronic platform."

21                 And you cite this at -- you cite footnote

22     86 for an e-mail on December 20th, 2010.  Do you see
```

175

1    that?

2         A.   Yes.

3         Q.   Okay.  The next sentence here, you write,

4    "These actions by IDCH hardly suggest DRW's bids

5    were at an artificial price but rather suggest that

6    it was encouraging DRW to engage in price discovery,

7    i.e., encouraging DRW to contribute electronic

8    quotes as a legitimate source of supply or demand

9    for the Three Month Contract."

10             Do you see that?

11        A.   Yes.

12        Q.   Okay.  And I think your paragraph 93

13   indicates that -- that the list of vendors to

14   facilitate the DRW's transmissions of bids through

15   the electronic platform by definition occurred

16   before DRW started putting in bids via the

17   electronic platform.  Is that correct?

18        A.   Yes.

19        Q.   Okay.  So when you write here that the

20   actions that IDCH hardly suggest that DRW's bids

21   were at an artificial price, that isn't supported by

22   the factual record in this matter; is that correct?

176

```
1              MR. MANNING:  Objection to form.

2              THE WITNESS:  This is the statement that

3    those actions don't speak to the artificial prices.

4    BY MR. ULLMAN:

5         Q.   Okay.  But you understand that this is

6    before the relevant period, right?

7         A.   Right.

8         Q.   Okay.  And, you know, I'm not trying to

9    be sarcastic, but IDCH can't see into the future of

10   what DRW is going to do once it has a direct

11   electronic platform connection?

12        A.   Right.

13        Q.   Okay.  If you could, turn to paragraph --

14   I'm interested in pages 44 through 49, with a

15   specific emphasis on -- on paragraph 98 or, sorry,

16   99.  Have you had a chance to look at paragraph 99?

17        A.   Yes.

18        Q.   Okay.  You write, "Based on my estimates

19   DRW's bids, while higher than the corresponding

20   rates, were largely lower than the fair value

21   rates."

22              Do you see that sentence?
```

177

```
 1          A.    Yes.

 2          Q.    Okay.  What do you mean by fair value

 3    rates?

 4          A.    That would be a benchmark to the rates

 5    that I estimated from my models.

 6          Q.    Okay.  And that -- would that be -- are

 7    the fair value rates synonymous with non-artificial

 8    prices?

 9          A.    Yeah, I would say the prices I would get

10    out of my model would be valid for disseminating to

11    the market.

12          Q.    Okay.  And your model shows that -- that

13    DRW's bids were never at the fair value rate; is

14    that correct?

15          A.    Well, there might have been instances

16    where they corresponded exactly with what my -- my

17    model came up with.  In fact, my two models come up

18    with two different prices on the same day.

19          Q.    Right.  But you write here that they were

20    largely lower than the fair value rates.  Is that --

21    do you stand by that?

22          A.    Yes.
```

Harris, Jeffrey 2015/09/02

178

1          Q.    Okay.   Okay.   Look at paragraph 102,

2     please.   Continue to read and when you've had the

3     chance, please look up.

4          A.    Okay.

5          Q.    I think this is what we were talking

6     about a little bit earlier, about Gupta and the

7     evolution of the incorporation of convexity and NPV

8     effect into the Eurodollars futures pricing.   Is

9     that fair to say?

10         A.    Yes.

11         Q.    Okay.   In the last sentence, you said,

12    you write, "Just as in the Three Month Contract,

13    eventually the market learned."

14               Do you see that sentence?

15         A.    Yes.

16         Q.    Okay.   What do you mean by that?

17         A.    Well, the market being market

18    participants and entities who were engaged with this

19    particular contract.   In my estimation, one of the

20    participants, DRW, incorporated that information

21    into their bids.

22               I think the record was that Jeffries has

179

```
 1    had some statements saying in the event we didn't

 2    know that convexity was priced in before and now we

 3    know, so they made the statement -- when they

 4    entered into the transaction with DRW, they made

 5    some statement that now they know in 2011, that that

 6    should have been priced.

 7             Is there other evidence?  I guess maybe

 8    even to my estimation, the lack of transaction

 9    suggested that the market didn't -- didn't trust the

10    prices, and so there was some uncertainty about what

11    the value was.

12        Q.   And -- and what prices are you referring

13    to, DRW's prices?

14        A.   Well, all the prices that were being

15    disseminated.  But the only prices that we had for

16    this particular contract were DRW's bids.

17        Q.   Going back to that sentence, you

18    testified earlier that DRW, during the relevant

19    period, was placing bids higher than the

20    corresponding rates and that resulted in higher

21    settlement prices on various tenors of the Three

22    Month Contract during the relevant period.
```

180

```
 1              Is that a fair summary of your testimony?
 2        A.   Yeah, I think that's a conviction.
 3        Q.   Okay.  So DRW enters these bids, they're
 4   not hit, the price changes, and then your testimony
 5   is that the market discovered those prices.  Is that
 6   fair?
 7        A.   Yes.
 8        Q.   Okay.  What was your dissertation about?
 9        A.   Interday patterns and bid ask spreads.
10        Q.   Thank God.  Is the -- is part of being an
11   economist understanding what rational economic
12   actors do?
13        A.   I mean, you could use rationality as a
14   benchmark for testing things or you could use -- so
15   rationality comes into play in a lot of economic
16   contexts.  I'm not sure -- there are people who
17   study irrationality as an economist.
18        Q.   Does -- does -- again, not a quiz, but
19   does rationality have a meaning in economics?
20        A.   Well, it's one of those terms that's
21   difficult to assess, right?  So there's critiques of
22   certain papers that -- that assume rationality or
```

181

1    they assume some sort of pattern of behavior that

2    someone deems rational and that other people take

3    exception to.

4         Q.   Um-hum.  Do you have a definition of what

5    rationality means?

6         A.   Well, I mean, in manipulation cases,

7    typically, I guess, as a chief economist, we'd try

8    to -- in investigations that we supported and other

9    things we did here in the building, was to try to

10   figure out were the actions rational and were they

11   -- do they comport with someone who had an economic

12   incentive that was not abusive to other traders.  It

13   was, you know, participating fairly.  So an

14   on-the-spot, no offense, definition of rationality

15   or not.

16        Q.   I know you testified earlier that you

17   didn't look at the final settlement prices for the

18   Three Month Contract.  But you did look at DRW's

19   bidding rates throughout the relevant period, right?

20             MR. MANNING:  Objection to form.

21             THE WITNESS:  Oh, I did look at the final

22   settlement prices, yeah, because they were pretty

182

1    much identical to the -- to the DRW bids.

2    BY MR. ULLMAN:

3        Q.    Okay.  And based on your modeling, the

4    bids that DRW were putting in were beneath where

5    your model shows fair value is; is that fair?

6        A.    For the most part, yes.

7        Q.    For the most part.  There are

8    exceptions --

9        A.    Right.

10        Q.    -- but as a general rule.  And I guess

11    the question goes back to rationality.  Is that --

12    if you're -- is that a rational -- assuming your

13    model is correct, okay, and -- is that a rational

14    way of bidding if you want to establish a long

15    position?

16        A.    Well, it's certainly a rational way of

17    bidding.  So, certainly, would never want to bid

18    over your estimates or else you'd be overpaying for

19    something.  Yeah, and so I think -- so I think

20    that's what a bid and an offer usually are.  There's

21    usually some midpoint assumed true price, and people

22    bid below that, and people offer above that, with

1    the expectation maybe you're going to find someone

2    in the range of that uncertainty that disagrees with

3    you and consummate a trade.

4            So there is -- I guess there's some

5    evidence in the DRW bidding behavior that suggests

6    rationality, that -- at least in -- some of the

7    tenors, they started bidding a little bit above

8    over-the-counter rates and they moved that up.  And

9    to me, that does indicate some bit of rationality,

10   maybe searching for -- hypothetically, of course,

11   searching for the counterparty and not wanting to

12   overbid.

13       Q.   When economists analyze rationality and

14   market behavior, do they take into account, I guess

15   what you would commonly call a course of conduct?  I

16   mean, would you look -- if, say, the behavior

17   occurred over 100 days.  Would you look at the days

18   before day 100 or is that impossible to say?

19       A.   Yeah, I'm not sure what the context would

20   be.

21       Q.   Okay.  Well, I guess the context would

22   be -- and I'm just wondering -- I don't think you

184

```
 1    have an opinion on this, but I just want to

 2    double-check.

 3              That if -- according to you, not all

 4    these bids are consistently or generally under where

 5    you perceive fair value to be.  And that continues.

 6    Day one, you do that and then your bids are hit.

 7    Day two, you do that; none of your bids are hit.

 8    Day three, you do that and none of your bids are

 9    hit.  Day four -- I don't remember specifically how

10    many days we have, but let's just say we have over

11    110 days of that, right?

12              And on day 110, do you have an opinion

13    whether that behavior is rational?

14        A.    Well, I mean, I think this is what we

15    faced in the Eris Exchange too.  The exchange is

16    trying to encourage people to stay onboard and

17    provide liquidity.  Yeah, it might be rational to

18    try -- if you think that there is a market for

19    future gains, then you might want to incur -- I

20    mean, if it's a small cost and you've invested in

21    the front-end systems and you think that generating

22    liquidity or generating transactions in the future
```

185

1   might lead to offsetting investment that you've made

2   in the past, that might be rational.

3        Q.   If you could, please turn to page 50,

4   under section D, paragraph 111.  If you could look

5   at 11 and look up when you've had a second.

6        A.   Okay.

7        Q.   What types of analysis did you do to

8   reach the conclusions in paragraph 111?

9        A.   Well, the analysis that I had was over

10  the length of time of this contract.  We estimated

11  what the convexity and net present value effects

12  would be.  As I mentioned before, the convexity

13  effect is determined by the volatility.  And whether

14  we start trading at 10 and jumping around 10, or we

15  start trading at 12 and there's volatility around

16  12, there's still value in the convexity effect.

17       Q.   Did you look at any actual P&L when you

18  were -- in your conclusions in paragraph 111?

19       A.   I guess the only background I have in

20  profits would be the fact that Jeffries closed out

21  their transaction.

22       Q.   Okay.

186

1          A.    In August, and so the empirical fact that

2     they paid to get out of this contract suggested, and

3     I think their own admission suggested, they

4     recognized the convexity effect was there and that

5     they were willing to pay to get out of the position

6     so they didn't face the long-term consequences.

7          Q.    Okay.  But --

8          A.    So they made the present value payment of

9     what they thought they might lose in the future.

10         Q.    Okay.  But just in response to my

11    question, did you look at any real-world P&L data

12    from the Three Month Contract in reaching your

13    conclusions?

14         A.    No, that's why I said it's the only --

15    the only data I had was that one transaction that

16    was reversed.

17         Q.    Okay.  And do you know why or how -- what

18    precipitated Jeffries unwinding its position with

19    DRW?

20         A.    I don't know specifics.  I do know that

21    they admitted that they -- as I recall, they

22    admitted that they understood that the convexity

1   effect was going to be something that happened as

2   interest rates varied looking forward through the

3   life of the contract; they made some assessment they

4   didn't want the exposure that they had in their

5   position.  So they negotiated some sort of present

6   value of what they deemed the appropriate value of

7   those future payments that they might have to make.

8        Q.   Do you know if it had anything to do with

9   a legal settlement between DRW and Jeffries?

10       A.   No.  I wasn't -- I don't think I was

11  aware of any legal settlement that precipitated the

12  unwinding.

13       Q.   And it looks here that you read

14  Mr. Bury's deposition, footnote 96 on paragraph 113?

15       A.   Yes.

16       Q.   Okay.  In his deposition, Mr. Bury

17  references strange pricing and marking behavior.  Do

18  you recall that from his deposition?

19            MR. MANNING:  Objection.

20            THE WITNESS:  No, not that particular

21  phrase.

22  BY MR. ULLMAN:

188

1      Q.   You don't recall it?

2      A.   No, I don't recall it.

3      Q.   Okay.  Do you know what the IDCH curve

4   interpolator is?

5      A.   Sounds like a product.

6      Q.   It does sound like a product.  Do you

7   know the document, what the curve interpolator is?

8      A.   No.

9      Q.   Okay.  Have you looked at any end-of-day

10  reports issued by IDCH to New Edge in this case?

11     A.   I don't think so.

12     Q.   Okay.  And do you have any idea what the

13  curve interpolator is?

14     A.   No, I'm not familiar with the phrase, no.

15     Q.   Okay.

16          MR. MANNING:  Can I just ask for

17  clarification?  If the curve interpolator is not,

18  you know, the Bates name that identifies the

19  document in the litigation, there may be a more

20  helpful way for the witness to idea the document

21  you're asking about.

22  BY MR. ULLMAN:

189

1        Q.    Yeah, we're going to get to it.  Did you

2   ever see a document that compared, for certain

3   tenors, different columns of what the OTC rate was

4   and what DRW's bid was and the resulting end-of-day

5   price?

6        A.    Well, we have -- we have spreadsheets of

7   that, that generated some of the figures that I

8   have.  So we have DRW's bids.  We have closing

9   prices and we have my estimates of what the value of

10  those contracts are.  So --

11       Q.    I'm going to show it to you, but I just

12  wanted --

13       A.    So they were all in there.

14       Q.    This is an internal IDCH document.  Do

15  you remember seeing it?

16       A.    I think that's where we got the -- well,

17  I'm not -- I'm not sure where we got the data, to

18  tell you the truth.

19       Q.    Okay.

20            MR. ULLMAN:  Can you mark this, please.

21            THE REPORTER:  This is Number 9.

22            (Deposition Exhibit Number 9 was marked for

190

```
 1    identification.)

 2             MR. MANNING:  Do you have a copy you

 3    could share with us?

 4             MS. SIDDIQUI:  Yes.

 5    BY MR. ULLMAN:

 6        Q.   I'm getting it.

 7             MR. MANNING:  I thought you were about to

 8    ask a question.  I apologize.

 9    BY MR. ULLMAN:

10        Q.   I don't have a lot on this document.  I

11    just want to -- and it's not Bates stamped because

12    it came in native form, but I want to show it to

13    you.

14             Do you recognize what this document is?

15        A.   Not really, no.

16        Q.   Okay.  Have you ever seen any documents

17    similar to this relative to this case?

18        A.   I don't believe so.

19        Q.   Okay.  Okay.  Moving to paragraph 121, in

20    the last sentence, you say, "However, we can

21    rationally conduct a thought experiment to ascertain

22    whether DRW's bids might have created an artificial
```

1    price."

2              Do you see that?

3         A.   Yes.

4         Q.   How do you describe this -- what's a

5    thought experiment?

6         A.   Well, I walk through it in the next two

7    paragraphs.

8         Q.   Okay.

9         A.   Would you like me to describe that?

10        Q.   Well, I guess in general, what's a -- is

11   this your thought experiment?

12        A.   It's an experiment that's -- it's an

13   observation of -- that anybody could do.

14        Q.   Okay.

15        A.   But it's my logic behind what I document

16   in the next two paragraphs.

17        Q.   Okay.  When you said -- when you

18   testified that anyone could do it, what did you mean

19   by that?

20        A.   Well, it's a series of logical

21   connections.

22        Q.   Okay.  If you could look at paragraph

192

```
1    133, please.  If you could read it and then look up.

2              MR. MANNING:  I don't mean to be

3    difficult, but the version that I was given actually

4    skips from page -- from paragraph 132 to 135.  That

5    doesn't seem to be a problem on the witness' copy.

6              MR. ULLMAN:  I found a trick.  These guys

7    are good.

8              MR. MANNING:  As long as the exhibit --

9              MR. ULLMAN:  Do you have another one?

10             MR. MANNING:  It's fine.

11             MS. SIDDIQUI:  Is he --

12             MR. MANNING:  Okay.  It's fine.

13             MR. ULLMAN:  Are you sure?  We have an

14   extra.

15             MR. MANNING:  Yeah, this copy here is

16   good.

17             MR. ULLMAN:  Thanks.

18             MR. MANNING:  Thank you.

19   BY MR. ULLMAN:

20      Q.   Okay.  So in the middle of the paragraph,

21   you say, "No short directly took the opposite side

22   of DRW's bid, suggesting that the 'collective
```

1    action' was only to withhold trades because the

2    compensation offered by DRW was not high enough,

3    (not far away from the corresponding rates)."

4              Do you see that?

5         A.   Yes.

6         Q.   Okay.  Were there -- do you believe there

7    are any -- there were any other potential reasons

8    why DRW's bids were not hit?

9         A.   I mean, there may be.  I can't -- I can't

10   think of any.

11        Q.   Okay.  Did you analyze any other

12   potential reasons?

13        A.   No, since I can't think of any, no, I

14   didn't analyze any.

15        Q.   Okay.  Why don't we just take a

16   two-minute break off the record, and I'll be right

17   back.

18              THE VIDEO OPERATOR:  Going on of the

19   record.  The time is now 15:29.

20        (A recess was taken at 3:29 p.m., after which

21        the deposition resumed at 3:36 p.m.)

22              THE VIDEO OPERATOR:  We are back on the

1    record.  The time is now 15:36.

2    BY MR. ULLMAN:

3        Q.    Plaintiff has no further questions at

4    this time.  Thank you, Mr. Harris.

5        A.    Thank you.

6            MR. MANNING:  Counsel for defendants will

7    just ask a few short clarifying questions.

8            EXAMINATION BY COUNSEL FOR DEFENDANTS

9    BY MR. MANNING:

10       Q.    Dr. Harris, you testified earlier that

11   you believed that all bids contribute to price

12   discovery.  Is that correct?

13       A.    Yes.

14       Q.    Does that -- does it necessarily follow

15   from -- from that statement that you believe a

16   clearinghouse or Exchange should necessarily

17   incorporate all bids into its settlement -- into

18   their settlement price determinations?

19       A.    I think the -- I mean, the clearinghouses

20   have rules set up on what they take in the

21   settlement period and what information they

22   incorporate in.  And they have the discretion of --

195

1    if they don't deem the bid to be appropriate, I

2    think that would be fair game for a clearinghouse to

3    exclude.

4         Q.   Okay.  And, Dr. Harris, you testified

5    earlier -- when discussing your experience analyzing

6    thinly traded products, you testified to the effect

7    that it's hard to do empirical analysis without

8    data.  What types of analysis were you referring to

9    in that testimony?

10        A.   Well, I mean, if you wanted to do some

11   study of liquidity in a market where there is no

12   trading, there wouldn't be much of anything there to

13   study because liquidity is usually based on some

14   sort of volumetric and things that we talked about.

15             So those types of analysis that rely on

16   specific data to the market, you know, if you're

17   trying to estimate bid on spreads and there's no ask

18   but only a bid, you're limited in, in the data

19   availability in thinly-traded markets.

20        Q.   But those types of analyses are separate

21   from, say, evaluation of the thinly-traded product

22   at issue?

196

1      A.    Yeah.  So, I mean, so what I did in this

2   case, there wasn't any or very -- there was very

3   little data from the market itself.  So, right, so

4   the valuation exercise we did, I guess, by

5   definition looks to outside markets to interpolate

6   what the effective prices would be in that market.

7           My statement was more along the lines of

8   analyzing that market, and not, you know, like I

9   said, bid/ask spreads or behavior, whatever, in that

10   marketplace.

11      Q.    Thank you.

12           MR. MANNING:  That's all we have.

13           MR. ULLMAN:  Nothing further.  Thank you

14   for your time.

15           THE VIDEO OPERATOR:  Going off the

16   record.  The time is now 15:39.

17           THE REPORTER:  Can counsel please state

18   their orders on the record or let me know if they

19   have a standing order with Alderson?

20           MR. ULLMAN:  We're going to both ask for

21   roughs, right?

22           MR. MANNING:  Yes, roughs and rush.

197

1          THE REPORTER:  So you want the final

2   tomorrow?

3          MR. ULLMAN:  Yes.

4          (Signature having not been waived, the

5   deposition of Jeffrey Harris was adjourned at 3:39

6   p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

198

1    Notice Date: 09/03/2015
     Deposition Date: 09/02/2015
2    Deponent: JEFFREY H. HARRIS
     Case Name: CFTC v. Donald R. Wilson and DRW
3    Investments LLC.

4    Page:Line          Now Reads              Should Read
     _____  _____  _____
5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

199

