# Exhibit 5

Page 1

1          UNITED STATES OF AMERICA
           BEFORE THE
2    COMMODITY FUTURES TRADING COMMISSION
3
4
      IN THE MATTER OF:     )
5                          )
      DRW TRADING GROUP and  )
6     DRW INVESTMENTS, LLC   )
7
8
9      Examination under oath of GARRY O'CONNOR,
10 taken pursuant to subpoena and the rules of the
11 U.S. Commodity Futures Trading Commission,
12 reported by Rhonda Snyder, a Certified Shorthand
13 Reporter, Illinois CSR License No. 84-3421, at 525
14 West Monroe Street, Suite 1100, Chicago, Illinois,
15 commencing at 9:10 a.m. on Wednesday, February 29,
16 2012.
17
18
19
20
21
22
23          SUSAN SOBLE ASSOCIATES, P.C.
            Certified Shorthand Reporters
24       1460 N. Clark Street, Chicago, IL 60610
              (312) 988-9868

Page 2

1
  PRESENT:
2
3
  U.S. Commodity Futures Trading Commission
4 Division of Enforcement
  MS. JENNIFER E. SMILEY, Senior Trial Attorney
5 MR. ALEX C. LEVINE, Senior Trial Attorney
  525 West Monroe Street, Suite 1100
6 Chicago, Illinois 60661
  (312) 596-0700
7
       On behalf of the CFTC,
8
  ARNOLD & PORTER
9 MR. DAN WALDMAN
  555 12th Street, N.W.
10 Washington, D.C. 20004
  (202) 942-5804
11
   -and-
12
  SUSMAN GODFREY, LLP
13 MR. SETH ARD
  560 Lexington Avenue, 15th Floor
14 New York, New York, 10022
  (212) 471-8354
15
       On behalf of the Witness.
16
17
18
19
20
21
22
23
24

Page 3

1                 I N D E X
2
  WITNESS                PAGE    LINE
3
      GARRY O'CONNOR
4
   Examination By Ms. Smiley    4    7
5
6
7            EXHIBITS
8  EXHIBITS              PAGE   LINE
9  Commission Exhibit No. 1      6    21
   Commission Exhibit No. 47    35    7
10 Commission Exhibit No. 61    50   23
   Commission Exhibit No. 62     6   10
11 Commission Exhibit No. 63    29    1
   Commission Exhibit No. 64    38    1
12 Commission Exhibit No. 65    43    8
   Commision Exhibit No. 66    50   23
13
14
15
16
17
18
19
20
21
22
23
24

EXHIBIT
5
9-2-15   KB

Page 4

1     MS. SMILEY:  Let's go on the record at 9:07.
2 Could you please swear the witness?
3          GARRY O'CONNOR,
4     having been first duly sworn was
5     examined and testified as follows:
6          EXAMINATION
7 BY MS. SMILEY:
8   Q.   Mr. O'Connor, could you please state and
9 spell your name for the record?
10   A.   Garry Neil O'Connor.  G-a-r-r-y, N-e-i-l,
11 O-'-C-o-n-n-o-r.
12   Q.   Mr. O'Connor, my name is Jennifer Smiley.
13 I'm an attorney with the Enforcement Division at
14 the Commodity Futures Trading Commission and I'm
15 here with my colleague Alex Levine who is also an
16 attorney with the Enforcement Division.  And your
17 testimony today is under oath.  It's also under the
18 penalty of perjury.
19        If you do not understand a question that I
20 ask for any reason, please just let me know and
21 I'll be happy to repeat it or rephrase it.
22 Otherwise I'll presume that if you answer a
23 question, you understood what I was asking, okay?
24   A.   Okay.

