UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

    Plaintiff,

    v.

DONALD R. WILSON AND DRW
INVESTMENTS, LLC,

    Defendant.

No. 13-7884 (AT/KF)

**BRIEF OF THE CME GROUP INC., COMMODITY MARKETS COUNCIL, FUTURES INDUSTRY ASSOCIATION, INC., INTERCONTINENTAL EXCHANGE, INC., AND MANAGED FUNDS ASSOCIATION AS _AMICI CURIAE_**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

*Attorneys for Amici Curiae CME Group Inc.; Commodity Markets Council; Futures Industry Association, Inc.; Intercontinental Exchange, Inc. and Managed Funds Association.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................2

INTRODUCTION ...............................................................................................................1

IDENTITY AND INTEREST OF *AMICI CURIAE* ......................................................................1

ARGUMENT.......................................................................................................................4

    I.      A Claim For Attempted Price Manipulation Requires The CFTC To Prove The Defendant Specifically Intended To Create An Artificial Price. .......................4

    II.     In *Indiana Farm*, The CFTC Considered And Rejected The Standard Of Intent It Is Now Asserting. ...............................................................................................5

    III.    The CFTC's New Intent Standard Will Curtail Legitimate Trading, Thereby Harming The Public Interests The Markets Serve.....................................6

CONCLUSION..................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*CFTC v. Stoller*, 834 F.2d 262 (2d Cir. 1987) ............................................................................... 7

*CFTC v. Wilson,* 27 F. Supp. 3d 517 (S.D.N.Y. 2014)................................................................... 4

*General Foods Corp v. Brannan*, 170 F.2d 220 (7th Cir. 1948) ..................................................... 8

*In re Abrams*, CFTC No. 88-10, 1995 WL 455791 (July 31, 1995)............................................... 6

*In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513 (S.D.N.Y. 2008) ............. 11

*In re Comm. Exch. Inc. Silver Futures Litig.*, 560 Fed.App'x. 84 (2d Cir. 2014) ...................... 4, 5

*In re Hohenberg Bros.*, CFTC No. 75-4, 1977 WL 13562 (Feb. 18, 1977) ................................... 5

*In re Indiana Farm Bureau Coop. Ass'n.*, CFTC No. 75-14, 1982 WL 30249 (Dec. 17, 1982)
 ............................................................................................................................................... passim

**Statutes**

7 U.S.C. § 5(a) (2012)……………………………………..…………………………………1

**Other Authorities**

CME Rule 813(8)……………………………………………..…………….……………10

ICE Clear Credit Rule 404(b)……………………………………..…………….……...……10

# INTRODUCTION

Each of the *amici*—CME Group Inc. ("CME Group"); Commodity Markets Council ("CMC"); Futures Industry Association, Inc. ("FIA"); Intercontinental Exchange, Inc. ("ICE"), and Managed Funds Association ("MFA")—plays a vital role in the futures and derivatives industry. The *amici* support enforcement by the Commodity Futures Trading Commission ("CFTC") of the statutory and regulatory prohibitions against manipulation and attempted manipulation as well as other market integrity protections. The *amici* also support the vital national public interests that futures and derivatives trading serve and that Congress sought to advance by enacting the Commodity Exchange Act ("CEA")—price discovery, market liquidity, managing (hedging) and assuming price risks, disseminating price information, fair markets, and financial integrity. *See* CEA Sec. 3(a), 7 U.S.C. § 5(a) (2012).

For decades, the jurisprudence on price manipulation under the CEA, including the CFTC's own precedents, established and maintained an important, carefully defined line between trading misconduct and legitimate trading—a line designed to advance the public interests enumerated by Congress. In this case, however, the CFTC proposes to change the settled legal standard for attempted price manipulation, effectively erasing that line and jeopardizing those public interests. Because that result is contrary to law and will bring adverse policy consequences, the *amici* support the long-standing legal standard for attempted price manipulation.

