# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

11/30/18

No. 13 Civ. 7884 (RJS)

UNITED STATES COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

VERSUS

DONALD R. WILSON AND DRW INVESTMENTS, LLC,

Defendants.

MEMORANDUM AND ORDER
November 30, 2018

RICHARD J. SULLIVAN, Circuit Judge:

Plaintiff, the United States Commodity Futures Trading Commission (the "CFTC"), brings this action against Defendants Donald R. Wilson ("Wilson") and his company DRW Investments, LLC ("DRW"), alleging that Defendants manipulated or attempted to manipulate the price of a commodity in violation of Sections 6(c) and 9(a)(2) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 9, 13(a)(2) (2006).[1]  Having

presided over a bench trial in this action, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).   For the reasons set forth below, the Court finds that the CFTC has failed to meet its burden of proof with respect to its market manipulation, attempted market manipulation, and control person liability claims, and enters a judgment in favor of Defendants.

## I. PROCEDURAL HISTORY

On November 6, 2013, the CFTC filed a complaint alleging that Defendants "unlawfully placed orders for certain futures contracts with the intent to move the prices of the contracts in their favor" and "to increase the value of the futures contract positions they

---

[1] The CFTC alleges violations of the CEA as it existed during the period relevant to this action, which extended to August 12, 2011. (*See, e.g.*, Doc. No. 1 ("Complaint" or "Compl.") ¶¶ 63, 70.) Although the Dodd-Frank Wall Street Reform and Consumer Protection Act amended portions of the CEA, these amendments did not take effect until August 15, 2011.   *See* Prohibition on the Employment or Attempted Employment of Manipulative and Deceptive Devices, 76 Fed. Reg. 41398 (July 14, 2011).

held in their portfolio." (Compl. ¶ 1.) In essence, the CFTC asserts that Defendants attempted to manipulate, and in fact did manipulate, the market for various interest rate swaps. According to the CFTC, this price manipulation scheme took place over an approximately seven-month period between January 24, 2011 and August 12, 2011, involved over 1,000 electronic bids, and netted Defendants approximately $20 million in ill-gotten gains. (*Id.*)

Defendants moved to dismiss the complaint and, in the alternative, asked for a discretionary transfer of venue to the Northern District of Illinois. Judge Torres, the presiding judge at the time, denied each motion. *See CFTC v. Wilson*, 27 F. Supp. 3d 517 (S.D.N.Y. 2014). The case moved forward and, following discovery, the parties submitted cross-motions for summary judgment. Judge Torres denied both motions, and, in anticipation of trial, also ruled on the admissibility of expert testimony. *CFTC v. Wilson*, No. 13–cv-7884 (AT), 2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016). Shortly thereafter, the case was reassigned to my docket.

On December 1, 2016, the Court commenced a four-day bench trial that was conducted without objection in accordance with the Court's Individual Rules for non-jury proceedings. Specifically, the parties submitted affidavits containing the direct testimony of the witnesses that they controlled, as well as copies of all exhibits and deposition testimony that they intended to offer as evidence at trial. The parties were then invited to call those witnesses whom they wished to examine or cross-examine. In its case in chief, the CFTC (1) submitted affidavits from three witnesses – David Van Wagner, chief counsel of the CFTC's Division of Market Oversight, expert witness Robert MacLaverty, and futures trading investigator George Malas; (2) took live direct testimony from third-party witness

John Shay; and (3) cross-examined Donald Wilson, DRW employees Brian Vander Luitgaren and Craig Silberberg, and defense experts Mathew A. Evans and Dr. Jeffrey Harris. For their part, Defendants submitted affidavits from six witnesses – Wilson, Vander Luitgaren, Silberberg, Harris, Evans, and Christopher Burry of Jeffries, LLC – and conducted cross examination of MacLaverty and Malas. Following the conclusion of trial on December 7, 2016, each party submitted a post-trial memorandum. (Doc. Nos. 193, 194 ("Post-Trial Mem.").)

## II. LEGAL STANDARD

The CFTC must prove its allegations by a preponderance of the evidence. *See CFTC v. Vartuli*, 228 F.3d 94, 100 (2d Cir. 2000). This standard is satisfied when the factfinder believes that "the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (citation omitted).

In this case, the Court is the factfinder. As such, in addition to considering the evidence presented, the Court is entitled to make credibility determinations as to the witnesses and testimony, and to draw reasonable inferences from the evidence. *See Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014).

## III. FINDINGS OF FACT

### A. The Parties

The CFTC is a federal regulatory agency charged with administering and enforcing the CEA, 7 U.S.C. § 1 *et seq.* (2012), and the regulations promulgated thereunder, 17 C.F.R. § 1.1 *et seq.* (2016). (Stip. Facts ¶ P1.)[2]

---

[2] These factual findings are taken from the Stipulation of Facts (Doc. No. 169 ("Stip. Facts")),

DRW is an Illinois limited liability corporation that trades in the financial derivatives markets. (*Id.* ¶ P2.) At all times relevant to this action, Donald R. Wilson served as the CEO and Manager of DRW. (*Id.* ¶ P3.) As such, he was authorized to, and in fact did, direct the trading of the swap contract at issue in this action. (*Id.* ¶ 5.)

### B. Financial Background

#### 1. Interest Rate Swap Futures

A "swap" is a generic term used to refer to a contract in which two parties agree to exchange cash payments at predetermined dates in the future. (Declaration of Dr. Jeffrey Harris, Ex. A ¶ 16 ("Harris Decl.").) The parties decide in advance how they will calculate the cash payments, and the value of each side's obligation in the swap contract fluctuates over time. Gain to one party represents loss to the other, and vice versa.

An interest rate swap is a particular kind of swap in which the parties agree to exchange cash payments that are calculated by applying an agreed-upon interest rate to a predetermined principal or "notional amount." (DX 166, Harris Decl. ¶¶ 16–19; PX 110, MacLaverty Decl. Att. 1 ("MacLaverty Opening") ¶ 15.)[3]

Colloquially, there is both a "long" party and a "short" party to the contract. The long party pays a fixed interest rate, while the short party pays a floating rate. (Harris Decl. ¶ 16, 19.) Generally speaking, the long party – as the name suggests – makes money when interest rates go up, because it pays a lower, locked-in fixed rate in exchange for a higher floating rate, whereas the short party makes money when interest rates go down, because it pays a lower floating rate in exchange for a higher fixed rate.

Traders who want to go "long" in a particular contract can bilaterally negotiate with others who want to go "short." Those agreements are called over-the-counter interest rate swaps ("OTC swaps"). (Harris Decl. ¶ 16; Tr. 442:15–19.) Since these contracts are privately negotiated, parties can agree to bespoke terms not offered or available through exchanges. But because one side's gain is the other side's loss under a swap contract, the parties to an OTC swap are subject to each other's credit risk; if one party makes a poor bet and can't pay up, the other has no immediate recourse. (Harris Decl. ¶ 21; Declaration of Donald R. Wilson, ¶ 22–23 ("Wilson Decl.").)[4]

To mitigate the impact of counterparty credit risk, a trader might decide to involve a middle-man. In that case, the contract is "cleared" through a CFTC-registered intermediary known as a Derivatives Clearing Organization ("DCO"), often referred to simply as a clearinghouse. The clearinghouse serves as the default

---

[3] The notional amount represents the total amount of a security's underlying asset at its spot price, not the amount of money that exchanges hands. (Harris Decl. ¶ 16 n.22.) Thus, notional value is different from the amount of money invested in a derivative contract.

the trial transcript ("Tr."), witness affidavits, Plaintiff's exhibits ("PX"), and Defendants' exhibits ("DX"). The Court also notes that the CFTC made timely hearsay objections to DX 30, 33, 34, 44, 56, 58, 75, 106, and 134–159. (PTO Ex. G.) To the extent that the Court cites these exhibits, the Court overrules these objections and/or uses the exhibits for non-hearsay purposes. To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

Rather, the notional amount is a reference value for calculating the interest on the transaction.

[4] The CFTC filed a series of evidentiary objections to the Wilson Declaration. (Doc. No. 186.) For any portions of this opinion that cite the Wilson Declaration, the Court has considered and overruled the CFTC's objections.

counterparty to every swap contract that it "clears" and, in effect, substitutes its own credit risk for that of the trading parties so that each party's financial obligation under the contract will be backstopped by the clearinghouse in the event of a default by the counterparty. (Harris Decl. ¶¶ 16, 21; Wilson Decl. ¶ 22–23; Stip. Facts ¶ P13; MacLaverty Opening ¶¶ 12, 22–23.)

For many cleared swaps, parties can trade on "exchanges" in the form of interest rate swap futures contracts. (Harris Decl. ¶ 19.) An exchange refers to a physical or electronic marketplace that centralizes the communication of bid and offer prices to all market participants, who are then free to buy and sell at the listed prices. A "futures contract" is an umbrella term for an exchange-traded contract where two parties agree to transact at some point in the future and agree on the price of the transaction at the time they create the contract. (Harris Decl. ¶ 19; MacLaverty Decl. ¶ 15.) That is, the buyer and seller agree today to "lock-in" the future selling price of an asset – whether it is a commodity or a financial instrument – as well as their respective obligations to buy or sell the asset. (*Id.*) An interest rate swap futures contract is a type of futures contract that is "based on the exchange of cash flows established by an underlying interest rate swap." (Harris Decl. ¶ 19.) In other words, an interest rate swap futures contract is an agreement to exchange cash payments – a fixed rate for a floating rate – at some point in the future. Because interest rate swap futures contracts are exchange-traded, they have routine parameters; they are "off-the rack" as compared to the bespoke OTC swaps that parties unilaterally negotiate. *See generally In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173–75 (2d Cir. 2013) (explaining how commodities futures work). Importantly, interest rate swap futures contracts, like all futures contracts, are cleared through a derivates clearing organization. (Harris Decl. ¶ 21.)

A trader who lacks an appetite for counterparty risk, therefore, can trade interest rate swaps in two ways. A trader can negotiate a swap with a counterparty, and then submit the swap to the clearinghouse for clearing, or, alternatively, a trader can post executable bids and offers directly on the relevant exchange and wait until a counterparty "hits" the bids or offers he places on the interest rate swap futures contract. (Harris Decl. ¶ 13.)