```
1            CERTIFICATE OF DEPONENT
2    I hereby certify that I have read and examined the
3    foregoing transcript, and the same is a true and
4    accurate record of the testimony given by me.
5    Any additions or corrections that I feel are
6    necessary, I will attach on a separate sheet of
7    paper to the original transcript.
8
9                    _____
10                     Signature of Deponent
11
12   I hereby certify that the individual representing
13   himself/herself to be the above-named individual,
14   appeared before me this _____ day of _____,
15   2015, and executed the above certificate in my
16   presence.
17                    _____
18                   NOTARY PUBLIC IN AND FOR
19
20                    _____
21                         County Name
22   MY COMMISSION EXPIRES:
```

200

1             CERTIFICATE OF SHORTHAND REPORTER

2       I, Karen K. Brynteson, the officer before whom

3   the foregoing proceedings were taken, do hereby

4   certify that the witness was duly sworn by me

5   pursuant to stipulation of counsel and that I was

6   authorized to and did report said proceedings.

7     I further certify that the foregoing transcript

8   is a true and correct record of the proceedings;

9   that said proceedings were taken by me

10  stenographically and thereafter reduced to

11  typewriting under my supervision; and that I am

12  neither counsel for, related to, nor employed by any

13  of the parties to this case and have no interest,

14  financial or otherwise, in its outcome.

15     IN WITNESS WHEREOF, I have hereunto set my hand

16  this 2nd day of September, 2015.

17

18

19

20  _____

21   KAREN K. BRYNTESON, RPR, RMR, CRR, FAPR

22   Notary Public

# Transcript Word Index

**[& - 40]**

## &

**&**
  3:16 4:6 7:6,9

## 0

**09/02/2015**
  198:1
**09/03/2015**
  198:1

## 1

**1**
  5:9 6:3 9:19,22 10:5
**1:00**
  129:15
**1:54**
  118:17
**10**
  5:11 17:15,16 21:5 49:21
  185:14,14
**10:00**
  1:18
**10:03**
  6:2,11
**10:40**
  40:2,3
**10:48**
  40:4,6
**100**
  59:22 60:11 76:20 157:8
  183:17,18
**100,000**
  65:9
**1002**
  5:13 76:10
**10022**
  3:18
**102**
  178:1
**109**
  5:15
**11**
  5:12 185:5
**11:40**
  80:12,13
**11:53**
  80:14,16
**110**
  184:11,12
**111**
  185:4,8,18
**113**
  187:14
**1155**
  2:6 3:8 6:12
**118**
  5:17

**11th**
  123:12 124:12 138:8
**12**
  21:5 185:15,16
**12,500**
  19:21 20:20
**12:56**
  129:18,19
**121**
  190:19
**13**
  167:7
**130**
  5:4
**132**
  192:4
**133**
  192:1
**135**
  192:4
**13-7884**
  1:8 6:9
**14**
  42:18 43:1 60:5,6 61:9
  65:19
**14:04**
  130:4
**14:54**
  174:5
**15**
  43:1 111:4 145:4
**15:02**
  174:9
**15:29**
  193:19
**15:36**
  194:1
**15:39**
  196:16
**16**
  43:2 79:11
**164**
  5:19
**166**
  5:21
**17**
  46:13,18 58:6 80:19 135:15
  145:3 152:11 153:5 155:4,4
**18**
  46:13
**189**
  5:22
**18th**
  31:20
**19**
  46:14

**1990**
  127:17

## 2

**2**
  1:17 4:7 5:10,18 10:15,16
  10:19 11:5
**2:04**
  130:2
**2:55**
  174:6
**20**
  49:21 58:18 100:11 111:4,5
**2000**
  108:7
**2010**
  5:16 29:12,17 52:22 69:3
  69:11,19 70:10,11 72:3,14
  72:21 73:3 75:12 79:1 87:4
  98:4 100:7 115:20 118:17
  121:14,17 133:13,17
  174:22
**2011**
  5:18,21 18:12,22 19:14,22
  20:1,4,5 21:16 35:19,19
  53:12 68:20 75:2,8 78:17
  122:19 124:2 139:13 167:1
  179:5
**2012**
  110:3,8
**2013**
  20:20
**2014**
  20:20
**2015**
  1:17 6:10 20:20 161:1,10
  199:15 200:16
**202-418-5420**
  3:10
**20581**
  2:7 3:9 6:13
**20th**
  174:22
**21**
  110:3,13,17 111:4
**212-488-1277**
  3:19
**21st**
  2:6 3:8 6:12
**22**
  110:3,14,17
**23**
  5:16 135:15
**23rd**
  118:17
**24th**
  53:11

**25**
  42:20 49:21 121:18,20
**25,000**
  20:3,17
**26**
  76:9,12
**27th**
  11:16 161:1
**29**
  60:10 79:10
**29th**
  110:3,8
**2nd**
  6:10 165:15 200:16

## 3

**3**
  5:12 11:9,10 17:13 30:5,7,7
  30:8,11 130:7 135:14 138:6
**3:02**
  174:7
**3:29**
  193:20
**3:36**
  193:21
**3:39**
  197:5
**30**
  49:21 60:10 85:17 139:8
**305-967-6107**
  4:10
**31**
  42:20 143:16
**312-542-1145**
  4:18
**32**
  80:21 155:6
**33131**
  4:9
**34**
  80:21 162:13
**35**
  95:3,3,5 168:22
**35th**
  4:8
**39**
  95:4,7
**3941**
  8:3

## 4

**4**
  5:13,21 59:14,16,22 60:12
  76:20 118:22
**40**
  126:22

**[41 - allocations]**

**41**
101:15 103:10
**42**
106:7,8,12
**43**
95:5 106:8 107:12 174:11
**44**
108:20 109:1 112:17
176:14
**45**
110:2,11
**46**
113:8
**47**
114:19 119:16
**49**
176:14
**4th**
167:1

**5**

**5**
5:14 109:16,18,21 110:1,7
147:13
**50**
185:3
**50,000**
147:14
**540**
4:16
**57**
130:10
**58**
134:17,18 135:6
**59**
5:13 134:18

**6**

**6**
5:16 118:2,4,8 164:6
**60**
21:9,10
**60661-2555**
4:17
**60934**
1:21
**65**
139:7
**66**
143:17,18
**68**
143:17 152:5

**7**

**7**
5:3,18 164:4,7,8,11,19,20
164:22 167:7,9

**70**
21:9,11
**72**
156:4 159:11,19
**75**
162:12,15
**78**
169:21

**8**

**8**
5:20 166:3,5,9,19 167:8,14
**800**
3:17
**86**
174:22

**9**

**9**
5:9,22 46:11 143:16 189:21
189:22
**90s**
146:10
**93**
174:13 175:12
**95**
125:11
**96**
187:14
**98**
176:15
**99**
125:12 176:16,16

**a**

**a.m.**
1:18 6:2 40:3,4 80:13,14
**ability**
38:1,7,8 39:12,15,18
**able**
74:10 81:19 89:14 98:17
115:6
**absence**
115:22 157:13
**abusing**
101:1
**abusive**
181:12
**academic**
16:13 28:20 29:4,14 42:6
90:9
**academics**
29:1
**academy**
2:17
**accept**
12:16 152:10

**acceptable**
120:6 136:15
**accomplish**
156:12
**accomplished**
122:3 171:11
**account**
14:16 66:1 73:21 127:7
151:9 183:14
**accounted**
101:22 102:12,15 103:18
**accounting**
103:9,11,12 148:9,14
**accounts**
14:18
**accretion**
117:16
**accrues**
99:21 101:2
**accurate**
37:21 90:3 169:11 199:4
**accurately**
47:4
**accused**
145:15
**acknowledgement**
5:10
**acronym**
22:21 62:19
**acronyms**
22:20
**action**
193:1
**actions**
175:4,20 176:3 181:10
**active**
85:14
**actively**
128:14 142:22
**activity**
69:15 76:3 93:9 115:22
157:14 170:13,16
**actors**
180:12
**acts**
156:13
**actual**
32:17 64:16 68:9 93:13
114:5 115:1 128:4,7 130:17
130:20 161:21 171:19,20
173:3,5 185:17
**additions**
199:5
**address**
8:2

**addressed**
165:20
**adds**
16:7
**adjourned**
197:5
**adjustment**
101:20 103:18 106:13,20
107:7 109:3 111:6 112:6,13
**administer**
7:13
**admission**
186:3
**admitted**
186:21,22
**admonishment**
11:1
**adopted**
85:2
**advantageous**
99:20
**affect**
71:7 78:2 88:3 117:2
**affording**
160:4
**afternoon**
5:4 130:1
**agency**
170:9
**ago**
8:15
**agree**
15:21 39:19 46:17 64:17
66:5 94:7,8 102:5 125:2
**agreed**
117:17
**agreement**
23:22
**ahead**
25:13 32:1 90:16 126:22
**ahhs**
9:4
**al**
5:19 79:13 88:11 127:22
139:12 140:3
**alderson**
6:16 196:19
**alignment**
111:5
**allegations**
35:5 105:14 106:1
**allocated**
14:17
**allocations**
14:14

[allow - basis]

**allow**
135:21 153:3
**alter**
116:16
**altered**
107:4 117:22
**amount**
55:10 89:12 132:11 153:6
154:8
**amounted**
51:21
**ample**
152:14 153:6
**analyses**
41:13 139:12 195:20
**analysis**
31:2,7,13 33:10 40:9,12,15
40:19 41:1 42:12,16 68:1,4
122:3 144:22 154:6 159:5
160:10 185:7,9 195:7,8,15
**analyze**
183:13 193:11,14
**analyzed**
153:12
**analyzing**
132:18 195:5 196:8
**andrew**
4:5 7:9
**andrew.lourie**
4:11
**angle**
16:17
**anne**
33:12
**answer**
9:3 34:12 36:8 38:15 57:6
71:10 89:5 134:8 141:5
167:18
**answers**
38:19
**anybody**
39:17 88:10,13 116:6 148:1
168:13,13 191:13
**anyway**
67:20 119:13 132:4
**apologize**
32:11 190:8
**apparent**
84:8
**apparently**
158:14
**appear**
70:12
**appearances**
4:2

**appeared**
11:19,21 13:18 41:18
199:14
**appearing**
34:22
**appears**
11:15,18 84:20 87:6 110:7
110:12
**application**
129:12
**applied**
29:15
**applies**
77:20 159:20
**apply**
115:3
**applying**
77:1,8,21
**appreciate**
143:4
**approached**
126:10
**appropriate**
44:19 55:19 76:16 87:5
115:3 119:21 169:16 187:6
195:1
**approve**
41:3
**approximately**
12:3 81:15
**aptly**
54:13
**arbitration**
12:5,14
**arrived**
114:8
**articles**
33:4
**artificial**
35:10 38:4,9,12 39:6,8,18
39:20 43:8,9,10,17,22 44:5
44:13,14,15 45:5,18 46:8
175:5,21 176:3 177:7
190:22
**artificiality**
45:9,22 46:3
**artificially**
173:10
**ascertain**
190:21
**asking**
15:13 33:20 38:16 39:4
42:10 45:21 54:9 55:8 57:8
94:5 112:9 117:3 130:9
188:21

**assess**
153:3,5 180:21
**assessment**
187:3
**asset**
45:15 156:8
**assist**
31:12
**assistance**
30:20
**assistant**
33:3
**assisted**
30:22
**associated**
58:11
**association**
28:17,19 29:4
**assume**
180:22 181:1
**assumed**
157:18 182:21
**assuming**
182:12
**assumption**
45:13
**assumptions**
34:3,5 139:15,22
**attach**
199:6
**attend**
36:1
**attended**
36:13
**attention**
17:18 59:19
**attorney**
173:17 174:1
**attract**
144:1,16,21 146:15 148:12
148:16,20 149:17 154:4
**attracted**
88:20
**attractive**
29:10 149:2
**attributable**
99:4
**august**
35:19 79:1 108:6,7 122:12
133:12,17 186:1
**author**
122:18
**authorized**
200:6
**availability**
195:19

**available**
81:7 159:8
**avenue**
3:17 32:4,5
**average**
49:17 54:2 81:18 145:2
152:11 154:8
**aware**
57:2,12 58:2 68:18 69:5
88:22 91:1,15 92:18 107:1
109:3 112:5,12 122:19
154:3 187:11

**b**

**back**
17:14 26:6 29:17 40:5,8
46:10 49:4 60:22 62:14
70:9 73:10,11 75:16 76:9
77:5 80:15,18 87:4,8
117:17 127:17 130:3,6
132:15,15 133:8,9 146:9
149:14 151:8 154:22 158:3
162:5 172:21 173:15 174:8
179:17 182:11 193:17,22
**backed**
12:20 13:4
**background**
16:14 185:19
**backgrounds**
16:13
**balance**
48:11
**banging**
171:14
**bankrupt**
47:17
**bargain**
120:7
**barrels**
65:8,9
**based**
16:12,15 20:19 44:16 48:22
72:13 73:4 74:4 75:14
82:17 83:15 84:7 86:15
87:1 89:9 90:6 93:13 95:5
99:9 119:21 122:5 142:8,9
144:19,22 149:7 151:12
153:9,11 160:10 176:18
182:3 195:13
**basic**
47:8
**basically**
18:3,6 23:6,8,12 71:22
145:5 157:8 161:22
**basis**
55:9 57:19 82:13 126:21
135:15 140:21 146:22

[basis - case]

**basis (cont.)**
148:13 169:6
**bates**
188:18 190:11
**beginning**
6:18 87:21 100:3 154:1
**begins**
6:3
**behalf**
3:3,14 4:4 6:16,22 7:3,7,10
**behavior**
38:5 39:7 93:18 127:5
170:18 181:1 183:5,14,16
184:13 187:17 196:9
**belabor**
78:21 111:15
**believe**
12:2,13 14:5 15:3 18:8,21
20:7 21:21 25:6 26:9 27:20
31:15 33:16 34:5,18 38:3
41:4 42:3,4 43:10 44:19
50:21 53:7 56:5 57:9 68:14
69:9 79:20 82:21 83:9,14
83:17 84:17 99:17 105:8
109:11 113:2 120:21
123:22 128:1 157:22
158:17 159:22 163:5
166:10 167:5 190:18 193:6
194:15
**believed**
68:4 194:11
**benchmark**
177:4 180:14
**benchmarked**
100:20 121:16 158:5
**benchmarking**
149:3
**beneath**
182:4
**benefit**
35:9 59:5,8 73:18 74:9
95:11 97:12,20,22 98:10,11
98:15,18,19,21 99:13,14,18
100:16 101:3 106:15 109:5
126:14 127:15 156:2 172:7
**benefits**
59:9,9 72:17,18 99:9
**benefitted**
97:22 98:3 99:19
**benefitting**
100:8
**best**
132:5 165:20 168:10
**better**
37:6 85:3 118:3 148:19,21

**beyond**
98:4
**bias**
83:3 119:2,9 126:21 128:16
**biased**
119:4,12
**bid**
45:13 66:19 67:1 77:3,10
77:15 88:15 89:13,13,15
90:8,11 91:16 92:5,13
94:17 105:3,9,19 107:19
123:6 124:1,1 136:12
138:18 142:2,8,20 143:1,8
144:9 145:2,14 146:11
147:15 148:5,18 150:18,19
151:3 152:11,22 153:2,4,5
153:7 154:9,10,15,15,17
155:1 156:19,20,21 157:4
157:10 158:15 163:10
168:14,14 170:20 171:1
180:9 182:17,20,22 189:4
192:22 195:1,17,18 196:9
**bidding**
39:7 88:18 124:8,9 147:12
147:22 148:22 149:10
171:5,5,5,7 181:19 182:14
182:17 183:5,7
**bids**
35:6 68:20,22 69:6 72:3
86:7,8,16 87:7,13 88:14,21
89:9 90:7 91:12 92:16
94:12 104:19,20 107:16
108:3,16 113:11,16,17,18
115:1 122:10,20 125:5
126:4,8,9,13 128:19 129:3
129:8 135:3,9,20 141:8,9
142:1,11,12,15 143:3,21
144:6,11,20 145:1,7,8
146:1,2,3,14,17,22 147:7
148:8 149:16,20 151:10
152:10 155:8,12 156:18
158:20 160:10,15,16
162:18 163:5,14 165:4
167:16 168:3,19 170:1
174:19 175:4,14,16,20
176:19 177:13 178:21
179:16,19 180:3 182:1,4
184:4,6,7,8 189:8 190:22
193:8 194:11,17
**big**
84:11 101:12
**bigger**
56:22,22
**biscayne**
4:7

**bit**
62:1 74:1 127:1 139:21
147:9 178:6 183:7,9
**blank**
163:15
**blindly**
139:4
**board**
18:11,16 24:10 27:6,6,22
28:8,11 49:10
**bob**
36:2
**bond**
47:11
**book**
54:7 59:21 60:15
**boston**
119:19 120:4
**boston's**
119:21
**bother**
134:6
**bottom**
167:6
**bought**
120:3
**boulevard**
4:7
**break**
9:7,9 39:22 80:10 95:6 99:3
193:16
**brian**
141:11,14
**briefly**
40:9
**broad**
147:19
**broaden**
29:7
**broader**
28:9 170:4
**broadly**
169:4
**broken**
167:3
**broker**
53:6 91:17,21
**brynteson**
1:22 2:14 6:14 200:2,21
**b's**
63:18
**build**
165:4 167:20
**building**
163:1,7 181:9

**built**
167:16
**bury**
187:16
**bury's**
187:14
**business**
18:4 20:11 30:2
**busted**
146:6
**buy**
97:1 120:19 157:5
**buyers**
63:9
**buying**
17:4 94:16 96:8 105:5

**c**

**calculate**
115:7
**calculated**
60:13
**calculating**
57:3 58:4
**calculations**
107:18
**calibrates**
130:19
**calibration**
130:10,12,19 131:14,15
**call**
25:22 27:6,7,8 75:10 133:2
172:14 183:15
**called**
13:21 35:17 49:13 84:18
**calls**
36:6
**cancel**
145:17
**canceled**
145:13
**canceling**
155:1
**capacity**
17:8 27:12,14,17 39:19
164:17
**capital**
39:17 170:3
**car**
147:14
**carried**
148:8
**case**
1:7 6:8 8:14 11:2 12:5,14
12:16,19,22 14:2,4 15:16
20:8 21:7,10 22:4,18 30:2
32:17 34:4 35:12 37:6,11

[case - concludes]

**case (cont.)**
37:16,20 40:22 41:7 81:12
82:11 116:14 117:16,20,21
122:2 132:16 149:1 155:3
156:17 157:11 171:3,18
188:10 190:17 196:2 198:2
200:13

**cases**
11:19 12:4 13:8 61:16
172:1 181:6

**cash**
20:11 47:1 48:8 58:7,14,21
73:8,14 81:14,17,19 82:6
96:10,14 100:16 101:13
103:5,22 106:2 109:4
155:22

**catherine**
33:12

**center**
169:22

**central**
56:13 118:17,17 150:21