Page 17

1   A. Well, I drew on my previous experience as
2 an interest rate derivatives trader and what I
3 understood to be industry standards about valuation
4 of these types of contracts.
5   Q. Were there specific decisions that you
6 made about how IDCG should approach the valuation
7 of these contracts?
8   A. Yeah, the guidance was to build a
9 valuation tool that was transparent and
10 replicatable, so we made decisions to try and
11 achieve that.
12   Q. What sort of decisions did you make that
13 would help make it transparent and replicatable?
14   A. We decided to use FRA contracts rather
15 than Eurodollar contracts. We decided to use a
16 LIBOR-based discount factor. We decided on various
17 interpolation schemes that were widely used and
18 well understood.
19   Q. About what time frame are we talking about
20 when you were working on developing these contracts
21 and valuations?
22   A. This was done as part of the DCO
23 application process so this was late 2008.
24   Q. Did you come to have a different title

Page 18

1 with IDCG at some point?
2   A. Yes. I became the chief product officer.
3   Q. When was that?
4   A. I believe that that was early 2009.
5   Q. Did that involve any additional
6 responsibilities other than what you've already
7 been describing?
8   A. No. I think it reflected the
9 responsibilities that I already had.
10   Q. Have you held any other positions with
11 IDCG?
12   A. I'm currently the chief executive officer
13 and I have been since January 2010.
14   Q. As CEO what responsibilities do you have?
15   A. I have overall responsibility for the
16 direction and management of the company.
17   Q. Sure. And in particular what are your
18 day-to-day responsibilities?
19   A. I'm not sure as a CEO that I have
20 day-to-day responsibilities.
21   Q. All right. Fair enough. All right. Are
22 you still involved in product design issues?
23   A. Yes. I do still get involved in product
24 design issues although most of the product that we

Page 19

1 have has already been designed so the
2 responsibility for that is more procedural now
3 rather than true design work so there's not very
4 much of that.
5   Q. Are you still involved in educating
6 potential participants?
7   A. Yes.
8   Q. What do you do in that respect?
9   A. I think that involves meetings with
10 potential participants and describing how IDCG
11 operates and why we operate the way that we do.
12   Q. I want to talk a little bit about -- first
13 of all, we've been talking about IDCG. What does
14 that stand for?
15   A. International Derivatives Clearing Group.
16   Q. And there's also IDCH?
17   A. Yes.
18   Q. What does that stand for?
19   A. International Derivatives Clearinghouse.
20   Q. What is the relationship between those
21 two?
22   A. IDCG is a holding company primarily. IDCH
23 is the clearinghouse and is where the DCO order is
24 held.

Page 20

1   Q. Turning to then IDCG I want to talk a
2 little bit about settlement prices and how those
3 get calculated in the interest rate swap futures
4 products on IDCH. How did IDCH calculate
5 settlement prices both for the OTC and then on the
6 exchange?
7   A. So for both futures products, which is I
8 think what you mean by on the exchange.
9   Q. Right.
10   A. So for futures products and for swap
11 products we use a two-step approach of implying
12 unknown future interest rates and then discounting
13 the implied unknown and the known interest payments
14 back to today's terms using a discount curve.
15   Q. Were there differences between the way
16 that the settlement was calculated in the OTC arena
17 versus on the exchange?
18   A. There are. Primarily that relates to the
19 form of the discount factor generation. So in the
20 futures environment the discount factors were LIBOR
21 based. In the swap environment the discount
22 factors were Fed funds based.
23   Q. Were you involved in decisions of what
24 discount factors to use?

Page 21

1   A. Yes.
2   Q. And what was the reason for using
3 different discount factors in the two different
4 areas?
5   A. The futures environment was developed
6 first and there was a desire to keep the valuation
7 tools as simple and as transparent as possible.
8 The swap environment was developed later and the
9 industry had moved towards Fed funds type
10 discounting as a standard approach. The futures
11 environment did not include price alignment
12 interest adjustment. The swap environment did.
13   Q. Price alignment interest, what does that
14 mean?
15   A. Price alignment interest is an adjustment
16 to variation margin to reflect the cost of funding
17 cumulative collateral.
18   Q. Why was that not applied in the futures
19 environment but applied in the swaps environment?
20   A. There were three main reasons why we did
21 not include PAI in the futures environment. We
22 thought it was unnecessary, we thought it was
23 complex, and the clients that we were targeting
24 were vocal that they did not want it in their