# IDENTITY AND INTEREST OF *AMICI CURIAE*

The CFTC has alleged that Defendants Donald R. Wilson and DRW Investments, LLC both manipulated and attempted to manipulate the price of the IDEX interest rate swap futures contract in violation of the CEA. The CFTC and Defendants have each filed briefs on the legal

standards for manipulation and attempted manipulation claims, and the CFTC has filed a motion for partial summary judgment on its attempted manipulation claims. In its brief, the CFTC asks this Court to adopt a new legal standard for intent in attempted manipulation cases that departs in a significant respect from decades of settled law. The CFTC argues it need only prove "an intent to affect price" and not that the price was intended to be artificial.

The *amici* respectfully submit that the Court should instead retain the well-established legal standard for attempted price manipulation under which the CFTC must prove that a defendant specifically intended to create an artificial price—a price that does not reflect the legitimate forces of supply and demand. In the CFTC's own words from 1982, "market participants have a right to trade in their own best interests without regard to the positions of others as long as their trading activity does not have as its purpose the creation of 'artificial' or 'distorted' prices." *In re Indiana Farm Bureau Coop. Ass'n. Inc.*, CFTC No. 75-14, 1982 WL 30249 *6 (Dec. 17, 1982). Continued application of this standard will facilitate the promotion of price discovery and the other congressionally endorsed public interests the futures markets serve.[1]

The *amici* represent the interests of futures exchanges, clearinghouses, futures brokerage firms, and major futures market participants subject to regulation by the CFTC.

CME Group consists of four separate exchanges: the Chicago Mercantile Exchange, Inc., the Board of Trade of the City of Chicago, Inc., the New York Mercantile Exchange, Inc., and the Commodity Exchange, Inc. These exchanges offer a wide range of benchmark derivatives products available across all major asset classes, including futures and options based on interest

---

[1] The *amici* are addressing only the legal standard for attempted price manipulation and express no view on any other issues or aspects of this case.

rates, equity indexes, foreign exchange, energy, metals, agricultural commodities, and alternative investment products. CME also includes CME Clearing, one of the largest central counterparty clearing services in the world, which provides clearing and settlement services for exchange-traded contracts, as well as for over-the-counter derivatives transactions.

CMC is a trade association that brings together producers, processors, merchants and commercial users of commodities, and commodity exchanges. CMC members include the complete spectrum of commercial end-users of all futures markets, including energy and agriculture. Specifically, CMC industry member firms are regular users of exchanges owned by the CME Group, ICE, and others and are customers of many FIA members.

FIA is the leading trade organization for the futures, options, and centrally cleared derivatives markets worldwide. FIA's membership includes clearing firms, exchanges, clearinghouses, and trading firms from 48 countries as well as technology vendors, lawyers, and other professionals serving the industry. FIA's mission is to support open, transparent, and competitive markets, to protect and enhance the integrity of the financial system, and to promote high standards of professional conduct.

ICE operates ICE Futures U.S., a CFTC-licensed futures exchange. ICE also owns and operates four derivatives clearinghouses registered with the CFTC: ICE Clear U.S., ICE Clear Credit, ICE Clear Europe, and The Clearing Corporation.

MFA represents the global alternative investment industry and its investors by advocating for sound industry practices and public policies that foster efficient, transparent, and fair capital markets. MFA is an advocacy, education, and communications organization established to enable hedge funds and managed futures firms in the alternative investment industry to participate in public policy discourse, share best practices and learn from peers, and

communicate the industry's contributions to the global economy. MFA members help pension plans, university endowments, charitable organizations, qualified individuals, and other institutional investors to diversify their investments, manage risk, and generate attractive returns.

## ARGUMENT

**I.     A Claim For Attempted Price Manipulation Requires The CFTC To Prove The Defendant Specifically Intended To Create An Artificial Price.**

This Court has held, and the CFTC and Defendants both agree, that to possess manipulative intent means to act "with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand …." *CFTC v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014); *see also* Pl. Memo. in Support of its Partial Summary Judgment Mot. at 20, ECF No. 109; Def. Memo. of L. in Support of Summary Judgment Mot. at 23, ECF No. 112. This standard was first set forth in *Indiana Farm*, 1982 WL 30249 at *7, and has also been adopted by the U.S. Court of Appeals for the Second Circuit. *See In re Comm. Exch. Inc. Silver Futures Litig.*, 560 Fed.App'x. 84, 87 (2d Cir. 2014).