In return for more predictable exposure to counterparty risk, the parties to a cleared contract agree to be held accountable to the clearinghouse's daily process of assessing gains and losses and the resulting obligation to "post margin." (MacLaverty Opening ¶ 17; Harris Decl. ¶ 22.) At the close of every trading day, the clearinghouse determines an official settlement price for each cleared contract, and it "marks-to-market" the value of the party's open positions. (MacLaverty Opening ¶ 17, 20–21; Harris Decl. ¶¶ 22–23.) Put simply, the clearinghouse looks at the prices of the contracts and keeps a daily tally of each party's gains and losses. (Stip. Facts ¶ P38.)

Significantly, the clearinghouse requires that whenever the value of a party's position has decreased, that party must make a margin payment to their counterparty, whose position has increased in value. (MacLaverty Opening ¶¶ 17; Harris Decl. ¶ 22.) These daily payments are referred to as "variation margin" or "maintenance margin" payments and are made through the clearinghouse rather than directly between the parties. (MacLaverty Opening ¶ 20; Harris Decl. ¶ 22.) The party who receives the margin payment can reinvest the money in its own account because there is a full transfer of ownership in the funds. (Stip. Facts ¶ P38.) Uncleared OTC swaps, by contrast – unless the parties expressly

negotiate otherwise – typically involve no such margin payments.

## 2. The Convexity Effect

At the risk of stating the obvious, money today is more valuable than money tomorrow, so the daily exchange of variation margin creates an opportunity to produce additional profit for the party that receives the margin payments. (Stip. Facts ¶ 39–40; Harris Decl. ¶¶ 30, 41.)  What's more, this ability to reinvest margin payments is, mathematically speaking, more valuable to the long party than the short party.  This is because the long party is "in the money" and receives margin payments when the prevailing interest rates are higher, whereas the short party receives margin payments when the interest rates are lower. (*Id.* ¶ 41.) As a general rule, investing in a high interest rate environment yields a better return than investing in a low interest rate environment, which means that the long party receives margin at a relatively better time to reinvest. (Harris Decl. ¶ 36-37.)  The impact that this phenomenon has on the value of a cleared interest rate swap is known as the "convexity effect" or "convexity bias." (*Id.* ¶ 38; Stip. Facts ¶ P42.)

The convexity effect does not arise in uncleared OTC swaps because only swaps processed through clearinghouses require the daily exchange of variation margin. (Harris Decl. ¶¶ 124–26.)  For that reason, there can be no dispute that a cleared interest rate swap contract is economically distinguishable from, and therefore not equivalent to, an uncleared interest rate swap, even when the two contracts otherwise have the same price point, duration, and notional amount. (Tr. 703:8– 10; Stip. Facts ¶ 72).  Put another way, because there is some additional value to the long party (and a corresponding diminution in value to the short party) in a cleared swap that does not exist in an uncleared swap, the

economic values of the two contracts are distinct.

As one might expect, modeling the impact that the convexity effect will have on the value of a cleared interest rate contract is a complex endeavor. (PX 44, Yuhua Yu Dep. 22:6–10, 30:1–22; Wilson Decl. ¶ 39; Harris Decl. ¶ 64, Ex. 4A–4G; DX 45.) Traders can – and often do – disagree as to the "correct" value of a cleared contract, which in part explains how the market ends up with long and short players to begin with. (*See, e.g.*, Tr. 456:17–459:17; Harris Decl. Exhibits 3A–3G.)  Nonetheless, some clearinghouses attempt to correct for the convexity effect by adjusting the variation margin calculations according to an agreed-upon formula; this adjustment is typically referred to as "Price Alignment Interest" ("PAI"). (Harris Decl. ¶ 39; Stip. Facts. ¶ P43.)  Such an adjustment is meant to "minimize distortion of pricing" and to bring the price of the cleared contract into closer alignment with the price of the uncleared contract. (Harris Decl. ¶ 39.)

## 3. The IDEX Three-Month Contract

This case involves a particular exchange-traded interest rate swap futures contract called the IDEX USD Three-Month Interest Rate Swap Futures Contract (hereafter referred to as the "Three-Month Contract"). As relevant here, the Three-Month Contract traded on a futures exchange and was cleared by a clearinghouse called the International Derivatives Clearinghouse ("IDCH"). (Stip. Facts ¶ P23.)[5]  Under the

---

[5] IDCH was registered with the CFTC as a DCO in 2008, and is a wholly owned subsidiary of the International Derivatives Clearing Group ("IDCG"), which was a subsidiary of the NASDAQ OMX Group, Inc. ("NASDAQ"). (*Id.* ¶ P14.) The Three-Month Contract was offered on the NASDAQ OMX Futures Exchange ("NFX") from at least June 16, 2010 until August 12, 2011. (Stip. Facts ¶¶ P14, P20–P23.)

terms of the Three-Month Contract, the long party paid a fixed rate and the short party paid a floating rate based on the three-month LIBOR rate. (*Id.* ¶ P24.)[6] The swap parties could choose from sixteen different "tenors" – which refers to the length of time between the start date and maturity date of the swap contract – ranging from one to thirty years. (*Id.* ¶ P26.)

As with other cleared contracts, traders could obtain a position in the Three-Month Contract by executing a bilateral agreement and then clearing the contract through IDCH, or by placing a bid or an offer through the NFX that was accepted by a counterparty. (*Id.* ¶¶ P29–P31.) With respect to the latter, a trader who desired a long position could "bid" a certain fixed rate in exchange for the three-month LIBOR floating rate, while a trader looking for a short position would "offer" the variable rate in exchange for the quoted fixed rate. Both parties were expected to quote their "bids" and "offers" in terms of a fixed interest rate, which was considered to be the "price" of the contract. The exchange operated electronically, and traders could not transact on the exchange directly without first procuring "expensive" software. (Wilson Decl. ¶ 48; Tr. 88:7–20; Stip. Facts ¶¶ P86–P87.) But once a party was connected to the exchange, it could place bids and offers anonymously and continuously for the Three-Month Contract. (Tr. 99:6–100:5; Wilson Decl. ¶ 97.)

---

[6] LIBOR, which stands for London InterBank Offered Rate, is a widely used benchmark for short-term interest rates, and provides an indication of the average rates at which a selection of banks are prepared to lend one another unsecured funds on the London money market. The US Dollar LIBOR interest rate is available in seven maturities, from overnight to twelve months, and the three-month rate serves as a base rate for many other financial products such as savings accounts, mortgages, loans, and in this case, interest rate swap futures.

### 4. IDCH Rules Governing the Three-Month Contract's Settlement Price

At the end of each trading day, the clearinghouse would determine the settlement price for the Three-Month Contract by taking into account different variables, including bids and offers placed during fifteen-minute settlement windows. As noted above, the daily settlement price was important because it determined which side – the long or the short – owed the other a margin payment. During the relevant period, IDCH used a two-step process to calculate margin payments.

First, IDCH would generate the IDEX Curve, which is a line graph that plots settlement prices for each of the Three-Month Contract tenors. The method by which the clearinghouse determined the settlement price for each tenor is especially important in this case. Each day, IDCH would extrapolate pricing information from a hierarchy of sources, including – in order of priority – (1) the midpoint of the electronically submitted bids and offers that were open between 2:45 and 3:00 p.m. EST, also known as the PM Settlement Period; (2) the settlement price of consummated trades made during the PM Settlement Period; and (3) the prevailing interest rates in the OTC swap markets, known as "Corresponding Rates," which were published daily. As a general matter, the best bids and offers submitted on the electronic platform during the afternoon settlement period set the limits for the curve – that is, the settlement price could not be higher than the best electronic offer or lower than the best electronic bid. (DX 82, at IDCG00009826–27; Harris Decl. ¶¶ 25–27; MacLaverty Opening ¶¶ 29–30.) Notwithstanding this methodology, IDCH maintained the authority to revise the IDEX Curve at its discretion to ensure that the

curve was "a fair and appropriate reflection" of the market.[7] (Stip. Facts ¶ D21.)

Second, after generating the IDEX curve, the clearinghouse would use the settlement price for each particular tenor to value each market participant's open positions in the Three-Month Contract. (Stip. Facts ¶¶ P52; *see also* MacLaverty Opening ¶ 25.) To do so, IDCH calculated the net present value of each position by using the settlement price for that tenor to discount the predicted fixed and floating payments due to the parties. (Stip. Facts ¶ P27; Harris Decl. ¶ 26.) That is to say, once the IDEX Curve – which reflected the settlement prices for each tenor – had been generated, marking the positions to market required only a straightforward net present value calculation.

## C. The Alleged Manipulation

### 1. The Arbitrage Opportunity

By mid-2010, Wilson had come to believe that regulatory changes would cause the market for uncleared interest rate swaps to migrate into exchange-traded, centrally-cleared contracts, like the Three-Month Contract. (Wilson Decl. ¶¶ 29–30, 34; Tr. 277:15–278:24.) As a result of his prior experience trading another derivative, Eurofutures, which also exhibited a

---

[7] Three separate provisions of the clearinghouse's Rulebook authorized IDCH to adjust the settlement price. Rule 1002(1) provided that IDCH "may, in its sole discretion, establish a Daily Settlement Price that is a fair and appropriate reflection of the market." (DX 83 at IDCG00010744.) Rule 602(c) provided that "when deemed necessary by the [IDCH] to protect the respective interests of the [IDCH] and Clearing Members, the [IDCH] may establish the Settlement Price for any Contract at a price deemed appropriate by the [IDCH] under the circumstances." (*Id.* at IDCG00010696.) And Rule 205 provided that IDCH may "take actions necessary or appropriate to respond to "any actual, attempted or threatened . . . manipulative activity." (*Id.* at IDCG00010656–7.)

convexity effect (Tr. 260:7–261:7; 278:1–25), Wilson also theorized that cleared contracts that lacked PAI would not be economically equivalent to uncleared swaps because of the convexity effect. (Wilson Decl. ¶¶ 35–38.)