156:6

**ceo**
109:2

**certain**
40:9 42:3 136:1,1 144:10
180:22 189:2

**certainly**
64:20 88:10 121:12 140:15
165:21 182:16,17

**certificate**
65:17 199:1,15 200:1

**certifications**
16:18,19

**certified**
2:16

**certify**
199:2,12 200:4,7

**cftc**
8:13 14:2 29:11 62:17
113:2 117:10,14,21 147:6
169:14 170:1 171:9 198:2

**cftc.gov**
3:11

**cftc's**
169:20

**chain**
5:18 118:16

**chance**
9:20 43:2 101:16 118:9
143:19 164:21 174:14
176:16 178:3

**change**
55:16 56:15 116:18 132:13
140:20 158:1 171:4

**changes**
47:5 69:21 75:14 91:8
100:15 126:18 140:17
180:4

**characteristic**
104:2

**characteristics**
63:13 64:4,16 71:6 82:19
104:5

**characterized**
22:8

**chart**
5:22

**charts**
31:5 32:22 40:21

**check**
184:2

**chicago**
4:17 18:1

**chief**
21:19,20 181:7

**choice**
127:20 139:15,22

**chose**
65:22 108:15 111:3

**cite**
60:7 76:10,19 93:1 110:2
112:9 159:14 174:21,21

**cited**
88:11 110:13 111:21

**cites**
112:16 168:6

**citing**
110:11 112:3

**clarification**
188:17

**clarifying**
194:7

**clarity's**
25:22

**classification**
62:18

**clear**
75:8 78:21 146:16 151:15

**cleared**
58:17 73:20,20 81:6,11
82:22 101:22 114:6 119:17
148:9,18

**clearing**
62:21 116:16 169:13

**clearinghouse**
23:6,6,13 24:3 47:3,3,11,15
47:18 48:6,10 54:16,20
55:11 56:3,14,14 57:2,18
58:3 61:11,17,21 62:2,8
63:12,16,18,18 70:3 72:5

**clearinghouse (cont.)**
107:10 114:17 116:9,16
155:17 169:16,18,19
194:16 195:2

**clearinghouses**
62:13,15,18 114:7 115:6
194:19

**clearly**
155:22

**clears**
18:5 23:19,21

**close**
105:5 171:14

**closed**
185:20

**closer**
148:11,15

**closing**
68:1,6,8,9 70:6,10,12 86:2
137:11,15 144:11 189:8

**cme**
18:6 23:18,19 24:1,4 63:5,6

**coded**
32:17

**collateral**
111:7,12 112:15

**collect**
40:19 55:19

**collected**
162:22

**collective**
192:22

**columns**
189:3

**combination**
91:7

**comfortable**
128:3

**coming**
37:3 125:9 149:5 160:12

**commission**
1:6 2:5 3:7 6:6,21 7:2,5
14:10 169:22 199:22

**commissioners**
22:1

**committee**
19:9,10,11,12

**committees**
19:5,8,13

**commodity**
1:5 2:5 3:7 6:5,21 7:1,4
14:9 45:15 63:20 65:2

**common**
172:20

**commonly**
183:15

**communications**
166:16

**company**
24:14,18 25:5,18 26:1,2

**comparable**
157:15

**compared**
189:2

**comparison**
153:9

**comparisons**
68:6

**compelling**
84:4

**compensate**
103:3 109:4

**compensated**
19:16

**compensation**
19:19 20:14 111:13 193:2

**competitor**
23:17,18 24:4

**complete**
160:17,21,21

**completed**
161:10

**completely**
24:13

**compliance**
5:11 11:1

**component**
24:11 86:20 132:22 133:1
151:11

**components**
67:19 70:13,15 133:22

**comport**
172:4 181:11

**comported**
127:4

**composed**
34:8

**computer**
148:1

**concept**
54:15 137:11

**concern**
31:14 145:18

**concerned**
50:22 56:15

**concerning**
139:14

**conclude**
165:4 167:16

**concludes**
84:6

[conclusion - court]

**conclusion**
132:3 148:13 150:13,13
152:17 153:9 169:6
**conclusions**
185:8,18 186:13
**concurrent**
131:15
**concurrently**
126:17
**conditions**
115:20 131:16 132:9
**conduct**
183:15 190:21
**conference**
27:7 171:20
**conferences**
28:21
**confidence**
163:1,7 165:5 167:16,20
169:10
**confident**
41:9 125:11,12 163:12
**confidential**
11:3
**confirm**
11:6 38:8 119:2
**connect**
51:19
**connecting**
137:17
**connection**
22:11 176:11
**connections**
191:21
**consequences**
186:6
**consider**
149:8
**considered**
70:18 77:14
**consistently**
135:2,9 184:4
**constructed**
128:18
**consulting**
31:8
**consummate**
183:3
**consummated**
69:8 90:12,17,18 91:13,14
92:16 93:5,16 131:2 132:6
146:13 162:17 171:11,19
173:3
**consummating**
94:1

**cont**
79:13 88:11 127:21 139:12
140:2
**contained**
37:13 39:11 46:18
**context**
39:8 66:10 102:7 183:19,21
**contexts**
180:16
**continue**
168:4 178:2
**continued**
4:2
**continues**
184:5
**contract**
18:7 22:9,9 35:8 39:13 47:5
48:6,14,15,19 49:6 50:10
50:20 52:7,21 53:3,5,9,18
58:12,13,14,15,20 59:3,21
60:14,20 61:6 63:16,19
64:2,5,8,15,17 65:8,21 66:2
66:9,12,13,14,16,20,22
67:7,12 68:2,5,15 69:6,12
70:2,7 72:8 73:7 74:8 75:5
75:6,22 77:15 78:4,7,11,13
79:4,6 81:10,11,13,15,16
81:22 82:4,6,16,21 85:6,11
86:3,12,15 87:2 88:8 94:6
95:12 96:8 97:13,15,18
98:7,14,16,20 99:1,6,16
100:4 101:20,21 103:2,6,13
104:5,10,21 105:4,10,20
106:5,22 107:4,6,8 108:4
109:7 110:22 111:3,18
112:7 113:4,5,10,13 114:2
114:12,14,22 115:13 116:1
116:10,18 117:6,8,18,21
118:1 119:2,17 120:13,20
121:1,5,8,13 122:22 124:18
128:15 130:18 131:3,5,21
132:6,7,9 134:10,12 135:1
135:17 136:21 137:11
138:7 141:9 142:14,18
144:7 149:9,13 150:8,10
151:20 153:22 154:2
155:16 157:2 158:19
159:19 160:1,9 161:16
162:5,7,11,17,19 163:6,12
163:13 167:12 175:9
178:12,19 179:16,22
181:18 185:10 186:2,12
187:3
**contracts**
13:1,3 49:18 50:6 63:2,6,9
63:12,22 64:11,21 65:5

**contracts (cont.)**
67:21 71:7,8 77:2,9 78:19
82:8 85:15 88:2 91:5
120:18 121:15 128:14
131:8 132:20 134:3 136:8
136:10 160:13 189:10
**contract's**
87:15 104:11
**contractual**
23:22
**contribute**
158:21 160:5 168:20 175:7
194:11
**contributed**
93:19 163:6
**contributes**
93:9 162:22 170:21
**control**
38:20
**controversy**
163:22
**conversation**
5:21 166:12
**conversations**
15:7,16 41:14
**converted**
131:8
**convexity**
67:22 71:2,16,18 72:18
73:4 74:14 75:19 79:17
82:10,11 83:3,3,5,9,15,20
84:1,8,12,13 86:22 87:1,10
89:5,9 95:10,16 96:5,5
97:11,21 98:5 99:4,9,13,15
99:21 102:2,14 103:7 104:9
106:14,15,21 107:18,21
108:13 119:2,4,9,12 122:13
124:5,14 125:15,17 126:21
128:15,19 133:6 135:2,17
148:10,14 149:6,12 178:7
179:2 185:11,12,16 186:4
186:22
**conveyed**
172:8,9
**conveying**
28:10
**conviction**
180:2
**convince**
107:2
**copy**
11:17 190:2 192:5,15
**corporation**
24:6
**correct**
11:17 18:10 43:14,17,19

**correct (cont.)**
44:2 45:6,10 46:4,19 52:12
59:12 60:8 63:3 69:10,21
70:20 71:2 109:17 111:10
130:14 136:9 139:19
149:17,21 171:21 173:18
175:17,22 177:14 182:13
194:12 200:8
**corrections**
199:5
**correlating**
31:11
**correspond**
168:18
**corresponded**
126:5 177:16
**corresponding**
31:12 89:15 105:10,20
109:7 110:22 111:18 112:7
112:8 113:9 114:21 115:2
116:2 123:4 124:22 126:5
176:19 179:20 193:3
**cosmetic**
33:7
**cost**
111:6,11 112:14 184:20
**counsel**
6:17 7:11,18 15:7,17 21:21
33:18 34:3,12,16 36:10
194:6,8 196:17 200:5,12
**counter**
68:16 75:16 86:18,19 87:8
90:3 91:17 114:1,4 121:15
132:20 157:15 158:3,6
164:2 183:8
**counteract**
103:15 106:13,21 107:3
**counterpart**
101:22 119:18
**counterparties**
62:11 89:1 145:7
**counterparty**
23:8,12 47:14 48:12 144:1
144:16,21 145:10 146:15
148:12,17,21 149:17,21
151:6 155:7 183:11
**country**
154:14
**county**
199:21
**course**
19:6 36:7 81:21 101:11
147:17 183:10,15
**court**
1:1 6:8,14,16 7:12 8:21 9:3
12:4,7

**[covered - determining]**

**covered**
152:4
**cox**
127:13
**create**
38:9 39:18,19 51:18 68:14
72:21 74:14 140:1
**created**
39:8 44:14 78:22 90:7
190:22
**creates**
74:7
**creating**
35:10 169:10
**creation**
64:16
**credence**
170:3
**credit**
12:20,21 61:19
**criticized**
13:15
**critiques**
180:21
**cross**
172:14,22
**crr**
1:22 200:21
**culls**
154:8
**cumulative**
111:7,11 112:14
**currently**
23:15 31:9 37:15
**curve**
49:22 51:14,18,20 71:16
95:19,20,22 128:1 188:3,7
188:13,17
**customers**
14:16

**d**

**d.c.**
1:16 2:7 3:9 6:12 8:4
**daily**
55:9 60:1 76:11,14 82:13
104:9 135:1 140:21
**dan**
6:20
**daniel**
3:4
**data**
31:5,5 34:15,16 40:18
85:21 122:6 128:4,7 130:16
139:15 140:1,3,4,5,6,13,16
153:19 154:6,8,12 158:10
158:11 161:8 186:11,15

**data (cont.)**
189:17 195:8,16,18 196:3
**date**
6:10 80:5 165:16 166:19
198:1,1
**dated**
11:16
**daubert**
13:20 14:20
**day**
8:18 47:2,5 48:3,5,7,9,18
49:1,17,19 51:1 52:11,12
54:3 55:17 56:7,16 57:11
57:20 58:5 67:13 73:17
92:6 101:7,14,14 105:19
123:14 128:14 131:17,20
132:1,13,14 136:1,10
137:18 138:1 140:20,20
143:22 144:6 155:19 156:1
162:1 177:18 183:18 184:6
184:7,8,9,12 188:9 189:4
199:14 200:16
**daylight**
118:18
**days**
144:8,10 167:5 183:17,17
184:10,11
**day's**
52:1,2,3
**dcio**
62:20
**dcm**
145:9 146:4
**deal**
13:9
**dealings**
30:3
**deals**
58:9
**dealt**
13:2
**debatable**
155:4
**december**
69:3,19 72:14 73:3 75:1,8
75:12 100:11 174:22
**decision**
153:7
**declaration**
5:10
**deem**
84:21 195:1
**deemed**
76:15,15 132:19 136:15
150:18 187:6

**deems**
181:2
**default**
12:21,21 47:12 75:16 113:9
113:22 114:3
**defaulted**
69:15 70:14
**defaulting**
86:18 87:7,8
**defaults**
23:10
**defendants**
1:11 3:14 4:4 7:7,10 15:12
34:3 35:12 37:19 127:2
194:6,8
**defense**
15:4
**define**
35:18 75:11
**defining**
22:19
**definitely**
170:14
**definition**
45:17,18,22 46:8,17 59:11
66:21 86:17 87:9 93:20
146:3 175:15 181:4,14
196:5
**definitions**
46:18
**degree**
42:6
**delaware**
29:15
**deletion**
152:12
**delineate**
58:19 137:15
**delineated**
127:7
**delivered**
65:3
**delivery**
64:22 65:7,18
**delta**
133:2
**demand**
43:11,13 44:2,3,11 45:19
97:1 107:20 108:12 113:12
113:20 114:5,11 120:14
121:10,13 138:6,11,12,21
138:22 159:6 173:11 175:8
**demanded**
108:16
**demonstrate**
84:5

**deems**
**depend**
126:18
**depending**
51:9 65:1
**depends**
71:15,17 72:18 85:7 132:8
**depleted**
47:16
**deponent**
198:2 199:1,10
**deposition**
1:14 2:1 5:8,14 6:4,11,19
8:5,9 9:22 10:10,16 11:10
14:2 15:5 22:19 35:18,21
36:1,14 40:4 59:16 80:14
109:18 110:2 118:4 164:4
166:5 174:7 187:14,16,18
189:22 193:21 197:5 198:1
**depositions**
8:17
**derivative**
13:5 23:5 147:20 172:1,18
**derivatives**
12:19 13:3 17:11 18:4 22:7
**describe**
10:7,21 11:14 43:6,8 55:1
61:12 91:4 191:4,9
**described**
48:14 54:13 103:10,14
**describing**
74:3 94:20
**description**
129:8
**design**
63:2,12
**designated**
18:7 62:16
**designed**
63:16 66:1
**designs**
63:6
**despite**
119:3
**details**
53:16
**determinations**
194:18
**determine**
48:11 55:10 60:19 61:5
114:7 115:7 135:22
**determined**
48:5 54:2 185:13
**determines**
104:14
**determining**
136:18 137:7 143:8 156:7

[detroit - dynamics]

**detroit**
119:20 120:4,8
**detroit's**
119:22
**development**
83:18
**dichotomous**
62:4
**dictate**
173:11
**dictates**
48:8
**differ**
120:15 121:11
**differed**
92:11
**difference**
22:8 67:20 68:14 70:5,18
72:8,13 75:5 101:21 109:6
110:21 111:9,12 112:6,15
121:6,8 133:3,5
**differences**
22:13 73:4 74:8,15,20 82:5
82:17 86:12,14 93:3,11
111:17 120:12,22 121:2
132:19 140:14
**different**
12:3 14:18 16:16 19:5
45:14,16 49:22 55:13 62:1
63:17 64:1,3,3,22 65:1,5,12
92:4 104:4 113:7 114:1
119:18 120:17,18 136:13
137:22 138:1,2,3 140:1,8
140:12 170:8 177:18 189:3
**differential**
82:22 87:6 111:14
**differentials**
64:11 84:7 87:1 89:8 93:12
94:22 96:22
**differentiate**
113:6
**differently**
16:4,8,10 74:1
**differs**
65:21 67:7,14
**difficult**
85:20 180:21 192:3
**dig**
33:4
**direct**
59:19 89:11 176:10
**directed**
32:14 40:14,20 41:9 122:4
**direction**
32:20

**directly**
13:10 39:15 78:9 174:19
192:21
**director**
17:19 18:10,19 19:4,16
21:2,13,17 24:11 26:2 27:1
27:14,18
**directors**
18:11,16 20:12 28:1,11
**directorship**
27:13
**disagree**
16:1 116:9
**disagreed**
16:3 150:21
**disagrees**
183:2
**disciplinary**
21:7
**disclose**
15:6
**discovered**
158:8 180:5
**discovery**
16:15 93:7,10,19 104:18
138:13,18 155:9,13 156:5,6
156:11,12 157:19 158:2,21
160:5 162:19,22 168:5,8,20
169:8,10 170:2,16,19,21
175:6 194:12
**discretion**
76:14 77:1,8,13 194:22
**discuss**
27:15,18 39:5 61:10 93:7
168:17
**discussed**
15:11 122:17 163:16
**discusses**
38:12 39:7 54:11
**discussing**
46:3 74:3 195:5
**discussions**
28:9
**disjunctive**
43:14
**disk**
6:3
**displayed**
128:8 154:16 163:10
**displeased**
117:9
**dispute**
12:6,19 14:17
**disqualified**
13:11

**disseminated**
179:15
**disseminating**
80:2 177:10
**dissemination**
61:15 124:12 148:5 162:21
**dissertation**
180:8
**dissimilar**
127:11
**dissuade**
170:13
**distinction**
77:12 102:15
**distinctions**
65:10 83:15
**district**
1:1,2 6:7,8
**division**
62:20,21 169:12,14
**dk'd**
91:18 92:11,15 163:16
165:13
**document**
118:12 164:13 188:7,19,20
189:2,14 190:10,14 191:15
**documented**
84:20
**documents**
34:14 60:6 163:17,18,21
190:16
**doing**
40:16 122:16 123:15 124:7
126:11 129:1
**dollars**
147:13
**don**
25:6 26:20 35:15 118:16
166:15
**donald**
1:9 6:6 7:7 14:10 198:2
**dots**
51:19 137:17
**double**
21:16 184:2
**downward**
95:20
**dr**
194:10 195:4
**drafted**
30:16,21
**drafting**
53:15 68:3
**draw**
17:18

**drawing**
169:9
**drawn**
137:17
**driven**
16:15
**drw**
1:9 4:15 6:6 7:8,11 26:5,6,7
26:10,13 27:19,21 28:14
30:3 35:5,15 39:11,19 52:5
53:4 55:4 68:20 69:5 72:2
78:3,5,9,12,16,22 79:3,8
86:6,12,16 97:14,20 98:21
99:10,14 101:4,5,7 105:3,9
106:4 108:3 115:11,21
116:2 118:22 122:8,20
123:6,22 124:21 125:5
127:22 133:8,11 141:8
143:21 144:5,10 148:7
151:10 152:13 155:20
163:18 165:13 167:4 175:6
175:7,16 176:10 178:20
179:4,18 180:3 182:1,4
183:5 186:19 187:9 193:2
198:2
**drwholdings.com**
4:19
**drw's**
38:1 39:7 53:22 56:6 57:10
69:19 78:6 87:7,13 88:14
89:9 90:7,15 91:12 92:16
104:19,20 107:16,17
113:17 125:20 126:3 127:8
128:19 129:2,8 135:3,9,20
146:14 152:10 155:8,12
158:8 162:18 163:5 165:4
167:16 174:19 175:4,14,20
176:19 177:13 179:13,16
181:18 189:4,8 190:22
192:22 193:8
**due**
65:21
**dufresne**
33:11,15
**dullman**
3:11
**duly**
7:16 200:4
**duties**
19:4
**dynamic**
74:7
**dynamics**
68:14 162:2

[earlier - exchange]

## e

**earlier**
7:21 30:13 43:7 72:1 81:13
82:2 97:14 133:10,11
163:16 166:14 169:12
178:6 179:18 181:16
194:10 195:5

**early**
29:12 78:17 81:19 82:12
98:8

**economic**
44:4 45:2 46:7 104:11,14
105:1 119:18 120:12,22
171:7 180:11,15 181:11

**economics**
133:2 172:4 180:19

**economist**
21:19 36:16,16 117:11