Page 22

1 clearing solution.
2   Q. Who were those clients that were vocal
3 about not wanting it?
4   A. The asset management working group of
5 SIFMA, that was a working group looking
6 specifically at clearing of OTC product, as a
7 collective group were vocal about not wanting PAI.
8 Various people within that group and outside of
9 that group individually spoke to us about not
10 wanting to have PAI.
11   Q. Did they give reasons for why they felt
12 that PAI was not something that they wanted
13 applied?
14   A. I think their reasons were the same as
15 ours, that it was an unnecessary complication to
16 the clearing process.
17   Q. But IDCH does apply a PAI adjustment in
18 the swaps environment, correct?
19   A. Yes.
20   Q. Why was the decision made to use that in
21 that environment?
22   A. The end users who were vocal about not
23 wanting to have PAI did not support our futures
24 platform, and the clearing members who we needed in

Page 23

1 order to be successful required PAI to be in the
2 model as a prerequisite to joining as clearing
3 members.
4   Q. In terms of the calculation of settlement
5 prices in the futures environment how did active
6 bids on the exchange affect the calculation of
7 settlement prices?
8   A. Exchange pricing was given precedence in
9 determining the inputs to the curve to determine
10 settlement prices. From memory, that was a
11 three-stage process. Relatively tight bid/offers,
12 a midpoint would be used. Why the bid/offers where
13 there had been recent transaction history, the
14 recent transaction history would be used. And
15 where there were only bids or offers, they would
16 bound the curve.
17   Q. Just to be sure I got that, you said there
18 were three different factors, there were relatively
19 tight bid/offers and the midpoint of those would
20 be, was that sort of the primary factor or were you
21 giving the factors in order of precedence?
22   A. The factors are, as I recall them, and,
23 yes, I gave them in their order of precedence.
24   Q. In terms of bids and offers that would

Page 24

1 figure into the pricing curve did that include any
2 voice bids through brokers or was that limited to
3 bids that were streamed electronically into the
4 exchange?
5   A. We used traditional OTC levels which are a
6 conglomerate of voice broker and other dealer
7 indications.
8   Q. So to the extent that bids through voice
9 brokers affected the OTC levels, that would affect
10 the settlement price?
11   A. Unless it was overruled by exchange
12 activity, yes.
13   Q. If there was activity on the exchange,
14 that would overrule the OTC levels?
15   A. Yes.
16   Q. Were you involved in any discussions or
17 recruitment efforts to get Jefferies & Company to
18 trade on the exchange or to clear through the
19 exchange?
20   A. I was involved with discussions to get
21 Jefferies to use the clearinghouse.
22   Q. What clearinghouse was that?
23   A. IDCH.
24   Q. So what was the time frame of those

# Exhibit 6

| | |
|---|---|
| **From:** | Brian Vander Luitgaren <bvander@DRWHoldings.com> |
| **Sent:** | Friday, July 23, 2010 5:23 PM |
| **To:** | Samuel Stephenson <sstephenson@DRWHoldings.com> |
| **Subject:** | Fwd: Cleared swaps |



Fyi

Sent from my iPhone

Begin forwarded message:

**From:** "Donald Wilson" <DonaldWilson@DRWHoldings.com>
**Date:** July 23, 2010 1:54:20 PM CDT
**To:** <neal.brady@thirdstonepartners.com>, "Jeffrey Levoff" <JLF@DRWHoldings.com>,
"Jennifer Wilson" <jwilson@DRWHoldings.com>, "Yuhua Yu" <yyu@DRWHoldings.com>,
"Brian Vander Luitgaren" <bvander@DRWHoldings.com>, "Barry Mendeloff"
<bmendeloff@DRWHoldings.com>, "Joe Meissner" <jmeissner@DRWHoldings.com>,
<david.boberski@cmegroup.com>, "Kevin Kroeger" <kkroeger@DRWHoldings.com>
**Subject: Cleared swaps**

We need to make a concerted effort to get these initiatives fully functional now. This is the beginning of what we have been talking about for years, but we need to get it right!!

I have asked Kevin Kroeger to help with overall coordination. Cleared swap priorities:

#1 priority is to agree on the daily settlement framework and off-market swap trading framework for Eris's existing contract spec. Goal is to have this agreed to and DOCUMENTED by Monday morning. Dave Boberski and Neal to take the lead, working with Yuhua, who is responsible for theoretical accuraccy, Sam for back-office logic, Barry and Joe Meissner and Brian Vander for practitioner's view. Kevin to help coordinate as needed. I will also be checking in. This includes ensuring we are comfortable with the derivation of the convexity biased curve, and our internal procedures for generating the curve.