The courts and the CFTC have interpreted this standard to be synonymous with a "specific intent to create or cause an artificial price." *Id.* at 86 (restating the intent element of manipulation as "specifically intend[ing] to cause the artificial price"); *Indiana Farm*, 1982 WL 30249 at *4 n.2 ("the intent requirement, which is the same for a manipulation and an attempted manipulation, is the performance of an act or conduct which was intended to effect an artificial price…. An 'artificial' or 'distorted' price is a price which does not reflect the market or economic forces of supply and demand ….").

In this case, however, the CFTC attempts to recast three decades of law, asserting that proof of intent to create an "artificial price" is not required to prove attempted manipulation. Pl.

4

Ltr. Mot. for Leave to File at 4, ECF No. 97 (hereinafter "CFTC Pre-Motion Ltr."). The CFTC relies on an oft-quoted short-hand summary of the elements of attempted manipulation: (1) an intent to affect the market price of the commodity, and (2) some overt act in furtherance of that intent. *See In re Hohenberg Bros.*, CFTC No. 75-4, 1977 WL 13562 (Feb. 18, 1977). Based on that summary, the CFTC argues that "'[a]rtificial price' is not an element of attempted manipulation …." CFTC Pre-Motion Letter at 4.

The CFTC's new position is a reversal of its precedents on attempted manipulation. In *Indiana Farm*, which we discuss in the next section, the CFTC refused to adopt the *Hohenberg* short-hand in identifying the legal elements of attempted price manipulation. *Indiana Farm*, 1982 WL 30249 at *4. Subsequently, the CFTC followed *Indiana Farm* in upholding the dismissal of an attempted price manipulation charge because the defendant "did not have the specific intent, purpose or conscious object *to create an artificial or distorted price*." *In re Abrams*, CFTC No. 88-10, 1995 WL 455791 at *4-5 (July 31, 1995) (emphasis added). Until now, the CFTC had consistently concluded that to establish attempted price manipulation it must prove a specific intent to create an artificial price.

## II. In *Indiana Farm*, The CFTC Considered And Rejected The Standard Of Intent It Is Now Asserting.

In *Indiana Farm*, the CFTC considered and rejected the legal standard that it is now urging this Court to adopt. It then concluded—correctly, in the view of the *amici*—that it would not be "enough to prove simply that the accused intended to influence price" to establish intent for manipulation or attempted manipulation. *Indiana Farm*, 1982 WL 30249 at *6.

In *Indiana Farm*, the CFTC refused to lower the intent standard because that could "wreak havoc with the market place. It is the intent of the parties which separates otherwise lawful business conduct from unlawful manipulative activity. This being so, a clear line between

5

lawful and unlawful activity is required in order to ensure that innocent trading activity not be regarded with the advantage of hindsight as unlawful manipulation." *Id.* at *6. This reasoning from *Indiana Farm* belies the CFTC's new litigation position, which would allow any trading activity undertaken with knowledge that the purchase or sale would establish a new price level to be characterized as an "intent to affect price."

The CFTC's *Indiana Farm* decision held that the higher standard was necessary to protect legitimate trading activity. The CFTC specifically emphasized: "market participants have a right to trade in their own best interests without regard to the positions of others as long as their trading activity does not have as its purpose the creation of 'artificial' or 'distorted' prices." *Id*. *Indiana Farm* correctly underscores the importance of an "artificial price" standard for attempted price manipulation to foster legitimate trading activity. The *Indiana Farm* decision has as much vitality today as it did in 1982 and it should continue to be followed.[2]

## III. The CFTC's New Intent Standard Will Curtail Legitimate Trading, Thereby Harming The Public Interests The Markets Serve.