In light of Wilson's belief that market participants would soon be migrating to the exchanges and that he had an insight into the pricing of the Three-Month Contract that might not be immediately apparent to other traders, Wilson organized a team of DRW employees to assess trading opportunities in cleared interest rate contracts. This team included Yuhua Yu and Radu Modescu, who were responsible for quantitative analysis, and Brian Vander Luitgaren, Craig Silberberg, and Barry Mendeloff, who were traders at the firm. (Wilson Decl. ¶¶ 38–39; Yuhua Yu Dep. 11:8–14:8, 17:19–18:19; DX 33; DX 55.) As part of this research, Yu and Modescu modeled the Three-Month Contact's fair value. (Wilson Decl. ¶ 39.) Based on this modeling, Defendants concluded that due to the convexity effect, the "fair value" of the Three-Month Contract was significantly higher than that of comparable OTC swaps. (Stip. Facts ¶ P72; *see also* Wilson Decl. ¶ 39.) Put differently, the "quants" confirmed Wilson's thesis that the Three-Month Contract was mispriced in relation to the OTC swap rate, thereby creating an arbitrage opportunity. (Vander Luitgaren Decl. ¶¶ 11, 14; Evans Decl. ¶ 14; DX 33; DX 69; Stip. Facts ¶ P72.)

### 2. DRW Begins Trading

In August 2010, DRW began to trade the Three-Month Contract. At first, DRW used a "voice broker." Voice brokers negotiated bilateral OTC swaps and then cleared these contracts through IDCH. (Stip. Facts ¶ D6; DX 22, DX 23, DX 34, DX 76.) DRW's traders initially executed relatively small test trades. (Vander Luitgaren Decl. ¶¶ 14–15; Wilson Decl. ¶ 49.) But soon their

confidence grew and, before long, Defendants started looking for larger trades. By the end of September, DRW had acquired, through a voice broker, a net long position of over $300 million notional in the 10- and 30-year tenors, with almost all the contracts negotiated at prices slightly above the price of the OTC swaps. (Stip. Facts ¶ P73.) Specifically, DRW successfully negotiated contracts with MF Global and Jeffries & Co., on notional amounts of $150 million and $175 million, respectively, at a "price" (i.e., fixed rate) that was two to three basis points above the Corresponding Rates for comparable OTC swaps. (Wilson Decl. ¶ 50; DX 43; DX 79–81; MacLaverty Opening Fig. 7.)

Starting in November, Defendants began to submit voice bids directly to IDCH – that is, DRW expressed bids to its voice broker, who then relayed the bids to IDCH. Wilson expected that the clearinghouse would incorporate those voice bids into the settlement price (Stip. Facts ¶ P84; Wilson Decl. ¶ 65; DX 36; DX 61; DX 76), thereby signaling to the market DRW's willingness to pay higher prices, which would hopefully attract swap counterparties while at the same time increasing DRW's variation margin on its existing positions. But Wilson was mistaken. In fact, IDCH did not consider voice bids in calculating the settlement price, and only incorporated bids submitted electronically to the exchange during the settlement period. (Stip. Facts ¶ P85; PX 85; DX 76.)

This policy of excluding otherwise binding voice bids from the calculation of the settlement price "surprised and frustrated" Wilson. (Wilson Decl. ¶ 63.) To Wilson's mind, the voice bids were essential to establishing the true value of the Three-Month contract, and IDCH's failure to incorporate them into the settlement price had two significant negative consequences for DRW's trading strategy. First, by failing

to incorporate DRW's voice bids into the settlement price, IDCH unwittingly threatened the long-term prospects for the entire market, since "price discovery" was essential for attracting new participants into what was a new and highly illiquid exchange. (Wilson Decl. ¶ 65.) Recognizing that traders in efficient markets pay attention to pricing information and might be enticed to trade with DRW upon learning of the firm's increased bids, Defendants feared that IDCH's pricing policy might prevent traders from entering the market in the first place. (Tr. 199:4–12.) And since DRW's trading strategy depended on the existence of swap counterparties – which was essential if the firm was to take advantage of the perceived arbitrage opportunities resulting from the convexity effect -- IDCH's static pricing method was potentially disastrous to that strategy. (Id. ¶ 84–85.) Second, and more relevant to DRW's existing swap positions with MF Global and Jeffries, the failure of IDCH to consider the firm's voice bids threatened to keep the settlement price artificially low, thereby reducing or eliminating the variation margin that would be owed on those existing contracts. (Id. ¶ 64.) In other words, if the voice bids were incorporated into the settlement price, the settlement price would go up, and Defendants – who were long on the contract – would be entitled to greater margin payments. If the voice bids were ignored, then DRW stood to lose, or at least leave money on the table, vis-à-vis their swap counterparties, since the settlement price would remain low and closer to the Corresponding Rates.

Upon learning of the clearinghouse's policy with respect to voice bids, Wilson determined to change DRW's bidding practices so as to ensure that its bids were incorporated into the settlement price. (Id. ¶ 65.) To do so, DRW first acquired software – from a vendor referred by IDCH itself – that enabled DRW to submit electronic bids

directly to the exchange. (DX 76; Stip. Facts ¶ P95.) In addition, DRW began placing electronic bids during the "settlement window" of 2:45 to 3:00 p.m. Recognizing that under the clearinghouse's own policy, only bids placed during that 15-minute period factored into the settlement price calculation, DRW submitted a large percentage of its bids during that time period. (PX 93, Malas Decl. Att. 1; Harris Decl. Ex. 3A–3G; MacLaverty Opening ¶ 67, Ex. 7; Tr. 588:16–19; Wilson Decl. ¶ 90.) There is no disagreement about this point: Defendants knew that their trading practices and, more specifically, their bids, would result in a higher settlement price. (E.g., Tr. 32:6–24, 35:15–36:4, 155:5–8; Stip. Facts ¶ P111 (disputed in non-relevant part).) Indeed, in such an illiquid market, the effects of these bidding practices were predictable. So much so that Yu summarized DRW's bidding strategy as follows: "Old regime: [IDEX Curve] is a LIBOR swap curve[.] New regime: [IDEX Curve] is DRW defined, which impl[ies] a deviation between the LIBOR swap curve and the [IDEX Curve]." (PX 25.) Of course, the increase in settlement price also had a significant impact on DRW's existing contracts with MF Global and Jeffries, since the rising settlement price directly affected the margin owed by the short party. But the fact remained that all of DRW's bids, whether submitted during the settlement window or earlier in the day, were binding bids that any counterparty – including MF Global and Jeffries – could have accepted if they wished to trade at those prices.

Notwithstanding these bidding practices, the market for the Three-Month Contract remained illiquid. (Tr. 58:10–13; see also PX 24; Tr. 41:22–42:10; 45:14–25; 155:9–23). Indeed, between January 24, 2011 and August 12, 2011, DRW submitted over 2,500 electronic bids, but failed to consummate a single trade. (Tr. 95:18–22,

MacLaverty Opening ¶ 48; Stip. Facts ¶ P115.)

### 3. The Busted Trade

There was, however, one significant "almost-trade" during this period. On February 2, 2011 – during a massive snow storm that swept from Chicago to New England – DRW's voice broker notified DRW that one of its electronic bids had attracted the attention of MF Global, which lacked the software necessary to transact electronically. (Tr. 113:2–20; Vander Luitgaren Decl. ¶ 38; Wilson Decl. ¶ 100; DX 32). That afternoon, DRW represented to MF Global that it was willing to transact in the 10-year tenor up to $1 billion notional. (Vander Luitgaren Decl. ¶ 41; Wilson Decl. ¶ 101.) Ultimately, the parties contracted for $250 million notional in the 10-year tenor at a price that was sixteen basis points above the Corresponding Rates. (Vander Luitgaren Decl. ¶ 42; Wilson Decl. ¶¶ 101–2.)

As it turned out, the deal cratered. After agreeing to consummate the trade via the voice broker, MF Global and DRW submitted the contract to IDCH for clearing. (Wilson Decl. ¶ 105.) However, perhaps because of the raging snowstorm, IDCH did not clear the contract that day. (Id.) And when Wilson attempted to clear the trade the next day, MF Global backed out of the deal. (DX 31, 32.) Wilson was livid; he demanded an explanation and endeavored to have the exchange compel MF Global to live up to its end of the bargain. (Id.) Eventually, the parties entered into a general litigation release in which MF Global agreed to pay DRW approximately $850,000. (Wilson Decl. ¶ 112; DX 56, DX 94.) This failed trade was the subject of much debate at trial, but, regardless of the outcome, the negotiation and its aftermath demonstrated that DRW was eager to find counterparties willing to transact at prices above the

Corresponding Rates. (Wilson Decl. ¶¶ 105–112; Tr. 340:24–345:8; DX 159.)

### 4. IDCH Investigation

But the "busted trade" did more than just establish that DRW was hungry to trade. It also triggered an investigation by the clearinghouse. On February 4, 2011, IDCH's risk management department inquired into DRW's electronic bidding practices based on concerns that an "increased number of [DRW's] bids for . . . [futures] contracts . . . occur at times during which IDCH calculates the IDEX [curve]." (DX 30.) As part of that investigation, IDCH requested that DRW provide "an explanation of its trading activity in the Three-Month Contract market between January 24, 2011 and February 3, 2011." (Stip. Facts ¶ D31; DX 30; Vander Luitgaren Decl. ¶ 45.)