147:6 171:10 180:11,17
181:7

**economists**
183:13

**economy**
170:4,5

**edge**
188:10

**editing**
33:5

**effect**
67:21,22 71:2,2,15,16,18
71:19,21 72:18 73:5 74:13
74:14 81:4,12,18 82:4,7,14
82:17,19,21 83:6,9,15,20
84:1,8,12,14 86:2,7,15,22
87:1,10,13 88:9 89:5,9
94:21 95:20 96:5,5 97:21
98:5,5,6,13,22 99:9,12,13
99:15 103:8 105:17,18
124:5,14 125:15,18 128:20
128:20 149:6,12 178:8
185:13,16 186:4 187:1
195:6

**effective**
170:11 196:6

**effects**
75:19 79:17 83:3,5 93:2
95:10,16 97:11 102:2,14
103:1 104:9 106:14,15,21
107:18,21 108:13 122:13
133:6 135:2,17 148:10,15
150:22 185:11

**efficiency**
62:17

**eight**
12:3 13:7 108:8 122:14

**either**
39:10 45:17 47:12 55:10
77:15 83:22 131:10,13
141:5 142:20 143:10
154:10 155:15

**elaborate**
113:21

**electronic**
90:7,15 91:12 92:16 115:1
122:20 124:1 142:11,12,13
146:17,22 147:3 149:20
152:19,20 153:14 174:20
175:7,15,17 176:11

**electronically**
86:16 108:3,5 125:1 154:15

**else's**
143:1

**emphasis**
176:15

**empirical**
84:18,19 85:19 122:6
153:18 154:6 186:1 195:7

**employed**
31:10 122:9 200:12

**employees**
27:22 28:13 42:15 78:17
122:3 124:13 125:8

**emulate**
129:2

**encourage**
184:16

**encouraging**
175:6,7

**ended**
92:11

**ends**
81:21 111:3

**engage**
175:6

**engaged**
178:18

**engagement**
30:2

**enter**
66:13 97:8 117:6 143:14

**entered**
78:3,10,14 79:6 98:1 99:20
115:13,17 116:2 143:3
151:10 179:4

**entering**
118:1

**enters**
180:3

**entire**
46:2 145:5 156:20 158:9
169:13 170:9

**entities**
178:18

**entity**
28:10 47:16 55:18 62:14,22

**entry**
142:13,13

**enunciate**
78:18

**enunciation**
79:16

**environment**
71:12

**equity**
25:14 153:15

**eric**
33:11 42:4

**eric's**
33:14

**eris**
17:22 18:1,16,19 19:4,17
19:20 21:2,18,21 22:2,10
23:17,19,21 24:5,7,11,15
24:16,18 25:4,17,20 26:2,3
26:11,14 27:1,15,18 28:1,5
28:7,9 102:22 103:4,21
104:2 153:20 184:15

**esq**
3:4,5,6,15 4:5,14

**establish**
51:11 114:4 182:14

**established**
51:11 52:20 104:17 117:18

**establishing**
76:14

**estate**
119:21 120:5

**estimate**
32:16 61:19 70:10 96:7,9
122:5 133:6 136:2,5 137:16
137:18 140:6 149:8 154:9
162:6,6 195:17

**estimated**
149:7 160:11 177:5 185:10

**estimates**
135:1,15 160:12 162:1
176:18 182:18 189:9

**estimating**
131:19

**estimation**
41:7 79:16 88:14 98:2 99:6
114:13,15 126:19 127:3
139:3 140:9 178:19 179:8

**et**
5:19 79:13 88:11 127:22
139:12 140:3

**eurodollar**
82:18 83:8,9,16 84:16 85:5
85:16,22 93:2,13 94:6,11
94:20 140:10,11,19 161:8

**eurodollars**
85:10,15 87:19 161:7 178:8

**evaluated**
56:6

**evaluating**
57:10

**evaluation**
195:21

**evans**
14:22 15:16 16:10

**event**
179:1

**eventually**
178:13

**evidence**
26:13 123:21 179:7 183:5

**evolution**
83:20 84:11,15 93:1,4,12
94:10,19 178:7

**evolved**
93:18

**exact**
25:19 94:14 104:21,22
161:2

**exactly**
136:6 139:2 141:1,1 144:13
165:11 177:16

**examination**
7:18 194:8

**examined**
7:16 199:2

**example**
62:12 63:6,21 73:13 82:15
106:14 116:15 138:5
141:17 158:10,14,15

**examples**
145:8 158:7

**exceeded**
72:22

**exception**
181:3

**exceptions**
182:8

**excerpt**
5:14 59:20 110:1

**exchange**
17:22 18:1,1 19:4,7,10,10
19:17,20 21:2 22:6 23:21
24:5,8,11,15 26:3 27:2,15
27:18 28:1,7 48:2 49:7,9
50:11 61:11,13,15,22 62:3
62:7 63:11,16,17,18 65:22

[exchange - firm]

exchange (cont.)
67:13 69:15 102:22 103:15
103:21 107:3,9 114:2
117:14 131:7 133:12 142:3
142:14,15 143:11 153:21
153:22 171:20 172:14,22
173:6 184:15,15 194:16
exchanged
47:2 58:15 70:2 72:4,21
101:2
exchanges
61:17 62:13 63:2 137:6
exclude
13:17 195:3
exclusion
13:20
excuse
97:2
executable
136:15 146:7,11
execute
164:1
executed
134:4 199:15
execution
154:20
executions
44:22
exercise
126:15 127:17 139:5 196:4
exhibit
5:8,9,10,12,13,14,16,18,20
5:22 9:19,22 10:5,15,16,19
11:9,10 17:13,15 30:5,7,7,8
30:11 59:16,22 60:12 76:20
109:18 110:1,7 118:4,8
130:7 135:10,14 164:4,11
164:19,20,22 165:3 166:5,9
166:19 167:14 189:22
192:8
exist
23:15 95:18
exists
46:2 100:14
exit
98:9,14 116:21
expectation
183:1
expectations
162:2,10
expected
107:20 120:15
expedite
8:18 22:18
expense
106:16 151:5

experience
42:6 117:10 147:5 153:11
172:19 195:5
experiences
22:7
experiment
190:21 191:5,11,12
expert
5:12 8:10 11:15,20 12:1,3,9
12:12,16 13:8,12,15,19
15:3 30:14,16 36:17 151:16
expires
199:22
explain
23:3 46:21 48:1 81:3
112:22 139:21
explained
71:19
explains
111:2
explanation
90:4
exposed
44:21 145:6,6
exposure
145:19 154:20 187:4
expressed
124:18
expressly
76:13
extended
29:16
extent
22:20 36:5,9 37:5 38:16
46:2 56:9 74:18 78:1 86:6
98:1 158:18
extra
96:14 192:14
extract
161:22
extrapolating
131:20
extrapolation
100:12
extremely
152:12,17

f

face
186:6
faced
184:15
faces
47:15
facilitate
174:18 175:14

facilitated
47:2
facing
22:3
fact
65:16 93:17 104:19,20
107:19 108:14 109:3 112:5
114:20 119:3 129:7 140:16
140:18 144:8 146:7 149:7
151:10 152:10,13 153:20
154:13 156:18 162:16
177:17 185:20 186:1
factor
122:5 127:11
factors
70:18 159:6,6 160:7 161:17
facts
34:14,16 38:6,7 123:21
125:9 143:13 156:17 163:9
factual
34:2,5 175:22
failure
63:8 64:8
fair
54:17 55:1 63:13 71:8
76:15,16 87:12 113:12
114:11,12 115:14 123:4
126:6 128:20 129:9 132:19
133:18 137:8 148:11,15
149:8 161:9 169:11 170:10
176:20 177:2,7,13,20 178:9
180:1,6 182:5,5 184:5
195:2
fairly
78:18 84:4 85:13 94:9
147:19 181:13
faith
146:2,3
fall
75:10,11,13 121:16
familiar
89:17 94:13 127:19 188:14
familiarity
22:17
fapr
1:22 200:21
far
24:17 41:5 49:7 54:8 76:4
91:9,19 92:18 147:15 193:3
favor
156:1
favorable
98:2
faye
33:12

feature
109:4
features
64:2 126:18 153:13
february
5:18,21 29:12 54:1 110:3,8
122:19 124:2 165:15 167:1
feed
158:10
feedback
33:5
feel
199:5
fees
20:12
fellow
2:16
ferber
5:19,20 164:15 165:7
166:12
field
29:2 103:12
figure
51:14 67:6 123:22 132:16
161:8,14 181:10
figures
140:18 189:7
filed
13:17
final
103:21 181:17,21 197:1
finalized
165:3
finance
28:17,19 29:2
financial
17:2 54:15 99:8 132:13
156:7 163:2 170:3 200:14
financially
98:11,21 99:14
find
85:13,20 134:22 140:15
159:22 160:8 161:17 171:3
183:1
finding
40:22 159:5
fine
192:10,12
finish
142:5
finra
12:5,14,18
firm
24:20,21,22 26:8,9 31:8
35:6 101:12

[firms - guess]

**firms**
101:9

**first**
7:16 8:19 18:22 20:7,16
21:12 33:13 61:10 66:8
70:6 81:7 86:10,22 99:18
100:4 114:19 118:15 140:2
141:6 142:5,12 143:21
161:3,6

**fit**
66:20 129:8

**five**
39:22 49:21 52:16

**fixed**
59:3,6 81:6,12 95:11 97:12
97:17 102:1,13

**flat**
95:22

**flip**
17:13 46:10 80:18

**floor**
4:8

**florida**
4:9

**flow**
73:9,14 100:16 103:5

**flows**
20:11 47:1 48:9 58:7,11,14
58:21 60:18 61:5 81:14,17
81:19 82:6 96:10,14 103:22
106:2 109:5 155:22 170:3

**focus**
56:13 57:17

**follow**
194:14

**follows**
7:17

**footnote**
110:2,11 174:21 187:14

**footnotes**
60:10

**force**
119:3

**foregoing**
199:3 200:3,7

**form**
25:1 42:9 45:11 46:5 56:8
64:19 70:8 79:12 127:9
129:10 134:7 138:9 145:11
160:19 167:17 173:7 176:1
181:20 190:12

**formal**
8:9 11:3 48:9

**formats**
32:21

**formatting**
31:5

**former**
109:2

**formulation**
31:3

**forth**
106:1 133:8 154:4

**forum**
80:2

**forward**
22:9 96:10 134:5 162:1,9
187:2

**foster**
170:10

**found**
192:6

**four**
19:5,13 41:12 42:1 184:9

**fractions**
153:1

**free**
136:21

**frequency**
145:15,22 153:13

**friday**
167:1

**front**
12:5,14 142:13 169:22
184:21

**fruitful**
117:20

**full**
7:21 84:22 119:2 141:5

**fully**
62:9 85:4

**function**
23:12

**funding**
111:7,11 112:14

**funds**
74:4

**further**
120:11 139:22 194:3
196:13 200:7

**future**
82:10 85:10 105:6 176:9
184:19,22 186:9 187:7

**futures**
1:6 2:5 3:7 6:5,21 7:1,4
13:1,3 14:10 17:9 18:5 22:9
23:7 35:7 49:15 50:6 58:14
64:5,8,11,17,21 65:2,5,7,11
70:1 82:8,10,16,18 83:8,10
83:16 84:16 85:5 91:5 93:2
93:13 94:6,11,21 95:12

**futures (cont.)**
97:13 114:2,6 131:8 136:8
136:10 137:2,3,11 153:10
153:12,14 170:6 178:8

---

**g**

**gain**
172:2

**gains**
184:19

**game**
145:13 195:2

**garry**
5:15 109:1 110:2

**general**
7:11 42:21 45:21 83:4
90:10 137:10 143:2,3,5,5
159:17 162:8 169:1 182:10
191:10

**generalize**
158:20

**generally**
67:9,11,14 83:1 113:6
114:16 121:19 136:22
137:2,3,4 160:14 170:6
184:4

**generated**
189:7

**generates**
73:19 142:18

**generating**
184:21,22

**generic**
128:8

**getting**
54:8 87:20 126:7 140:12
149:11 190:6

**give**
9:12,19 42:21 80:21 82:15
100:15 106:8,9 107:13
108:8 110:16 118:8 138:1,8
142:6 149:12 152:6 162:13

**given**
70:13 71:11 101:19 114:22
120:12 136:10 162:16
192:3 199:4

**gives**
38:19 157:6

**global**
88:20 91:15 92:15 158:15
163:17,18,20 164:16
165:14 167:4

**go**
8:16 25:13 26:6 29:17 32:1
37:8 40:8 49:15 57:13 59:7
59:9,10 70:9 73:10,13 87:4
90:16 95:3 98:16 101:15

**go (cont.)**
105:14 114:19 132:15
133:8 139:7 140:9 151:3
154:22 155:6 156:1 158:3
174:3

**god**
180:10

**goes**
47:17 48:10 101:1 124:9
182:11

**going**
8:16 22:18 35:16,18 36:21
37:8 40:1 42:19 50:3 61:9
64:22 72:16,17 80:11,20
87:10 95:4 96:10,12 97:6
117:7 125:18 129:17 132:4
134:5 147:14 149:14 152:5
156:4 157:7 158:2 163:22
164:1 172:21 173:12,15
174:2,4 176:10 179:17
183:1 187:1 189:1,11
193:18 196:15,20

**gold**
85:9

**good**
6:20 7:20 55:14 61:19
62:10 63:21 85:13,21 146:2
146:3 150:18 156:8 192:7
192:16

**goopta**
92:20

**gotten**
151:4

**govern**
61:14

**graham**
6:15

**graphs**
32:22 40:21

**group**
4:15 18:6 23:19,20 24:1,4
24:16 31:2,3,7,13 32:3
33:10 40:9 41:2 42:12,16
122:3

**group's**
40:13

**grown**
84:20

**guess**
16:8 20:12 21:9 27:10 32:7
33:4 37:6 49:11 50:16 54:9
56:9,19 57:6,15 67:5 73:22
82:11 83:1 86:6 94:5
105:14 111:4 113:6 114:17
116:21 125:19 146:5
147:18,21 152:19 154:19

[guess - information]

**guess (cont.)**
158:13 162:8 169:21 170:9
170:22 172:18 179:7 181:7
182:10 183:4,14,21 185:19
191:10 196:4

**gupta**
83:17 84:6 92:19,21 178:6

**gupta's**
92:22

**guy**
141:14

**guys**
42:5 192:6

**h**

**half**
8:14 18:22 19:1

**halfway**
81:16 152:8

**hand**
200:15

**handed**
110:7 164:11

**handing**
109:22 118:7

**happened**
15:7 187:1

**happens**
8:16 59:4 127:21

**happy**
151:4 167:21

**hard**
134:15 143:13 153:18
154:5,9 195:7

**harris**
1:14 2:1 5:2,12 6:4 7:15,20
8:1 40:8 130:7 194:4,10
195:4 197:5 198:2

**hasbrouck**
168:7

**head**
9:4

**headed**
151:5

**header**
65:20 66:22 67:7 139:8
155:7,10

**heard**
166:11

**heavily**
94:7 96:17,21

**hedging**
170:7

**held**
2:1 6:11 97:15

**help**
30:19 31:3 32:13 36:21

**help (cont.)**
37:1 103:7 159:22

**helped**
33:6,10 40:10 160:8 161:17
165:4

**helpful**
43:5 188:20

**helps**
37:5,6

**hereunto**
200:15

**high**
145:15,22 147:10 150:3,12
153:13 193:2

**higher**
59:7 74:11 88:15 89:15
102:1,12 105:3,9,20 106:1
107:19,20 108:12,17 148:8
150:22 176:19 179:19,20

**hit**
94:18 108:15 143:1 145:9
146:4,12 147:3,7,10,15,16
148:4 149:20 150:2,6,19
151:3,11 153:2,4,8 154:9
154:11,17,17 155:7 163:11
180:4 184:6,7,9 193:8

**hitting**
94:12

**hold**
27:6 62:16 173:20

**holding**
99:15

**holds**
27:13

**home**
119:19,20

**hopefully**
8:18

**horizon**
66:17

**horse**
154:14

**hour**
129:16 174:3

**hours**
21:1,5,9,11

**house**
120:3

**huge**
63:8

**hull**
41:5 122:5 127:11,12,15,17
129:12

**hum**
42:14 62:12 86:5 105:13
135:19 146:19 150:9 155:6

**hum (cont.)**
181:4

**humenik**
21:20

**hypothetically**
183:10

**i**

**i.e.**
114:20 175:7

**idc**
65:22

**idcg**
25:21 109:2 119:2 158:13
165:22

**idch**
23:1,4,14,14,17 24:3 25:21
27:15 49:1,1,18 51:6,13
55:8 56:7 57:10 60:12
76:13 104:10 113:10
114:21 158:11 174:17
175:4,20 176:9 188:3,10
189:14

**idch's**
50:8,19

**idea**
101:4 143:7 170:1,5 188:12
188:20

**ideas**
80:3

**identical**
139:12 182:1

**identification**
10:1,17 11:11 59:17 109:19
118:5 164:5 166:6 190:1

**identifies**
188:18

**idex**
5:13

**ignores**
131:2

**ii**
3:4

**illinois**
4:17

**illiquid**
153:16

**illustrated**
40:22

**imbalance**
81:7 82:11,12

**immediately**
22:11 84:8

**implementing**
146:10

**implication**
170:9

**important**
8:19 47:6,9 54:14,14 170:2

**importantly**
76:13

**impossible**
183:18

**impound**
83:6

**impounded**
157:10

**impression**
39:16 103:7 119:13

**incentive**
181:12

**incentives**
154:4

**include**
70:15 86:19 113:5

**included**
34:20

**including**
86:7

**incorporate**
102:2,13 107:3 194:17,22

**incorporated**
178:20

**incorporates**
103:1 162:9

**incorporation**
178:7

**incorrectly**
98:11

**incur**
173:9 184:19

**independent**
127:4,6

**independently**
128:18

**indicate**
183:9

**indicates**
52:5 95:9 175:13

**individual**
50:5 51:17 52:1 55:18
199:12,13

**individuals**
42:11

**infeasible**
150:11

**influence**
38:1 39:12

**information**
16:12,15 29:1 36:6 61:15
80:8 94:14 128:11,12 132:6
142:10 156:21 157:6,8
159:8 162:21 168:9,11,12

[information - knowledge]

**information (cont.)**
168:16 178:20 194:21
**informative**
36:15,19
**informed**
37:6 151:5
**informing**
27:12
**informs**
46:2
**inger**
127:13
**inherent**
71:6 74:14 98:15
**inherently**
117:15
**initiation**
98:2
**innovation**
103:20
**innovations**
103:20
**inordinate**
153:5
**inputs**
139:15 140:1
**instance**
64:21 102:22 128:13
**instances**
177:15
**instantaneous**
154:17
**instantaneously**
154:16
**instructed**
41:4
**instruction**
8:22 9:2,5,10,16
**instrument**
94:8
**instruments**
139:1
**integrity**
54:15
**intent**
15:10 37:19
**interaction**
32:10
**interactions**
33:18
**interchange**
92:14
**interchangeable**
61:22
**interday**
180:9

**interest**
13:9,10 18:2,5 29:9 41:15
52:14 54:5 58:10 59:7
63:22 64:1,5 65:21 67:14
69:20 71:6,12,17 73:8,10
73:13,16 81:5,6 82:9,20
95:11 96:6,12 97:13 100:1
100:15,22 101:1 109:7