#2 is to do an eris test trade as soon as newedge will let us. Vander and Sam are in charge of this.

DRW only: #3 priority is to finish the alternative contract specs. This is lead by Yuhua and Jeff Levoff. The others do not need to be involved in this. Goal is to file by a week from today. I will be available to help.

DRW only:#4 priority is to really understand idcg. Confirm the contract has full convexity bias (despite the fact they will force it to settle at non-convexity biased prices). Do a one-lot test trade next week etc. Vander is in charge of this, working with yuhua, barry, kevin.

#5 priority is to do a convexity bias writeup for the eris contract highlighting the issue and extent of it by the 6th of august. I am open to suggestions on who takes the lead on this.

I will try to be available, especially to help get #1 right by Monday.

**CONFIDENTIAL TREATMENT REQUESTED BY DRW INVESTMENTS, LLC**          **D0134940**
**Highly Confidential**

# Exhibit 7



| From: | Ferber, Laurie (NY Int) <LFERBER@mfglobal.com> |
|---|---|
| Sent: | Wednesday, February 2, 2011 2:25 PM |
| To: | 'John.Shay@idcg.com'; Cantor, Lauren (NY Int) <LCANTOR@mfglobal.com>; Young, John (NY Int) <jyoung@mfglobal.com>; Mahoney, Jack (NY Int) <JMAHONEY@mfglobal.com> |
| Cc: | 'Matthew.Guadagno@idcg.com'; 'Garry.O'Connor@idcg.com'; 'Michael.Dundon@idcg.com' |
| Subject: | Re: We have an issue |

John - I would suggest this is not the moment to be marketing to us about MF's increased involvement. We believe you have a serious issue with the prices being shown, and potentially market manipulation, which has to be addressed for your own best interests and certainly before we do anything with IDCG.

Of course, I'm confident you will address this. I would suggest that Dundon and Garry need to speak with Lauren Cantor.

Thanks,
Laurie

---

**From:** John Shay
**To:** Cantor, Lauren (NY Int); Young, John (NY Int); Mahoney, Jack (NY Int); Ferber, Laurie (NY Int)
**Cc:** Matthew Guadagno ; Garry O'Connor ; Michael Dundon
**Sent:** Wed Feb 02 15:18:00 2011
**Subject:** RE: We have an issue

Lauren- I know we've been trying to get you guys connected to the API since inception ( Dec-08)- Given  current activity on the screens is this something that you would like expedited?

Please advise on how you'd like to proceed please as OMNet API is something you guys are very familiar with.

All prior  IDCG activity was done Off Screen and  then EFS'd into IDCH- maybe we should have a quick meeting as soon as possible to discuss the exchange environment and developments?

John

---

**From:** Cantor, Lauren (NY Int) [mailto:LCANTOR@mfglobal.com]
**Sent:** Wednesday, February 02, 2011 2:56 PM
**To:** John Shay; Young, John (NY Int); Mahoney, Jack (NY Int); Ferber, Laurie (NY Int)
**Cc:** Matthew Guadagno
**Subject:** RE: We have an issue

I just spoke to Marc Katz at Newedge and Hull.  NO one can get me a price.  2 minutes ago.  WHERE IS MY BID???????????

---

**From:** John Shay [mailto:John.Shay@idcg.com]
**Sent:** Wednesday, February 02, 2011 2:30 PM
**To:** Cantor, Lauren (NY Int); Young, John (NY Int); Mahoney, Jack (NY Int)
**Cc:** Gerard Kopera; Michael Miller; Matthew Guadagno
**Subject:** RE: We have an issue

Lauren-

Matt will be calling you in 4 minutes- if you need immediate attention – our Market Ops team – copied here – can

handle.

John

_____

John C. Shay
Founder, Head of Sales and Marketing
IDCG,LLC.
150 E 52nd Street,5th floor
New York, NY
10022
john.shay@idcg.com
w. 646.867.2529
c.917.763.5362

This communication and all information (including, but not limited to, market prices/levels and data) contained therein (the "Information") is for informational purposes only, is confidential, may be legally privileged and is the intellectual property of International Derivates Clearing Group LLC, its parent company and their affiliates (the "Company") or third parties. No confidentiality or privilege is waived or lost by any mistransmission. The Information is not, and should not be construed as, an offer, bid or solicitation in relation to any financial instrument or as an official confirmation of any transaction. The Information is not warranted, including, but not limited, as to completeness, timeliness or accuracy and is subject to change without notice. The Company assumes no liability for use or misuse of the Information. All representations and warranties are expressly disclaimed. The Information does not necessarily reflect the views of the Company. Access to the Information by anyone else other than the recipient is unauthorized and any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it is prohibited. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender.