If adopted by this Court, the CFTC's proposed new intent standard would upset settled trading expectations and practices, and risk compromising the many public interests that derivatives markets serve—including price discovery, liquidity, and hedging. The *Indiana Farm* decision recognized the important policy considerations implicated by an overbroad application of the anti-manipulation provisions of the CEA. In particular, *Indiana Farm* endorsed the need for market participants to trade—unless they sought to create artificial prices—"to protect their own interests" or to engage in activities that involve a profit motive, which are critical to well-

---

[2] Rewriting the legal standards for attempted manipulation in the context of an enforcement proceeding could also prejudice market participants "who may have relied on the agency's prior policy or interpretation." *CFTC v. Stoller*, 834 F.2d 262, 265-66 (2d Cir. 1987).

6

functioning markets and price discovery. 1982 WL 30249 at *6 (quoting *General Foods Corp v. Brannan*, 170 F.2d 220, 231 (7th Cir. 1948)).

In the present case, the CFTC concedes that its proposed intent standard would impose liability for attempted manipulation where a market participant places bids or offers or trades with the intent to move prices toward its own view of fair value. *See* CFTC Pre-Motion Ltr. at 4. If placing bids or offers with the intent to move prices in accordance with one's own market view becomes illegal, it could materially curtail trading by many market participants. Trading with the expectation that the trades will move the price closer to the trader's view of fair value is a critical part of the price information dissemination and price discovery functions of the markets—important public interests the CEA is intended to protect.

Contrary to its current position, in *Indiana Farm* the CFTC recognized that trading in one's own interest based on legitimate information or hedging needs should not be constrained by fear of liability if those trades are expected to move market prices. This is how price discovery is intended to work. 1982 WL 30249, at *6 ("trad[ing] in their own best interests without regard to the positions of others … is the very motivation which gives lifeblood to the forces of supply and demand, [and] makes the price discovery function of the marketplace viable"). Now, the CFTC is asking this Court to adopt a standard that could cause the submission of bids or offers, or executing trades, with the expectation that prices will move to reflect the trader's view of fair value, to be considered illegitimate and manipulative. By proposing its new legal standard, the CFTC appears to be particularly concerned that such price movements would also benefit the trader's positions. Yet *Indiana Farm* holds that "the self-interest of every market participant plays a *legitimate* part in the price setting process"; therefore,

7

"it is not enough to prove simply that the accused intended to influence price." *Id*. (emphasis added).

If *Indiana Farm* is set aside and merely "intent to affect price" becomes the new standard for attempted manipulation, then price discovery, efficient hedging, and disseminating price information would be expected to suffer as traders could forego customary and efficient trading practices out of fear of prosecution as an attempted manipulator. For example, a cattle rancher may reasonably believe that futures market prices are lower than expected given her view of supply and demand. The rancher has an interest in the market accurately reflecting supply and demand because the futures price sets the price the rancher will receive for her for cattle in the cash market. Given her market view, the rancher believes she would profit from futures trading if she buys low and then sells at a higher prices when prices better reflect the forces of supply and demand. She also wants futures prices to accurately reflect supply and demand when she sells her cattle. It may be rational for the rancher to buy all of the existing futures offers at the best offered price and one or two levels higher. She expects her trading would result in prices moving higher to reflect the direction of trading activity in the market. But this is consistent with seeking to trade profitably based on a perception of market fundamentals—a legitimate activity—which also affects prices in a manner that could benefit her cattle sales in the cash market. Under these circumstances, the rancher's trading is not only legitimately profitable, but also important to the mix of market information that drives prices to equilibrium.

Even if the rancher's view of prices is based on inaccurate or incomplete information, her bids or purchases will disseminate new price information and encourage others to trade—thus facilitating price discovery. Under a mere "intent to affect prices" standard, however, the

rancher may abstain from legitimate trading to avoid the risk of being branded an attempted manipulator, even though she never intended to create artificial or distorted prices.