Two weeks later, DRW provided a written response to the investigators. (DX 76.) In that report, DRW explained, first, that the Three-Month Contract was not economically equivalent to an uncleared interest rate swap because, unlike other cleared futures contracts, it did not adjust for the convexity effect. (*Id.*; *see also* Dundon Dep. 83:14–25; Wilson Decl. ¶¶ 113–22; Vander Luitgaren Decl. ¶ 45.) As a result, DRW explained its belief that "a significant pricing differential" existed between the Three-Month Contract and the Corresponding Rates, and that DRW's bids were significantly closer to the true value of the swap than were the Corresponding Rates. (DX 76, at D00001709.) Second, DRW explained that its traders placed bids during the PM Settlement Period to aid in the price discovery process – that is, to "provide additional data points to enable IDCH to fill out the swap curve." (*Id.* at D0000108–9.) DRW noted that price discovery and the development of a "smooth" swap curve were essential to

attracting market participants for the Three-Month Contract, and it pointed to the fact that the clearinghouse itself had encouraged DRW to submit bids electronically in order to "aid in the price discovery process" to ensure that the contracts settled "near their true values." (*Id.*) DRW freely admitted to concentrating its bids during the settlement window, which was the only way in which its traders could contribute to price discovery. (*Id.*) But DRW reiterated several times that it "stood ready to trade at any posted bid." (*Id.*)

To explain its bidding practices even further, DRW also submitted a draft white paper outlining its economic analysis of the Three-Month Contract. (DX 45; Wilson Decl. ¶ 120.)[8] The final version of the paper explained the convexity effect in detail, contained a formula for valuing the Three-Month Contract, and provided valuations for certain tenors that were well above the Corresponding Rates. (DX 45.) Specifically, the white paper concluded that "the difference between the [Three-Month Contract] and the corresponding uncleared swap rate [is] around 18 basis points for [the] 10-year [tenor] and about 60 basis points" for the 30-year tenor, while noting that "an interest rate environment with higher volatility will result in larger differences." (*Id.*)

After receiving DRW's response, IDCH never contacted Defendants for additional information, nor did the clearinghouse require DRW to change any of its bidding

---

[8]  That paper – entitled "Central Clearing of Interest Rate Swaps: A Comparison of Different Offerings" – was authored by Rama Cont, Yu, and Mondescu. Pursuant to the Court's decision on the CFTC's motion *in limine*, the Court only considers the white paper for "the purpose of showing Defendants' state of mind at the time they engaged in the trades at issue in this case" and not for the truth of the matters asserted therein. (Doc. No. 175.)

practices. (Wilson Decl. ¶ 123.) The exchange *did*, however, respond to a letter from Jeffries complaining about the way in which IDCH set the settlement prices for the Three-Month Contract. (DX 25.) In that response, IDCH rejected Jeffries's assertion that DRW's electronic bids should be disregarded in determining the settlement price, noting that the contract specifications and the rules of the exchange clearly provided that electronic bids and offers were to be "given precedence" in creating the IDEX curve. (*Id.*) IDCH further explained that the electronically posted bids and offers provided "a more accurate valuation . . . than OTC prices," and that Jeffries's assumption that "swap contracts should have the same price regardless of whether or how they are cleared" was simply "mistaken." (*Id.*) The exchange likewise rejected Jeffries's claim that it was somehow "misled when it entered into the swap futures contracts" with DRW, since the terms of those contracts were "fully disclosed in advance," and Jeffries "had ample opportunity to consider and evaluate them." (*Id.*) IDCH observed that "[n]o investor – and particularly not a sophisticated investor like Jeffries – can plausibly claim to have been misled about the content of IDCH's swap futures contract when it had the contract specifications, Rules, and voluminous other materials detailing those contracts." (*Id.*) In an obvious reference to DRW, IDCH noted that "other parties had access to the same contractual terms and understood that they did not include a PAI and should be valued accordingly." (*Id.*) Thus, according to IDCH, the mere fact that "Jeffries apparently believes, in hindsight, that it should have negotiated a different deal to account for variation margin in the absence of a PAI adjustment is no basis for changing the terms of the contracts." (*Id.*)

Dissatisfied with IDCH's "refusal to take any of the remedial actions requested," Jeffries next lodged a "formal complaint"

with the CFTC's Inspector General, demanding that IDCH be ordered to (1) "resume setting settlement prices . . . in accordance with its historical practice[s]," i.e., defaulting to the Corresponding Rates for OTC swaps, and/or (2) "amend the terms of the [Three-Month Contract] to expressly include a PAI adjustment in order to make such contracts economically equivalent to a plain vanilla [OTC] swap." (DX 14.) After inviting responses from IDCH and DRW, the director of the CFTC's Division of Clearing & Intermediary Oversight (the "Clearing Division"), Ananda Radhakrishnan, ultimately rejected both of Jeffries's demands. (DX 26.) Specifically, the director found "no grounds to conclude that [IDCH] has violated [its] rules or the contract specifications with regard to the determination of settlement prices" for the Three-Month Contract. (*Id.*) Thus, Radhakrishnan determined that "the incorporation of [DRW's] bids" was not improper and in fact was consistent with the "methodology for calculating the settlement price" laid out in the contract's specifications. (*Id.*) And since "neither the contract nor [IDCH's rules] contemplate[d] any PAI adjustment," the director concluded that there was "no basis to materially alter the terms and value of open positions in these contracts by requiring them to be amended to include such an adjustment." (*Id.*)

### 5. DRW Continues Bidding

Notwithstanding the busted trade and the assorted complaints of MF Global and Jeffries, DRW continued to place electronic bids on the Three-Month Contract at prices higher than the Corresponding Rates during essentially every trading day until August 12, 2011. (Tr. 169:13–15; MacLaverty Opening Ex. 7; Harris Decl. Ex. 5.) In all, DRW placed 2,895 electronic bids during this time frame (Harris Decl. Ex. 5), 61% of which were placed or left open during the

settlement period and 1,024 of which were incorporated by the clearinghouse into its calculation of the settlement price (MacLaverty Opening ¶ 59; Stip. Facts ¶ P128; Wilson Decl. ¶ 74; Vander Luitgaren Decl. ¶ 34).

DRW's bidding practice required a trader to input the specifications manually for between 20 minutes and several hours per day, with more time required when the markets were volatile. (Tr. 51:14–52:7.) Although no other party placed a bid or offer on the electronic exchange during that time, several other market participants had the ability to transact on the electronic exchange. (Kopera Dep. 72:11–20.)[9] As a result, any party interested in accepting, or "hitting," DRW's bids could have done so, and DRW would have been bound to transact at that price.

Between January 2011 and August 2011, DRW gradually increased its bids on the Three-Month Contract across all tenors. (MacLaverty Decl. ¶¶ 64–65.) Although these bids were incorporated into IDCH's settlement prices and therefore resulted in increased variation margin on DRW's open positions with MF Global and Jeffries, they likewise were consistent with a trading strategy designed to attract *new* counterparties in a nascent market. (*See, e.g.,* Evans Decl. ¶ 70; *see also* Tr. 585:9–26; Harris Decl. ¶¶ 124–126; DX 45.) Put differently, because Defendants had determined that the Three-Month Contract was worth considerably more than an uncleared swap with similar terms, and because they had developed a model for assessing the "fair value" of the contract compared to the Corresponding Rates, they had an economic incentive to transact at prices up to their assessment of fair value. Obviously, the lower the bid, the more profit DRW would realize on a consummated swap. Nevertheless, in order to attract new swap counterparties – including those who understood the convexity effect and had developed their own notions as to the "true value" of the contract – Defendants recognized the need to increase their bids, up to their own calculation of the fair value of the contract. (Wilson Decl. ¶ 59.) Although higher bids would result in less profit on the newly consummated swap, the goal was still to bid at the lowest price necessary to attract a new counterparty – since some profit is always better than none – without going *over* the fair value of the contract, at which point DRW would lose money on the transaction. So long as Defendants had confidence in the accuracy of their modeling, they would have every incentive to keep bidding up to their calculation of fair value. And as long as the market was an efficient one, they would be deterred from making bids at prices *higher* than their assessment of fair value, since such bids, if "hit," would bind DRW to a money-losing swap.

Throughout the depositions and trial in this case, Defendants credibly maintained that this was, in fact, their trading strategy. (*See* Silberberg Decl. ¶ 43 ("At all times, . . . we bid below what we believed to be the Three-Month Contract's fair value, so any trade would have positive expected value."); *id.* ¶ 44 (DRW gradually increased its bids, "taking a little profit off the table while increasing the odds of executing a trade"); Vander Luitgaren Decl. ¶ 29 ("Our trading strategy continued to be to acquire fixed-rate long positions in the Three-Month Contract . . . below our assessment of its fair value.");

---

[9] Although John Shay testified that no actors other than DRW were capable of bidding on the electronic exchange (Tr. 100:6–21), the Court declines to credit Shay's testimony in light of the deposition testimony of Gerard Kopera, IDCH's director of operations, who was far more knowledgeable regarding the Three-Month Contract and who demonstrated Shay's ignorance of numerous facts concerning the operation of that market (Tr. 102:13–126:21).

Wilson Decl. ¶ 56 ("The basic principle for our bidding was always the same: we wanted to acquire long positions . . . at rates below our estimate of fair value."); *id.* ¶ 57 ("The lower the [bid], the more profit we expected to generate through convexity, if our valuation model was accurate and we hedged properly."); *id.* ¶ 59 ("To attract more sellers, we began gradually raising the spread to the corresponding rates that we were bidding. . . . While bidding at higher spreads would obviously cut into the expected profits associated with a given transaction, it also increased the likelihood that we would find additional counterparties.").) The CFTC offered no evidence to refute this testimony.

### 6. Unwinding and Termination of the Three-Month Contract

On August 12, 2011, DRW placed its final bid on the Three-Month Contract. (Stip. Facts. ¶ D95.) That same month, DRW unwound all its open positions with its existing counterparties for approximately $20 million. (Wilson Decl. ¶ 131.)[10] In each case, the transactions were unwound at or near the settlement prices established by IDCH for the prior day. (*Id.*) In the words of Christopher Bury, Jeffries's managing director for sales, "[t]hese prices were commensurate with the range of values we believed (based on our work with our experts) these positions had, which value was substantially different than the value that Jeffries had originally understood . . . when we first entered into those positions." (Bury Decl. ¶ 8.) Or as Jeffries's CEO succinctly summarized in an email to Don Wilson in August 2011: "You won big. We lost big." (DX 95.)

---

[10] An unwind occurs when parties contract to void their existing contractual obligations. (Wilson Decl. ¶ 131; Tr. 658:14–16.) Usually, one party will simply pay up to settle their losing position at present value. (*Id.*)

Although neither Jeffries nor MF Global ever sued DRW for market manipulation, fraud, or anything else related to the Three-Month Contract, Jeffries eventually commenced an arbitration against IDCH, IDCG, and NASDAQ for fraud, fraudulent inducement, promissory estoppel, breach of contract, and negligent misrepresentation on the theory that IDCH has falsely stated that the Three-Month Contract was "economically equivalent" to an OTC swap. (DX 110.) The arbitration panel unanimously rejected Jeffries's claims, finding no evidence that IDCH acted fraudulently or in bad faith. (*Id.*)

On December 1, 2011, NFX submitted a letter to the CFTC conceding that it was unlikely to "generate significant business" in the Three-Month Contract and notifying the CFTC that it was delisting the contract. (PX 109, Van Wagner Decl. Ex. 1, at 2.) The delisting of the Three-Month Contract became effective on December 16, 2011. (*Id.*)

### 7. Absence of Evidence

In addition to the recitation of facts set forth above, the Court notes that there are several gaps – concessions, almost – in the CFTC's case that are worth enumerating.