110:22 111:5,18 112:8
119:17 120:13 121:1
126:18 127:13 128:1
130:22 133:19 138:22
139:14 147:19 148:19
151:14 160:13,14 161:20
162:2,10 171:7 187:2
200:13
**interested**
29:1 59:22 61:14 119:5
130:9 155:18 163:11
169:15 176:14
**interesting**
39:14
**interests**
165:21
**interfaced**
32:5
**intermediary**
169:13
**intermediate**
62:22
**internal**
78:5 79:8 115:11 163:18,20
189:14
**internally**
78:8 123:15
**international**
23:5
**interpolate**
196:5
**interpolator**
188:4,7,13,17
**interpret**
70:21
**interrupted**
50:3 90:16
**introduce**
6:17
**invaluable**
155:8,12,20,21
**invest**
74:10 81:14
**invested**
184:20
**investigate**
41:12 53:14 88:17

**investigation**
84:19
**investigations**
181:8
**investing**
81:20
**investment**
73:15,16,17 101:10 185:1
**investments**
1:10 6:7 7:8 198:3
**investor**
163:1,7 165:4 167:16,20
169:10
**investors**
152:10,15 163:11
**involves**
139:14 159:5 171:19,20
**irrationality**
180:17
**island**
148:1
**isolate**
134:2
**issue**
113:11,18 123:18 126:16
165:8 195:22
**issued**
160:22 188:10
**issues**
22:2,3,5 40:15 41:15

**j**

**january**
35:18 53:11 68:19 108:6
**jason**
3:6,15 7:3,6
**jason.manning**
3:20
**jeffrey**
1:14 2:1 5:2,12 6:4 7:15 8:1
197:5 198:2
**jeffries**
53:7 76:6 88:22 107:2
116:15 158:17 178:22
185:20 186:18 187:9
**job**
1:21 9:12 142:19
**journals**
28:22
**jr**
7:8
**judge**
13:15
**july**
5:16 11:16 118:17 160:22
**jumping**
185:14

**june**
138:8
**justify**
126:10

**k**

**karen**
1:22 2:14 6:14 200:2,21
**keep**
11:2 15:12 50:3 60:6
101:10
**kept**
25:15
**kf**
1:8 6:9
**kim**
3:16 4:6 7:7,9
**kind**
121:4 135:10 156:3
**knew**
21:21 126:12 141:19
156:20
**know**
9:14 14:19,22 18:20 23:1
25:16 26:5,7,10,15,15,16
26:18,20,21 27:21 28:15
29:20 31:12 33:7 35:9
36:17 38:5,11 41:1,11,18
42:1,8 44:22 45:1 47:19
48:12 49:8 51:9,13 52:20
53:4,10 57:6,7 58:3 61:18
62:2,10,17 63:5 65:8 66:16
70:21 76:4,8 78:12 79:3,7
79:18 83:4 85:14 88:15,19
88:20 89:2,22,22 90:14
91:19 95:18 96:2,20 98:8,8
99:2,8 100:2,9,15 101:7,13
105:16,18 108:14,18 113:4
115:18,21 116:7 117:19,19
117:21 119:8 121:6 122:8
122:11 123:7 124:3 125:6
125:10,10,22 126:1,3,11,19
132:13 135:11 141:7 142:4
145:14 147:13,18 153:3,12
154:13,22 155:22 157:4,7
158:16,17 160:15 163:14
164:15,17 165:10,12 166:1
168:13 171:4,10 173:10
176:8 179:2,3,5 181:13,16
186:17,20,20 187:8 188:3,7
188:18 195:16 196:8,18
**knowing**
53:17 152:22
**knowledge**
13:13 53:20 57:9 78:15
85:18 89:7,11 123:18 124:6
152:19

[kobre - manipulation]

**kobre**
3:16 4:6 7:6,9
**kobrekim.com**
3:20 4:11

**l**

**lack**
103:17 109:3 110:20 112:5
115:1 179:8
**lacked**
101:20
**large**
61:16 147:21
**largely**
122:2 176:20 177:20
**late**
52:22 69:11 82:12
**launch**
63:9
**laurie**
164:15
**law**
12:7
**lawsuit**
34:22 35:4
**lawyers**
15:12
**lch.clearnet**
102:8
**lead**
64:7,10 106:2 123:14 185:1
**leading**
111:9
**leads**
44:4
**learn**
87:19 88:1
**learned**
178:13
**learning**
87:22 88:7 89:6,8
**leave**
29:11,13,14,15,16,16
**led**
92:13 109:5 110:20 112:6
**left**
157:1
**legal**
173:21 187:9,11
**legitimate**
44:1,8 155:9 175:8
**lehman**
159:15
**lending**
170:3
**length**
154:21 185:10

**letter**
112:21 113:1,2
**level**
123:6 142:8 143:8
**levy**
4:14 7:11
**licensures**
16:22
**life**
66:14 81:9,15,22 82:3,3
96:7 98:7,13 99:6 100:4
103:2,5 117:8 187:3
**likewise**
120:12
**limit**
50:17
**limited**
195:18
**line**
51:20 111:4,4 137:17 167:7
167:9 198:4
**lines**
137:21 196:7
**link**
142:15
**linking**
147:22
**liquid**
85:5,10 94:9 101:11
**liquidity**
16:6,7,10,11,14 85:14 90:4
90:6,9,11,13,18,21 91:5,7,9
97:5 98:18 147:17 154:1,5
184:17,22 195:11,13
**list**
34:7,20 174:18 175:13
**listed**
34:15,17 42:2 49:6,7,7,9,18
49:19
**listen**
33:19
**listening**
36:16
**literal**
33:21
**literature**
83:1 125:16
**litigation**
188:19
**little**
55:12 62:1,6 74:1 127:1
139:6,21 178:6 183:7 196:3
**live**
120:8 140:4,16
**livingston**
8:3

**llc**
1:10 6:7 7:8 198:3
**llp**
3:16 4:6 7:7
**lobbied**
116:17
**lobbying**
117:13,14 146:6
**logic**
70:13 87:6 191:15
**logical**
151:2 191:20
**long**
45:1 52:21 53:8,18 54:1,21
54:22 55:7 58:20 59:2,8
69:20 72:16,16,22 73:8,9
73:14,15,19 74:9 95:18
97:15 98:22 99:15,22,22
100:21,22,22 101:3 106:3,4
106:16 108:3 109:5 115:14
116:3 143:22 144:16,20
145:1,4 150:17 152:9,12,17
154:10 155:4 182:14 186:6
192:8
**longer**
52:19
**look**
9:18,20,20,21 10:14 11:9
11:13 14:7 16:14 17:14
30:5 43:1,2 46:13,16 53:16
54:6 55:16 58:18 60:2 68:8
73:12 80:21,22 85:7 87:5
94:7 95:2,7 100:10 101:16
101:16 103:4 106:8,9
107:12 108:20,21 118:9,15
121:18 122:8 125:20
126:16 130:7 131:13
132:15 134:19 135:14
138:6 143:17,18 152:6
162:12,13 164:10,18,21
167:6 171:2 174:13 176:16
178:1,3 181:17,18,21
183:16,17 185:4,5,11
186:11 191:22 192:1
**looked**
49:3 50:8,19 51:2 76:10
115:11 126:2 163:17
167:14 188:9
**looking**
38:6 54:7 65:15 66:14 76:9
89:12,13 96:10 131:15
154:3 162:1,9 187:2
**looks**
38:3 60:7 83:18 187:13
196:5

**lose**
172:17 173:1,12 186:9
**losses**
173:9
**lost**
103:3
**lot**
42:5 62:7 137:6,6 157:6
180:15 190:10
**lourie**
4:5 7:9,9
**lower**
173:11 176:20 177:20
**luitgaren**
5:17 141:12,13,21 143:6
**lunch**
129:16,19 130:6

**m**

**maclaverty**
36:2
**maclaverty's**
36:13
**madison**
4:16
**mahoney**
3:6 7:3,3
**mail**
5:16,18 118:16 122:12,17
124:4 164:19,22 165:17
174:22
**mails**
78:5,6,8 115:11,12
**main**
49:20
**maintaining**
163:1
**major**
147:9
**making**
97:4 129:7 155:18 169:15
171:6
**manage**
62:3
**managed**
101:13
**management**
28:12 56:2
**manager**
27:12
**manages**
23:9
**manipulate**
35:7 38:9 105:15
**manipulation**
165:9 171:10,18 172:1,14
172:22 181:6

[manipulations - model]

**manipulations**
171:15
**manipulative**
170:13,15,18 172:11
**manning**
3:15 7:6,6 25:1 36:5 38:14
39:2 42:9 45:11 46:5 56:8
64:19 70:8 71:10 74:17
75:7 79:12 87:16 92:7
100:13 102:17 116:13
127:9 129:10 134:7 136:20
138:9 145:11 146:16,20
151:21 157:16 160:19
167:17 173:7 176:1 181:20
187:19 188:16 190:2,7
192:2,8,10,12,15,18 194:6
194:9 196:12,22
**map**
99:5
**march**
123:12 124:11
**margin**
46:22 47:1,6,10,10,15,16
48:22 54:11,12,14 55:10,20
55:22 56:11,21 57:18,20
60:17 61:4 67:13 70:2
71:20 72:3,13,20 73:11
74:4,22 101:2,5,8 106:2
136:18
**margins**
55:19 56:22 65:22 73:21
101:11
**mark**
109:21 118:2 136:17 166:3
189:20
**marked**
9:19,22 10:4,15,16 11:10
30:8 47:20 48:3,19 52:11
59:16 82:13 109:18,22
110:1 118:4,7 164:5 166:5
166:8 189:22
**marker**
80:4
**market**
18:7 22:14 38:1,9 39:12,16
44:17 47:20 48:3,7,19
52:11 57:4 63:1 65:16 76:3
76:16 82:13 83:19 84:9
85:2,19,22 87:18,21 88:13
89:2,18 90:10 93:9 94:21
96:17 97:4,5,8 98:16 100:1
104:22 111:6 112:13 113:7
115:22 116:7,8,12 117:5,12
128:4,7,11,12,13 131:15
132:13 134:10,10 136:16
136:17,21 137:3 139:4

**market (cont.)**
140:5,9,10,11,11,16,19,19
147:16,20,20 148:11,15,19
149:1 154:5 155:15 156:13
156:14,20,22 157:5,11,12
157:14,14,17 158:3,4,9,18
159:7 160:8,12,14 161:15
161:17 162:20 164:2 165:9
168:4,9,16,16 170:8 171:10
171:18 172:2,3,4,7,9
177:11 178:13,17,17 179:9
180:5 183:14 184:18
195:11,16 196:3,6,8
**marketplace**
23:9 43:12 44:21 84:5 85:2
85:14 125:14 138:12,13
196:10
**marketplaces**
123:11
**markets**
18:3,4 22:13 87:19 91:3
94:15 104:16,17 120:14
121:11 122:6 125:17
130:20 133:8,17,20 136:11
136:21 138:21 147:18
152:20 153:10,12,13,15,15
153:17,17 154:4 156:7
158:1 169:12 170:3,6,11
172:1,18 195:19 196:5
**marking**
48:22 54:6 59:14 187:17
**marks**
48:6
**material**
34:8
**matt**
14:22 15:16
**matter**
6:5 8:12,13 12:18 13:18
14:12,13 38:2 58:2 113:11
166:17 168:15 175:22
**mattered**
56:10 88:13
**matters**
148:6
**maturities**
135:4 144:11
**maureen**
168:10
**maximizing**
151:2
**mean**
21:4 43:15 45:14 50:15,16
52:18 55:15 57:14 59:1
64:20 65:11 66:8 67:6,10
73:6 87:18 90:14,17,18

**mean (cont.)**
91:6 98:10,12,12 99:11
100:12 101:9 103:20
104:22 114:12 115:1
117:14 120:16 121:4 122:4
122:15 123:9 125:14 126:2
129:11 135:8,13 136:5
137:4 140:14 146:5 147:12
147:21 149:5 150:16 154:2
154:2,12,19 155:22 156:2
157:17 160:5 168:15
169:20,21 171:14,22 177:2
178:16 180:13 181:6
183:16 184:14,20 191:18
192:2 193:9 194:19 195:10
196:1
**meaning**
33:21 180:19
**means**
45:9 47:20 48:1 58:20 59:3
90:14 181:5
**meant**
58:14 62:2 108:16
**measure**
134:1
**measurement**
67:16
**measures**
133:1
**measuring**
134:2
**mechanically**
142:7
**mechanics**
143:2
**mechanisms**
103:6 137:7 169:17
**meeting**
21:4 28:9
**meetings**
19:6 27:6
**member**
18:16
**members**
40:10
**membership**
28:22
**mentioned**
169:12 185:12
**merit**
2:15
**met**
7:20 21:20 26:21 166:15
**methodologies**
41:2

**methodology**
51:14
**metric**
91:4 132:5
**metrics**
91:7
**mf**
88:20 91:15 92:15 158:14
163:17,18,20 164:16
165:13 167:4
**miami**
4:9
**michael**
33:11 42:4
**microphone**
118:2
**microseconds**
145:14,17 155:2
**mid**
108:7 146:10
**middle**
95:8 162:15 192:20
**midpoint**
182:21
**million**
65:8
**mind**
15:12 27:10 66:11 142:17
143:10
**mini**
65:11
**minification**
171:3
**minimizes**
47:4 172:12
**minute**
30:6 39:22 80:9 164:10
174:3 193:16
**minutes**
145:3,4,19 152:11 153:4,5
155:4
**mirror**
58:14
**misstating**
43:20 71:4
**mistake**
74:2
**misunderstanding**
74:16
**mode**
151:2
**model**
31:3,4 41:5 96:11,16 97:7,7
122:5,9 123:8,10,12,17,22
124:13,15 125:6,13,20
126:3,5,8 127:12,12,19

[model - occasions]

**model (cont.)**
128:8,18 129:2,3,7,13,13
130:13,18 131:19 132:18
134:1,4 135:15,21 136:2
137:14,22 138:8,20 140:1,6
140:15,21 142:16,17
143:10,10 150:15,20,21
151:9,11,12,16 160:18,22
161:6,7,9,22 162:9 177:10
177:12,17 182:5,13

**modeled**
149:7

**modeling**
41:16 95:10,16 96:4,15
97:12 121:21 122:1,2
123:15 124:5 139:5,14,15
139:22 151:16 182:3

**models**
127:14,18 137:22 138:2
161:20 177:5,17

**model's**
129:8

**money**
23:11 35:10 171:6 173:1,2
173:12

**monitor**
125:16

**monitoring**
158:17

**month**
18:18 35:8 39:13 48:14,15
48:18 49:6,17 50:9,20 52:6
52:21 53:3,5,8 58:12,13,20
59:2,21 60:14,20 61:6
65:20 66:2,9,11,20,22 67:7
67:12 68:2,5,15 69:6,12
70:7 75:5 78:4,6,13 79:4
86:3,12,15 87:2,14 88:8
97:15,18 99:1,16 101:20,21
104:5,11,20 105:4,10,19
106:5,21 107:6 108:4 109:6
110:21 111:17 112:7
113:10,13 114:11,22
115:13 116:1 119:16
120:13,22 121:5,7,13
124:18 130:17 131:1,3,5,21
134:10,12 135:1 138:7
141:9 144:6 151:19 159:18
160:1,9 161:16 162:5,7,10
162:17,19 163:6 167:12
175:9 178:12 179:22
181:18 186:12

**months**
52:17 108:8,9,10,11,12
122:14 132:15

**montreal**
32:8

**moot**
121:9

**morning**
6:20 7:20

**mortgage**
12:20 13:4

**motion**
13:17 14:20

**mouth**
43:19 56:5 137:10

**move**
91:10 106:7

**moved**
31:20 55:18 183:8

**movements**
57:19

**moving**
172:7 190:19

**multiple**
101:12 135:4 136:9

**multiplied**
54:5

**n**

**n.w.**
2:6 3:8

**name**
7:21 8:1 14:3 25:17,19,21
33:13,14 188:18 198:2
199:21

**named**
199:13

**names**
33:9 141:8

**nasdaq**
146:10

**national**
49:15

**nationally**
105:15

**native**
190:12

**nature**
35:4

**ndx**
49:11

**near**
95:8 160:16

**necessarily**
50:11 56:1 65:17 70:19
114:5 115:20 117:1 126:11
146:1 194:14,16

**necessary**
199:6

**necessitate**
131:16

**necessitated**
20:11

**need**
47:9 142:12,14

**needs**
165:20

**negative**
81:17

**negotiated**
91:16,21 98:9 99:3 131:7
187:5

**negotiation**
92:1 107:2

**neither**
200:12

**net**
81:4 82:4 185:11

**network**
79:21 80:1

**new**
1:2 3:18,18 6:8 37:12 63:6
63:9 168:11 188:10

**newell**
14:10

**nfx**
49:14,15,18 50:18 161:15
161:17

**nominations**
19:9

**non**
44:15 45:5 101:22 117:16
119:4,12,17 146:2 148:9,18
177:7

**normally**
27:7

**north**
145:3

**northwest**
6:12 8:3

**notary**
199:18 200:22

**noted**
119:16

**notice**
198:1

**noticing**
6:19

**notion**
56:20 88:12 143:3 148:5

**notional**
51:7

**november**
69:3

**npv**
67:21 71:1,15,18,21 74:13
75:18 81:11,18 82:4,7,14
82:17,19,21 83:6 86:2,7,15
87:13 88:9 95:9,15,19
97:11,20 98:5,6,13,22 99:4
99:9,12 102:2,13 103:7
104:9 106:13,14 107:18,21
108:13 128:20 133:6 135:2
135:17 148:10,14 149:6,12
178:7

**number**
6:8 9:22 10:16 11:10 32:15
59:14,16 61:16 63:22 83:4
109:18 118:4,22 127:18
147:21 164:4 166:5 189:21
189:22

**numeral**
46:11 65:19

**o**

**oath**
7:13

**object**
127:9 134:7

**objection**
25:1 36:5 38:14 42:9 45:11
46:5 56:8 64:19 70:8 71:10
74:17 75:7 79:12 87:16
92:7 100:13 102:17 116:13
129:10 138:9 145:11
151:21 157:16 160:19
167:17 173:7 176:1 181:20
187:19

**obligations**
12:21

**observable**
82:8,16

**observation**
191:13

**observe**
70:6 86:11,14,22

**observed**
70:11

**observing**
155:15

**obsolete**
168:12

**obtained**
53:4

**obvious**
65:6

**obviously**
22:17 38:15 39:17 48:13
88:20,22 167:21

**occasions**
8:8

[occur - page]

**occur**
28:9 151:13
**occurred**
84:16 93:13 151:18 165:13
167:3 175:15 183:17
**occurs**
94:10
**o'connor**
5:15 109:2,12 110:3,20
**october**
69:2,18 75:1,8
**offense**
181:14
**offer**
45:13 94:17 136:12 141:8
142:20 143:1 146:12
147:13 156:22 182:20,22
**offered**
77:3,10,15 193:2
**offering**
37:18,22 148:21
**offers**
94:12 156:18 159:2 170:1
**office**
32:4
**officer**
200:2
**officers**
27:22 28:14
**offices**
2:2 22:1 31:17
**official**
27:11
**offset**
82:1 103:7 107:21 108:13
**offsetting**
185:1
**oh**
30:10 112:2 161:11 170:14
171:12 181:21
**o'hara**
168:7,10
**okay**
8:8,10,12,16 9:2,12,18 10:2
10:7,11,14,21 11:5,8,17
12:8,11,17 13:11,14 14:3,6
15:2,5,10,15,19,21 16:18
16:22 17:5,8,11,13,17,22
18:9,12,18,21 19:3,8,16,22
20:6,9,13,15 21:1,6,10,17
22:16 23:1,3,14,17 24:2,5
24:10,13,18 25:4,8,11,16
26:5,10,13,17,20 27:4,9
28:3,13,16 29:3,6,18 30:1,5
30:13,16,22 31:9,13,16,18
31:21 32:3,9,11 33:1,19,20

**okay (cont.)**
34:2,7,11,21 35:3,11,16
36:1,21 37:4,8,15,22 38:11