**From:** Cantor, Lauren (NY Int) [mailto:LCANTOR@mfglobal.com]
**Sent:** Wednesday, February 02, 2011 2:20 PM
**To:** Young, John (NY Int); Mahoney, Jack (NY Int); John Shay
**Subject:** We have an issue

We are attempting to contact IDCG and NO ONE has called us back.  We have an issue.

_____

**Lauren Eve Cantor**
Principal Strategies Group

MF Global, Fixed Income
55 East 52nd Street, 39th Floor
New York, NY 10055
T: 212.589.6520
F: 212.935.2223
lcantor@mfglobal.com
www.mfglobal.com

DISCLAIMER: MF Global Inc ("MFGI") is a US registered futures commission merchant and a member of the NFA and is a US registered broker-dealer and a member of the CBOE, FINRA and SIPC. Except as otherwise indicated, references to MFGI also refer to all affiliates of MFGI (collectively "MFG"). MFG does not warrant the correctness of any information herein or the appropriateness of any transaction. The contents of this electronic communication and any attachments are for informational purposes only and under no circumstances should they be construed as an offer to sell or a solicitation to buy any futures contract, option, security, or derivative including foreign exchange. The information is intended solely for the personal and confidential use of the recipient of this electronic communication. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited and you are requested to return this message to the sender immediately and delete all copies from your system. All electronic communication may be reviewed by authorized personnel and may be provided to regulatory authorities or others with a legal right to access such information. At various times, MFG or its affiliates may have positions in and effect transactions in securities or other financial instruments referred to herein. Opinions expressed herein are statements only of the date indicated and are not given or endorsed by MFG unless otherwise indicated by an authorized representative. Due to the electronic nature of electronic communication, there is a risk that the information contained in this message has been modified. Consequently, MFG cannot guaranty that messages or attachments are virus free, do not contain malicious code or are compatible with your electronic systems and MFG does not accept liability in respect of viruses, malicious code or any related problems that you may experience. Trading in futures, securities, options or other derivatives, and OTC products entails significant risks which must be understood

prior to trading and may not be appropriate for all investors. Please contact your account representative for more information on these risks. Past performance of actual trades or strategies cited herein is not necessarily indicative of future performance. Privacy policy available upon request.

HIGHLY CONFIDENTIAL

MF046118

# Exhibit 8



WILSON/FERBER TELEPHONE CONVERSATION
FRIDAY, FEBRUARY 4, 2011

1   MR. WILSON:  Hello?

2   MS. FERBER:  Hi, Don?

3   MR. WILSON: Hi.

4   MS. FERBER: Hey, how are you?

5   MR. WILSON:  Okay.

6   MS. FERBER:  All right, so, you know, hopefully you got the
7   message that I was asked to call you 'cause Peter's traveling
8   all day today.

9   MR. WILSON:  Yeah.

10   MS. FERBER:  So, I actually think you two should keep talking
11   about it when he's back, but I did not want to leave you hanging
12   and wanted to, to make the call.

13   MR. WILSON:  Okay.

14   MS. FERBER:  So --

15   MR. WILSON:  Thank you for calling me.  Do you have anything to
16   tell me?

17   MS. FERBER:  Well, well, I mean, look, I -- there isn't a lot to
18   say.  I, you know, look, I, I -- certainly the way we look at
19   it -- first of all, obviously, we did not know who the customer
20   was, as we shouldn't have known in this.

21   MR. WILSON:  No, actually, you should know who the customer is.

22   MS. FERBER:   No, because this was meant to be a clear trade.

23   MR. WILSON:  Yeah --

24   MS. FERBER:  We didn't know the customer.

25   MR. WILSON:  Because just as on ClearPort -- this is basically
26   mimic ClearPort, okay?  And on ClearPort when you do the trade
27   with the broker, initially you don't know.  And then the broker
28   has to tell you who it is because for a nanosecond you have an
29   OTC transaction on.