The CFTC's proposed "intent" standard also does not require that the alleged attempted manipulation be for the *sole* purpose of influencing price, or even require proof that influencing price to a specific level was the clear, principal purpose of the trader. In other words, the CFTC offers no modifier to its proposed intent standard. The CFTC's proposed standard also apparently allows it to infer intent to impact price from knowledge that impact would occur—no further evidence is necessary. Consider an example in which an investment manager anticipates the price of gold to fall and has already established a large short position. The manager expects a significant further sell-off in the price of gold and each day continues to sell at what the manager believes to be inflated prices. The manager expects to profit when prices fall and trades during the closing or settlement period knowing that the end-of-day price calculation will include, and signal to the market, the manager's interest in selling gold. The manager understands that the trades are likely to move prices lower, which also benefits the daily mark-to-market value of the manager's pre-existing short position.

The law of attempted manipulation should not preclude a person from trading during the settlement period merely because the trader already has a position that will be affected by the settlement price, as the manager does in this example. Yet, under the CFTC's new theory, the manager may reasonably fear that the CFTC would construe its activities as attempted price manipulation.

Finally, consider the situation in which an exchange or clearinghouse is trying to attract liquidity to a new futures contract that is currently thinly traded. The exchange or clearinghouse may solicit market makers to place bids and offers during the settlement period to promote

9

liquidity and attract other market participants.[3] Market makers will compete with one another to execute trades with other market participants at profitable prices. Each time a market maker submits a higher bid or lower offer to provide more competitive pricing, it does so with the intent to affect price.

These trading examples illustrate that legitimate, common trading strategies that merely "affect price" are necessary to promote price discovery, liquidity, and risk management, and to disseminate new price information—each an important component of a well-functioning market. Therefore, the CEA's anti-manipulation provisions should only be invoked when market participants intend to create artificial or distorted prices. As one court in this district has observed, "[t]he laws that forbid market manipulation should not encroach on legitimate economic decisions lest they discourage the very activity that underlies the integrity of the markets they seek to protect." *In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513, 534-35 (S.D.N.Y. 2008). On that score, the CFTC's new position falls short.

## CONCLUSION

The CFTC, respectfully, got it right in *Indiana Farm*; the line it drew in 1982 has worked well to promote price discovery, liquidity, and hedging, as well as market integrity. The futures markets and futures trading have, *amici* believe, served the public interests Congress sought to advance. Changing the legal standard for attempted price manipulation would upset the settled trading expectations that facilitate these salutary market conditions. For all of the foregoing reasons, this Court should reject the CFTC's contention that the law of attempted manipulation

---

[3] In a similar context, the CFTC has approved clearinghouse rules that require clearing members to submit executable bids and offers at the end of day to determine the daily settlement prices used by the clearinghouse. Each clearing member submits bids and offers with the intent and for the purpose of affecting the settlement price. *See, e.g.*, CME Rule 813(8); *see also* ICE Clear Credit Rule 404(b).

merely requires "an intent to affect price" and hold that attempted manipulation requires the CFTC to establish that the defendant specifically intended to create an artificial price.

Dated: New York, New York
January 12, 2016

> SKADDEN, ARPS, SLATE,
>   MEAGHER & FLOM LLP
>
> By: /s/ Boris Bershteyn
> Boris Bershteyn
> Four Times Square
> New York, New York 10036
> Tel: (212) 735-3000
> Fax: (212) 735-2000
> boris.bershteyn@skadden.com
>
> Mark D. Young
> Theodore M. Kneller
> 1440 New York Ave, NW
> Washington, D.C. 20005
> Tel.: (202) 317-7000
> Fax: (202) 393-5760
> mark.d.young@skadden.com
> theodore.kneller@skadden.com
>
> Jerrold E. Salzman
> 155 N. Wacker Drive
> Chicago, Illinois 60606
> Telephone: (312) 407-0700
> Fax: (312) 407-0411
> jerrold.salzman@skadden.com
>
> *Attorneys for Amici Curiae CME Group Inc.; Commodity Markets Council; Futures Industry Association, Inc.; Intercontinental Exchange, Inc. and Managed Funds Association.*