First, there is no evidence that DRW ever made a bid that it thought might be unprofitable. (Tr. 740:14–17) ("THE COURT: There is no evidence that I have seen to suggest that the rates at which they are bidding are money losers for them. Is there some[thing] that you can point me to? [THE CFTC:] No, your Honor, I cannot."); (*see also* Tr. 187:13–188:22; DX 45, 76).)

Second, there is no credible evidence that DRW ever made a bid that it thought could not be accepted by a counterparty. (Tr. 738:17–20 ("THE COURT: This is a

situation where they make bids and the bids could be hit, right? Anybody at any time can say 'I will take that bid,' yes? [THE CFTC]: Yes."); *see also* Harris Decl. ¶ 67 & Exhibit 6; Evans Decl. ¶¶ 43–45, 51).)

Third, the CFTC provided no credible evidence as to what the fair value of the contract actually was at the time DRW was making its bids. (Tr. 754:6–9 ("THE COURT: [I]s there any evidence to indicate that [Defendants] were making bids above, north of, their fair value point? [THE CFTC]: I haven't seen any evidence of what their fair value is at all.").) Indeed, the CFTC's own expert, MacLaverty, gave no testimony as to the fair market value of the contract. (Tr. 440:8–13.) And although MacLaverty's pre-trial submissions imply that the contract should have settled "at or near" the Corresponding Rates, at trial MacLaverty refused to express any opinion as to what the "non-artificial" or fair market price should have been. (*Compare* MacLaverty Tr. Decl. ¶ 6(c) *and* MacLaverty Opening Ex. 7 *with* Tr. 448:16–17). When pressed, MacLaverty only claimed that DRW's bids were "artificial" – a legal conclusion beyond the scope of his expertise – not that they "were higher than fair value." (Tr. 448:16–17.) Significantly, he could not even state whether any of DRW's bids were closer to, or farther from, the Three-Month Contract's fair value than the Corresponding Rates. (Tr. 456:3–11, 489:20–494:8.)

Fourth, there is no credible evidence that DRW's bidding practices ever scared off would-be market participants.[11] The Court,

during closing arguments, examined in depth this part of the CFTC's narrative – that DRW's bidding practices were so manipulative as to scare off potential market participants – and received no satisfactory response:

> THE COURT: You didn't offer any evidence to suggest that other would-be counterparties and market participants were scared off by the busted trade, did you?

> THE CFTC: No, we did not bring forward any counterparties who testified to that fact . . . .

(Tr. 729:13–17.)

And finally, there is no evidence that DRW ever made a bid that violated any rule of the exchange – a fact the CFTC conceded in its closing argument. (Tr. 753:1–14 ("No. And that's never been a component of our case.").)

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction

The CFTC has jurisdiction to bring this action pursuant to its authority under the Commodities Exchange Act, 7 U.S.C. § 13a-1 (2006 & Supp. IV), and the Court has subject matter jurisdiction to adjudicate the CFTC's enforcement proceeding under 28 U.S.C.

---

[11] John Shay, the co-founder of IDCH exchange, provided the only potentially probative testimony on this point when he testified that IDCH had to shut down the electronic exchange because of DRW's manipulative conduct. (Tr. 96:20–97:1.) However, the evidence at trial reflected that IDCH intended to shut down the exchange due to inactivity *before* DRW engaged in most of its allegedly manipulative

electronic bidding. (Tr. 115:10–125:9; DX 75.) Specifically, Shay made statements to an IDCH employee on February 3, 2011 that the company "want[ed] to close the [exchange] down . . . due to lack of activity." (DX 75.) Because Mr. Shay was utterly incapable of reconciling his trial testimony with these past statements, the Court declines to credit Shay's testimony.

§ 1331.[12]   Venue in the Southern District of New York is proper under 28 U.S.C. § 1391 and 7 U.S.C. § 13a–1(e). *See Wilson*, 27 F. Supp. 3d at 536.

## B. Market Manipulation

The CFTC alleges that Defendants violated Sections 6(c) and 9(a)(2) of the CEA.[13]   Section 6(c) authorizes the CFTC to bring an action "[i]f the Commission has reason to believe that any person . . . has manipulated or attempted to manipulate the market price of any commodity." 7 U.S.C. § 9 (2006).   Section 9(a)(2) similarly prohibits any person from "manipulat[ing] or attempt[ing] to manipulate the price of any commodity . . . on or subject to the rules of any registered entity." 7 U.S.C. § 13(a)(2) (2006).

Although the CEA does not define the term "market manipulation," the Second Circuit has identified the elements for such a cause of action on several occasions. *See, e.g.*, *In re Amaranth*, 730 F.3d at 173; *DiPlacido v. CFTC*, 364 F. App'x 657, 661 (2d Cir. 2009). Thus, to prevail on its market manipulation claim, the CFTC must establish by a preponderance of the evidence that "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial price; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth*, 730 F.3d at 183 (*quoting Hershey v. Energy Transfer Partners*, 610 F.3d 239, 247 (5th Cir. 2010)); *see also DiPlacido*, 364 F. App'x at 661 (market manipulation established where "(1) [Defendants] had the ability to influence market prices; (2) [Defendants] specifically intended to do so; (3) . . . artificial prices existed; and (4) . . . [Defendants] caused the artificial prices.").

Here, there can be no question that Defendants had the ability to influence the settlement price of the Three-Month Contract by making bids on the electronic exchange; indeed, the terms of the contract expressly provided that unconsummated electronic bids and offers were a driving force in the determination of the settlement price, something the exchange and Defendants themselves acknowledged and understood. (DX 82 at IDCG00009826–28; Stip. Facts ¶ D22; Tr. 52–53, 146, 155, 165, 223, 226; PX 25.)[14]   But while the CFTC may have

---

[12] Defendants argue that manipulating the settlement price of the Three-Month Contract cannot qualify as "manipulation" because the settlement price is determined by IDCH in a discretionary manner. As a result, Defendants claim that the CFTC lacked (and continues to lack) statutory authority to proceed against them in this enforcement action. (Defs.' Post-Trial Mem. 24–25.) Although Defendants label this as a jurisdictional argument, the Court finds that it is properly considered a merits issue. *See Vitanza v. Bd. of Trade*, No. 00–cv–7393 (RCC), 2002 WL 424699, at *5 (S.D.N.Y. Mar. 18, 2002) (finding that the question of whether a settlement price is a commodity under the CEA is a merits issue); *cf. Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 254 (U.S. 2010) ("But to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case. . . . It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief." (citations and quotations omitted)). Therefore, because the Court deems this to be a merits issue rather than a jurisdictional one, and because the Court finds against liability on other grounds, it need not adjudicate this issue here.

[13] As noted above, although these sections have since been amended, all references to the CEA here refer to the version of the statute in effect at the time of the alleged violations. *See supra* note 1.

[14] To the extent Defendants argue that they lacked the ability to influence the settlement price because IDCH retained the "sole discretion" under its rules to adjust the settlement price to ensure that it was a "fair and appropriate reflection of the market" (DX 83 at IDCG00010744), the Court is unpersuaded. The mere fact that IDCH had the ability to change the settlement price cannot obscure the reality that, given the illiquidity of the market and the lack of other market participants, Defendants' bids effectively made the IDEX curve "DRW defined." (PX 25.)

established the first element of its market manipulation claim, its case founders on its abject failure to produce evidence – or even a coherent theory – supporting the existence of an artificial price.

In the usual market manipulation case, an artificial price is a price that "does not reflect basic forces of supply and demand." *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012) (citations and internal quotation marks omitted); *In re Indian Bureau Coop. & Louis M. Johnston*, CFTC No. 75-14, 1982 WL 30249, at *6 (Dec. 17, 1982). In other words, a price is artificial when it has been set by some mechanism which has the effect of "distort[ing] those prices" and "prevent[ing] the determination of those prices by free competition alone." *Parnon*, 875 F. Supp. 2d at 246 (quoting *In re Kosuga*, 19 Agric. Dec. 603, 618 n.4 (U.S.D.A. 1960)).

Here, the CFTC offered no evidence or explanation demonstrating that IDCH settlement prices were artificially high. Its sole witness on this issue was its expert, Robert M. MacLaverty, who opined that "the daily settlement prices . . . were artificial because they were not based on basic forces of supply and demand but instead were based on DRW's self-serving actions." (MacLaverty Opening ¶ 7; *see also* MacLaverty Rebuttal ¶ 101 ("DRW's illegitimate bids, as the only market participant on the NFX, created artificial settlement prices.").) But in addition to being conclusory and circular, MacLaverty's opinions were premised not on evidence or settled economic principles, but rather on MacLaverty's own personal discomfort with IDCH's criteria for determining settlement price. In MacLaverty's view, the clearinghouse should not have considered unconsummated bids and offers at all; instead, settlement price should have been determined on the basis of *consummated* trades only, and in the absence of those,

should have defaulted to the OTC swap rate. (Tr. 427–29.) But this view, which MacLaverty clung to as an article of near religious conviction, has no basis in law or logic and was contradicted by the contract's very terms and IDCH's own rules.

Nor was MacLaverty able to articulate why the Corresponding Rates were any more reflective of the Three-Month Contract's intrinsic value than were DRW's bids, which at least attempted to account for the convexity effect and the lack of PAI. Significantly, MacLaverty couldn't (or wouldn't) even attempt to say what the fair market value of the Three-Month Contract was. Indeed, although he at times suggested that the fair market value was a mere two basis points above the Corresponding Rates (Tr. 423), he later conceded that the fair market value of the Three-Month Contract might actually be more than 70 basis points higher than those rates, and therefore significantly higher than the vast majority of Defendants' bids. (Tr. 424–26.) He nonetheless persisted in insisting that the settlement prices were "artificial" simply because they were based on DRW's bids and not on consummated trades. That he could not say whether the settlement prices were artificially high or artificially low (*id.* at 426) only underscored the irrelevance of his opinions on the subject.