39:4,10,21 40:12,17 41:1,8
41:11,17,20,22 42:7,18
43:4,13,16 44:7,10,13 45:8
46:10,15 47:6,8,19,22
48:13,21 49:3 50:2,8,13
51:2,4,4,13 52:9,14,20 53:1
53:4,10,14,19 55:3,14,21
56:4,18 57:5,16 58:6,16,18
59:4,11,14 60:4,10,10,16
63:2,5 64:7,10,13 65:14
66:15,19 67:5,8,16 68:8,18
69:1,3,4,9,17 70:1,5,17
71:1,14 72:1,7,12 74:22
75:4,12,20 76:5,7,9,22
77:19,22 78:12,20 79:2,8
81:2 83:8,13 84:15 86:10
86:21 87:12 88:7 89:12
90:15 91:12 93:11 95:2,15
96:16 97:9,20 98:21 99:8
99:14,18 100:6,9 101:18
102:11,21 103:9 104:8,14
105:8 106:4,11 107:5,9,12
107:14 108:20,22 109:15
110:6,13,16,18 112:20
113:16,19 114:10,15
115:10,16,21 116:8 118:11
118:15 119:10,15 120:3,11
120:21 121:18 123:20
124:8,21 125:22 129:6,15
129:15 130:11,16,21 131:2
131:11,18,22 132:10,18
133:1,15 134:14,17,21
135:8,21 136:4,8 137:9,14
137:19 138:2,5,16,19 139:9
139:18,21 141:20 143:4,13
143:16,20 144:15 145:8,21
145:21 146:8,14,14 147:5
147:11 148:7 149:19 150:5
151:15 152:5,7,8,21 155:6
155:12 156:11 157:21
158:7,12 159:1,4,13,14,17
159:21 160:3,7 161:4,12
162:12,14 163:5,9 164:3,12
164:15,18 165:2,12,16,19
166:3,11,14,19 167:2,6,10
167:14 168:18,22 170:15
173:15,20 174:2,15,16
175:3,12,19 176:5,8,13,18
177:2,6,12 178:1,1,4,11,16
180:3,8 182:3,13 183:21
185:6,22 186:7,10,17
187:16 188:3,9,12,15
189:19 190:16,19,19 191:8

**okay (cont.)**
191:14,17,22 192:12,20
193:6,11,15 195:4
**old**
168:12
**onboard**
22:15 184:16
**once**
26:22 146:12 176:10
**ones**
85:7
**oohs**
9:4
**open**
50:9,12,17,20 51:5,12,15
52:6,16,19 53:5,10,17,22
54:4,21,22 55:4 56:6 57:3
57:10 58:11 60:6,13,19
61:5 69:18,20 72:4 76:1
77:2,9,20 78:4,14 79:1
100:5,10 154:9,11 173:4
**opened**
53:8 133:8,11,16
**operate**
94:16 154:13
**operated**
62:13
**operations**
19:7 32:16
**operator**
6:3 7:12 40:1,5 80:11,15
129:17 130:3 174:4,8
193:18,22 196:15
**opines**
84:12
**opinion**
39:10 86:1 144:19 163:9
168:2 173:22 184:1,12
**opinions**
13:14 37:12,16,19,22 38:18
43:7
**opportunities**
170:7
**opportunity**
152:14 160:4
**opposite**
59:12 95:21 172:6 192:21
**optimization**
31:4 32:15,18 41:5
**option**
116:22 117:1
**options**
116:11 117:11
**order**
142:13 145:13 153:1
196:19

**orders**
93:5 107:5 143:14 146:11
196:18
**organization**
21:15 24:8 28:21 42:16
**original**
58:1 84:13 199:7
**ot**
70:14
**otc**
65:21 67:8,14 69:13,16
70:15 71:8 72:8 89:15
100:18,21 109:7 110:22
111:18 112:8 114:20 116:2
116:5 119:17 120:13 121:1
131:6 134:3 148:9,18 149:1
149:3,16 189:3
**outcome**
200:14
**output**
32:19,20 161:3
**outside**
15:15,17 30:1,1 33:21
34:11,14 37:12 92:15 93:22
107:17 123:20 196:5
**overall**
172:5
**overbid**
183:12
**overnight**
73:16 74:5,11
**overpaying**
182:18
**oversee**
40:12,14
**oversight**
19:11 62:22 169:13
**owned**
24:13
**owner**
25:7,17 26:10,14
**owners**
24:19,22 25:4,9
**owning**
98:19

---

**p**

**p&l**
185:17 186:11
**p.m.**
118:17 129:19 130:2 174:6
174:7 193:20,21 197:6
**page**
5:2,8 11:5 17:15,16,19
42:18 46:11 53:21 59:22
60:5,6,11 61:9 65:19 76:20
79:10 80:19 111:4,5 121:18

[page - position]

**page (cont.)**
121:20 139:8 143:16 155:6
162:12 167:6,7,8 168:22
174:11 185:3 192:4 198:4

**pages**
43:1 46:11 110:3,13,17
167:12 176:14

**pai**
101:20 103:1,18 104:6
106:14 109:3 110:20 111:3
111:13 112:5,12,13 113:5

**paid**
23:11 49:1 186:2

**panel**
12:15

**panes**
57:21

**paper**
65:15 78:17 79:13,18 80:6
83:18 84:3,21 88:11,12
94:14 122:14,18 123:12,13
124:11 127:8,16,22,22
140:3 146:9 168:7,7 199:7

**papers**
92:22 168:17,18 180:22

**paragraph**
46:13,18 58:6,18 60:1,11
60:16 61:3 76:9,11,12
79:10 80:21 95:7,8 101:15
103:10 106:7,12 107:12
108:20 109:1 112:17 113:8
114:19 119:16 130:9
134:17,18 139:7 143:17
148:7 152:5,8 156:4 159:11
159:19 162:12,15 169:21
174:13,17 175:12 176:13
176:15,16 178:1 185:4,8,18
187:14 190:19 191:22
192:4,20

**paragraphs**
42:20 46:13 95:3,5 106:8
191:7,16

**parameters**
131:20 161:22 162:4

**part**
64:17 87:19 94:19 99:12
100:4 121:14 149:6 172:11
180:10 182:6,7

**partially**
79:10 85:1

**participant**
44:17 116:8,12 117:6,12
156:13,19 158:16

**participants**
19:11 57:4 62:9 85:3 87:21
113:7 157:11,13 170:8

**participants (cont.)**
178:18,20

**participate**
158:4

**participating**
181:13

**particular**
22:4 48:6 84:3 85:15,21
88:12 117:20 131:17
135:18 147:20 162:1
163:12 169:18 178:19
179:16 187:20

**particularly**
28:12

**parties**
14:15 29:1 89:6,8 200:13

**parts**
170:2

**party**
6:19 66:19 67:1 72:16,17
73:8,9,14,15,19 74:3,9
103:3 106:3,15,16 107:20
109:5 146:4 171:21 174:18

**party's**
51:5 69:17,19 77:1,9

**passed**
132:12 169:16

**pat**
7:11

**path**
96:12

**patricia**
4:14

**patrick**
6:15

**pattern**
181:1

**patterns**
180:9

**pay**
105:4 148:22 186:5

**payer**
59:3,6 81:12 95:11 97:12
97:17

**paying**
20:2 81:17

**payment**
186:8

**payments**
81:8,9,13 82:1,2,12 187:7

**peer**
79:18

**pending**
9:9

**pennsylvania**
31:20 32:4,4

**people**
28:13 31:2 32:7 33:9 41:12
42:1 80:4 83:5,11,13 88:1,7
88:19 89:19,22 94:16
117:22 120:18,19 143:12
150:7 157:5 180:16 181:2
182:21,22 184:16

**perceive**
184:5

**perceived**
150:11

**percent**
125:11,12 157:8

**performance**
47:11

**performed**
41:13

**period**
35:7,17,21 38:5 52:6,16
55:5 68:19,19,22 69:2,5,8
69:11 70:3 72:2,9 75:10,11
75:13 88:9 89:10 100:19
107:17 108:6 124:10 125:1
131:10,12 133:16 134:16
135:3 144:2,12 145:3,4,6
146:18 149:21 151:18,19
152:9 154:10 162:18 176:6
179:19,22 181:19 194:21

**permutes**
45:9

**personally**
26:21

**ph.d.**
42:4

**philadelphia**
49:10

**phone**
32:10

**phrase**
47:19 149:9 187:21 188:14

**phrased**
16:4,8,9

**physically**
142:2

**piece**
168:8,11

**pile**
103:21

**place**
105:18 145:1

**placed**
107:5 122:9 129:3 141:8,9
143:21 144:6 145:2,9 146:1
146:3 163:6

**placement**
152:11 168:3

**places**
172:19

**placing**
68:20 69:6 72:2 108:3
122:9,20 142:1 145:2
179:19

**plaintiff**
1:7 3:3 6:21 7:1,4 194:3

**plaintiffs**
7:18

**planned**
40:20

**plate**
157:3

**platform**
147:4 174:20 175:15,17
176:11

**play**
13:5 180:15

**please**
6:17 7:13,22 9:14,19,19
10:8,14,22 11:9,14 14:8
17:14 30:6 34:12 46:11
59:15 60:2,6 61:1,12 80:19
101:15 106:8,9 109:21
113:21 114:19 130:8
134:17,18 143:18 152:5
162:13 166:4,22 174:11,12
178:2,3 185:3 189:20 192:1
196:17

**plenty**
154:12

**plevy**
4:19

**point**
66:13 73:2 79:3 110:19
124:7 125:2 134:11 137:18
158:19 162:6

**pointed**
112:11

**points**
64:22 126:21 130:16
135:16

**poisonous**
150:11

**policy**
169:4,4 170:8

**portfolio**
172:1

**portions**
16:10

**position**
51:5,10,12,15 53:8 54:22
54:22 55:9 56:1,10,22 59:5
60:19 61:6 69:18,20 74:9
77:2,9,20 78:4 79:1 97:15

[position - providing]

**position (cont.)**
98:22 99:15 100:5,10 106:5
106:16,17 116:10,21 172:5
173:4,5 182:15 186:5,18
187:5

**positioned**
61:18

**positions**
50:9,12,17,20 52:6,15,18
52:21 53:5,11,17 54:1,2,20
55:4 56:6,12 57:3,11 58:2
58:11 60:13 62:3 72:4 76:2
77:17 78:14 101:12 115:14
116:3 131:6 133:12,16

**positive**
100:15 101:8

**possible**
144:14

**post**
56:22 142:15

**posted**
56:21 79:20 91:16 143:22
144:15,20 152:14

**posting**
90:11 92:13 168:14

**posts**
94:17

**potential**
150:5,14 152:10 155:16
193:7,12

**potentially**
74:10 144:1,16,21 145:9
165:9

**practices**
19:10

**practitioner**
28:20

**practitioners**
29:10

**preceded**
94:4

**precedes**
112:12

**precipitated**
186:18 187:11

**precise**
139:11

**preclude**
38:6

**predicated**
150:14

**predicts**
96:11

**premise**
150:21

**premium**
105:5

**prepare**
21:4

**presence**
148:10,14 199:16

**present**
44:22 81:4,22 82:4 185:11
186:8 187:5

**presenting**
6:16

**presents**
47:17

**presumably**
67:2 99:5

**presume**
69:7 79:5 94:13 116:4
122:15 123:9,14 128:6,10
144:14

**presuming**
143:9

**presumption**
123:20

**pretty**
112:18 181:22

**previous**
132:6,12

**previously**
46:1

**price**
16:14 35:7 38:12 43:8,9,10
43:11,17,22,22 44:4,8,13
44:14,15,19,21 45:1,3,5
46:6 48:4,4,7 51:8,9,10
55:16,18 57:19 60:1,18
61:5 66:12 68:15 69:12,13
69:16 73:2,7 74:18 75:4,14
76:11,15 77:13,14 82:16
86:9 87:5 89:8 91:8,10 92:3
92:10,11,12 93:6,9,19 94:2
94:10 97:3 98:18 99:3,21
104:18 111:5 113:9,11,19
114:1 135:22 136:3,7,19
137:7,12,13,15 138:7,8,13
138:18 140:17,22 141:2
148:19,21 149:3 155:9,13
155:18 156:5,6,8,11,12
157:18 158:2,21 159:5,22
160:5,8,11 161:18 162:6,19
162:22 163:12,14 168:4,8
168:20 169:7,10 170:1,16
170:19,21 171:4,15,16
175:5,6,21 180:4 182:21
189:5 191:1 194:11,18

**priced**
72:8 179:2,6

**prices**
32:17 35:10 38:1,4,10 39:6
39:9,12,18,20 41:7 45:14
47:4 50:14 65:1 68:2,6,9
70:7,10,12 72:16,17 75:17
75:17 78:1 83:22 84:13
85:4 86:2,4,18,19 87:9,10
90:2 94:11 104:10,10 106:2
114:3,3,8 119:4,12,22
120:8 121:6,9 124:22
126:14 128:14 134:9 136:9
136:9,12,14 138:1,3 140:9
140:12,18 149:10 150:12
150:22 152:14,15 158:8
160:16 165:8 173:10 176:3
177:8,9,18 179:10,12,13,14
179:15,21 180:5 181:17,22
189:9 196:6

**pricing**
64:10,15 65:10 70:20 72:7
73:4 74:14,19 78:13 79:4
83:14,22 84:7 86:11,14
87:1,15 88:16 93:3,12
94:22 121:2,4 124:17
130:10 132:5 169:11 178:8
187:17

**primarily**
29:3

**primary**
25:6 28:20 162:18

**prior**
113:10

**priority**
119:1

**privileged**
36:6

**privy**
25:15

**probably**
16:12 21:4,12,15 24:4 29:5
75:21 100:7 126:19 128:6
153:21 158:17

**problem**
171:8 192:5

**problematic**
127:1

**procedure**
12:15 48:10

**procedures**
116:17 117:2

**proceedings**
200:3,6,8,9

**proceeds**
60:18 61:4

**process**
23:20 93:7 119:19 141:22

**process (cont.)**
142:2 143:7 156:7 158:21

**produce**
78:16

**produced**
46:7 68:21 78:17 123:11

**producing**
40:21

**product**
23:22 48:2 49:9 52:15 85:3
104:2 113:6 114:6 188:5,6
195:21

**products**
13:9 17:3,9 18:2 21:14 48:3
126:17 195:6

**professional**
2:15,17 16:19 17:8 42:16

**professionally**
42:17

**profit**
151:2

**profits**
185:20

**program**
32:18

**programmed**
41:6

**project**
80:5

**promote**
169:7 170:19

**promoting**
170:16

**proper**
135:22 159:5,22 160:8
161:18

**properly**
62:10

**proprietary**
26:8

**prospect**
22:5

**protect**
169:18

**provide**
90:21 104:17 137:16 170:7
173:21 184:17

**provided**
32:19 46:1 55:11 152:14
174:17

**provides**
90:9

**providing**
31:4 43:7 90:11 97:5
168:15

[proximity - referring]

**proximity**
167:3
**prudent**
97:6 125:14
**public**
124:12 143:11 199:18
200:22
**publicly**
123:12 128:7 163:10
**publishes**
28:21
**purchase**
97:2
**purposes**
85:12 136:17,18
**pursuant**
2:14 200:5
**push**
171:15
**pushing**
172:2 173:10
**put**
32:20 33:8 35:6 43:18
44:20 56:4 73:11 80:4
85:19 87:7 105:18 119:9,11
126:4,16 128:8 137:6,9
142:20 143:8 144:11
145:17 146:11 152:22
154:4 156:19 162:4 169:22
**puts**
66:19 157:4 168:10
**putting**
31:5 67:1 80:3 123:7 124:1
124:2,22 125:5 126:13
142:2 155:1 175:16 182:4

**q**

**qualification**
12:13
**qualifications**
41:13 42:2,7,11
**qualified**
12:11
**qualify**
67:4
**quantify**
95:18 96:1,13 100:3 156:3
**quantifying**
95:9,15 97:11
**quantity**
65:7
**quarter**
17:19
**quarterly**
19:6 21:4
**question**
9:9,13 27:10,17 28:5 33:18

**question (cont.)**
33:21 34:12 36:9 38:16
39:14 45:22 57:14 60:21
61:2 70:22 77:6,7 86:21
143:6 155:2 182:11 186:11
190:8
**questions**
15:13 37:9 42:19,21 47:8
60:3 80:20 95:5 118:10
130:9 169:2,4 194:3,7
**quick**
42:21
**quiddity**
14:11
**quinn**
33:12 42:4
**quite**
57:14
**quiz**
53:19 180:18
**quote**
45:14 94:2 111:22
**quotes**
93:8 94:1,15 175:8
**quoting**
92:12 93:17 121:7 126:22

**r**

**ra**
33:3
**rage**
136:14
**range**
135:3,9,16,20 137:19
149:11 183:2
**rate**
13:9 18:2 41:15 52:15
58:10 59:3,6 63:8,22 65:21
67:8,14 69:20 70:15 71:7
71:12 74:11 81:5,6,7,12
82:9,20 95:11,11 96:6,12
97:12,13 98:2 100:1,15
101:1 109:7 110:22 111:18
112:8 119:17 120:13 121:1
126:18 127:13 128:1
133:19 134:3 138:22
139:14 147:19 148:9,19
151:14 160:13 161:20
162:2,10 177:13 189:3
**rates**
13:10 18:5 59:7,8,9,10 64:1
64:5 70:14 71:17 73:8,10
73:13,16 89:16 100:18,21
100:22 102:1,13 105:5,11
105:21 112:7 113:9 114:20
114:21,22 115:2,3,7 116:2
116:5 123:3,4 124:1,2,18

**rates (cont.)**
124:22 125:1,5,7 126:5
130:22 133:4 148:8 149:16
157:15 160:14 176:20,21
177:3,4,7,20 179:20 181:19
183:8 187:2 193:3
**rational**
105:9,12,16 180:11 181:2
181:10 182:12,13,16
184:13,17 185:2
**rationality**
46:7 180:13,15,19,22 181:5
181:14 182:11 183:6,9,13
**rationally**
45:1 104:21 190:21
**reach**
185:8
**reached**
44:8
**reaching**
186:12
**read**
22:16 33:6 42:21 60:22
71:5 73:22 77:5,21 83:14
84:6 88:10 97:10 98:10
106:8 107:13 108:21
110:16 118:8 134:18
139:18 142:10 152:6
166:21 167:8 178:2 187:13
192:1 198:4 199:2
**reading**
73:22 98:11 111:16
**reads**
198:4
**ready**
97:2 152:13
**real**
98:19 119:21 120:5 140:12
186:11
**realize**
8:20
**realized**
94:21
**really**
119:1 121:4 129:13 151:16
157:18 172:8 190:15
**realm**
64:5
**realtime**
2:16
**reap**
73:18 98:17 126:14
**reason**
65:6 89:20 149:4 150:2,4
169:5

**reasons**
105:9,12 147:6,9 150:6
193:7,12
**recall**
8:14 28:2 78:11 113:3
141:5 144:13 163:20,21
186:21 187:18 188:1,2
**receive**
34:2,15
**received**
49:1 55:11 59:7
**receives**
81:13
**recess**
40:3 80:13 129:19 174:6
193:20
**recognize**
10:4 30:6,7 167:11 190:14
**recognized**
89:19 186:4
**recollect**
14:3
**recollection**
119:6
**reconstruct**
87:4
**record**
7:22 10:8,22 11:14 23:3
36:12 40:2,6 43:8 46:21
47:9,22 59:20 61:12 78:21
80:12,16,18 81:3 129:18
130:4,6 141:18 166:22
173:16 174:3,4,9 175:22
178:22 193:16,19 194:1
196:16,18 199:4 200:8
**recordings**
166:11
**reduced**
200:10
**reestimated**
140:20
**refer**
26:1 35:16 83:2 122:17
168:1
**reference**
60:17 61:3 79:9,10 114:22
**referenced**
41:12 160:18
**references**
187:17
**referencing**
172:13