1  MS. FERBER:  Yeah, we don't. Well, you say for a nanosecond,
2  okay.

3  MR. WILSON:  For a nanosecond.  And then you, you turn in --
4  you, you turn it into the Exchange and wave a magic wand, and it
5  becomes a cleared transaction.

6  MS. FERBER:  So, yeah, so you're -- that may be.

7  MR. WILSON:  The NYMEX actually, cracked down on us if that
8  information

9  MS. FERBER:  Uh-huh.

10  MR. WILSON:    -- the counterparty, is not contained on the
11  confirms.  The broker is actually required to disclose the
12  counterparties there, and they make a big deal about it.

13  MS. FERBER:  Yeah, I don't believe they did on the confirm we
14  got.

15  MR. WILSON:  I didn't see it on the confirm either.

16  MS. FERBER:  Yeah.

17  MR. WILSON:  But in every trade that we've done, they've always
18  told us after the trade was consummated who the other side was
19  for that exact reason, because we're supposed to know.

20  MS. FERBER:  Okay, see, none of those things happened here
21  and, and  --

22  MR. WILSON:  But, I, mean, did you ask them?
23
24  MS. FERBER:  No, I don't believe so, and I don't --

25                      (Telephone ringing)

26  MS. FERBER:    -- wait, wait, wait, wait.  I don't think people
27  would have expected that to be the process here.  So, I'll
28  gather some more facts on that, okay?  But my understanding is
29  the terms of the trade, and we've done it with, with Newedge
30  before, are that the trades have to be cleared.  There is not
31  trade if it's not cleared.  So, in fact you actually never have
32  that, that nanosecond, you know, event thing, but, but I
33  understand it for confirmation purposes that's how you treat it
34  because of the EFF thing and stuff like that.  So, you know, so,

WILSON/FERBER TELEPHONE CONVERSATION
FRIDAY, FEBRUARY 4, 2011
3

1  so, you know, I will look at that.  But I'm just telling you
2  that honestly we did not know who it was, okay?  So, that's just
3  one thing.  The terms were it had to be, it had to be cleared.
4  And look what happened here really is that, you know, for the,
5  you know -- first off, we really did knock ourselves out to with
6  like seven minutes, you know, to get in the form and extend the
7  limits and all of that, very genuinely pursuing this.  When it
8  didn't come in, you know, that afternoon and the next day,
9  people got really nervous, and they got nervous because for the
10 same reasons we started looking -- we start looking at these
11 numbers and some of the patterns of trading or of numbers on
12 the, on the Exchange and got nervous. And when it didn't come
13 in, Peter said, you know, oh, I really think I don't have a
14 trade, because for the same reason the clearing member or the
15 customer got nervous about this, and this isn't clearing.  And
16 the only information he was getting was we don't have a clear
17 trade.

18 MR. WILSON:  Okay.  Laurie --

19 MS. FERBER:  So, that, you know, that stuff you're telling me
20 about, you know, about the timing and everything else --

21 MR. WILSON:  Let's just take a time out here.

22 MS. FERBER:  Uh-huh.

23 MR. WILSON:  Okay, I understand you are wearing your hat as
24 legal counsel of MF Global.

25 MS. FERBER:  I'm not, I'm not even.  I truly, truly am not.  I
26 am truly -- let's put it -- if anything, I'm like -- I mean yes,
27 you, you should view it as that, but this is my, just my senior
28 management role here. Did we do the right thing?  How are we
29 handling this situation?  I have some young lawyer looking at
30 all that stuff he ought to look at and stuff.  So, I'm talking
31 to you more as a relationship, and I'm just telling you very
32 honestly how we look at it, and I'll tell you, you know, all the
33 hair on it, so.

34 MR. WILSON:  Okay, well, I, I have a, a wildly different
35 perspective on it.

36 MS. FERBER:  Uh-huh.

WILSON/FERBER TELEPHONE CONVERSATION
FRIDAY, FEBRUARY 4, 2011                          4

1    MR. WILSON:  So, I have -- and, you know, we'll go ahead and
2    pull all the tapes and get all of the documentation that flowed,
3    and all the communication, us and Newedge, and we'll compile it.