Equally absurd were MacLaverty's assertions regarding convexity bias and its effect on the value of the Three-Month Contract. Specifically, MacLaverty stated that "DRW's assumed price premium based upon convexity bias in the Three-Month Contract was never realized in the marketplace, i.e. the basic forces of supply and demand never verified DRW's assumed price premium based on convexity bias." (MacLaverty Opening ¶ 40.) But the busted trade in February 2011 and the unwinding of DRW's open positions with MF Global and Jeffries in August 2011 provided exactly the

sort of marketplace verification of convexity bias and its effect on the value of the Three-Month Contract that MacLaverty claimed to be missing. With respect to the busted trade in early February, MF Global agreed to hit DRW's bid at sixteen basis points above the corresponding rates, proof positive that the Three-Month Contract was worth more than a plain vanilla OTC swap. And although it is true that this trade was ultimately not consummated, it bears noting that MF Global paid more than $800,000 to avoid litigation on the aborted swap transaction. But even more compelling were the events of August, when MF Global and Jeffries each agreed to unwind their open positions with DRW "at or near the settlement prices that had been established by IDCH at that time based on bids submitted by DRW." (Bury Decl. ¶ 8.) In August 2011, those settlement prices were approximately 100 basis points over the Corresponding Rates in the thirty-year tenor and 25 basis points over the Corresponding Rates in the ten-year tenor. (Evans Decl. Ex. 3.) Significantly, Jeffries itself acknowledged that those "prices were commensurate with the range of values we believed (based on our work with our experts) these positions had, which value was substantially different than the value that Jeffries had originally understood . . . when we entered into those positions." (Bury Decl. ¶ 8.) In short, the "basic forces of supply and demand" – as exercised by three highly sophisticated market participants – clearly "verified DRW's assumed price premium based on convexity bias." (MacLaverty Opening ¶ 40.)

In contrast to MacLaverty's sermonizing, Defendants – although not obliged to do so – offered ample and persuasive evidence demonstrating that the Three-Month Contract was not the economic equivalent of an uncleared swap, that the contract's true value was consistently higher than DRW's bids and *significantly* higher than the Corresponding Rates, and that DRW's bidding practices

actually contributed to price discovery rather than price manipulation. Defendants' economic expert, Jeffrey Harris, was particularly credible on these points, and unlike MacLaverty, was able to explain a methodology for ascertaining the fair market value for the Three-Month Contract even in a highly illiquid market. Although Harris himself acknowledged that economic modeling was not an "exact science" and that "ten different parties" would likely reach ten different conclusions as to the impact of the convexity effect given the sheer number of variables and assumptions implicit in such a project (Tr. 735), Defendants nevertheless offered a plausible – in fact, overwhelming – basis for concluding that the "natural" or "fair market price" for the Three-Month Contract was well north of the Corresponding Rates and also higher than DRW's bids.

The inescapable conclusion from the evidence introduced at trial is that DRW's bids, and the consequent settlement prices, were the result of free competition, since sophisticated market participants would surely have accepted Defendants' open bids if they thought they were above market value. Indeed, the CFTC's portrayal of MF Global and Jeffries as victims of a price manipulation scheme ignores the fact that these counterparties *themselves* were free to accept any bid that they thought exceeded the contract's "natural" value, with obvious negative consequences for Defendants had they been inflating the price. That, after all, is how markets work, and the CFTC's failure to articulate any theory as to why the market was inefficient, or why would-be counterparties were prevented from enforcing market discipline by hitting DRW's allegedly inflated bids, is ultimately fatal to its claim.

Unable to prove that the settlement prices were actually inflated or above fair market value, the CFTC resorts to a tautological fallback argument that endeavors to conflate artificial prices with the mere intent to affect

prices. Relying on dictum in its own thirty-five year-old administrative decision, *Indiana Farm*, 1982 WL 30249, at *4 n.2, the CFTC essentially argues that *any* price influenced by Defendants' bids was "illegitimate," and by definition "artificial," because Defendants understood and intended that the bids would have an effect on the settlement prices. (Pl.'s Post-Trial Mem. 22.)  To use the CFTC's own words: "It's the way that [Defendants] structured their bidding that makes it illegitimate.   That factor alone causes artificial prices, and that is the artificiality." (Tr. 739:4–7; *see also* Tr. 743:9-10 ("An illegitimate bid is a bid that is designed to define prices.").)  In other words, because Defendants understood and intended that their bids would affect the settlement price – and by consequence, variation margin on DRW's open positions – those bids were inherently manipulative, regardless of whether they were reflective of fair market value and regardless of whether they were designed to attract counterparties for future transactions. (Tr. 751–52.)

This theory, which taken to its logical conclusion would effectively bar market participants with open positions from ever making additional bids to pursue future transactions, finds no basis in law. Indeed, it is simply an attempt to read out the artificial price element of the *Amaranth* test by collapsing it into the subjective intent requirement. The Court pointed out as much during the CFTC's summation, when it noted:   "There are multiple elements for market manipulation, and . . . a central one . . . is artificiality. Artificiality is not proven or disproven by intent. . . . Your theory, it seems to me, is that [Defendants] had intent to affect the prices, and because they had intent to affect the prices, that means that [the prices] were illegitimate, which means that the prices were artificial, [but that] is . . . circular . . . ." (Tr. 750–51.) The CFTC nevertheless persisted in its view that "[i]ntent is the transformative element for

market manipulation" (Tr. 750:23–24) and that artificial price could be proven merely by showing that Defendants intended to affect the settlement price by making electronic bids during the PM Settlement Period. (Tr. 751–52.)

Because there is nothing in *Amaranth* to support this reading, and because the Court lacks the authority to reduce *Amaranth*'s four elements down to two, the Court declines to adopt the CFTC's intent-based approach to assessing artificial price. But it's not merely that the CFTC's theory of artificial price would alter the Second Circuit's standard by conflating elements; it would also lower the bar for proving market manipulation. Proving the existence of an artificial price is difficult – and with good reason. As Judge Scheindlin noted in *Amaranth*, "[t]he laws that forbid market manipulation should not encroach on legitimate economic decisions lest they discourage the very activity that underlies the integrity of the markets they seek to protect." 587 F. Supp. 2d at 534–35. As long as a "trading pattern is supported by a legitimate economic rationale, it cannot be the basis for liability under the CEA." *(Id.* at 534.)

Here, Defendants have articulated and demonstrated a rationale and a formula that supports the pricing strategy carried out in this case.   The existence of the convexity effect is supported both as a matter of theory, as reflected in the testimony and report of Dr. Harris, and in practice, as evidenced by the busted trade and the unwinding of open positions with MF Global and Jeffries at prices far above the Corresponding Rates. Against this evidence, the CFTC merely argues that the DRW's bids affected the settlement price for its open positions – which is obviously true – and that Defendants intended as much.     Clearly, that is insufficient to establish the existence of an artificial price. For this reason alone, the

CFTC's claim for market manipulation must fail.

### C. Attempted Market Manipulation

Of course, the CFTC also alleges that Defendants engaged in *attempted* market manipulation in violation of Sections 6(c) and 9(a)(2) of the CEA. Unlike market manipulation, attempted market manipulation does not require proof of an artificial price – only that Defendants "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Parnon*, 875 F. Supp. 2d at 249. But again, the mere intent to affect *prices* is not enough; rather, the CFTC must show that Defendants intended to cause *artificial* prices – i.e., prices that they understood to be unreflective of the forces of supply and demand. The CFTC itself acknowledged that if Defendants made bids with an honest desire to transact at those posted prices, then there could be no liability. (Tr. 748:2–14.)

Here, the CFTC has failed to prove that Defendants intended to cause artificial prices. In fact, the trial testimony and exhibits prove beyond the shadow of a doubt that Defendants sincerely believed the fair market value of the Three-Month Contract was higher than the bids they submitted over the course of the alleged conspiracy.

First, Defendants offered credible trial testimony concerning their understanding and intent in making electronic bids on the Three-Month Contract. For example, Silberberg made clear that "[w]e believed that a Three-Month Contract was inherently more valuable than an OTC swap with similar terms." (Silberberg Decl. ¶ 25.) Accordingly, Silberberg explained that he and his fellow traders at DRW "bid below what we believed to be the Three-Month Contract's fair value, so any trade would

have positive expected value." (*Id.* ¶ 43; *see also* ¶ 47 ("At all times . . . I submitted bids at rates that I believed would lead to profitable transactions."); Tr. 214 ("We bid prices we were always willing to buy. . . . That's how we trade. We think of a theoretical value and buy below th[at] price.").) Vander Luitgaren echoed that testimony, noting that "[o]ur trading strategy [was] to acquire fixed rate long positions in the Three-Month Contract below our assessment of its fair value." (Tr. 27.) Thus, according to Vander Luitgaren, "if we could (a) purchase a long fixed-rate position in the Three-Month Contract, and (b) hedge that trade with various other financial products, we would (c) be able to profit as a result of the convexity bias in the Three-Month Contract." (Vander Luitgaren Decl. ¶ 16.) Given his understanding of the convexity bias's effect on the fair market value of the contract, Vander Luitgaren credibly asserted that "I wanted and was willing to execute each and every bid that I submitted for the Three-Month Contract." (*Id.* ¶ 35; *see also* ¶ 29 ("Our trading strategy continued to be to acquire fixed rate long positions in the Three-Month Contract . . . below our assessment of its fair value.").)

This, of course, was Wilson's strategy all along. Based on his conclusion that a long position in the Three-Month Contract "was worth significantly more than a long position in uncleared interest rate swaps due to the convexity effect" (Wilson Decl. ¶ 45), Wilson saw an "arbitrage opportunity" (*id.* ¶ 46). Thus, Wilson hoped "that other parties . . . would sell us the Three-Month Contract . . . at prices between the Corresponding Rates and our model's fair value of the Three-Month Contract." (*Id.* ¶ 55). Wilson explained that "[t]he lower the price we paid, the more profit we expected to generate through convexity, if our model was accurate and we hedged properly." (*Id.* ¶ 57.) In the absence of counterparties willing to hit DRW's bids, Wilson eventually increased the

spreads of those bids – not to gouge his existing swap counterparties, but to attract new counterparties and consummate new transactions. As Wilson himself credibly articulated at trial:

> To attract more sellers, we began gradually raising the spread to the Corresponding Rates that we were bidding. . . . While bidding at higher spreads would obviously cut into the expected profits associated with a given transaction, it also increased the likelihood that we would find additional counterparties . . . . Ultimately, as long as our bids were below our estimate of the Three-Month Contract's fair value (which I believe they were at all times), we expected to make additional profits and therefore wanted to transact.

(*Id.* ¶ 59.)