**referred**
34:19,19 35:8 62:15 167:11
**referring**
79:9 113:16 159:18 166:1

[referring - rules]

**referring (cont.)**
179:12 195:8
**refers**
83:2 102:9 165:10
**reflect**
43:11,18 44:1 84:1 104:10
104:22 105:1 111:6 113:12
113:20 140:18 148:11,15
**reflected**
57:20 70:13 73:3 75:18
86:8 104:9 107:17 128:19
**reflecting**
105:4 107:19 112:14
**reflection**
76:16
**reflects**
74:19 137:8
**refresh**
119:6
**regard**
57:1 136:13 140:5 148:20
149:2 170:12 173:13
**regarding**
151:19
**regime**
84:2
**registered**
2:15,15
**registrant**
62:18
**regulated**
63:1
**regulation**
169:14
**regulator**
170:17,17 171:2
**regulators**
169:1,7 170:13
**regulatory**
19:11
**reiterating**
152:13
**relate**
28:8 71:19
**related**
22:5 25:21 39:15 96:6
130:17 154:20 159:7
161:17 200:12
**relating**
160:7
**relation**
23:20
**relationship**
61:10
**relative**
37:16 70:7 105:5 190:17

**released**
123:12 124:11
**relevant**
22:14 35:17,20 38:5 52:6
52:16 55:5 68:19,22 88:9
89:10 108:6 122:7 124:9,10
125:1 131:10,11 133:16
134:16 135:3 146:18
149:21 151:18,19 153:21
162:18 176:6 179:18,22
181:19
**rely**
195:15
**remained**
143:22 144:15,20
**remaining**
66:14 82:5
**remedy**
116:11
**remember**
14:12 18:18,21 19:2 133:13
161:2 184:9 189:15
**repeat**
60:21 77:4
**rephrase**
9:15 24:14 44:14 64:14
86:13 89:6 101:6
**report**
5:12 11:15 15:19,21 16:2
16:10 17:15 22:16 30:8,9
30:14,17,21 32:6,13,22
33:6,10 34:4,7,9,15,17,20
35:9 37:9,13 38:3,11,17,17
38:20,20 39:1,5,5,11 40:10
40:13 42:19 45:9 46:2
48:15 52:5,10 53:15 54:11
60:5 61:9 67:19 68:3 69:9
71:1,5 74:1,7,13,16 79:8
80:19 83:2 85:12 87:20
93:8 95:9 123:2 124:16
126:7,10,15,20 127:6
128:18 130:8,13 147:9
160:18,22 165:3 167:15
169:1 174:12 200:6
**reported**
1:22
**reporter**
2:15,16,16 6:14 7:13 8:21
9:4 61:2 77:7 109:17 164:7
189:21 196:17 197:1 200:1
**reporters**
2:17
**reporting**
6:16
**reports**
12:3 13:7 71:19 188:10

**represent**
6:18 44:6 56:1 78:22
**representatives**
28:8 35:6
**represented**
85:4 133:11
**representing**
199:12
**represents**
45:2,18,19 81:18 137:21
138:22
**request**
9:8
**require**
95:16
**requires**
95:10 97:11
**research**
28:22 29:9 33:3 79:21,22
80:3,8 84:18
**reserved**
76:13
**residential**
12:20
**response**
143:5,5 186:10
**result**
14:19 51:22 65:9 94:12
123:7,10 150:22
**resulted**
121:1 179:20
**resulting**
72:12 93:3 94:22 189:4
**results**
121:3 127:16 139:11 140:1
140:7 171:1
**resumed**
40:4 80:14 174:7 193:21
**resumes**
41:21
**retained**
12:1
**retroactively**
117:22
**reveal**
15:6
**reversed**
186:16
**review**
15:19 19:7 43:3 81:1
101:15 106:9 134:20
143:19 174:12,14
**reviewed**
34:8 78:5 79:19
**right**
18:13 20:22 26:19 30:14

**right (cont.)**
34:9 37:18 38:12,17 39:1
40:10 44:3 45:12 48:15
50:6,7 52:3,15,17 54:21
55:7 56:20 57:5 59:13
60:15,16 61:3 63:4,7,20,21
64:5 65:3,7,13 68:16 69:17
70:3 71:9,20 74:5,11 75:3
75:15,17 76:20 89:21 91:1
91:3,5,18,18,21 92:4,9
93:14,20 94:19 95:1 96:2
96:22 97:3,16,19 99:20
100:8,21 102:8,10 103:8,14
103:15,16 104:2,3,6,7
107:11 108:19 110:6,14
111:8 113:18 115:8 116:17
118:19 119:12,14 120:7,9
121:14,21 122:1 123:5
124:10 127:3 129:5 132:20
132:22 133:4,5 136:6 137:3
137:10,20 138:1,3,4 141:13
146:21 147:2,15 148:4
150:3,4 151:22 152:3
155:18 157:12 159:16
166:3 168:21 171:2 172:13
172:15,16 173:9 176:6,7,12
177:19 180:21 181:19
182:9 184:11 193:16 196:3
196:21
**risk**
23:8,10 47:4,15,18 48:11
56:2 61:19 62:3,10 96:5
169:15 170:7 171:21 172:6
172:8,12 173:5,13
**rix**
29:18
**rmr**
1:22 200:21
**road**
117:17
**role**
62:4
**roman**
46:11 65:19
**ross**
127:13
**roughs**
196:21,22
**rpr**
1:22 200:21
**rule**
5:13 49:3 59:21 60:7,15
76:10,19 77:12 93:17
182:10
**rules**
8:17 50:8,19 51:2 61:14

[rules - sizes]

**rules (cont.)**
169:17 194:20
**run**
61:17
**running**
31:4 101:12
**runs**
23:21
**rush**
196:22

**s**

**safe**
20:19 29:3
**sake**
25:22 171:6
**samir**
33:11
**sand**
80:4
**sarcastic**
173:16 176:9
**savings**
118:18
**saw**
88:14 126:21 158:16
**saying**
37:2 43:21 71:5 74:13
102:11 112:3,13 117:4
159:17 179:1
**says**
18:9 38:17,20,21 69:9 74:7
77:12 101:19 104:20 111:5
112:10 120:17 123:2
124:16 134:22 139:10
165:19
**scenes**
30:20 31:1 56:19 57:22
92:1 122:16
**scholarly**
168:2
**science**
126:16
**sciences**
79:21,22
**scope**
37:10
**screen**
88:21 89:13 92:5 142:17
143:11 158:16
**searching**
33:3 183:10,11
**second**
9:2 11:13 18:22 49:4 60:2
62:14,16 80:22 81:1 101:19
103:10 134:19 139:10
151:8 159:12,19 162:21

**second (cont.)**
185:5
**seconds**
153:2,3 155:4
**section**
46:12 58:9 169:2 185:4
**securities**
12:20 13:4 17:4 18:3
151:14 160:13 161:21
**security**
48:7 133:19
**seeing**
88:21 189:15
**seen**
10:19 70:12 78:8 164:13
165:2 166:8 190:16
**sell**
44:18,20 73:17 97:2 98:17
120:19 157:5
**sellers**
63:10
**selling**
94:16
**send**
154:14
**sending**
154:14
**sends**
113:2
**senior**
42:5
**sense**
11:21 13:2 26:3 44:5 48:4
127:11 138:21 158:4
**sensitive**
64:1 130:22 133:19 139:1
151:14 160:13 161:20
**sent**
33:2 122:12
**sentence**
97:9 101:19 102:5,6,9
103:10 104:8,19 106:12
107:15 113:14 114:20
115:4 120:16 134:22 135:5
135:6 139:10 143:21 159:4
159:12,19 175:3 176:22
178:11,14 179:17 190:20
**separate**
195:20 199:6
**separately**
23:21 63:1
**september**
1:17 6:10 69:2,19 72:14
73:3 75:11 79:1 100:11
133:12,17 200:16

**series**
42:19 80:20 85:21 191:20
**serious**
165:8
**service**
156:8
**session**
5:4 130:1
**set**
50:14 106:1 169:17 194:20
200:15
**settle**
116:1 119:3 137:5 157:14
163:22
**settled**
92:10 117:7,9 122:4
**settlement**
35:7 48:4 50:14,22 51:8,9
51:10 60:1 69:12 76:11,14
77:13,14 78:1 86:4,9 103:1
104:10 107:17 113:11,19
114:8 115:7 116:16 117:2
117:18 126:14 137:13
144:2 145:3,4,6 179:21
181:17,22 187:9,11 194:17
194:18,21
**settling**
83:22 116:5,7,10 119:11
**seven**
49:21 85:13 94:6 108:8,10
108:11,11
**share**
190:3
**shared**
22:7
**shares**
28:22
**sharing**
80:8
**sharma**
3:15
**shay**
5:19
**sheet**
199:6
**sheets**
85:9
**shifted**
83:21 133:18
**short**
54:21,22 59:9,11 72:17,22
74:11 101:10 103:3 105:6
106:17 107:20 108:12
150:8 151:3 154:10 192:21
194:7

**shorthand**
200:1
**shorts**
108:15 150:14
**show**
87:19 127:16 189:11
190:12
**showed**
84:10
**shown**
82:18,20 83:11 87:14 88:5
92:5 165:8
**shows**
83:19 123:21 125:17
135:10 177:12 182:5
**shrugs**
9:5
**siddiqui**
3:5 6:22,22 190:4 192:11
**side**
8:13 15:4 21:8 28:11 36:17
47:12,17 72:22 73:1 101:3
105:6 127:2 150:8 157:4
192:21
**sided**
168:14,14
**sides**
54:21
**signature**
11:5,6 197:4 199:10
**similar**
22:12 113:3 119:20 126:9
127:18 190:17
**simple**
73:13 156:5
**simply**
139:2,3 158:5
**simulated**
128:1 140:4
**simulations**
128:3
**single**
73:2
**sit**
18:15 41:22 42:8 46:16
66:6 102:6 109:11 141:7
**sits**
54:20
**sitting**
58:4
**six**
52:16 122:13
**size**
51:10 56:10 58:2 92:2
**sizes**
65:12 164:1

**[skips - supply]**

**skips**
192:4
**slate**
163:15
**slight**
96:22
**slope**
96:2
**sloping**
71:16 95:19,20
**small**
184:20
**social**
79:21,22
**sole**
76:14
**solicits**
28:22
**soll**
127:13
**somebody**
90:22 94:17,18 96:22
105:15 143:1 149:1 154:15
155:1 172:2
**sophia**
3:5 6:22
**sophisticated**
78:18
**sorry**
24:14 25:13 28:4 30:7,10
32:1 33:13 50:2 60:21
75:10 90:15 112:8 143:18
151:16 159:11 161:11
164:19 176:15
**sort**
16:15 21:14 22:11 25:20
31:6 33:3 44:4 45:21 49:20
80:4 101:9 129:6 142:18
145:13 156:22 181:1 187:5
195:14
**sorts**
65:12
**sound**
52:17 188:6
**sounds**
188:5
**source**
88:17 155:9 162:18 175:8
**sources**
44:1 168:2
**south**
4:7
**southern**
1:2 6:8 28:17,19
**speak**
78:9 157:18 176:3

**speaking**
114:16
**speaks**
38:17 93:6
**specific**
33:17 34:12 60:7 63:15
78:15 85:18 104:1,4 123:6
124:6 125:5 136:5 158:7,10
161:13 173:5 176:15
195:16
**specifically**
13:3 32:12,14 33:19 34:13
95:8 116:17 135:22 139:6
184:9
**specifications**
66:17,18 88:3 113:4
**specifics**
91:20 125:4 135:13 143:7
186:20
**spectrum**
51:19
**spent**
21:15 48:13 151:7 153:16
**spirit**
126:9
**sponsors**
28:21
**spoofing**
146:2
**spot**
181:14
**spread**
133:3 134:3 139:4
**spreads**
180:9 195:17 196:9
**spreadsheets**
189:6
**spring**
29:17
**st**
6:9
**stable**
163:2
**stage**
25:10 62:20
**stages**
161:5
**stakes**
25:14
**stamped**
190:11
**stand**
24:5 31:14 97:2 177:21
**standing**
36:7 196:19

**stands**
23:7
**start**
11:22 43:6 49:8 81:16
121:19 142:5,6 167:7
185:14,15
**started**
18:19 20:2 86:16 100:8
153:22 175:16 183:7
**starting**
18:12 46:11 53:11 121:20
**startup**
18:4 20:11
**state**
6:18 7:21 38:15 97:10
196:17
**stated**
109:2 112:4
**statement**
64:18 66:5 99:12 126:6
128:21 149:6 159:18 162:8
169:9 176:2 179:3,5 194:15
196:7
**statements**
16:6 37:3 124:3 125:8
145:19 179:1
**states**
1:1,5 6:5,7
**stay**
184:16
**stem**
140:16
**stems**
64:13,15
**stenographically**
200:10
**stephenson**
5:17
**steps**
157:3
**steve**
21:20,21 22:10
**stipulation**
200:5
**stochastic**
41:15
**straight**
173:17
**strange**
187:17
**strategy**
98:9 101:10 172:10
**streaming**
86:16
**street**
2:6 3:8 4:16 6:12 8:3

**structure**
21:15 51:20
**study**
180:17 195:11,13
**stuff**
143:15
**subject**
12:17 14:12
**submit**
145:13
**submitting**
145:14
**subparagraph**
149:15
**subpoena**
2:14 5:9 10:9,12
**subrahmanyam**
83:18
**subscribed**
158:11
**subsequently**
174:17
**subsidiary**
24:15
**substantial**
132:11
**success**
64:8
**suffering**
154:1
**suffices**
50:4
**sufficiently**
152:9
**suggest**
175:4,5,20
**suggested**
179:9 186:2,3
**suggesting**
192:22
**suggests**
119:8 183:5
**sum**
20:16 142:6
**summarize**
38:22
**summary**
39:4 54:17 87:12 115:14
180:1
**supervision**
200:11
**supply**
43:11,13 44:1,3,8,16,18
45:2,19 113:12,20 114:5,11
120:14 121:10,13 138:6,11
138:12,20,22 159:6 173:10

**[supply - three]**

**supply (cont.)**
175:8
**support**
112:16 163:9
**supported**
175:21 181:8
**sure**
11:3 14:8 21:13 23:10,16
25:9,19 26:4 27:11 28:12
34:18 37:10,11 38:11 39:2
43:10,15 47:3,12 53:20
55:17 57:14,19 62:9,19
73:6 77:11 81:5 84:12
103:19 108:18 118:13
121:3 128:17 132:2 135:12
140:2 141:5 155:18 169:15
170:18 173:16 180:16
183:19 189:17 192:13
**surprising**
139:13 140:7
**suspect**
145:16
**swap**
58:15 65:21 67:14 68:16
70:14,15 73:20 75:16,17
81:5,6,8 87:9,9 90:3 95:12
97:13 109:8 111:1 114:1
119:17 120:13 121:1,15
132:20 148:9
**swaps**
12:21 18:5 22:6 58:10
111:19 112:9 114:4
**swaption**
140:10,11,19
**swaptions**
128:13 161:6
**sworn**
7:16 200:4
**synergistic**
23:20
**synonymous**
177:7
**system**
142:13 145:13
**systems**
146:10 154:13,21 163:2
184:21

**t**

**tables**
31:5 32:21
**tahiti**
147:22 148:2
**taken**
6:4 8:5 40:3 80:13 129:20
174:6 193:20 200:3,9

**talk**
8:21 40:8 58:6 69:1,2 70:17
83:5 85:9 106:10 111:8
121:20 125:15 130:12
141:20,20 142:5 168:22
170:4
**talked**
22:1 36:10 40:15,18 92:19
92:22 133:10 195:14
**talking**
24:21 41:19 67:9 70:19
86:4 102:15 103:11,12
107:7 117:4,5 121:19
122:13 136:20,21 137:2
142:11 165:7 169:4 172:22
178:5
**talks**
17:19 28:16 71:1 93:1
111:16 156:4 168:7,8,10
**tautology**
116:6
**teach**
22:7 29:17
**teaching**
22:8
**technical**
32:15
**technicality**
62:1
**technically**
47:13
**technique**
41:6 56:2 57:12 103:4
**techniques**
127:10
**telephone**
5:20
**tell**
22:21 36:13 71:4 123:16
189:18
**telling**
126:12
**tells**
156:19
**ten**
49:22 80:9 85:10,13 94:7
**tenets**
156:6
**tenor**
52:1,2 105:19 136:1
**tenors**
48:18 49:20,22 50:6 51:18
85:22 179:21 183:7 189:3
**tension**
62:6

**term**
51:19 101:10 186:6
**terms**
13:7 54:15 58:21 70:6
73:12 88:8 90:12 93:11
94:20 103:12 104:5 107:4
116:18,20 117:18 124:16
124:18 125:4 143:6,8 146:1
150:10,12 156:5 180:20
**test**
141:15
**testified**
7:17 12:8 30:13 32:12 43:6
54:10,19 55:3 72:1 74:6
97:14 109:12 115:10 123:3
133:10 149:19 166:14
179:18 181:16 191:18
194:10 195:4,6
**testifies**
110:20
**testify**
5:9 10:9 34:22 36:9
**testifying**
133:22
**testimony**
10:12 20:20 36:22 37:7
43:20 52:9 54:17 87:13
107:16 111:20 142:9
149:14,15 150:1 168:19
180:1,4 195:9 199:4
**testing**
180:14
**thank**
11:8 146:20 180:10 192:18
194:4,5 196:11,13
**thanks**
129:16 192:17
**theirs**
140:8,15
**theory**
173:4
**thing**
8:19,19 31:6 97:6 104:21
104:22 114:10 119:7
127:21 138:17 149:2
**things**
16:4,5,8,16 87:3 112:22
113:3 132:13 180:14 181:9
195:14
**think**
12:16 16:3,3,12 20:2,16
22:10 27:5 31:20 32:2
36:21 37:1,1,21 38:7 43:5
45:2,17 46:6,8 50:4 52:18
53:6 54:10,13 55:12,15
56:11,13 57:17 63:21 67:11

**think (cont.)**
67:19 71:11 72:15 74:6
76:7 77:19 83:3,6,11 84:3,4
84:18 85:12,13 87:17,18,19
87:21 88:4,4,13,20 90:2,8
90:10 92:10 93:6,8,9,15,17
96:13 97:5,14 98:6 99:19
99:21 100:7 103:19 105:15
105:22 106:1 107:1 108:5
115:10 116:14 117:13,15
117:16 118:13 123:2 126:7
132:8 133:10,21 137:6
139:5 140:17 142:9 150:1
152:4 155:3,14,17,21 157:7
160:14 164:14 166:14
167:19 168:9,19 169:20
171:1 173:8 175:12 178:5
178:22 180:2 182:19,19
183:22 184:14,18,21 186:3
187:10 188:11 189:16
193:10,13 194:19 195:2
**thinly**
153:17,19 156:13 168:4
195:6,19,21
**third**
3:17 174:18
**thirds**
174:16
**thought**
36:15 40:21 80:7 122:6
141:14 170:20 186:9 190:7
190:21 191:5,11
**three**
35:8 39:12 48:14,15,18
49:6,17,21 50:9,20 52:6,21
53:2,5,8 58:12,13,20 59:2
59:21 60:13,20 61:6 65:20
66:1,9,11,20,21 67:7,12
68:2,5,15 69:6,12 70:7 75:5
78:4,6,13 79:4 86:3,12,15
87:2,14 88:8 97:15,17 99:1
99:16 101:20,21 104:5,11
104:20 105:3,10,19 106:5
106:21 107:6 108:3 109:6
110:21 111:17 112:7
113:10,13 114:11,22
115:13 116:1 119:16
120:13,22 121:5,7,13
124:17 130:17 131:1,3,5,21
134:10,12 135:1 138:7
141:9 144:6 151:19 159:18
159:22 160:9 161:16,16
162:5,7,10,17,19 163:6
167:12 175:9 178:12
179:21 181:18 184:8
186:12

**time**
6:11 9:7 40:2,6 48:13 50:21
63:6 66:14,17 68:19 72:2