4    MS. FERBER:  With Newedge, not with us, right, but that's fine.

5    MR. WILSON:  I'm sorry?

6    MS. FERBER:  You mean they're not with us.  They're between you
7    and Newedge.

8    MR. WILSON:  No, no, no, a lot just is with MF, between Newedge
9    and MF.

10   MS. FERBER:  You have tapes between us and Newedge?

11   MR. WILSON:  No, I --

12   MS. FERBER:  Because that would be a violation of law.

13   MR. WILSON:  Newedge has --

14   MS. FERBER:  Well, by the way, I do not think Newedge -- I mean,
15   by the way, there's no way they would just would give them to
16   you.  Think about that, but it's, you know, there are all those
17   taping laws and stuff, so that's just surprising to me.

18   MR. WILSON:  Oh, okay.  So, so, yeah, I don't know what they can
19   and can't do, okay.  But, you know, what we intend to do is to
20   compile a timeline, and Newedge will compile a timeline.  And,
21   and, you know, whatever information can be shared will be
22   shared, and we'll be happy to share it with you as well.  But
23   it's -- Newedge, the broker who did the trade with MF
24   communicated to the trader that the, you know, that the trade
25   was good, that the limits were being increased.  Obviously,
26   there was a blizzard here, and so the person at Newedge who
27   needed to sign the stuff was not in the office.  Newedge offered
28   to have somebody else sign it.  IDCG said no, they're not an
29   authorized signatory, but don't worry about; just get it in
30   tomorrow.  This is IDCG's chief risk officer.

31   MS. FERBER:  This is what you're hearing from Newedge, and that
32   is what I heard from Newedge.  That -- I don't not think IDCG
33   totally agrees with those facts.

34   MR. WILSON:  Okay.  And --

WILSON/FERBER TELEPHONE CONVERSATION
FRIDAY, FEBRUARY 4, 2011                                    5

1   MS. FERBER:  I only know it from you and Newedge that --

2   MR. WILSON:  Yeah, yeah.

3   MS. FERBER:  -- you know, there is another piece of this, but I
4   do not know what that is.

5   MR. WILSON:  The -- here, let me put it another way.  If, if I
6   ever have a trade, if I've done a trade, I know I've done the
7   trade; I've confirmed the trade, okay?  And then for whatever
8   reason the trade hasn't cleared, I take -- I go through great
9   pains before I would ever assume that that trade is no good,
10  including find out who the counterparty is, talking to the
11  counterparty, talking to the broker.  I, I would take many steps
12  because I would know the gravity of the situation of taking my
13  hedge off and DK'ing the trade.  And in my 22 years in this
14  industry, I have seen this happen once, only once before.  It
15  happened in the Eurodollar options pit in like 1998, and the guy
16  who did it was exiled, okay?  And I view this in exactly the
17  same light.

18  MS. FERBER:  Well, look, Don, I understand.  You've said that; I
19  heard what you said to Peter yesterday.  And let me think of
20  what -- I want to say this to you right, and I really do -- I
21  really -- I think there is some alignment on this.  You know, we
22  reacted -- Peter reacted genuinely -- out of a genuine concern
23  that there's something, there's something fishy here, and the
24  other side must think that because that's why this trade didn't
25  clear.  This is a very big trade.  We would expect this to clear
26  right away.  And Newedge is a big shop, and they're very capable
27  of handling this, you know.  So, so, they should have been, you
28  know, making sure this cleared.  So, I think -- I do think you
29  have a problem with Newedge, you know, more than you have a
30  problem with us.  But what I want to say carefully is those
31  things, those very things that made us nervous about it -- look,
32  yesterday you were saying things about -- casting, you know.
33  You know, I'll, I'll, I'll go out and tell everybody all these
34  horrible things about MF Global.  I, I will -- I'd like to
35  assume that was just a peek; I hope that doesn't happen.  I feel
36  very strongly it shouldn't happen for both of us for a
37  different -- for another reason, which is, look, I respect you
38  tremendously, you know.  What I've said to my guys is, is I
39  assume these trades were very kosher.  John -- you know, Don
40  would not be doing anything that wasn't.  I don't know about his
41  team, but I assume everybody that works for him the same.  You
42  know, if I were to say oh, we heard good things from Kevin from,