The CFTC never introduced any evidence to suggest that Wilson or his traders didn't mean what they said at trial. Thus, based on the trial testimony alone, the Court has no hesitation in concluding that Defendants sincerely believed their bids to be *more* reflective of the legitimate forces of supply and demand than were the Corresponding Rates. Put differently, Defendants believed their bids to be *below* their estimated fair market value of the Three-Month Contract, and therefore not artificial. In fact, their bidding practices were obviously designed to bring the settlement price *closer* to their conception of fair market value in order to attract more swap counterparties.

The sincerity of this conviction is corroborated by the contemporaneous correspondence and emails between DRW's employees going back to the summer and fall of 2010. As early as July 2010, Wilson sent an email to his team stating that "our priority is to really understand idcg" and "[c]onfirm

the contract has full convexity bias." (DX 67.)[15]   Inquiries from DRW to the clearinghouse reflect as much, and prompted officials there to note "that DRW is trying to understand our curve construction methodology with a degree of precision not seen from other clients." (PX 31.) Within days of Wilson's email, Vander Luitgaren and Yu had confirmed the existence of convexity bias in the Three-Month Contract (DX 34, DX 68), leading Vander Luitgaren to observe that "there is an arb[itrage opportunity] waiting to happen with IDCG and the lack of PAI" (DX 69). Defendants' first "test trade" in August (*see* DX 70) was consistent with that observation, as were the transactions with MF Global and Jeffries in September 2010 (DX 51–55, DX 79–80). As Vander Luitgaren emailed to Silberberg just before Labor Day: "On IDCG . . . the contract is flawed and we are working on taking advantage of the PAI/convexity flaw (pay fixed on longer dated IDCG swaps)." (DX 35).

For the next ten months, DRW continued to model the effects of convexity bias on the price of the Three-Month Contract in order to attract new swap counterparties and to correctly assess the value of their bids and open positions. (*See* DX 43.) And while the CFTC makes much of a flippant email from Vander Luitgaren in November 2010 that characterized would-be swap-counterparties as "suckers," that exchange actually confirms the sincerity of the view inside DRW that they had a better understanding of the true value of the Three-Month Contract than anyone else – and that they were prepared to bet on that hypothesis.

Yu's March 2011 white paper reiterated that conviction, and endeavored to demonstrate quantitatively the effect of convexity bias on uncleared interest rate

---

[15] Wilson and his team often referred to the IDCG and IDCH interchangeably.

swaps in general and the Three-Month Contract in particular. (DX 45). Moreover, in letters to IDCH and the CFTC's Clearing Division in 2011, DRW consistently took the position that it first espoused privately in the summer of 2010 – namely, that "there is a significant price difference between a swap futures contract without a PAI adjustment and an otherwise identical swap futures contract with a PAI adjustment," and "that the lack of a PAI adjustment ha[d] a material effect on the value of the [Three-Month Contract.]" (DX 27; *see also* DX 76.) Significantly, neither IDCH nor the CFTC's Clearing Division ever took issue with DRW's explanation of its trades or trading practices. To the contrary, each essentially endorsed DRW's conclusion that the Three-Month Contract "did not include a PAI adjustment and should be valued accordingly." (DX 25; *see also* DX 26.) As a result, Defendants had no reason to revisit or reassess their original views regarding the fair market value of the Three-Month Contract. The fact that MF Global and Jeffries ultimately came around to the same view only underscores the objective reasonableness of Defendants' beliefs regarding the value of the Three-Month Contract.

In the face of such overwhelming evidence of Defendants' actual intent, the CFTC resorts not to testimony or exhibits, but to a slogan – "banging the close" – that it repeated unrelentingly throughout the trial. (*See* Tr. 4 ("How did the defendants do it? They banged the close."); Tr. 8 ("DRW kept banging the close for six more months."); Tr. 12 ("DRW intended to affect prices outside of the legitimate forces of supply and demand . . . by banging the close."); *id.* ("the evidence will demonstrate the defendants banged the close to profit illegally"); Tr. 697 ("From January to August 2011, the defendants manipulated the price of the three-month contract. . . . They banged the close."); Tr. 701 ("the bids are illegitimate because of . . .

the timing, the price[,] and the pattern that they used [–] because they banged the close").) But a slogan is a poor substitute for evidence, particularly when the slogan doesn't fit the facts of the case.

Although courts have not precisely defined the term, the parties largely agree on what it means to "bang the close." According to Wilson, banging the close occurs where a party makes a bid in which "they think they're going to lose a little bit of money on the transaction but the movement of the price would still help some other position." (Tr. 302; *see also* Tr. 241 (banging or "marking the close . . . is entering orders that move the settlement price to a level that isn't reflective of where you truly want to trade.").) Harris agreed that "banging the close" involves "someone putting in a disproportionate number of trades to push the price up or down to affect the closing price, typically in a noneconomic fashion, to benefit a position that they held elsewhere." (Tr. 677–78; *id.* ("my definition of banging the close is doing something uneconomic"); *id.* 680 ("banging the close typically . . . [involves] doing something uneconomic trading-wise to benefit some other position").) Citing the CFTC's own glossary of terms, MacLaverty more circularly defined "banging the close" to be a "manipulative or disruptive trading practice whereby a trader buys or sells a large number of futures contracts during the closing period of a futures contract (that is, the period during which the futures settlement price is determined) in order to benefit an even larger position in an option, swap, or other derivative that is cash settled based on the futures settlement price on that day." (MacLaverty Decl. ¶ 59, n.58.) But whatever the precise definition of the term, the CFTC has failed to prove that Defendants intended to engage in such conduct here.

To be sure, there can be no dispute that Defendants made numerous trades during the

PM Settlement Period with an understanding that such bids would affect the settlement price. Indeed, the record is clear that Defendants were determined to do just that, after being frustrated that their voice bids were not reflected in the daily settlement price. (*See, e.g.,* PX 22, PX 25, PX 43, DX 36.) But the fact that Defendants made numerous bids during the PM Settlement Period says nothing about whether they understood those bids to be artificially high. To the contrary, Wilson made clear that "since we were willing to pay higher yields than the Corresponding Rates, we wanted the exchange's settlement prices to reflect this." (Tr. 223.)

And since there is no dispute that the bids were consistent with bids made earlier in the day and were open long enough for any would-be counterparty to "hit," there is no reason to think that Defendants believed themselves capable of submitting inflated or "artificial" bids with impunity in the settlement period. In fact, the trial evidence reflects that Wilson and DRW's traders were hungry to attract swap counterparties and were always ready to trade at the prices they bid. In Wilson's words, DRW always submitted "real bids, at prices at which we were willing to transact, which were open on the market for long periods of time." (Wilson Decl. ¶ 132.) Vander Luitgaren agreed that he "wanted and was willing to execute each and every trade that [he] submitted for the Three-Month Contract" (Vander Luitgaren Decl. ¶ 35); Silberberg likewise insisted that "what I really want[ed was] someone to transact with me" (Tr. 185). Harris noted that DRW posted bids for an average of nearly 47 minutes (Harris Decl. ¶ 104), ample time for any would-be counterparty to hit the bid and take advantage of DRW's allegedly uneconomic or artificial prices, if that was in fact Wilson's game. Indeed, anyone with even a passing familiarity with markets and market discipline would understand that the CFTC's

theory of artificiality cannot be squared with the facts, since even the so-called victims of this "scheme" – Jeffries and MF Global – were free to hit on what the CFTC believes were overinflated, uneconomic bids.

But perhaps the best insight into Defendants' true intention can be discerned from Wilson's own contemporaneous statements made in the aftermath of the "busted trade" with MF Global in February 2011. Those statements, recorded in real time, have the ring of excited utterances and reflect Wilson's unvarnished view of the value of the Three-Month Contract. Thus, in a phone conversation with an MF Global partner on February 3, 2011, Wilson expressed shock that MF was attempting to back out of the trade, noting that "we all know IDCG contracts [are not equivalent to] OTC interest rate swap[s]," and that they "trade[] differently." (DX 32.) Wilson proposed putting the trade back on at the original spread of "15 basis point[s] . . . over the OTC market," noting that "I think the 10 year IDCG contract is worth at least 30 basis points over" the Corresponding Rates. (*Id.*)

Unable to persuade MF Global to put the trade back on, Wilson spoke with Laurie Ferber, MF Global's general counsel, the very next day. In that call, Ferber vaguely raised concerns "that there is something fishy here" and that "the timing of [DRW's] prices were very smelly." (DX 31.) Wilson forcefully responded that "[w]e'd be happy to trade on any of those prices all day long." (*Id.*) After explaining that "we think there is a fundamental difference [between] the IDCG contract and the [OTC rate]," Wilson reiterated that "I'm still willing to trade at those prices. I'll trade right now. We'll trade 20 over." (*Id.*) Wilson reminded Ferber that "[t]his is an electronic trading platform. Anyone can trade with the marks. My instruction to the guys is actually to put the prices up pretty much all day long." (*Id.*) He then announced, again, that DRW was

"happy to trade at those prices, any day, all day long. And so I am not at all concerned about an accusation that we are manipulating the market[,] because we are there, we're really there, we're there all day. Anybody who wants to trade with us, we're happy to trade with them." (*Id.*)[16]

In the days, weeks, and months following those calls, DRW maintained a consistent approach to the Three-Month Contract. Indeed, there is nothing in the record to suggest that DRW or Wilson ever waivered from the conviction that the contract was worth "significantly more" than the Corresponding Rates – a conviction that MF Global, Jeffries, IDCH, and the CFTC's own Clearing Division all eventually recognized as true. In fact, it appears that only the CFTC's Enforcement Division, and MacLaverty, persist in holding otherwise in the face of overwhelming proof to the contrary.

At the end of the day, the CFTC's only evidence of Defendants' intent to manipulate prices was the lack of consummated trades in the Three-Month Contract. In essence, the CFTC argues that Defendants "knew there were no other participants" in the market and were therefore free to make uneconomic bids at inflated prices. (Pl.'s Post-Tr. Mem. 2; *see also* Tr. 731:11–13, 737:18–24.) Resorting to another metaphor – of Defendants "yelling into an empty pit" – the CFTC insists that Defendants must have intended to inflate the settlement price in order to gouge their existing swap counterparties. (Tr. 4 ("day after day for seven months DRW's traders were shouting into an empty trading pit

devoid of traders and trades"); *id.* at 5 ("every day before 2:45 DRW's traders walk down to an empty trading pit"); *id.* ("They are yelling in this empty trading pit. They are all alone. Their voices echo back to them because no one else is there."); *id.* ("DRW never consummated a single trade, ever, in this empty trading pit."); Tr. 11 ("Again, it is like they are yelling into an empty trading pit. It just is implausible that after the hundredth time, after the 250th time, after the 500th time, and after the thousandth time they still thought their bids were going to get hit. It's just not credible.")