78:3,10,13,16 80:12,16
83:21 84:20 85:21 86:10
94:14 118:17,18 121:8
122:11 123:14 124:7
129:18 130:4 132:11,14
152:9,12,18 153:6,6,16
154:8,19,21 155:5 158:19
165:12 166:15 171:9,13
174:5,9 185:10 193:19
194:1,4 196:14,16

**times**
11:22

**timestamp**
80:6

**timing**
123:18,18

**today**
7:10 10:10,12 18:15 34:22
41:22 42:8 46:17 66:6 96:8
102:6 109:11 141:7

**today's**
6:10 141:1

**tomorrow**
197:2

**top**
24:9 37:10 164:18,21

**topic**
143:16

**total**
11:19 20:16 58:4 157:1

**touched**
141:4

**trace**
140:17

**trade**
14:10,14 18:2 22:6 23:9
47:17 49:11 53:2,7 63:10
69:8 76:6,7,8 88:1 90:12,17
90:18,19 91:2,9,10,11,13
91:14,15,17,18,20 92:15,17
93:22 94:1 98:3 119:9,11
120:19 131:16 132:12
142:19 144:2 146:6,12
151:4 152:13,15 155:16
163:17 165:13 167:3 173:1
173:2,2 183:3

**traded**
17:2 48:2 75:21 94:8 96:17
96:21 114:2,14 121:15
126:17 128:14 142:22
153:17,19 156:13 161:16
168:4 195:6,19,21

**trader**
142:16 155:15,16

**traders**
23:7,9 114:16 123:10
125:14 141:8,10 145:15
147:21 181:12

**trades**
14:17 93:5,8,14,16 94:15
101:6 130:17,20 131:2,4,12
132:7 134:12 171:11
173:12 193:1

**trading**
1:6 2:5 3:7 4:15 6:6,21 7:1
7:4 17:9 26:8,9 39:17 48:5
49:17 52:11,12 54:3 56:6
57:11 61:14,18 62:5,8 89:3
89:18,21 90:1 91:4,8
105:19 121:4 143:22
145:22 152:20 153:13,14
153:14 172:4,10 185:14,15
195:12

**transaction**
14:15 47:13 136:12 151:17
159:7 163:19 171:17 173:3
179:4,8 185:21 186:15

**transactions**
47:14 151:13 156:22
159:21 160:2 161:21
162:16 171:19 184:22

**transcribed**
8:20

**transcript**
110:8,10,19 199:3,7 200:7

**transfer**
170:6

**transferred**
75:1

**translated**
86:9 160:15

**translates**
77:16 143:11

**transmission**
174:19

**transmissions**
175:14

**trema**
29:18

**trial**
12:8

**trick**
192:6

**tried**
67:18 85:19 93:7 116:15
147:8

**trimming**
20:12

**true**
11:17 45:3 57:1 59:12
104:11,14 105:1 109:12
113:12,20 114:10 139:18
182:21 199:3 200:8

**trust**
179:9

**truth**
126:13 189:18

**try**
22:18 29:7 32:16 83:2 96:1
96:13 97:6 107:2 126:16
132:16 145:12 154:4
170:13 181:7,9 184:18

**trying**
53:19 62:4 63:9 67:5
125:15 126:8,14 129:2
161:2,7,13,14 170:10
173:15 176:8 184:16
195:17

**turn**
42:18 134:17 135:11
174:11 176:13 185:3

**type**
51:14 63:15 151:17

**types**
185:7 195:8,15,20

**typewriting**
200:11

**typically**
48:2 61:13,16 93:22 104:16
105:1 128:4 141:1 171:3
181:7

**typo**
33:6

**u**

**u.s.**
14:9

**ullman**
3:4 5:3 6:20,20 7:19 10:3
10:18 11:12 25:3 36:7,11
38:22 39:3,21 40:7 42:13
45:20 46:9 56:17 59:18
60:22 61:8 65:4 70:16
71:13 74:21 75:9 77:5,18
79:14 80:9,17 88:6 92:8
100:17 102:20 109:16,20
116:19 118:6 128:9 129:14
130:5 134:13 137:1 138:15
145:20 146:19 147:1 152:2
157:20 160:20 164:6,8,9
166:7 167:22 173:14
174:10 176:4 182:2 187:22
188:22 189:20 190:5,9
192:6,9,13,17,19 194:2
196:13,20 197:3

**um**
42:14 62:12 86:5 105:13
135:19 146:19 150:9 155:6
181:4

**umbrella**
24:8,14,16,18,20,21,22
25:5,17 26:1,1 29:7

**uncertainty**
157:1 179:10 183:2

**underlying**
45:13 63:19 65:2

**underneath**
28:16

**underpinned**
152:16

**understand**
8:22 9:5,10,13,14,16 10:11
15:8,13 20:15 22:17,20
24:17 33:22 35:11,20 37:2
37:10 43:9 50:2,5 51:17
52:10 58:19 61:11 68:21
74:12 76:22 77:8 84:2
89:14 91:15,22 93:2 117:7
119:1,10 124:17,19,21
128:17 141:10 167:2 176:5

**understanding**
22:12,12 34:21 35:3,14
43:16,22 44:7,11 45:5,8
48:17,21 49:5,16 51:5
53:22 55:4,8 58:10 60:8,12
69:11,13,14 72:10 78:6,10
83:20 84:11 92:13 93:4
108:2 115:12 133:7 141:3,6
141:22 142:7 144:5 180:11

**understood**
21:14,14 55:13 78:12 79:4
85:3 115:22 120:4 133:15
157:12,13 186:22

**unfair**
117:15

**unilateral**
156:12 168:3,3

**uniquely**
61:18

**united**
1:1,5 6:5,7

**university**
29:15

**unwinding**
186:18 187:12

**upfront**
81:8

**upward**
71:15 95:19

**use**
35:21 74:4 91:7 127:14

**[use - wondering]**

**use (cont.)**
128:3,6,10 130:13,16 140:3
140:4 154:21 156:17
180:13,14
**uses**
138:20
**usually**
94:17 136:14 142:17
182:20,21 195:13

**v**

**valid**
44:22 177:10
**valuable**
155:14,17
**valuating**
52:1
**valuation**
50:16,22 56:12 58:1 60:19
61:6 67:3 70:5,19,20 71:7
72:13 74:7 77:1,8 78:18
79:5 88:2,3,8,18 109:6
110:21 111:9,12,17 112:6
115:12,20 121:3 127:18
134:11,22 139:11 142:18
142:19 150:15,17,18 196:4
**valuations**
83:21
**value**
44:6 47:5 50:12 51:7,11,15
54:1,4,7 55:15 56:1,5,15,20
57:3,10,13 58:1,4 60:13
65:20 66:9,9,11,21 67:4,6,9
67:11,17,20,20 72:21,22
73:7,9,19 74:19 75:18
77:16 81:4,18 82:1,1,5
84:22 96:9,13 97:6,7 98:15
99:7,21 100:10 101:21
102:2,13 103:3,13 104:11
104:15 105:1 111:14
113:12 114:11,12,13
119:21 120:5 124:14 129:9
131:21 132:19 135:16
137:8 148:11,11,15,16
149:8,13 150:18 173:5
176:20 177:2,7,13,20
179:11 182:5 184:5 185:11
185:16 186:8 187:6,6 189:9
**valued**
51:6,17 52:11
**values**
119:18
**valuing**
50:9,20 55:9 119:19,20
128:15
**vander**
5:16 141:12,13,21 143:6

**variability**
127:14
**variable**
59:7
**variables**
134:2
**variation**
46:22 47:1,6,10 48:22
54:11,12,14 55:10,20,22
57:18,20 60:17 61:4 65:22
67:13 70:2 71:20 72:3,13
72:20 73:11,21 74:4,22
101:2,5,8 106:2 111:6
112:13 136:18
**variations**
65:12
**varied**
21:3 187:2
**various**
48:18 63:12 179:21
**vasicek**
127:13
**vastly**
63:17
**vendor**
142:14
**vendors**
174:18 175:13
**venue**
80:2,8 104:17
**verb**
33:7
**verbally**
9:3
**verify**
123:16
**version**
192:3
**versus**
14:10 81:6
**vetted**
62:9
**vi**
46:12
**video**
6:3 7:12 40:1,5 80:11,15
129:17 130:3 174:4,8
193:18,22 196:15
**videographer**
6:15
**videotaped**
1:14 6:4
**view**
16:11 153:6
**vii**
65:19

**vis**
71:7,7 74:11,11
**visible**
138:11 143:12
**vitae**
14:5
**voice**
53:6 68:20,22 69:6 72:2
91:17
**volatility**
71:17 96:6,12 99:22 100:21
185:13,15
**volume**
91:4,8
**volumetric**
195:14
**vouch**
136:6
**vs**
1:8

**w**

**waived**
197:4
**walk**
52:4 191:6
**want**
15:6 17:18 20:15 33:17,19
33:20 36:8 37:9 38:14 40:8
42:20 43:18 46:10 53:20
55:17 56:4 63:17 78:20
95:17,18 96:9,20 97:1,3
101:10 111:15 115:18
135:11,14 151:3 153:4,7
154:16 155:2 169:11 170:5
171:15 173:16 182:14,17
184:1,19 187:4 190:11,12
197:1
**wanted**
21:13 40:18 66:13 98:17
114:18 128:3 141:17
189:12 195:10
**wanting**
183:11
**wants**
44:18 47:11 62:7,8 105:15
120:8 155:16
**warty**
33:11
**washington**
1:16 2:7 3:9 6:12 8:4
**watched**
143:14
**watching**
116:6
**ways**
102:21 103:17 140:12

**ways (cont.)**
145:12
**wednesday**
1:17
**week**
36:2 132:14,14
**went**
22:10 40:13 73:8,16 92:1
128:13 156:21
**west**
4:16
**we've**
153:12 174:2
**wheat**
65:16,17
**whereof**
200:15
**white**
41:5 78:17 122:5 127:8,11
127:12,15,17,22 129:12
**willing**
44:20 120:18,19 148:22
156:19 157:5 186:5
**willingness**
105:4
**wilson**
1:9 5:20 6:6 7:7 25:6,16
26:20 27:1 35:15 118:16
119:1 166:12,15,16 198:2
**window**
152:12,17
**winning**
74:3,9
**withhold**
193:1
**witness**
5:2 8:10 10:2 11:20 12:1,9
12:12 13:12,15,19 25:2
38:15 42:10 45:12 46:6
56:9 61:7 64:20 70:9 71:11
74:18 75:15 77:11 79:13
87:17 100:14 102:18
116:14 127:10 129:11
134:9 138:10 145:12
146:21 151:22 157:17
167:19 173:8 176:2 181:21
187:20 188:20 192:5 200:4
200:15
**woman**
122:16
**won**
101:5
**wonder**
88:16
**wondering**
183:22

[word - zero]

**word**
  11:3 66:9 98:10
**words**
  26:17 43:19 56:4 111:22
  137:9 146:2 154:7 169:21
**work**
  21:1,8 31:12 40:13 85:20
  122:16 127:4,6 153:18,20
**worked**
  21:22 164:16
**working**
  37:11,15 80:5,6 153:16
**works**
  131:15
**world**
  31:17 32:2 90:9,10 186:11
**worldwide**
  153:15
**worry**
  158:2
**worth**
  68:5 96:2 147:14 157:2
**write**
  65:20 76:12 106:13 107:15
  109:1 113:8 119:15 123:13
  139:10 144:15 148:7 156:5
  162:16 174:17 175:3,19
  176:18 177:19 178:12
**writes**
  119:1
**writing**
  112:17
**written**
  12:2 13:8 126:20
**wrong**
  33:7 69:10
**wrongly**
  151:5
**wrote**
  146:9 167:15

---

**y**

---

**yeah**
  8:1 14:9 19:5 24:7 29:5,8
  37:21 38:22 39:7 40:14
  46:6 49:8,10,12 52:18
  58:13 63:8,11 64:3,20
  65:11 67:11 69:14 71:11,21
  71:21 72:11 73:20,22 79:15
  83:17 90:8,8,20 91:6,22
  93:21 94:3,9 96:18 98:3,12
  100:20 105:22 108:10,14
  111:15 113:18 114:9
  115:18 116:5 119:13
  120:10 122:4 124:6 125:13
  129:11,11 131:4 132:22
  133:19 134:10 136:13

**yeah (cont.)**
  137:4,4,13 141:13 142:6
  146:5,7 148:3 158:22 159:3
  160:10 161:2,11,11 165:10
  166:1 167:5,19 170:22
  171:12 172:21 177:9 180:2
  181:22 182:19 183:19
  184:17 189:1 192:15 196:1
**year**
  8:14 11:16 20:1,17,21 21:1
  21:9,11,12 49:21,21 85:10
  85:13,17
**yearly**
  19:19
**years**
  20:7,16 21:3 94:7
**yesterday's**
  140:22
**yield**
  71:16 95:19,20,22 107:21
  108:12 138:2
**yields**
  105:3,9 107:19 136:2

---

**york**
  1:2 3:18,18 6:8

---

**z**

---

**zero**
  81:21 98:7,13 157:7

# Exhibit 1



AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Southern District of New York

| | | |
|---|---|---|
| U.S. Commodity Futures Trading Commission | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    13-cv-7884 |
| Donald R. Wilson, Jr. and DRW Investments, LLC | ) | |
| | ) | |
| *Defendant* | ) | |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
Matthew Evans c/o Kobre & Kim LLP
800 Third Avenue, New York, NY  10022
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: U.S. Commodity Futures Trading Commission<br>140 Broadway<br>New York, New York  10005 | Date and Time:<br>08/28/2015 10:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographic and Videotape

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   08/20/2015

CLERK OF COURT

_____          OR          _____
*Signature of Clerk or Deputy Clerk*                                 *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
U.S. Commodity Futures Trading Commission _____ , who issues or requests this subpoena, are:

Sophia Siddiqui, Esq., U.S. Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581, (202) 418-6774, ssiddiqui@cftc.gov

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 13-cv-7884

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*   Matthew Evans

on *(date)* _____ .

☑ I served the subpoena by delivering a copy to the named individual as follows:  Matthew Evans

c/o Kobre & Kim LLP 800 Third Avenue, New York, NY  10022

_____   on *(date)*   08/20/2015   ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   08/20/2015                          _____
                                                        *Server's signature*

                                                        Sophia Siddiqui, Esq.
                                                        *Printed name and title*
                                                U.S. Commodity Futures Trading Commission
                                                        1155 21st Street, N.W.
                                                        Washington, D.C. 20581

                                                _____
                                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
   **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

   **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
   **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
   **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
   **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES COMMODITY FUTURES TRADING COMMISSION,** | **13-7884 (AT/KF)** |
| **Plaintiff,** | |
| **v.** | |
| **DONALD R. WILSON AND DRW INVESTMENTS, LLC,** | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2015, service of the foregoing subpoenas was made on the following via UPS Overnight, with a courtesy copy sent via e-mail:

Michael S. Kim, Esq.
Jonathan Cogan, Esq.
Jason Manning, Esq.
Melanie L. Oxhorn, Esq.
Kelly Karneeb, Esq.
Kobre & Kim LLP
800 Third Avenue
New York, New York 10022

**Attorneys for Defendants**

Andrew C. Lourie, Esq.
1919 M Street, N.W.
Kobre & Kim LLP
Washington, DC 20036

**Attorney for Defendants**

/s/ Sophia Siddiqui
Sophia Siddiqui



EXHIBIT

9-2-15  KB

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| U.S. Commodity Futures Trading Commission | ) |
| *Plaintiff* | ) |
| v. | ) |
| Donald R. Wilson, Jr. and DRW Investments, LLC | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.   13-cv-7884

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
Jeffrey H. Harris c/o Kobre & Kim LLP
800 Third Avenue, New York, NY  10022
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: U.S. Commodity Futures Trading Commission<br>Three Lafayette Centre, 1155 21st Street, N.W.<br>Washington, D.C. 20581 | Date and Time:<br><br>09/02/2015 10:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographic and Videotape

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  08/20/2015

CLERK OF COURT

OR

_____
*Signature of Clerk or Deputy Clerk*

*Sophia Siddiqui*
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
U.S. Commodity Futures Trading Commission                              , who issues or requests this subpoena, are:

Sophia Siddiqui, Esq., U.S. Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581, (202) 418-6774, ssiddiqui@cftc.gov

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 13-cv-7884

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*   Jeffrey H. Harris

on *(date)* _____ .

☑ I served the subpoena by delivering a copy to the named individual as follows: Jeffrey H. Harris

c/o Kobre & Kim LLP 800 Third Avenue, New York, NY 10022

_____ on *(date)*   08/20/2015   ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   08/20/2015

_____
*Server's signature*

Sophia Siddiqui, Esq.
_____
*Printed name and title*
U.S. Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).