But the hindsight observation that none of DRW's electronic bids resulted in a consummated trade is not enough to demonstrate an intent to manipulate the market – particularly where the CFTC itself admits that there was nothing to prevent would-be counterparties from hitting DRW's bids and reaping the rewards of the allegedly inflated prices. In fact, the busted trade shows that DRW's bids did attract at least one market participant – MF Global – in February, and the winding up of Jeffries's and MF Global's open positions in August further confirms that Defendants' bids were market-based and reflective of the Defendants' honest appraisal of the contracts' value.

Defendants persuasively explained that new contract markets, such as the one for the Three-Month Contract, often have periods of illiquidity before eventually taking off. Wilson noted that "[s]ome futures contracts take years to catch on, trading very little and then for one reason or another [start] generating significant volumes." (Wilson Decl. ¶ 49). Vander Luitgaren likewise observed that in his experience it could take several years for a new product to become liquid. (Tr. 58:1–59:14; *see also* Tr. 110:12–111:15 (Shay testifying that it takes time for a contract to fully develop); Tr. 209:7–10 (Silberberg testifying that "[t]here have been

---

[16] It bears noting that approximately 40% of DRW's bids were placed completely *outside* the Settlement Period (Tr. 477:3–479:4; Malas Decl. Att. 1), a statistic that is hard to square with the CFTC's narrative, since those bids would have been a complete waste of time and resources absent an authentic intent to transact.

many attempts by the [exchange] to launch products that have not succeeded . . . . [I]t's difficult to get people to engage in new products in general.").) Defendants thus credibly testified that they believed there was always a chance that DRW's bids might have been traded on. (*See, e.g.*, Tr. 178:11–179:10 (Silberberg testifying that near the end of the Relevant Period he viewed the chance of transacting to be "5, 10 percent"); 261:20–22 (Wilson testifying that he viewed the probability of transacting as diminishing but still possible); 324:19–325:3 (Wilson testified that by July the probability of trading was between one and five percent).)

In contrast to this testimony, the CFTC offered only vague conjecture as to why the market for the Three-Month Contract remained an "empty pit." This was aptly demonstrated by the following exchange during the CFTC's summation:

> THE COURT: . . . So what made this an empty pit?
>
> CFTC: This empty pit was a result of the price distortion that the defendants had caused. People saw what was going on.
>
> THE COURT: . . . [B]ut if there is a price distortion that made the prices higher than they ought to have been, then presumably someone would have . . . hit the bids and made money off of it, right? . . . [I]f the bids are artificially high, then that's an opportunity for a person to short and make a killing, right?
>
> CFTC: Perhaps, your Honor. But I think that what people – it was just an illiquid market. People just didn't see the same valuation that the defendants did. The defendants recognized the flaw in the contract and they tried to

take advantage of it. And why other people didn't come, we don't know.

(Tr. 697:25–698:22.)

But, of course, there was nothing wrong with Defendants recognizing the flaw in the contract – the lack of a PAI – and taking advantage of it. That's what markets are for. And the so-called price distortion decried by the CFTC was simply a more accurate assessment of the fair market value of the Three-Month Contract. At least Defendants believed it to be, and the record reflects that IDCH, MF Global, Jeffries, and the CFTC's own Clearing Division all eventually agreed. Nor was the "distortion" caused by Defendants. It was, rather, a reflection of the inherent and provable economic difference between the Three-Month Contract and an uncleared OTC swap, otherwise known as the convexity effect.

Significantly, the CFTC made no attempt to demonstrate that the exchange was an inefficient market, or that Defendants believed it to be, and even conceded as much during closing arguments.

> THE COURT: Your theory seems to presume an inefficient market. It seems to presume that would-be counterparties wouldn't recognize an opportunity when they see one. You have not really articulated a theory as to why that is the case other than vague innuendo or [the] suggestion that [others] were scared off. These are entities that generally don't scare that easily. I'm surprised to hear the CFTC taking such a dim view of markets and market participants.
>
> CFTC: I can't point to anything in evidence of why [other traders] didn't come. But the fact is that they didn't.

(Tr. 730:9–18; *see also* Tr. 747:24–748:2 (CFTC unable to point to "any specific barrier" that was "keep[ing] other trading participants out").)

In fact, it was the Court that endeavored to explore whether Defendants had some knowledge of market inefficiency that enabled them to gouge their existing swap counterparties with impunity. Thus, during the cross examination of Wilson and Vander Luitgaren, the Court inquired as to the reasons for DRW's bids, particularly in late July and early August 2011, when the bid prices for certain tenors increased significantly. Although not required to prove the bona fides of their bidding strategy – since the burden of proof remained with the CFTC to prove *artificial* pricing and the intent to do so – Defendants nonetheless explained and demonstrated the bases for their bids in the final weeks before the contracts were unwound. (*See, e.g.*, DX 45 ("An interest rate environment with higher volatility will result in larger differences" between the fair market value of the Three-Month Contract and the Corresponding Rates); Tr. 663 (Harris noting that the bids were higher in "the summer of 2011" "right after Dodd-Frank," which was followed by "the treasury market default[ing] . . . in August that summer").) Ultimately, Defendants were able to articulate an economically rational theory justifying their bids, while the CFTC could offer no evidence to refute it, much less prove that Defendants themselves understood the settlement price to be unreflective of market forces.

Put simply, Defendants' explanation of their bidding practices as contributing to price discovery in an illiquid market makes sense and is supported by the evidence. That practice also happens to have been sanctioned by the very case the CFTC relies on. *See Indiana Farm*, 1982 WL 30249, at *6 ("[M]arket participants have a right to trade in their own best interests without regard to the positions of others as long as their trading activity does not have as its purpose the creation of 'artificial' or 'distorted' prices. Indeed, it is this very motivation which gives lifeblood to the forces of supply and demand, th[at] makes the price discovery function of the marketplace viable.")

In light of Defendants' explanations for their bidding practices, and the CFTC's complete inability to contradict those explanations with credible evidence, the Court finds that Defendants made bids with an honest desire to transact at those posted prices, and that they fully believed the resulting settlement prices to be reflective of the forces of supply and demand. Since Defendants' trading pattern is supported by a legitimate economic rationale, it "cannot be the basis for liability under the CEA." *In re Amaranth*, 587 F. Supp. 2d at 534; *see also In re Crude Oil Commodity Litig.*, No. 06-cv-6677 (NRB), 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007). Any other conclusion would be akin to finding manipulation by hindsight. *See Indiana Farm*, 1982 WL 30249, at *6 ("[A] clear line between lawful and unlawful activity is required in order to ensure that innocent trading activity not be regarded with the advantage of hindsight as unlawful manipulation."). Accordingly, the Court finds for Defendants, and against the CFTC, on the CFTC's attempted market manipulation claim.[17]

---

[17] The CFTC's failure to prove intent in connection with its attempted market manipulation claim provides a second basis for dismissing its market manipulation claim, since both market manipulation and attempted market manipulation require the same intent to engage in artificial pricing. *In re Amaranth*, 730 F.3d at 183 (requiring that "Defendants specifically intended to cause the artificial price"); *CFTC v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014) (holding that the intent requirement for attempted manipulation is the same as that for perfected manipulation).

### D. Remaining Issues

The CFTC's failure to prove either market manipulation or attempted market manipulation also compels dismissal of its control person and aiding and abetting claims against Wilson, as these claims require an underlying violation. *See In re Platinum & Palladium*, 828 F. Supp. 2d 588, 599 (S.D.N.Y. 2011); *CFTC v. Standard Forex*, Inc., No. 93–cv–0088 (CPS), 1993 WL 809966, at *13 (E.D.N.Y. Aug. 9, 1993). Accordingly, the Court finds for Wilson, and against the CFTC, on those claims too.

### V. CONCLUSION

It is not illegal to be smarter than your counterparties in a swap transaction, nor is it improper to understand a financial product better than the people who invented that product. In the summer and fall of 2010, Don Wilson believed that he comprehended the true value of the Three-Month Contract better than anyone else, including IDCH, MF Global, and Jeffries. He developed a trading strategy based on that conviction, and put his firm's money at risk to test it. He didn't need to manipulate the market to capitalize on that superior knowledge, and there is absolutely no evidence to suggest that he ever did so in the months that followed.

By August 2011, virtually every market participant – including MF Global, Jeffries, IDCH, and even the CFTC's Clearing Division – came to acknowledge that Wilson was right, that the Three-Month Contract was *not* the economic equivalent of an OTC swap, and that it was in fact significantly more valuable as a result of the convexity effect and the lack of PAI in the clearinghouse's rules for establishing the settlement price. That acknowledgment resulted in MF Global and Jeffries unwinding their open positions, Jeffries withdrawing its

threat to sue DRW, and NFX terminating the Three-Month Contract altogether. It is only the CFTC's Enforcement Division that has persisted in its cry of market manipulation, based on little more than an "earth is flat"-style conviction that such manipulation must have happened because the market remained illiquid. Clearly, that is not enough to prove market manipulation or attempted market manipulation, and the CFTC has simply failed to meet its burden on any cause of action.

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED THAT the Clerk of the Court shall enter judgment for Defendants on all claims and close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: November 30, 2018
     New York, New York

\*   \*   \*

Plaintiff is represented by Daniel Ullman, Traci Lynne Rodriguez, Danielle E. Karst, Jonah Eric McCarthy, Lucy Charlotte Hynes, David Bernard Kent, Jason Andrew Mahoney, Paul G. Hayeck, Sophia Siddiqui, Michael Robert Berlowitz, of the U.S. Commodity Futures Trading Commission, 1155 21st St., N.W., Washington, DC 20581.

Defendants are represented by Michael Sangyun Kim, Benjamin Jeffrey Aaron Sauter, Jason Maurice Manning, Jonathan David Cogan, Kelly Spatola, Matthew I. Menchel, Melanie Lisa Oxhorn, and Andrew

C. Lourie, of Kobre & Kim LLP, 800 Third
Avenue, 6th Floor , New York, NY 10022.